# Exhibit 3

U.S. Department of Labor
Wage and Hour Division
Washington, DC 20210



**Administrator's Interpretation No. 2014-2**

June 19, 2014

Issued by ADMINISTRATOR DAVID WEIL

SUBJECT: Joint employment of home care workers in consumer-directed, Medicaid-funded programs by public entities under the Fair Labor Standards Act.

In the Final Rule, Application of the Fair Labor Standards Act to Domestic Service, 78 FR 60454 (Oct. 1, 2013),[1] the Department modified the "third party employment" regulation, 29 CFR 552.109, to prohibit third party employers of domestic service employees—i.e., employers other than the individuals receiving services or their families or households—from claiming the companionship services exemption from minimum wage and overtime or the live-in domestic service employee exemption from overtime. 78 FR at 60480-85.[2]

Private agencies, non-profit organizations, or public entities[3] may be third party joint employers of domestic service employees, and in particular home care workers, under the Fair Labor Standards Act (FLSA or "the Act"), 29 U.S.C. 201 *et seq*. Although the Final Rule did not change any of the longstanding case law or the Department's guidance about joint employment, the regulatory changes prohibiting third party employers from claiming the companionship services and live-in domestic service employee exemptions will require each public or private agency that administers or participates in a consumer-directed, Medicaid-funded home care program to evaluate whether it is an employer under the FLSA.

The Department's outreach to the regulated community and engagement with the Department of Health and Human Services (HHS), including the Centers for Medicare and Medicaid Services (CMS), on implementation of the Final Rule have indicated that additional guidance about the

---

[1] The effective date for the Final Rule is January 1, 2015.

[2] For additional information, *see* Fact Sheet 79E: Joint Employment in Domestic Service Employment Under the Fair Labor Standards Act.

[3] Public entities include instrumentalities of state, county, or municipal governments or special-purpose entities created by a state, county, or municipal government.

1

application of the FLSA's joint employment principles, and specifically, how these principles apply to consumer-directed, Medicaid-funded programs, would be useful.  The structures of these programs vary by state, and states often have several programs with differing models; as such, each third party involved in each program must be individually evaluated for joint employer status.

Part I of this Administrator's Interpretation provides background on general joint employment principles; in particular, it describes the "economic realities" test for determining whether an entity is an employer under the FLSA.  Part II addresses consumer-directed programs specifically, and analyzes the most common questions arising from these programs, including which parties are likely employers, how federal regulation of Medicaid programs affects the economic realities analysis, what the implications are for public entity joint employers administering consumer-directed programs, and how the most relevant factors of the economic realities test weigh when considering various types of consumer-directed programs.  Part III considers several hypothetical examples drawn from actual programs.

The Department emphasized in the preamble of the Final Rule that the question whether a particular entity will be considered an employer under the economic realities test depends on the specific facts and circumstances of the particular program, as well as the law of each Circuit Court of Appeals.  The Department has, however, attempted to address the most common types of programs in this guidance.  The Department believes that in most, but not all, consumer-directed models, a third party will be a joint employer of a provider.  As noted in the Final Rule, potential third party joint employers may include a public entity, private agency, or non-profit organization.

## I.  Joint Employment and the Economic Realities Test

Under the FLSA, the term "employee" means "any individual employed by an employer," where "employ" means "to suffer or permit to work," and "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. 203(d), (g).  These definitions, and therefore the scope of employment relationships the Act covers, are exceedingly broad.

The Department's regulation regarding joint employment under the FLSA provides that a single worker may be "an employee to two or more employers at the same time."  29 CFR 791.2(a); *see also Baystate Alternative Staffing, Inc. v. Herman,* 163 F.3d 668, 675 (1st Cir. 1998) ("The FLSA contemplates several simultaneous employers, each responsible for compliance with the Act.").  In such cases, the employee's work for the joint employers during the workweek "is considered as one employment," and the joint employers are responsible, both individually and jointly, for FLSA compliance, including paying overtime compensation for all hours worked during the workweek.  29 CFR 791.2(a).[4]

---

[4] The joint employment regulation further explains that an employee has joint employers if "the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason

2

Whether an entity is an employer under the FLSA is governed by longstanding case law from the U.S. Supreme Court and other federal appellate courts interpreting the Act. In any joint employment analysis, it must be determined whether there is an employment relationship between the employee and each of the alleged employers. Courts have consistently explained that the employment relationship under the FLSA is much broader than the common-law concept of master and servant. Additionally, the determination whether an employer-employee relationship exists does not depend on "isolated factors but rather upon the circumstances of the whole activity," *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947), and the touchstone is "economic reality," *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 33 (1961).

