IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RALPH TALARICO, INDIVIDUALLY AND, ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | } } } | |
| Plaintiffs, | } } | Docket No. 17-2165 |
| v. | } } | Judge Schmehl |
| PUBLIC PARTNERSHIPS, LLC, D/B/A PCG PUBLIC PARTNERSHIPS. | } } } | |
| Defendant. | } } | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CONDITIONAL CERTIFICATION AND NOTICE PURSUANT TO 29 U.S.C. §216(B)**

Defendant Public Partnerships LLC ("PPL") submits this Brief in opposition to Plaintiff's

Motion for Conditional Certification and Notice Pursuant to 29 U.S.C. §216(B) [Dkt. No. 47].

## I.    INTRODUCTION

Plaintiff Ralph Talarico ("Plaintiff" or "Mr. Talarico") asks this Court to conditionally

certify a group of direct care workers ("DCWs" or "the Putative Class") in the Commonwealth

of Pennsylvania on the grounds that PPL has failed to make overtime payments to him and other

DCWs.  Plaintiff's Motion has failed to meet the standard required by the Third Circuit for

conditional certification of an action brought under the Fair Labor Standards Act ("FLSA") for

two reasons.

First, Plaintiff clearly and unequivocally asserted *as fact* in his Motion and Proposed

Class Notice that PPL is his employer when he has made no such showing.  Rather, the evidence

demonstrates that his employers are the statutorily mandated program participants who hired him

(defined in the statute as the "Participant-Employers"). Accordingly, the Plaintiff cannot make a factual showing that a common policy of the defendant, PPL, violated the FLSA.

Second, Plaintiff's Motion is premature. He has failed to properly define a class of individuals to receive the proposed notice. The Putative Class members each have individualized work experiences and claims and Plaintiff has made an insufficient showing that conditional certification is appropriate at this time. Prior to discovery, Plaintiff is unable to identify an ascertainable class of individual DCWs. As currently proposed, the Putative Class essentially includes a self-selecting group of DCWs (a) that believe they may have submitted a timesheet for over forty hours in a single week at any time after January 1, 2015, and (b) who allege that their individual experiences establish an alleged joint employment relationship with PPL. The Putative Class does not account for DCWs that may be subject to statutory exemptions from overtime compensation (those who live with the Participant-Employers) and those whom have been fully compensated for overtime work. Moreover, the particular experiences of those DCWs who have filed to opt-in to the suit and submitted declarations in support of the Plaintiff's Motion ("Opt-In Plaintiffs"), in conjunction with their various differing claims for overtime compensation, as opposed to the individualized experiences of the thousands of other DCWs, counsels against certification of an entire class of all DCWs – potentially 38,000 individuals state-wide. For the reasons set forth within, conditional certification of the Putative Class should be denied.

## II.    PROCEDURAL BACKGROUND

On May 11, 2017, Plaintiff, individually and on behalf of all other similarly situated persons, brought this action pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.,* the Pennsylvania Wage Payment and Collection Law ("PWPCA"), and the

Pennsylvania Minimum Wage Act ("MWA") [Dkt. No. 1].  In his Complaint, Plaintiff asserts

class claims against PPL for:  (1) the alleged failure to compensate DCWs retroactively for

overtime hours dating back to January 1, 2015; (2) the alleged failure to pay certain overtime

after January 1, 2016; (3) the alleged failure to pay overtime hours at an overtime rate; and (4)

the alleged failure to pay compensation for time spent traveling between Participant-Employers.

*Id.* at ¶¶ 49-52.

Plaintiff, a DCW in the Lancaster, Pennsylvania region, contends that PPL is his

employer and that he is entitled to overtime payments from PPL.  Since the time of the filing of

the Complaint, additional Plaintiffs have filed consent notices to join the action.   On June 16,

2017, PPL filed a Motion for Summary Judgment, demonstrating why PPL is not Plaintiff's

employer or joint employer.  After oral argument on November 15, 2017, this Court issued a

decision denying PPL's Motion without prejudice.  Though Opt-In Plaintiffs are not similarly

situated to each other, let alone similarly situated with all of the DCWs in Pennsylvania, on

February 8, 2018, Plaintiff filed a Motion for Conditional Certification seeking conditional

certification of a Pennsylvania-wide class of DCWs.

III.    **FACTUAL BACKGROUND**

    A.  **The Federal HCBS Waiver Program**

The Home and Community-Based Services ("HCBS") waiver program is a Medicaid

program administered at the federal level by the Center for Medicare and Medicaid Services

("CMS") under § 1915 (c) of the Social Security Act, 42 U.S.C. § 1396n and in Pennsylvania by

the Department of Human Services ("DHS") (formerly, the Department of Public Welfare)

Office of Long Term Living ("OLTL").  55 Pa. Code § 52.1.  The objective of the HCBS waiver

program is to provide services that disabled participants need to avoid institutionalization and to remain in their homes and communities.  42 C.F.R. § 441.300.

The Independence and Attendant Care Waiver Programs ("Waiver Programs"),[1] which authorize "Self-Directed Personal Assistance Services" to participants with physical disabilities who are between the ages of 18 and 60, are Pennsylvania HCBS waiver programs administered by OLTL.  55 Pa. Code § 52.3.  Self-Directed Personal Assistance Services are "designed to allow individuals ... to exercise decision-making authority in identifying, accessing, managing and purchasing" the resources that they need.  42 C.F.R. § 441.450 (b).[2]  As part of these services, the CMS regulations mandate and describe the authority to be given to the self-directed Medicaid participants as including, at a minimum, recruiting workers, hiring and discharging workers, training workers, specifying workers' qualifications, determining worker duties, scheduling workers, supervising workers, evaluating worker performance, determining the amount paid for a service, and scheduling when services are provided.  *Id.* § 441.450 (b)(1)-(12); *see also* 42 C.F.R. § 441.478.[3]  All of the functions of an employer are vested by the federal regulations in the Medicaid participant who receives the services – the Participant-Employer.