The "economic realities" test examines a number of factors to determine whether a worker is economically dependent on a purported employer, thus creating an employment relationship. The factors to be considered include whether the alleged employer has the power to hire and fire the employees, supervises and controls the employees' work, determines the rate and method of payment, maintains employment records, and controls where the work is performed, as well as whether the work performed is an integral part of business or of a rote or repetitive nature.[5] Moreover, because the ultimate question is one of economic dependence, the factors are not to be applied as a checklist, but rather the outcome must be determined by a qualitative rather than a quantitative analysis. *See* 29 CFR Part 791; 29 CFR 500.20(h); *Charles v. Burton*, 169 F.3d 1322 (11th Cir.), *cert. denied*, 528 U.S. 879 (1999); *Lopez v. Silverman*, 14 F. Supp. 2d 405 (S.D.N.Y. 1998).

---

of the fact that one employer controls, is controlled by, or is under common control with the other employer." 29 CFR 791.2(b)(3). On the other hand, if the employers "are acting entirely independently of each other and are completely disassociated" with respect to an employee who works for both of them, each employer may disregard all work performed by the employee for the other when determining its own responsibilities under the FLSA. 29 CFR 791.2(a). Thus, the focus of the joint employment regulation is the degree to which the two possible joint employers share control with respect to the employee and the degree to which the employee is economically dependent on the purported joint employers.

[5] Although courts consistently consider the economic reality of the relationship between the worker and potential employer when making joint employment determinations in FLSA cases, the exact factors applied may vary. Some courts apply only the factors addressing the potential joint employer's control; however, "[m]easured against the expansive language of the FLSA," this analysis "is unduly narrow, as it focuses solely on the formal right to control the physical performance of another's work." *See Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 69 (2d Cir. 2003). These factors "may approximate the common-law test for identifying joint employers," but they "cannot be reconciled with the 'suffer or permit' language in the [FLSA], which necessarily reaches beyond traditional agency law." *Id.* Thus, although there may be several acceptable formulations of the economic realities factors used to determine the employee's economic dependence, a set of factors that addresses only control is not consistent with the breadth of employment under the FLSA.

3

## II.     Consumer-Directed Medicaid Programs and Joint Employment

### A. Background

In "consumer-directed," Medicaid-funded programs, consumers[6] (or their representatives if applicable) have decision-making authority over some services and take direct responsibility for managing their services with the assistance of a system of available supports. The consumer-directed service delivery model is an alternative to more traditionally delivered and managed services, such as an agency delivery model that includes little or no consumer control.

In the discussion of joint employment included in the preamble to the Final Rule, the Department explained how the economic realities test would apply to two types of consumer-directed programs, each exemplifying one end of the joint employer continuum. In the first example, the Department described a cash and counseling program in which the consumer was likely the sole employer because she alone had a great deal of control over the employee and the work performed. She retained budget authority, negotiated the wage rate with the direct care worker, was wholly responsible for day-to-day duty assignments, and had the sole power to hire and fire the direct care worker. *See* 78 FR at 60483-84. In the second example, the Department described a state "public authority" model in which the public entity was likely a joint employer with the consumer because the public entity set the wage rate, decided the method of payment, reviewed worker time sheets, and determined what tasks workers were to perform (even as the consumer also exercised considerable control over the employee and the work performed). *See* 78 FR at 60484.

Although these examples provided guidance as to some types of consumer-directed programs, a wide range of such programs exist around the country and even within states. A determination whether any particular public entity will be considered an employer under the FLSA will involve an application of the economic realities test to all of the facts and circumstances of a particular program. Additionally, the economic realities factors applied by courts vary somewhat among the Circuit Courts of Appeal. Thus, any assessment of whether a public entity is a joint employer necessarily involves a weighing of all the facts and circumstances, and there is no single factor that is determinative, *see Rutherford Food Corp.*, 331 U.S. at 730, nor is there any "mathematical formula" that can be applied, *Antenor v. D & S Farms*, 88 F.3d 925, 933 (11th Cir. 1996). Furthermore, "courts have found economic dependence under a multitude of circumstances where the alleged employer exercised little or no control or supervision over the putative employees." *Antenor*, 88 F.3d at 933 (citations omitted).

There is limited federal appellate case law explicitly addressing whether a public entity is a joint employer in a consumer-directed, Medicaid-funded program. In *Bonnette v. California Health &*

---

[6] Throughout this document, the Department uses the term "consumer" to refer to an individual receiving home care services and "provider" to refer to a home care worker providing services through a consumer-directed program.

4

*Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983), the Ninth Circuit concluded that three California state welfare agencies and three county agencies were, for purposes of the FLSA, joint employers of workers providing in-home care to individuals with disabilities and seniors based on an analysis of the economic realities of the situation. The court noted that the public entities had significant involvement in supervising the workers' performance, controlled the rate and method of payment, paid the employees' wages (directly or indirectly through the consumers), exercised considerable control over the structure and conditions of employment by making the final determination, after consultation with the recipient, of the number of hours each worker would work and exactly what tasks would be performed, and supervised the workers when problems arose. *Id.* The court thus concluded that the state and its agencies were the workers' employers. *Id.*; *see also Guerrero v. Superior Court,* 213 Cal. App. 4th 912 (Cal. App. 2013). In *Harris v. Quinn*, 656 F.3d 692 (7th Cir. 2011), a case concerning a "fair share" provision of a collective bargaining agreement, the Seventh Circuit determined that personal assistants paid by the state through a Medicaid-funded program were, because of the control the state exercised over their employment, employees of the state under a common-law test (which is much narrower than the broad FLSA employment test), *cert. granted*, 134 S. Ct. 48 (Oct. 1, 2013) (No. 11-681).[7] The court reasoned that because "the State does have significant control over virtually every aspect of a personal assistant's job"—including setting the qualifications for employees, evaluating consumers' choice of assistants, refusing payment for employees who do not meet the state's standards, approving a mandatory service plan that lays out a personal assistant's job responsibilities and work conditions, annually reviewing each personal assistant's performance, setting salaries and work hours, paying for training, and paying all wages—the state was plainly an employer. 656 F.3d at 697-98.