---

[1] A Participant in the Independence Waiver Program who has elected Participant-Directed Services is a person between the ages of 18 and 60 years with permanent physical disabilities, who requires personal assistance services to complete the functions of daily living, self-care and mobility, but who is capable of selecting and supervising a DCW and is capable of managing their own financial and legal affairs.  Declaration of Regina Stewart ("Stewart") ¶ 10 [Dkt. No. 12-2].  The Attendant Care Waiver program, that applies to a person that needs assistance with daily living activities due to a physical impairment that can be expected to last for a continuous period of not less than 12 months, while different from the Independence Waiver Program, uses the same definitions and regulations that are applicable to personal assistance services.  *Id.*, ¶ 47.

[2] Self-directed personal assistance services are provided for in 42 U.S.C. § 1396n (j).  The statute requires that the participant "exercise choice and control over the budget, planning, and purchase of self-directed personal assistance services, including the amount, duration, scope, provider and location of service provision."  42 U.S.C. § 1396n (j)(5)(A).

[3] In addition to giving participants the right "to hire any individual capable of providing the assigned tasks," the regulations specify that "Participants ... retain the right to train their workers in the specific areas of personal

The CMS regulations that establish the Self-Directed Services option require the development of a Service Plan, which is a "document that specifies the services and supports that are to be furnished to meet the needs of a participant in the self-directed [Personal Assistance Services] option...", *Id.* § 441.450 (c); § 441.468, as well as a "Service Budget," which is "an amount of funds that is under the control and direction of a participant." *Id.* § 441.450 (c); *see* 55 Pa. Code § 52.3. The CMS regulations also authorize states to provide (on their own or through third party contractors such as PPL) certain financial management services to Participant-Employers who are self-directing their Personal Assistance Services. These fiscal management services include, among other things, processing payroll and collecting and disbursing withholding taxes as the agent of the Participant-Employers. *Id.* §§ 441.454, 484 (a)(2).

### B.  DHS OLTL Designates the Program Participant as  the Employer

In order to establish the Waiver Programs, OLTL submitted an application to CMS for a waiver to provide an array of options under the HCBS waiver program umbrella. *See* 42 U.S.C. § 1396n; 42 C.F.R. § 441.301. CMS approved the application and OLTL now administers the options in the Commonwealth. 52 Pa. Code § 52.1. The OLTL application for a § 1915(c) HCBS waiver describes its administration of the program in detail.[4] *See* Declaration of Michael C. Hale, Exhibits 1, 2 and 3 [Dkt. No. 12-1]. The stated purpose of the Waiver Programs is to permit a state to furnish "services that assist Medicaid beneficiaries to live in the community and

---

assistance needed by the participant and to perform the needed assistance in a manner that comports with the participant's personal, cultural and/or religious preferences." Further, "Participants ... retain the right to establish additional staff qualifications based on participants' needs and preferences." *Id.*

[4] OLTL's Application for a Waiver, pertinent sections of which are attached to the Hale Declaration [Dkt. No. 12-1], will be cited hereafter as "Application p. ___ "

avoid institutionalization." Application p. 1.  OLTL elected to implement the Self-Directed

Services option (which it refers to as "Participant Directed Services"). *Id.*, pp. 169-180.  The

Application clearly states that the Participant-Employer has the right to "*serve[] as the common-*

*law employer and is responsible for hiring, firing, training, supervising and scheduling their*

*support workers.*" *Id.*, p. 169 (Emphasis Added).  It is an integral feature of the Self-Directed

Participant Directed Services option that the Participant-Employer be permitted to fully function

as the employer of the DCW.

### C. PPL's Role as Fiscal Agent to the Participant-Employer

Pursuant to its Grant Agreement with OLTL, PPL "serves as a fiscal intermediary and provides

Financial Management Services" to Medicaid-eligible individuals who qualify for home care under

HCBS waiver programs," *i.e.*, Participant Directed or Self-Directed Personal Assistance Services.

Stewart ¶¶ 3-4, Ex. A, p. 2 [Dkt. No. 12-2].  The role of PPL as the fiscal agent ("Fiscal Agent")[5] under

both programs is limited to providing or facilitating payroll and financial functions, tax services,

background checks, insurance coverage assistance, some record maintenance, and processing services

only to the Participant-Employer as its agent.  PPL is not contracted by the Commonwealth to, nor does

it otherwise, provide services to or supervision of DCWs such as Mr. Talarico.  Application pp. 169-70,

173-74 [Dkt. No. 12-1].  PPL's role as the Fiscal Agent is also similarly described and defined under its

state contract.  Stewart ¶¶ 3-4 [Dkt. No. 12-2].[6]  None of these services involve any of the functions

---

[5] This is the role ascribed to PPL in its state contract with OLTL.  Stewart ¶ 4 [Dkt. No. 12-2].