### B. Which Third Parties May Be Employers

As noted in the Final Rule, the fact-specific economic realities test should be applied to all situations to assess whether there is an employment relationship or joint employment. Depending on the structure of a consumer-directed program, different public entities may be potential employers. For example, a state itself, a statewide agency that oversees Medicaid programs, or a county department of aging could all be potential joint employers of home care workers providing services through a consumer-directed program.

Furthermore, an employment analysis is necessary regardless of the name used by the third party (*e.g.*, fiscal/employer agent, Agency with Choice, fiscal intermediary, registry, or employer of record) or worker (*e.g.*, personal care attendant, registry worker, independent provider, or independent contractor). As the Department has repeatedly noted, with respect to exemption status, job titles are not determinative. *See, e.g.*, 29 CFR 541.2; Wage & Hour Div. (WHD), Division Field Operations Handbook (FOH) § 22a04 (rev. 661 Nov. 29, 2010), available at http://www.dol.gov/whd/FOH/FOH_Ch22.pdf; WHD Fact Sheet #17A: *Exemption for Executive, Administrative, Professional, Computer & Outside Sales Employees Under the Fair Labor Standards Act (FLSA)* (rev. July 2008), available at

---

[7] The issues on appeal to the U.S. Supreme Court do not include whether the state of Illinois is an employer of home care workers for FLSA purposes.

5

http://www.dol.gov/whd/overtime/fs17a_overview.pdf. This principle holds true for determining employment status as well.

Thus, the same analysis will be utilized for the entire range of consumer-directed programs and should be applied to state or county entities, managed care organizations, fiscal intermediaries, private agencies, and non-profit organizations alike.

### C. Federal Regulation of Medicaid Programs

Consumer-directed, Medicaid-funded programs are regulated by federal laws and regulations setting forth various legal requirements with which states must comply. Within this framework, however, states have discretion to decide how to structure each consumer-directed program, and how much control to exercise over home care providers. The source of this control in various consumer-directed programs established by public entities, namely Medicaid laws and regulations, needs to be understood and appropriately appreciated when determining the existence of an employment relationship. There are many different variations of consumer-directed programs that are compliant with the FLSA. Thus, the manner in which states choose to implement these federal mandates must be closely examined and considered in assessing whether a public entity is an employer.

Specifically, federal Medicaid law and regulations require a state administering any Medicaid-funded program to perform a range of functions as a condition for participation in the Medicaid program. For example, the state must set general eligibility criteria for consumers, determine whether individuals meet these criteria, conduct an assessment of each consumer's needs, and develop individualized plans of care together with the consumer. In addition, the state must implement measures designed to prevent fraud and abuse, which may include setting basic qualifications for providers to participate in the Medicaid program (e.g., requiring providers to pass a criminal background check and have no history of fraud), conducting on-site visits, and developing a process for reporting and investigating abuse, neglect, and/or exploitation of consumers. The state must demonstrate to CMS that it has processes in place for each required administrative function.

Additionally, federal Medicaid rules mandate that states assure the financial accountability of services. Any state participating in Medicaid is required to submit to the Secretary of Health and Human Services a "plan for medical assistance," 42 U.S.C. 1396, that establishes a system for reimbursing health care providers, including providers of home and community based services, for services provided to Medicaid participants. Medicaid requires states to set rates for services, including in-home personal care services, and CMS must approve the state's rate setting methodology. In addition, for some programs (in particular, for 1915(c) home and community based services waivers), the state must demonstrate cost neutrality, meaning that a state must prove to CMS that the cost of serving consumers in the community using the waiver does not exceed the costs of placing those consumers in institutions. *See* 42 U.S.C. 1396n(c)(6). As such, states set rates within parameters designated by the federal Medicaid system that may differ from the parameters that govern the private sector.