[6] As in the Application and pursuant to its contract with OLTL, on behalf of the Participant-Employers, PPL issues payments to the Direct Care Workers for the services they provide, with money allocated by DHS to the Participant-Employer in their Service Budget.  PPL withholds legally required income from the Direct Care Workers' pay for tax purposes, and pays the taxes to the state and federal taxing authorities.  PPL also provides program documentation and instructions to the Participant-Employers regarding such services.  Stewart ¶¶ 12, 14-15 [Dkt No. 12-2].

reserved to and ordinarily exercised by employers. Under the federal and state regulatory mandates, those functions are assigned to the Participant-Employers.[7]

DHS, not PPL, approves a Participant-Employer for the Waiver Programs. After approval, he or she works with a third-party Service Coordinator (not PPL, and not an agent of PPL) to prepare a Service Plan and Service Budget. Stewart ¶ 14 [Dkt No. 12-2]. PPL has no involvement whatsoever in the creation of the Service Plan or the Service Budget. Eligibility determinations and participation in the Waiver Programs, as well as determinations of services and their attendant costs are not made by PPL. PPL does not even receive a copy of the Service Plan. *Id.* After the Service Plan is completed, the Service Coordinator notifies PPL of the service hours allotted for the Participant-Employer. *Id.* ¶ 15. This notification triggers PPL's involvement as the Fiscal Agent for the Participant-Employer.

### D. Participant-Employers Hire Their Own DCWs.

Mr. Talarico is a DCW that provided personal assistance services in the Lancaster area to four individuals, three of whom are Participant-Employers in the Independence Waiver Program and one of whom is a Participant-Employer in the Attendant Services Program. Stewart ¶ 8 [Dkt. No. 12-2]. Mr. Talarico and each Participant-Employer signed a Direct Care Worker Agreement ("DCW Agreement"), acknowledging that Mr. Talarico was employed by the Participant-Employer and not by PPL. *Id.*, Ex. C, pp. 2-4, 14-16; Ex. D., pp. 2-4, 14-16, 23-25; Ex. E, pp. 2-4, 14-16; Ex. F, pp. 2-4, 14-16 [Dkt. No. 12-2, 12-3]. Mr. Talarico signed such agreements as the "DCW employee," with each Participant-Employer who is specifically designated the "Common Law Employer." *Id.* In fact, he signed a DCW Agreement on no less than nine occasions since 2013, as those agreements are renewed every two years

---

[7] PPL's role is to act as the payroll agent for the Participant-Employers similar to the functions performed by the ADP payroll company for many corporate employers. The payroll company does not employ the individuals for whom they process payroll, they merely provide payroll services on behalf of the employer for whom the individuals work.

or so for each Participant-Employer. *Id.* Every one of Mr. Talarico's employment agreements includes the statement that Mr. Talarico "understand[s] and acknowledge[s] that [PPL] is not [his] employer," and that he "understand[s] that the participant or their appointed representative is [his] employer." *Id.*, Ex. C, pp. 3, 15; Ex. D, pp. 3, 15, 24; Ex. E, pp. 3, 15; Ex. F, pp. 3, 15 [Dkt No. 12-2, 12-3].

In addition to the DCW Agreement, Mr. Talarico filled out and signed several other documents that named the Participant-Employers as his employers (i.e., DCW Re-Qualification Form, Qualified DCW Rate Sheet, Transition Common Law Employer Confirmation of Information Form). Each Participant-Employer also signs a Common Law Employer Agreement ("CLE Agreement") with every DCW who works for them stating that they accept the responsibility for managing the services provided to them by the DCW and are recognized as the "legal employer of the qualified Direct Care Workers (DCW) hired to provide" the services identified in their service plans. *Id.*, ¶¶ 30, 50; Ex. D, pp. 17-19; Ex. F, pp. 17-19 [Dkt. No. 12-2, 12-3]. The CLE Agreement specifically states that each Participant-Employer must meet certain criteria under the program including the ability to: make decisions on how to best meet their needs and use of service and to make changes as needed; collaborate with their Service Coordinator to develop an individualized plan based on needs; determine how their budget will be spent; recruit, hire, manage and dismiss their DCW; train their DCW to meet the needs of the plan; establish a mutual agreeable schedule with their DCW; decide how much to pay their DCW within certain guidelines; provide feedback to their DCW; review and approve all timesheets to their Fiscal Agent; ensure their DCW only works the hours budgeted or for the amount available under their approved plans and a number of other duties. *Id.*, Ex. D, pp. 17-19; Ex. F, pp. 17-19 [Dkt. No. 12-3].[8]

---

[8] In certain circumstances, the Participant-Employers may elect to have a personal representative or family member act on their behalf with respect to the Waiver Program requirements and/or communications with PPL. They can be referred to as "the Designated Common Law Employer." *See e.g.*, Stewart, Ex. E, p. 17 [Dkt. No. 12-3].

This documentation, in particular the DCW Agreement, establishes that the Participant-Employer assumes the exclusive employer responsibility of his or her DCWs, consistent with the mandate of the Social Security Act and CMS regulations. *Id.*, Ex. C, p. 2-4.[9]

### E. The Participant-Employers Perform All the Employer Duties

After each Participant-Employer hired Mr. Talarico, they in fact performed all of the employer duties consistent with the federal and state statutory and regulatory schemes under the Waiver Programs. Each Participant-Employer:

- Established the hourly wage rate for Mr. Talarico;
- Decided how many service hours would be worked, in conjunction with the Service Coordinator;
- Determined the schedule of Mr. Talarico;
- Paid the employer taxes from their budgeted funds, through their agent, PPL;
- Covered Mr. Talarico under workers' compensation insurance;
- Directed and supervised the work of Mr. Talarico;
- Provided Mr. Talarico with a place to work and any necessary supplies;
- Had the authority to discharge or discipline Mr. Talarico (which two did: EJ and KS); and
- Performed the payroll functions, including withholding and payment of employer taxes, through their agent, PPL.

Stewart ¶¶ 27-56 [Dkt. No. 12-2].

PPL did not perform any employer functions relating to Mr. Talarico; it provided services to the Participant-Employers as their Fiscal Agent.[10] No PPL employee or representative ever traveled to or appeared at the residence of the Participant-Employers to observe, provide direction, control, or evaluate the services of Mr. Talarico, or any other DCW. *Id.* ¶ 61.