Again, under an economic realities analysis, all of the facts and circumstances of the relationship between a provider and the state must be evaluated, and no single factor is determinative. Relevant factors that must be considered when evaluating whether a state administering a consumer-directed program is an employer include the various legal requirements with which consumer-directed programs must comply, and how programs choose to comply with those requirements. *See, e.g., Godlewska v. HDA*, 916 F. Supp. 2d 246, 261 (E.D.N.Y. 2013) (explaining that the oversight actions of the city "stem entirely from the nature of the business of providing heavily regulated, government-funded health services to patients in their homes") (internal quotation marks and citation omitted). Indeed, the federal Medicaid regulations provide a broad framework of legal requirements for Medicaid programs, including consumer-directed programs. States, however, have considerable discretion in designing and implementing their own programs within this framework. For instance, some programs choose to comply with the federal regulations by implementing low-control functions and processes, and permitting the consumer considerable discretion to perform nearly all employer functions; as explained below, the facts of those scenarios relevant to the economic realities test will likely not be strong indicators of employer status. In other state programs, however, the state chooses to comply with Medicaid's legal requirements by exercising a high degree of control over the terms and conditions of a provider's employment. As described in the factor-by-factor analysis below, in these circumstances, the state's exercise of control will weigh in favor of a determination of employer status.

Because the state is the public entity required by the federal Medicaid program to perform these functions, other public entities, such as a county or municipal government, that perform additional functions beyond those required by the federal Medicaid program, or that have been given discretion and choose to implement high-control mechanisms for assuring compliance, should be aware that these functions may be viewed as strong indicators of employer status.

### D. Implications of Joint Employment for Public Entities

As with any other employer, if a public entity is determined to be a joint employer, that entity is then responsible for compliance with the requirements of the FLSA. The Act requires that employers pay employees at least the minimum wage for all hours worked, including any time spent traveling between worksites, and overtime compensation for all hours worked over 40 in a workweek, including, in the consumer-directed program context, combined hours spent working for more than one consumer as part of the joint employment by the third party entity. As noted in the Final Rule and emphasized in subsequent guidance, the Rule did not change any of the Department's longstanding travel time or overtime rules.

Under the Department's regulations, normal travel from the employee's residence to his or her workplace is not hours worked regardless of whether the employee works at a fixed location or at different job sites. 29 CFR 785.35; *see* WHD Opinion Letter W-454, 1978 WL 51446 (Feb. 9, 1978). Thus, if a direct care worker travels to a consumer's home directly from her own home and returns directly home from a consumer's home, this commuting travel time generally does not need to be paid. *Id.* Employees who travel to more than one worksite for an employer during the workday, however, must be paid for travel time between each worksite. 29 CFR 785.38; *see* WHD Opinion Letter W-454, *supra*.

Additionally, an employee to whom the FLSA applies must be paid one and one-half times her regular hourly rate for all hours worked over 40 for any employer. 29 U.S.C. 207. Therefore, an employee who works for multiple consumers of a single joint employer must receive compensation at the overtime rate for any hours worked over 40, aggregating the time worked across consumers for the joint employer. For example, if a worker spends 30 hours per week providing home care services to consumer A and 20 hours a week providing home care services to consumer B, any entity that is joint employer with both consumers—whether a private agency, a state, or both—is responsible for ensuring that the worker receives overtime compensation for the 10 hours over 40 worked each week.

In circumstances in which public entities are joint employers, they must also consider their obligations under other federal laws, including the Americans with Disabilities Act (ADA), 42 U.S.C. 12101 *et seq.*, and the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), as they are developing policies to comply with the FLSA. As noted in the Final Rule, the Department fully supports the ADA's and *Olmstead*'s requirement that government programs provide needed services and care in the most integrated setting appropriate to an individual, and recognizes the important role that home and community based services have played in making that possible. *See* 78 FR at 60486. If a public entity as a joint employer of its home care workers puts in place new policies that have the impact of reducing or otherwise disrupting a consumer's services, the state must ensure that the policy does not place the affected individuals at serious risk of institutionalization. *See id.* This could include making exceptions to the policy or providing alternative services to individuals who otherwise would be placed at serious risk of institutionalization. *Id.* (citing October 22, 2012 Letter from DOJ and OCR to Washington State, available at www.ada.gov/olmstead/documents/ltr_gov_gregoire.docx); *accord M.R. v. Dreyfus*, 663 F.3d 1100 (9th Cir. 2011) (finding that a state violates the ADA and *Olmstead* when policies place individuals at serious risk of institutionalization). The Department of Justice has made information about a state's obligations under the ADA and *Olmstead* available at www.ada.gov/olmstead.

## Economic Realities Factors As Applied to Public Entities[8]

This section discusses the most commonly applied economic realities test factors and assesses the significance of various ways states may design and implement aspects of their consumer-directed programs. The Department has analyzed whether each of these program variables is a "strong," "moderate," or "weak" indicator of an employment relationship.

Although this guidance focuses on the most common factors that may make a public entity an employer, all of the relevant facts and circumstances must be assessed to make a determination about employment status. Additionally, courts may consider multiple other factors when evaluating the economic dependence of a worker on a purported employer.[9]

### 1. Power to Hire and Fire

The ability to hire and fire is generally considered a strong indicator of employer status.