---

[9] In his case, Mr. Talarico transitioned from a prior fiscal agent and completed the necessary transition forms for the programs for which he provided services including execution of his employment agreement between himself and the Participant-Employers for whom he works. *Id.* Exs. C, D, E, F, p. 1 [Dkt No. 12-2, 12-3]. The Exhibits were redacted to remove personal identifying information.

[10] The Participant-Employer determined how many hours Mr. Talarico would work and sent information to PPL each pay period reflecting the number of actual hours worked for that pay period. *Id.* ¶¶ 23, 34, 43, 53 [Dkt. No. 12-2]. PPL then paid Mr. Talarico for those hours by direct deposit to their bank accounts. *Id.* ¶¶ 24, 35, 44, 54. As the duly authorized Fiscal Agent for the Participant-Employer, PPL withheld payroll taxes, FICA and FUTA assessments, as well as state and local income taxes from Mr. Talarico's pay, and paid that money to the respective taxing authorities. *Id.*

## IV.    CONDITIONAL CERTIFICATION STANDARD

The FLSA does not mandate notice to potential class members in a collective action.

Rather, the Supreme Court has authorized district courts to conditionally certify and send notice

of a collective action only "in appropriate cases."  Hoffmann-La Roche Inc. v. Sperling, 493 U.S.

165, 170 (1989) (noting that courts should exercise discretion to authorize notice to potential

class members only "in appropriate cases," where the "judicial system [would] benefit[] by

efficient resolution in one proceeding of common issues of law and fact arising from the same

alleged . . . activity"); Zavala v. Wal Mart Stores Inc., 691 F.3d 527, 536 n.4 (3d Cir. 2012)

("'conditional certification' … is actually the district court's exercise of its discretionary

power…and is neither necessary nor sufficient for the existence of a representative action under

the FLSA") (internal citations omitted).  The Supreme Court cautioned that this discretion is not

"unbridled," and that although "[c]ourt intervention in the notice process for case management

purposes" is an appropriate use of the court's power, "the solicitation of claims" is not, and

"courts must be scrupulous to respect judicial neutrality."  Hoffmann-La Roche Inc., 493 U.S. at

174.

Before a court may exercise its discretion to conditionally certify an FLSA collective

action and authorize the issuance of notice, the plaintiffs must make a "'modest factual showing'

that the proposed recipients of opt-in notices are similarly situated."  29 U.S.C. §216 (b)("an

action may be maintained … by any one or more employees for and on behalf of … other

employees similarly situated."); Zavala, 691 F.3d at 536, n.4.  The Third Circuit has explained

that "[u]nder the 'modest factual showing' standard, a plaintiff must produce some evidence,

'beyond pure speculation,' of a factual nexus between the manner in which the employer's

alleged policy affected her and the manner in which it affected other employees."  Id. at 536, n.

4. (emphasis added). In other words, "Plaintiff[] must 'make a modest factual showing' that [she] and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" Hall v. Guardsmark, LLC, No. 11-213, 2012 WL 3580086, at *6 (W.D. Pa. Aug. 17, 2012) (quoting Myers v. Hertz Corp., 624 F.3d 537, 555 (2d Cir. 2010)). Conditional certification at this juncture, therefore, requires at least a conditional showing that there exists a common policy affecting Plaintiff and the DCWs he seeks to represent alike and that the policy violates the FLSA. See Wright, Miller & Kane, Federal Practice & Procedure, § 1807, at 489-90 (3d. ed. 2005).[11]

In order to "avoid the 'stirring up' of litigation through unwarranted solicitation," conditional certification should be denied where plaintiffs fail to satisfy their burden. Bramble v. Wal-Mart Stores, Inc., No. CIV.A.09-4932, 2011 WL 1389510, at *4 (E.D. Pa. Apr. 12, 2011); see also Burkhart–Deal v. Citifinancial, Inc., No. 07–1747, 2010 WL 457127, at *5 (W.D. Pa. Feb. 4, 2010) (holding that given the "dearth of evidence" to support plaintiff's claims of substantial similarity to a nationwide class "any court-facilitated notice to a nationwide opt-in class would constitute little more than solicitation on behalf of Plaintiffs cause").

## V.    ARGUMENT

### A. Plaintiff Has Made an Insufficient Factual Showing That PPL Is His Employer, and Therefore, That the Putative Class Was Affected by a Common Policy of the Defendant

---

[11] Contrary to Plaintiff's contention, PPL has not "confirmed" the propriety of the conditional certification of the class by virtue of its filing a Motion for Summary Judgment because it is not the employer of Plaintiff or any member of the Putative Class. See Plaintiff's Memorandum of Law, p. 9. PPL moved for summary judgment because PPL has a strong legal defense, not because PPL believes that a class is presumptive; on the contrary, as this Opposition makes clear, PPL contends that there should be no conditional certification of a class in part due to the individualized nature of each of the DCWs' potential claims.

Plaintiff requests that this Court conditionally certify a class – and Notice to the Putative

Class – without any "modest factual" showing that PPL is his employer, or the employer of any

portion let alone the entirety of the Putative Class.  At a minimum, Plaintiff must provide a

factual showing that the defendant, PPL, had a "common policy or plan" that violates the FLSA.

*See* Hall, 2012 WL 3580086, at *6; Chemi v. Champion Mortg., No. 05-CV-1238 WHW, 2006

WL 7353427, at *4 (D.N.J. June 21, 2006) ("The courts must require more factual allegations

that demonstrate a particular plan or policy initiated by defendants that violates FLSA…")

(emphasis added).  PPL has no such common policy or plan that it initiated pertaining to

overtime compensation.  As noted above, the allegations of PPL's status as an employer are

directly contradicted by the language and regulations of the federal and state waiver programs,

its state contract, the documents executed by Participant-Employers, and the associated

documentation received and executed by DCWs.