*Provider Qualifications*

In consumer-directed programs, even where a consumer makes all specific hiring decisions, the state sets certain provider qualifications as mandated by federal Medicaid requirements. The setting of very basic qualifications in order to assure consumer safety, such as requiring a criminal background check and First Aid or CPR certification, should be considered a weak indicator of employer status. These basic provider qualification requirements are akin to licensing requirements common at the state and local level, compliance with which does not, by itself, suggest the existence of a joint employment relationship between, for example, a security

---

[8] Administrator's Interpretation No. 2014-1 ("Shared Living AI") addressed the application of the FLSA to shared living programs, i.e., programs that facilitate home care arrangements "in which a consumer and provider share a home in order to allow the consumer to remain in his home and community." *Id.* at 2. The Shared Living AI emphasized that an economic realities analysis must be utilized in all shared living situations to assess whether a consumer or a third party could be an employer of a provider; in some shared living situations (typically in adult foster care or host home programs), a provider may be an independent contractor.

Adult foster care and host home programs are distinct from consumer-directed programs. In these types of shared living arrangements in a provider's home, a provider typically exercises control over the conditions of the work rather than taking direction from the consumer, and may have invested in the shared living arrangement, such as by making modifications to his or her home. In contrast, the very nature of a consumer-directed program creates an economically dependent relationship between a provider and a consumer, and potentially one or more third parties, as the consumer and any third party employers will necessarily be controlling the wage and other conditions of this work.

[9] This analysis is for FLSA purposes only. Most other federal laws apply different, narrower employment tests.

guard who is required to obtain his own license prior to being hired, and a security agency and the state or local security licensing agency.

In contrast, more extensive provider qualifications, such as fulfilling comprehensive, state-administered training requirements (beyond training required for relevant licenses), should be considered a strong indicator of employer status.

*Hiring Decisions*

If a public entity permits the consumer to recruit, interview, and hire any provider who meets basic qualifications (or maintains an open registry to which the consumer can refer his or her preferred provider for inclusion), that fact will not weigh in favor of employer status of the public entity. If a public entity runs a registry and permits a consumer to only hire from the closed registry, that fact will be a moderate-strength indicator of employer status of the public entity. If the public entity must co-interview or approve a provider based on criteria beyond the previously discussed setting of basic qualifications, those facts should be considered strong indicators that the public entity is a joint employer.

*Firing Decisions*

In consumer-directed programs, consumers nearly universally retain the right to fire any individual worker from providing services in his or her home at any time. If a public entity may exclude providers from working within the Medicaid program only in situations dictated in federal Medicaid requirements—i.e., if the worker is determined to have committed fraud or is found after an investigation to have abused a consumer—that fact should be considered a weak indicator of employer status. If, however, a public entity reserves the right to remove a worker at any time from the household, or can fire a worker for poor performance, then these facts would be strong indicators of employer status. Whether an entity rarely, if ever, exercises a retained right to fire is not particularly relevant to employment analysis. *See, e.g.*, *Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1064 (E.D. Wash. 2013) (explaining that the frequency with which the entity exercised its right to fire is not indicative of employment; the fact that the entity had the power to fire is what is relevant to the economic realities test); *see also Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (observing that joint employer's exercise of limited or occasional control did not remove employment relationship from protections of the FLSA).

### 2. <u>Control over the Wage or Other Employment Benefits</u>

States administering consumer-directed programs exert control over wages in different ways. Some states have a set wage for home care workers, while others set a "wage range" or a "cap" for home care worker pay. Other states set a reimbursement rate, rather than a wage, for personal care services.

The critical inquiry as to whether an entity is a joint employer under the FLSA is not which employer the worker is more dependent on, but rather the economic reality of each individual worker-employee relationship. *See, e.g.*, *Torres–Lopez v. May*, 111 F.3d 633, 640 (9th Cir.

1997). The ability to determine the method and rate of payment is an essential factor in the joint employment analysis.

*Setting a Wage Rate*

The Department believes that setting a wage rate is so fundamental to the ultimate question of economic dependence that any entity that sets a wage rate will likely be considered an employer. The Department re-emphasizes, however, that the economic realities test is a multi-factorial analysis in which all factors must be considered in order to analyze the ultimate question of economic dependence.

It will thus be considered a strong indicator of employer status if a public entity administering a consumer-directed program sets the wage rate for home care workers. In the private sector, where a larger entity contracts work out to a smaller entity that hires employees, determining the wages of that employee has been considered a highly determinative factor in the economic realities test. There is substantial case law in the agricultural context finding joint employment with an entity based, at least in part, on influence over the pay rate. For example, in *Barrientos v. Taylor*, 917 F. Supp. 375 (E.D.N.C. 1996), the court found joint employment because a farm labor contractor's dependence on the cash from the farm owner allowed him no discretion in setting the pay rates for plaintiffs, concluding that "[e]ssentially, the [farm owner] dictated what plaintiffs would receive." *Id.* at 382-83. In *Hodgson v. Griffin & Brand, Inc.*, 471 F.2d 235 (5th Cir. 1973), the Fifth Circuit identified several facts which indicated that an employment relationship existed: the farmer set the workers' pay, determined whether to pay on an hourly or piece-rate basis, and deducted Social Security contributions. *Id.* at 238, *cert. denied*, 414 U.S. 819 (1973).