The sole basis for Plaintiff's claim – the declarations of nine (9) DCWs – are insufficient

at this stage to conditionally certify an entire class of thousands of individuals.  *See* Plaintiff's

Memorandum of Law, at p. 8-9 [Dkt. No. 47-1]; White v. Rick Bus Co., 743 F. Supp. 2d 380,

387–88 (D.N.J. Sept. 28, 2010) ("Plaintiffs who rely on affidavits or certifications with similarly

sparse factual support have faced rejection in other courts as well."); Kronick v. Bebe Stores,

Inc., No. CIV. 07-4514 (RBK), 2008 WL 4546368, at *2 (D.N.J. Oct. 2, 2008) ("Such general

and vague assertions might be tenable if Plaintiff affiants had presented more detailed factual

evidence to bolster their assertions."). This is especially true in this case, where other members

of the Putative Class have commenced an unrelated litigation against the Commonwealth, but in

which they assert an arguably diametrically opposed legal position, i.e. that the Court must

protect their rights as employees with respect to their relationships with their sole and exclusive

employers, the Participant-Employers. *See* <u>Markham v. Wolf</u>, 2016 WL 5266705 (Sept. 22, 2016).[12] Plaintiff's Motion and proposed Notice fail to meet the "modest factual showing" that pertains to the critical question of PPL's status with respect to the DCWs.

The facts do not reflect the creation of any employment relationship between PPL and the DCWs, but instead readily shows that PPL works as a Fiscal Agent under a Participant-Directed Services model of home care services. *See supra*, p. 5. That PPL is required by its state contract to communicate on the telephone with DCWs or process paychecks to DCWs cannot be the basis for a determination that PPL is an employer entitling Plaintiff to conditionally certify a statewide class. Under the Waiver Programs and pursuant to its state contract, PPL lacks any authority to take the actions that the DCWs erroneously claim that it performs. *See e.g.*, Supplemental Declaration of Regina Stewart, ¶ 3 [Dkt. No. 28-1]. Plaintiff cannot demonstrate that there is a "common policy" that affects an entire class sufficient for conditional certification when PPL has absolutely no discretion to create or set the complained of policies.[13]

### B. Plaintiff Cannot Properly Define a Class

---

[12] In <u>Markum</u>, a group of direct care workers challenged an executive order issued by Governor Thomas Wolf that established an advisory group to address home care services. The DCW plaintiffs argued, *inter alia*, that the "[e]xecutive Order interferes with the participant-DCW employment relationship under Act 150, and establishes organizational labor rights for DCWs. In a companion case, <u>Smith v. Wolf</u>, No. 177 M.D. 2015, 2016 WL 6069483, at *1 (Pa. Commw. Ct. Oct. 14, 2016), Petitioners, a DCW and his Participant-Employer, sought to enjoin the Commonwealth's Executive Order mandating certain training of DCWs as interfering with the "*unique relationship between a DCW providing in-home care, and the participant who employs him.*" *Id.*, at *3 (emphasis added).

[13] Moreover, to the extent that such a "policy" exists, it is clearly not "common" to all putative class members as evidenced by the Declarations submitted. Mr. Talarico, for example, claims that PPL failed to compensate him retroactively for all of the overtime pay he worked in 2015. Complaint, ¶ 51 [Dkt. No. 1]. However, other declarants have no claim that PPL failed to provide retroactive back pay where they did not work prior to January 2016. *See* Declaration of Racheal Rock, ¶ 2 [Dkt No. 47-8]. Likewise, those DCWs that work for multiple Participant-Employers claim that PPL failed to provide overtime compensation for traveling between Participant-Employers, and others have no such claim where they work for only one Participant-Employer.

The Motion also should be denied as Plaintiff cannot properly define a Putative Class at this time.

Plaintiff proposes that notice be sent as follows:

All direct care workers in Pennsylvania who were employed by PPL between January 1, 2015 and the date of final judgment in this matter, and who worked over 40 hours in one or more weeks.

At the same time, Plaintiff requests that PPL provide a Putative Class list, as he has defined it. Memorandum of Law, p. 15 [Dkt. 47-1]. At this time, Plaintiff cannot properly define the Putative Class without sufficient information and documentary support that DCWs actually submitted timesheets indicating work in excess of forty (40) hours in one week during the proposed class period. Also, the proposed notice is not properly defined where it seeks to notice DCWs that in fact were paid overtime. In the Declarations submitted in support of Plaintiff's Memorandum of Law, Mr. Talarico and multiple other Plaintiffs admit that they have received certain overtime compensation for work in excess of forty (40) hours in a week. For example, Mr. Talarico acknowledges receiving overtime compensation during a period from January 1, 2016 to the present. Meaning, that a certain unknown – and potentially large – number of the DCWs that commenced work after January 1, 2016, that Plaintiff seeks to notice will have received overtime compensation for all weeks in which they exceeded forty (40) hours, and therefore, have no comparable claims.

Conditional certification is premature in the absence of any evidence of a properly defined class. Discovery must occur before certification to properly define and limit the Putative Class of individuals to receive notice. The entirety of the proposed class to receive notice is 38,000 individuals, but only certain of these individuals may have claims at all comparable to Opt-In Plaintiffs. At this stage, PPL requests that the Court deny Plaintiff's Motion in lieu of

discovery in order to prevent the waste of resources. *See* <u>Silva v. Gordon Gaming Corp.</u>, No.