*Reimbursement Rates*

All states are required to set rates for Medicaid-approved services, including home care services. All providers of Medicaid-funded services, including agencies, non-profit organizations, and individuals, are subject to the approved reimbursement rates.

Reimbursement rates included in a contract for consumer-directed home care services between a state and another third party entity, such as an agency or fiscal intermediary, do not directly correlate with worker wages. These rates often include costs other than wages (such as administrative costs, overhead, worker benefits, profit for the agency, etc.), and the third party sets the wage after taking the rate and these costs into account. Where the third party ultimately controls the hourly wage paid to workers, such reimbursement rates do not, by themselves, convert a public entity to a joint employer. *See, e.g.*, *Aimable v. Long & Scott Farms*, 20 F.3d 434, 442 (11th Cir.) (rejecting argument that farm owner was a joint employer, because contractor alone determined what portion of his revenue to expend on labor, housing and equipment, and "most importantly" determined what wages to pay workers), *cert. denied*, 513 U.S. 943 (1994). Moreover, a third party entity would be free to pay its workers differing amounts, or to reward seniority or excellent performance with additional bonuses. This reasoning parallels that which applies to reimbursement rates for procedures performed by a doctor; the setting of such rates (taken alone) do not convert the state into an employer of the

doctor, due to the attenuation between the per-procedure reimbursement rate and the doctor's wage rate.

In contrast, in the context of home care services in a consumer-directed program in which no private agency or other third party other than a public entity is involved (or in which the third party's involvement is limited such as in the case of a fiscal intermediary that only processes payroll), the reimbursement rate for home care workers is essentially what the hourly wage will be and may allow no discretion to set a wage rate. The reimbursement rate likely only differs from the hourly wage in that it might include the employer's social security or unemployment tax contribution that will later be deducted from the wage. Additionally, state plans require providers to accept Medicaid reimbursements as payment in full, without any supplemental payments from consumers (aside from applicable deductibles, coinsurance or copayments). *See* 42 CFR 447.15. In this situation, the public entity is exerting considerable, if not complete, control over the amount of money a worker can earn. These situations, in which the consumer and any private third party do not have any discretion in adjusting the wage earned by the home care worker, should be considered a strong indicator that the public entity is an employer.

*Setting a Cap or Wage Range*

Many programs that do not set a specific wage or rate instead include a wage range or "cap" on wages or reimbursement rates in order to comply with federal Medicaid regulations mandating that a state implement safeguards to prevent the premature depletion of the participant-directed budget. *See* 42 CFR 441.464. In addition to the regulatory requirements concerning fiscal accountability, this cap/wage range can also help consumers manage their budgets so that they have resources for the entire month and serve as a tool to guard against consumer exploitation. The setting of a "cap" or wage range is a factor to consider as part of an economic realities analysis; however, the Department believes that a true cap or range, as described below, would be a weak indicator of employer status.

A true cap or range (1) provides a consumer with meaningful discretion to determine how much to pay home care workers within his or her individual budget; and (2) allows a consumer choice in how to spend unused funds that are available as a result of using a lower wage rate on other authorized Medicaid expenditures. In contrast, if a cap/range essentially functions as a wage rate, and the consumer has little discretion to actually set a wage, the Department would view this type of cap as more similar to a predetermined wage rate, and thus would view this type of cap as a strong indicator of employment status of the public entity.

### 3. Hours and Scheduling

In certain consumer-directed programs, a consumer retains complete control (within his or her individual budget) over scheduling, including the number of work hours, for home care workers. This factor should be considered a weak indicator of employer status for the public entity, because the consumer is able to freely decide when, how often, and for how long the provider will work.

In programs in which the public entity sets an explicit number of hours for which the consumer may receive home care services from which the consumer may not deviate, and the consumer controls the scheduling within that timeframe, this fact should be considered a moderate indicator of employer status for the public entity.

If the public entity specifies certain hours or specific weekly schedules to be worked, that fact is a strong indicator that the public entity is an employer.

### 4. Supervises, Directs, or Controls the Work

Day-to-day supervision of providers is an important factor to be considered in conducting an economic realities analysis.  The Department emphasizes, however, that economic dependence rather than simple control is the ultimate inquiry.

In programs in which the consumer has sole control over the worker, the tasks that are performed (within the limits of Medicaid-authorized services), how the tasks are performed, and when the tasks are performed, and the public entity does not supervise or direct the day-to-day work in any manner, but rather only performs minimal functions focused on the well-being of the consumer (rather than any assessment or management of the provider), these facts would be weak indicators that the public entity is an employer.

In programs in which the public entity more explicitly identifies (perhaps in a plan of care) the specific permissible tasks and limits the worker to performing those exact tasks, and the public entity engages in quality management activities that are more similar to daily supervision (for example, a case manager/service coordinator makes regular, on-site visits and assesses the provider's performance beyond ensuring the safety of the consumer), these factors should be viewed as moderate indicators that the public entity is an employer.