2:06CV00696JCMPAL, 2006 WL 3542716, at *3 (D. Nev. Sept. 27, 2006) (denying motion for

conditional certification without prejudice to allow parties to conduct discovery).   Denial of the

conditional motion pending additional discovery will cause no harm to Plaintiff or the Putative

Class, as PPL would agree to tolling of claims pending discovery.   Alternatively, should this

Court be inclined to grant Plaintiff's Motion, the notice to the class should be stayed pending

completion of that discovery.

### C. Plaintiff Has Failed To Make the Requisite Factual Showing That the Opt-In Plaintiffs – and the Putative Class – Are Similarly Situated

The policy behind collective actions in fact supports allowing these claimants to pursue

their claims individually.   The main benefit of a collective action is twofold: it gives plaintiffs

the advantage of lower individual costs to pursue their rights with pooled resources; and it allows

for an efficient resolution in one proceeding of common issues of law and fact arising from the

same alleged activity.   <u>Hoffmann-La Roche</u>, 493 U.S. at 170.   These policy considerations are

not present here.

Trying this matter as a collective action will not result in efficient resolution.   Rather,

adjudication of the proposed collective action will require this Court to inquire into each putative

claimant's day-to-day circumstances to determine his or her similarly situated status.   *See*

<u>MacGregor v. Farmers Ins. Exch.</u>, Civ. A. No. 10-3088, 2011 WL 2981466, at *2 (D.S.C. July

22, 2011) ("If individualized determinations are likely to predominate, collective action will

hinder, rather than promote efficient case management, and thus notice should not be granted."

(citations omitted)).   Given the sheer magnitude of the collective action Plaintiff seeks – over

38,000 current and former DCWs – the individual factual determinations necessary to any

liability finding will render any collective action unmanageable. Courts routinely deny certification for this reason. *See* <u>Bond v. Nat'l City Bank of Pennsylvania</u>, No. 05CV0681, 2006 WL 1744474, at *4 (W.D. Pa. June 22, 2006) (affirming denial of motion for conditional certification due to the "fact-intensive, individualized inquiry of the job position, job duties, work history, and alleged individual branch policies of every prospective plaintiff."). Plaintiff has not shown similar legal issues as to nonpayment overtime arising from at least a manageably similar factual setting with respect to their job requirements or pay provisions. *See* <u>Pelcynski v. Orange Lake Country Club, Inc.</u>, 284 F.R.D. 364, 369 (D.S.C. July 12, 2012) (denying motion for first-stage conditional certification because of "the manageability problems of the collective action proposed by Plaintiffs" where "the heart of [the] case is a dispute of the amount of overtime hours worked…").

The various allegations in the Complaint demonstrate why the Putative Class is not similarly situated for certification. Although Plaintiff's claims focus on unpaid overtime, the allegations with respect to different forms of non-payment (e.g., non-payment of any overtime prior to November 2015, non-payment of some overtime for DCWs post-November 2015 employed by a single Participant-Employer, payment of all overtime hours but non-payment at an overtime rate, or non-payment of travel time between Participant-Employers) means that the categories of potential plaintiffs created by the allegations are numerous. By way of example, there are two distinctive time periods that apply within which different payments were being made:

- Any DCWs who worked more than 40 hours in a week for one or more Participant-Employer during January 2015 through December 2015; and
- Any DCWs who worked more than 40 hours in a week for one or more Participant-Employer after January 1, 2016 through the present.

Within this second categorical time frame, there are significant differences between individuals, all allegedly part of the Putative Class, and who would have divergent issues and questions related to liability and damages:

- Potential Group #1 – DCWs who were only employed by a single Participant-Employer, and were not compensated for hours worked over forty per week at either straight time or overtime rates;

- Potential Group # 2 - DCWs who were employed by two or more Participant-Employers, and worked more than forty hours for just one of those Participant Employers, but were not compensated for such time at either straight time or overtime rates;

- Potential Group # 3 - DCWs who were employed by two or more Participant-Employers, and worked more than forty hours between those Participant Employers, but were not compensated for such time at either straight time or overtime rates;

- Potential Group # 4 - DCWs who were employed by two or more Participant-Employers, worked and was compensated for more than forty hours for one of those Participant Employers, but was not paid for any alleged overtime performed for the second Participant-Employer;

There are additional and various permutations of Putative Class members based on the foregoing examples, and as reflected in the Declarations submitted as Exhibits 4-12 to Plaintiff's Memorandum of Law.  [Dkt. No. 47-6 to 47-14].  For example, Plaintiff has not addressed the statutory exemptions that may apply to certain members of the Putative Class as 29 U.S.C.A. § 213 is interpreted by the DOL.  Under DOL regulations and guidance, a Participant-Employer may claim an exemption for overtime payments for any live-in direct care workers providing domestic or companion services.  If plaintiffs are not similarly situated as to their status under the FLSA (i.e. exempt or not exempt) then they cannot be similarly situated for collective action purposes.  *See* Evancho v. Sanofi-Aventis U.S. Inc., No. CIV. A. 07-2266 (MLC, 2007 WL 4546100, at *4 (D.N.J. Dec. 19, 2007) ("[I]t appears that plaintiffs are not 'similarly situated' to

potential collective action members as to their status under the FLSA, so conditionally certifying a collective action pursuant to Section 216(b) would be inappropriate.")