Strong indicators that the public entity is an employer include: if the public entity mandates the list of specific permissible tasks and the time allocated for performance of each task, if the provider is required to inform both the consumer and the program contact of tardiness or absences, if the program contact intervenes or mediates issues between the consumer and providers, if the program provides for a grievance procedure for workers, if the program conducts regular performance reviews, if the program requires ongoing public-sponsored training, or if the provider must sign in and sign out directly with the public entity.[10]

---

[10] If the provider is required to provide sign in and sign out times directly to a representative of the public entity (such as a case manager), this fact would be a strong indicator that the public entity is an employer; in addition, if the provider is required to utilize an electronic verification system and the consumer does not verify or approve provider timesheets, this fact will also be viewed as a strong indicator that the public entity is an employer.  If, however, the provider is required to utilize an electronic verification system (for purposes of auditing or to generate payroll), but the consumer still retains the ultimate responsibility for verifying or approving provider timesheets, this fact will be viewed as a moderate indicator that the public entity is an employer.

### 5. **Performs Payroll and Other Administrative Functions**

In many programs, the public entity or a fiscal management agent performs payroll or other administrative functions on behalf of the consumer. As noted in the Final Rule, functions that are similar to the tasks performed by commercial payroll agents for businesses, such as maintaining records, issuing payments, addressing tax withholdings, and ensuring that workers' compensation insurance is maintained for the worker on behalf of the consumer, are weak indicators that the entity is an employer.

### 6. **Other Factors**

This list is meant to be illustrative. There are multiple other factors a court may consider to be relevant in evaluating whether an employment relationship exists. These factors may include, for example, whether the purported employer provides equipment for the worker to use or whether the purported employer provides mandatory training. All of the facts relevant to whether a worker is economically dependent upon a purported employer should be assessed.

## III. Hypothetical Examples

*Hypothetical One – High Control Consumer-Directed Programs, with Public Entity and Consumer as Joint Employers*

In this consumer-directed program, the public entity collectively bargains with a union representing home care providers. The public entity exercises control by providing extensive required training, offering paid time off, furnishing equipment, creating a procedure for redress of grievances, setting a wage rate, and offering a benefits package. The public entity also retains some control over hiring and firing by completing performance evaluations and reserving the right to terminate a worker for poor performance. A fiscal intermediary processes payroll and tax withholding.

The Department believes that in such programs, the public entity administering the program is a joint employer of the provider along with the consumer. The fiscal intermediary, performing purely ministerial functions, would not be an employer.

Other public programs in which the home care providers are not parties to a collective bargaining agreement but in which the public entity nonetheless demonstrates similar levels of control over the providers' working conditions will also be considered joint employers. For example, some programs are structured such that a case manager is involved in determining the worker's schedule or directing the method of work, or the public entity sets a wage rate for providers. In programs such as these, with similar levels of control as described above, the public entity will be considered a joint employer with the consumer.

*Hypothetical Two – Cash and Counseling Program with a Wage Cap, with Consumer as Sole Employer*

In this cash and counseling program, consumers are given the option to manage a flexible budget and decide what mix of Medicaid-allowable goods and services best meet their personal care needs. Participants may use their budgets to hire personal care workers, purchase other services, purchase items, or make home modifications that help them live independently. The consumer retains authority over hiring and firing, negotiates the wage rate paid to the employee within a cap, and sets the terms and conditions of employment.

The public entity sets minimal qualifications for providers (by requiring a criminal background check and CPR/First Aid certification), determines eligibility and assesses need under the program, and then performs only ministerial payroll and tax functions through a fiscal intermediary, similar to those that commercial payroll agents perform for businesses, such as maintaining records, issuing payments, and addressing tax withholdings. The public entity also sets a cap on wages for all workers participating in the program so that consumers will have enough resources in their budget for the entire month, and to help ensure fiscal accountability as well as guard against exploitation. The cap for home care workers is at the agency reimbursement rate of, for example, $26 per hour. Thus, the consumer may pay anywhere from minimum wage to $26 per hour, and if the consumer elects to pay less than the cap, the remaining funds remain in the consumer's individual budget.

In this scenario, the consumer is likely the sole employer of workers hired through such a program.

*Hypothetical Three– Consumer-Directed State Plan Program, with Consumer and Public Entity as Joint Employers*

In this consumer-directed state plan program, the consumer posts a job announcement and selects applicants to interview. The consumer conducts interviews and chooses a provider, but the case manager must approve the hiring decision. The consumer provides all day-to-day supervision and controls the schedule as well as the manner in which work is performed. The consumer and public entity case manager conduct regular performance evaluations, and either the case manager or consumer may decide to fire the provider for poor performance. The program also has required, ongoing, comprehensive, state-sponsored training requirements. The public entity sets a reimbursement rate for home care services, from which the consumer may not deviate. Payroll and withholdings are processed through a fiscal intermediary of the consumer's choice.

In this scenario, the public entity and the consumer are likely joint employers of the provider. The fiscal intermediary is not an employer.