In addition, the Declarations of Opt-In Plaintiffs demonstrate the need for particularized discovery and individual actions. For example, compare the Declaration offered by Mr. Talarico in Exhibit 4 and the Declaration offered by Shaneena Jackson ("Ms. Jackson") in Exhibit 5. Mr. Talarico avers that he has worked as a DCW from 2013 to the present, Ex. 4, ¶ 1, [Dkt. No. 47-6] during which he has been employed by multiple Participant-Employers at one time, has had to travel between the two (2) Participant-Employers in a single day, and claims that he has exceed forty (40) hours per week in at least two difference circumstances: one while working for only one Participant-Employer, and in another while working for both Participant-Employers. *See* Complaint, ¶ 49-52. Mr. Talarico further alleges that he received retroactive overtime pay dating back to November 2015, Ex. 4 ¶ 16 [Dkt. no. 47-6], but also that he is entitled to further retroactive pay and overtime compensation for travel between his multiple Participant-Employers. The factual circumstances of Ms. Jackson's work as a DCW are not at all comparable to Mr. Talarico's. Ms. Jackson avers that she worked as a DCW from 2009 to March 2015, during which time her "sole client was her mother," and she cared for her "full-time." [Dkt. No. 47-7]. According to Ms. Jackson, by 2015, she worked up to "52 hours per week" and was never compensated for overtime. *Id*. Ms. Jackson's claim for damages and the time period in which she worked, and her potential status as an exempt, live-in direct care worker pursuant to 29 U.S.C.A. § 213, contrasts distinctly with Talarico's experience as a DCW and his claim for damages.

The other submitted Declarations demonstrate a similarly diverse set of circumstances and claims that warrants against conditional certification of the Putative Class. By way of

example: Racheal Rock claims to have worked for three (3) months in 2017 and that she was paid for straight hours and on one occasion was paid straight time for overtime hours worked, but then also claims she was never paid for any overtime hours, Ex. 6, ¶16 [Dkt No. 47-8]; Denise Lang avers that she actually worked more hours than she submitted on her time sheets, and presumably will claim that she is entitled to overtime hours that were never actually submitted to PPL, Ex. 7 [Dkt. No. 47-9]; Linda Kavanagh states that she worked for two (2) separate Participant-Employers – one of whom she lived with, again raising potential exemption implications – and that she would work cumulatively one hundred and two (102) hours in a week, Ex. 8 [Dkt No. 47-10]; Tariah Bryant claims that she received overtime payments starting in January 2016, but makes no allegation as to the retroactive payments that Mr. Talarico received, Ex. 9 [Dkt No. 47-11]; other declarants, Saschelle Simms and Mindy Gillin, make only vague allegations that they did not receive "proper overtime pay," with no specification. *See* Ex. 10-11 [Dkt. No. 47-12, 47-13]. The factual circumstances of the current Opt-In Plaintiffs demonstrate precisely why conditional certification of the Putative Class is not suitable.

Moreover, with respect to the desire to avoid the "stirring up" of interest in the litigation, *see* Bramble, 2011 WL 1389510, at *4, the submission of only nine (9) declarations out of a putative class of over 38,000 individuals demonstrates an inadequate showing of interest to conditionally certify the class. The Plaintiff and Opt-In Plaintiffs that submitted declarations represent a mere **0.023% of the Putative Class**. There is no suggestion or indication that the factual experiences of the remaining 38,000 are at all similar to Plaintiffs. Courts have refused to authorize certification and notice when a plaintiff's showing evidences such an infinitesimal percentage of the potential class. *See* West v. Border Foods, Inc., No. 05-2525 (DWF/RLE), 2006 WL 1892527, at *6 (D. Minn. July 10, 2006) (denying certification where plaintiffs

submitted evidence of alleged off-the-clock work for only 2.5% of the class); Harrison v. McDonald's Corp., 411 F.Supp.2d 862, 865–66 (S.D. Ohio 2005) (averments from two (2) employees who claimed FLSA violations, out of a potential class of 300, were insufficient to allow for conditional certification); Flores v. Lifeway Foods, Inc., 289 F.Supp.2d 1042, 1046 (N.D. Ill. 2003) (evidence that demonstrated an employer's payment practices with respect to two (2) employees out of fifty (50) did not amount to "even a 'modest factual showing' of a common policy or plan.").

Contrary to Plaintiff's contention, the only common policy that unites the Putative Class is that they are employed by their respective Participant-Employers in the two programs.  The regulations of the waiver program dictate a Participant-Employer controlled model of services, which means that each employment situation is unique and dependent upon the circumstances of the Participant-Employer.  PPL lacks the authority to make the sort of determinations that Plaintiff and Opt-In Plaintiffs claim – e.g., to offer or approve raises for DCWs.  *See* Supplemental Declaration of Regina Stewart ¶ 3 [Dkt. No. 28-1].  To the extent that any employee or third-party representative of PPL inadvertently may have made or may have been understood to have made any representation to the contrary – i.e., that PPL is the employer, or performs the function of a traditional employer – that representation is contrary to the statutory framework, the program rules, the employment documentation, and the policy and reality that PPL acts only in its authority as a Fiscal Agent for the Participant-Employer.  Such representations, to the extent that they exist as alleged by Opt-In Plaintiff, cannot be the basis for class adjudication.

In summary, all of the foregoing claims require individualized factual discovery.  *See* Spellman v. Am. Eagle Express, Inc., No. 10-CV-1764, 2011 WL 12855818, at *1 (E.D. Pa.

Nov. 30, 2011) ("Some individualized discovery is appropriate in this particular case, because liability and/or decertification of the opt-in class may depend on the individualized circumstances of the opt-in plaintiffs"); Lloyd v. J.P. Morgan Chase & Co., No. 11 CIV. 9305 LTSHBP, 2015 WL 1283681, at *2 (S.D.N.Y. Mar. 20, 2015) (allowing individualized discovery of opt-in plaintiffs to determine if they are "similarly situated"). The diverse nature of the work experiences of the Opt-In Plaintiffs mitigates against conditional certification of a class.