*Hypothetical Four –Intermediary Agency Model, with Consumer and Agency as Joint Employers*

In this program, the public entity administers an intermediary agency model. The state sets reimbursement rates for all Medicaid services within the public entity, including home care services. The minimum qualifications for home care workers are set by state regulation. The public entity does not supervise the work, set schedules, or control conditions of employment. The public entity contracts with agencies to provide home care services, and provides a bundled reimbursement rate from which the agency is free to set a wage rate and retain a portion for administrative costs. The public entity reserves the right to conduct certain functions, including visiting the agency to assess performance, conduct fiscal and quality audits, and review personnel files on a random basis.

Consumers may recruit and select a provider, and the agencies participating in the program then screen and hire the worker (the agency may also recruit potential providers). Both consumers and agencies retain the right to fire the workers, and the agencies generally handle any disciplinary issues involving the workers. Agencies also conduct the administrative functions and supervision of workers required by regulation, train the workers, and evaluate job performance. The agencies maintain all employment records, although copies of such records are also sent to the public entity administering the program. Consumers provide daily supervision, set the worker's schedule, and decide how and when certain tasks will be performed.

In this scenario, the agencies and consumers are employers, and it is likely that the public entity is not an employer. The public entity performs minimal functions required by regulation, while the agencies set the wage rate, hire and train workers, and supervise much of the work.

*Hypothetical Five – Public Entity, Managed Care Organization, and Intermediary Agency Program, with Consumer and Agency as Joint Employers*

This public entity contracts with a managed care organization (MCO) to provide health care services, including home care services, to Medicaid recipients. The public entity pays the MCO a per consumer monthly rate, and from that total budget the MCO contracts with various providers in its network, including home care agencies. Within this network are several agencies participating in a consumer-directed intermediary agency program. The MCO pays the agencies a bundled rate from which the agency sets the wage rate; authorizes a certain number of hours based upon an assessment; pays health insurance, workers' compensation, and unemployment insurance premiums; and also may choose to authorize overtime. The participating agencies permit consumers to hire and fire their own workers, and consumers set the provider's schedule and provide all day-to-day supervision.

In this scenario, on these specific facts, it is likely that the agencies and the consumers are joint employers, and that the MCO and public entity are likely not joint employers. The MCO merely pays the bundled rate to the agencies, and the agencies perform all other indicia of employment. However, any slight change in the particular facts could change the analysis.

*Hypothetical Six – Public Entity, Managed Care Organization, and Intermediary Agency Program, with Consumer, Managed Care Organization, and Agency as Joint Employers*

This public entity contracts with a managed care organization (MCO) to provide health care services, including home care services, to Medicaid recipients.  The public entity pays the MCO a per consumer monthly rate, and from that total budget the MCO contracts with various providers in its network, including home care agencies.  Within this network are several agencies participating in a consumer-directed intermediary agency program.  The MCO pays the agencies a bundled rate but requires the agencies to pay workers a particular hourly wage.  The MCO also sets comprehensive provider qualifications and requires providers to attend training provided by the MCO on a regular basis.  The agencies authorize a certain number of hours based upon an assessment; pay health insurance, workers' compensation, and unemployment insurance premiums; assist the consumer if disciplinary matters regarding the provider arise; provide back-up workers when needed; and may choose to authorize overtime.  The participating agencies permit consumers to hire and fire their own workers, consumers set the providers' schedules, and consumers provide all day-to-day supervision.

In this scenario, based on these specific facts, it is likely that the MCO, the agencies and the consumers are joint employers and that the public entity is likely not a joint employer.  The MCO does far more than simply pay the bundled rate (as the MCO did in Hypothetical Five) in this example, and indicia of employment is spread among the MCO, agencies, and consumers.  However, any slight change in the particular facts could change the analysis.

*Hypothetical Seven – Consumer-Directed Waiver Program, with Consumer as Sole Employer*

In this consumer-directed waiver program, the public entity sets forth basic hiring requirements (such as a criminal background check or CPR/First Aid certification) and retains the limited right to remove a provider from the program if it is determined, after an investigation, that there has been fraud or abuse.  The public entity also sets a wage rate range for services that is approved by CMS.  The wage rate range for home care workers is from $10 per hour to $24 per hour.  A consumer can hire anyone who meets minimal qualifications and the consumer retains the ability to fire for any reason.  The public entity retains the right, pursuant to Medicaid regulations, to terminate a provider from the program in circumstances of fraud or abuse.  A budget is developed annually by the consumer with the help of a case manager.  It is the responsibility of the consumer to keep up with financial statements to determine whether monthly spending should be adjusted.  The consumer sets the worker's schedule, determines the tasks to be performed, and supervises how the work is performed.  The consumer reviews and approves the worker's payroll, and the provider's tax withholdings are deducted from the individual consumer's budget (not any general state fund).  The consumer has a choice between three fiscal intermediaries that perform payroll and other administrative functions.  The public entity does not provide any paid time off, equipment, mandatory training, or contributions to health insurance premiums.

In this scenario, the consumer is likely the sole employer of the worker.  Any slight change in the specific facts of this hypothetical may change the analysis.