### D. The Contents and Method of Communication of the Proposed Notice Are Blatantly Improper

To the extent that this Court authorizes notice to the Putative Class, PPL strongly objects to the proposed content. *See* Plaintiff's Memorandum of Law, Ex. 1-3. The proposed notice to the Putative Class is blatantly improper in that it is addressed to any "current or former direct care *worker for* Public Partnerships, LLC, (emphasis supplied)" and contains a conclusion of law – that PPL is an employer of DCWs and pays their compensation – where no such factual showing or judicial determination has been made. *Supra*, p. 11-12. Rather, Plaintiff's notice presumes an answer to the fundamental *legal* question that the Court has yet to decide. Likewise the contents of the notice expressly state that the notice be sent to "all direct care workers *employed by* PPL (emphasis supplied)." Again, PPL does not employ DCWs and Plaintiff has made no factual showing to the contrary. This is the key issue in the case, and obviously cannot be assumed in the notice. The inclusion of the statement in the notice is improper. PPL submits as Exhibits 1-2 to its Memorandum of Law proposed notice as an alternative to the Plaintiff's submission as notice language for regular and email should this Court grant Plaintiff's motion.

Furthermore, PPL does not object to the proposed methods of communication by mail and email, however, the proposed method of communication by text message is not appropriate,

nor is thirty (30) day reminder required. In addition, all of the notifications outlined should be conducted by an independent class administrator and not Plaintiff's counsel. First, the character limitations placed on the text message mean that the entire contents of a court-approved notice cannot be presented in text message form. Instead, a text message will likely have to provide a hyperlink to a web address where the full contents can be viewed. The additional step to direct an individual receiving the text message notice to another location has the potential to cause confusion. Many cases that have allowed notice to be sent by text involve circumstances where there is evidence that text messaging is a form of communication previously used by the employer, or the employees were seasonal or short-term workers, such as in the restaurant industry. *See* Butler v. TFS Oilfield Servs., LLC, No. SA-16-CV-1150-FB, 2017 WL 7052879, at *7 (W.D. Tex. Sept. 26, 2017); Bhumithanarn v. 22 Noodle Mkt. Corp., No. 14-CV-2625 RJS, 2015 WL 4240985, at *5 (S.D.N.Y. July 13, 2015). Plaintiff has not made a showing that text message was a method of communication used by PPL to communicate with DCWs, or that mail or email notice would be insufficient to reach the Putative Class. *See* Lynch v. Dining Concepts Grp., LLC, No. 2:15-CV-580-PMD, 2015 WL 5916212, at *6 (D.S.C. Oct. 8, 2015); Garcia v. Spectrum of Creations Inc., 102 F. Supp. 3d 541, 551 (S.D.N.Y. May 4, 2015). Here, to the extent that this Court authorizes any notice to class members, it should be communicated via mail and electronic mail.[14]

For the same reasons stated above, reminder notices provided 30 days before the close of the op-in period is not needed in light of the skip tracing and double notice provided by regular and by electronic mail. Finally, such actions and activities should be handled by a class

---

[14] To the extent the Court does permit notice by text message, PPL submits as Exhibit 3 to its Memorandum of Law a proposed notice as an alternative to Plaintiff's submission.

administrator to appropriately balance the interest of notice without undue solicitation to join the class.

## VI.   CONCLUSION

For the reasons stated herein, PPL respectfully requests that the Court deny Plaintiff's Motion for Conditional Certification of a Class and requests that any notice to the Purported Class be denied pending additional discovery concerning the individualized class certification issues raised herein.  See Proposed Order submitted herewith.  In the alternative, should the Court be inclined to allow Plaintiff's Motion, PPL respectfully requests a brief additional time of 5 days from the Court's decision to submit an alternative proposed order that reflects the issues raised herein.

Respectfully submitted,

PUBLIC PARTNERSHIPS LLC
By its attorneys,

*/s/ Walter M. Foster*
Walter M. Foster (admitted *pro hac vice*)
Jonathan R. Nadler (PA ID 80998)
Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th Street - 22nd Floor
Philadelphia, PA  19102
(215) 851-8410
jnadler@eckertseamans.com
wfoster@eckertseamans.com

Dated: February 27, 2018

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RALPH TALARICO, INDIVIDUALLY AND, }
ON BEHALF OF ALL OTHERS SIMILARLY }
SITUATED, }
 }  Docket No. 17-2165
     Plaintiffs, }
 }  Judge Schmehl
v. }
 }
PUBLIC PARTNERSHIPS LLC, D/B/A PCG }
PUBLIC PARTNERSHIPS, }
 }
    Defendant. }

## CERTIFICATE OF SERVICE

I hereby certify that, on February 27, 2018, I electronically filed the foregoing document using the CM/ECF system, and that I served the same by electronic filing via ECF, pursuant to the administrative procedures of the United States District Court for the Eastern District of Pennsylvania governing the filing and service by electronic means, upon all counsel of record as follows:

Richard A. Katz, Esquire
Arnold, Beyer & Katz
140A King Street
Lancaster, PA 17602
(717) 394-7204

Christine E. Webber, Esquire *pro hac vice*
Miriam R. Nemeth, Esquire
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., N.W. Suite 500
Washington, DC 20005
(202) 408-3645

*Attorneys for Plaintiff*

{K0709682.1}       24

Respectfully submitted,

PUBLIC PARTNERSHIPS LLC
By its attorney,

_/s/ Walter M. Foster_
Walter M. Foster (admitted _pro hac vice_)
Jonathan R. Nadler (PA ID 80998)
Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th Street - 22nd Floor
Philadelphia, PA  19102
(215) 851-8410
jnadler@eckertseamans.com
wfoster@eckertseamans.com

Dated: February 27, 2018