# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RALPH TALARICO, INDIVIDUALLY AND, ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | } } } } | |
| | } | Docket No. 17-2165 |
| Plaintiffs, | } | |
| | } | |
| v. | } | Judge Schmehl |
| | } | |
| PUBLIC PARTNERSHIPS, LLC, D/B/A PCG PUBLIC PARTNERSHIPS. | } } | |
| | } | |
| Defendant. | } | |

---

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

I.     **INTRODUCTION** ................................................................................................. 1

II.    **PROCEDURAL HISTORY** ............................................................................ 2

III.   **STATEMENT OF FACTS** ............................................................................. 2

   A. **Statutory, Regulatory, and Programmatic Framework** ................................ 2

    *i. Each Participant-Employer Elects at the Outset to Either Act as an Employer or to Have an Agency Serve as an Employer for their DCWs* ......................................... 3

    *ii. The Federal HCBS Waiver Program and Relevant Regulations Identify the Participant-Employer, Not PPL, as the Employer* ......................................................... 4

    *iii. OLTL Designates the Participant-Employer, Not PPL, as the Employer* ...................... 6

    *iv. The Service Plan Provider, with the Participant-Employer, Sets the Type of Services to be Provided, Amount of Hours, and Schedule* ............................................. 7

    *v. PPL's Role as Payroll Fiscal Agent to the Participant-Employer* ................................. 9

   B. **Factual Background** ................................................................................ 10

    *i. PPL Did Not Hire DCWs* ........................................................................... 10

     1. Participant-Employers and DCWs Sign Multiple Agreements Explicitly Stating the Participant-Employer is Their Employer, Not PPL ........................................... 12

     2. Participant-Employers Retain the Ultimate Decision to Hire DCWs After Criminal History Background Checks. ........................................................... 14

    *ii. PPL Could Not Discipline or Terminate DCWs.* .......................................... 15

    *iii. Participant-Employers Perform All the Employer Duties and PPL Lacks Discretion or Authority to Exert Control Over Any DCW.* ......................................... 17

IV.   **ARGUMENT** ............................................................................................. 18

   A. **Applicable Legal Standards** ................................................................... 18

   B. **DCWs' Claim under the FLSA Fails** ...................................................... 18

    *i. The Participant-Employers are the Sole Employers of DCWs* ......................... 19

    *ii. PPL Is Not a Joint Employer with the Participant-Employers, Neither by Law, Nor in Fact.* ........................................................................................................ 21

     1. PPL Has No Authority to Hire and Fire (or Discipline). .......................... 22

     2. PPL Does Not Promulgate Work Rules, Make Assignments, Set the Conditions of Employment, or Determine the Compensation Rate, Benefits or Work Schedules ......... 24

     3. PPL Had No Involvement in Day-to-Day Employee Supervision .............. 27

     4. PPL Does Not Control Employee Records ............................................ 28

     5. Every Program Document Designates Participant-Employer as the Employer, Not PPL .............................................................................................. 30

     6. PPL Plays No Role in Allocating or Managing Overtime Performed by a DCW ....... 31

7.  PPL Does Not Meet the Economic Realities Test to Qualify as a Joint Employer Under the Department of Labor Guidance ....................................................................... 34

**C.  PPL is Not DCWs' Employer under the Pennsylvania Minimum Wage Act** ............. 36

**D.  DCWs Cannot State a Claim under the Pennsylvania WPCL** ..................................... 38

**V.    CONCLUSION** .............................................................................................................. 40

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)........................................................................................... 18

*Blake v. Batmasian*,
   191 F. Supp. 3d 1370 (S.D. Fla. 2016) ............................................................. 36

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)........................................................................................... 18

*Com., Dept. of Labor and Industry, Bureau of Labor Law Compliance v. Stuber*,
   822 A.2d 870 (Pa. Commw. Ct. 2003), *order aff'd*, 859 A.2d 1253 (Pa. 2004) .............. 36, 37

*DeJohn v. Pitt Ohio Exp., LLC*,
   No. CIV.A. 3:13-1417, 2015 WL 4356064 (M.D. Pa. July 14, 2015) ................. 38

*Gallagher v. Cerebral Palsy of Mass., Inc.*,
   92 Mass. App. Ct. 207 (2017)............................................................................ 29

*Garcia v. Nunn*,
   No. 13-6316, 2015 WL 5585451 (E.D. Pa. Sept. 23, 2015)........................... 23, 25

*Godlewska v. Human Development Ass'n, Inc.*,
   916 F. Supp. 2d 246 (E.D.N.Y. 2013) ............................................................... 28

*Goldberg v. Whitaker House Coop., Inc.*,
   366 U.S. 28 (1961)............................................................................................. 21

*Hardgers-Powell v. Angels in Your Home LLC*,
   No. 16-CV-6612-FPG, 2019 WL 409276 (W.D.N.Y. Feb. 1, 2019) ..................... 26

*In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litig.*,
   683 F.3d 462 (3d Cir. 2012)....................................................................... passim

*Itterly v. Family Dollar Stores, Inc.*,
   606 F. App'x 643 (3d Cir. 2015) ........................................................................ 37

*Keating v. Pittston City Hous. Auth.*,
   No. 3:17-CV-465, 2018 WL 1414459 (M.D. Pa. Mar. 21, 2018) ......................... 22

*Lehman v. Legg Mason, Inc.*,
   532 F. Supp. 2d 726 (M.D. Pa. 2007) ............................................................... 37

*Livi v. Hyatt Hotels Corp.*,
   No. 17-3646, 2018 WL 4944823 (3d Cir. Oct. 12, 2018)..................................... 37

*Mackereth v. Kooma, Inc.*,
   No. CIV.A. 14-04824, 2015 WL 2337273 (E.D. Pa. May 14, 2015) ..................... 21

*Markham v. Wolf is*,
   190 A.3d 1175 (Pa. 2018).................................................................................. 37

*Markham v. Wolf*,
   147 A.3d 1259 (Pa. Commw. Ct. 2016), *vacated on other grounds*, 190 A.3d 1175
   (Pa. 2018)........................................................................................................... 38

*McKenna v. Healthease, Inc.*,
   No. CIV.A. 10-3940, 2013 WL 1702639 (E.D. Pa. Apr. 19, 2013) ................. 27, 28

*N.L.R.B. v. Browning–Ferris Indus. of Pennsylvania*,
   691 F. 2d 1117 (3d Cir. 1982)............................................................................ 21

*Nerviano v. Contract Analysis Sys., LLC*,
   No. CV 17-4907, 2018 WL 2240533 (E.D. Pa. May 16, 2018) ............................ 23

iii

*Olvera v. Bareburger Group,*
    73 F. Supp. 3d 201 (S.D.N.Y. July 10, 2014) ...................................................... 21
*Richardson v. Bezar,*
    No. CV 15-0772, 2015 WL 5783685 (E.D. Pa. Oct. 5, 2015) ................................ 24
*Sendi v. NCR Comten, Inc.,*
    619 F. Supp. 1577 (E.D. Pa. 1985), *aff'd*, 800 F.2d 1138 (3rd Cir. 1986) ............. 39
*Silfee v. Automated Data Processing, Inc.,*
    No. 3:CV-15-23, 2015 WL 1137526 (M.D. Pa. Mar. 12, 2015) ............................ 40
*White v. Ciber, Inc.,*
    No. 1:07-CV-1483, 2007 WL 3491272 (M.D. Pa. Nov. 14, 2007) ................................. 39, 40
*Yue Yu v. McGrath,*
    597 F. App'x 62 (3d Cir. 2014) ........................................................................... 23, 24

**Statutory Authorities**
26 U.S.C. § 3504 ............................................................................................................. 29
29 U.S.C. §§ 201 ............................................................................................................... 1
29 U.S.C. § 203(d) .......................................................................................................... 19
42 U.S.C. § 1396a ............................................................................................................. 2
42 U.S.C. § 1396n ............................................................................................................. 6
42 U.S.C. § 1396n (j) ........................................................................................................ 3
42 U.S.C. § 1396n (j)(5)(A) ......................................................................................... 3, 20
Social Security Act, 42 U.S.C. § 1396n .............................................................................. 3

**Rules and Regulations**
29 C.F.R. § 791(2)(a) ...................................................................................................... 21
42 C.F.R. § 441.300 .......................................................................................................... 3
42 C.F.R. § 441.301 .......................................................................................................... 6
42 C.F.R. § 441.450 ........................................................................................................ 20
42 C.F.R. § 441.450 (b) ..................................................................................................... 3
42 C.F.R. § 441.450 (b)(1)-(12) ....................................................................................... 5
42 C.F.R. §§ 441.450(c), 441.468 ................................................................................... 25
42 C.F.R. § 441.478 .......................................................................................................... 5
Fed. R. Civ. P. 12(d) and 56 .............................................................................................. 2
Fed. R. Civ. P. 56 .............................................................................................................. 2
Fed. R. Civ. P. 56(a) ....................................................................................................... 18

## INDEX OF EXHIBITS

| Exhibit | Description |
|---|---|
| A | September 26, 2018 Deposition of Julie Skovera |
| B | November 27, 2018 Deposition of LZ |
| C | Declaration of Michael C. Hale |
| D | Declaration of Regina Stewart |
| E | Service Coordination Unlimited, Inc. Response to Subpoena |
| F | October 5, 2018 Deposition of MJ |
| G | November 27, 2018 Deposition of EW |
| H | May 31, 2018 Deposition of Ralph Talarico |
| I | February 26, 2019 Deposition of Latiesha Santiago |
| J | December 14, 2018 Deposition of Saschelle Simms |
| K | December 17, 2018 Deposition of Denise Lang |
| L | February 4, 2019 Deposition of DS |
| M | June 27, 2018 Deposition of Regina Stewart |
| N | Ralph Talarico Support Tickets |
| O | U.S. Wage and Hour Division Administrator's Interpretation No. 2014-2, SUBJECT: Joint employment of home care workers in consumer-directed, Medicaid-funded programs by public entities under the Fair Labor Standards Act (June 19, 2014) |
| P | Administrative Decisions |

## I.    INTRODUCTION

Plaintiffs' claims in this case fail for a fundamental reason: Defendant, Public Partnerships LLC ("PPL"), is not and has never been their employer.  It merely acts as the payroll/fiscal agent for disabled individuals (known as Participant-Employers) who specifically elected to be sole employers of their Direct Care Workers ("DCWs") under the Medicaid Home and Community-Based Services waiver program.  Not only do the applicable statutory edicts prescribe PPL's limited role, but every document required under the program and executed between the Participant-Employers and their DCWs is consistent with this delineation and Department of Labor guidance.  Moreover, PPL has not acted in any manner as a DCW's employer as it does not recruit, hire, terminate, set the rate of pay, supervise, approve weekly timesheets, evaluate, monitor, determine the amount of hours to be worked in the home, or set the work schedule of DCWs.  This fact is fatal to each and every claim DCWs assert in this case.

Most relevant to the claims of this case, PPL plays no role whatsoever in the allocation or authorization of overtime as that is addressed by the Participant-Employer together with their Service Coordinator (a third party, contracted by the Commonwealth, and unaffiliated with PPL) through an Individual Service Plan according to program dictates.  Finally, Plaintiffs' claim that somehow PPL is a joint employer is wholly without basis in law or in fact, and PPL seeks dismissal of all claims predicated upon its alleged status as a joint employer.

As there is no genuine dispute of material fact that PPL is not the joint employer of Plaintiff, Ralph Talarico ("DCW Talarico"), or any of the other opt-in DCWs (collectively "Plaintiffs"), under the *Fair Labor Standards Act* ("FLSA"),[1] the Pennsylvania Minimum Wage

---

[1] 29 U.S.C. §§ 201, *et seq*.

Act ("MWA"),[2] or the Pennsylvania Wage Payment and Collection Law ("WPCL"),[3] PPL moves

pursuant to Fed. R. Civ. P. 56 for summary judgment on all claims brought by Plaintiffs.

## II.    PROCEDURAL HISTORY

DCW Talarico filed a Complaint against PPL on May 11, 2017, alleging claims under the

FLSA, MWA, and WPCL.  (ECF Doc. 1).  On June 16, 2017, PPL responded to the Complaint

by moving for summary judgment pursuant to Fed. R. Civ. P. 12(d) and 56, which the Court

denied without ruling on the merits of PPL's arguments.  (ECF Doc. 11).  The Court granted

Plaintiffs' Motion for Conditional Certification of the Class and notices were sent out in late

August of 2018. (ECF Doc. 72).  In the two years since the case was initiated, the Parties have

engaged in extensive discovery responding to interrogatories, producing tens of thousands of

pages of documents, and conducting numerous depositions.  Four DCWs including DCW

Talarico, four Participant-Employers, a Service Coordinator, and Defendant were all deposed.

The extensive record overwhelmingly demonstrates that the claims against PPL should be

dismissed.

## III.    STATEMENT OF FACTS

### A.  Statutory, Regulatory, and Programmatic Framework

PPL operates in a unique regulatory environment, the structure of which must be

understood in order to properly evaluate the limited role PPL plays as the payroll and fiscal agent

for the actual employers.

The Home and Community-Based Services ("HCBS") waiver program[4] is a Medicaid

program administered at the federal level by the Centers for Medicare and Medicaid Services

---

[2] 43 P.S. §§ 333.103, *et seq.*
[3] 43 P.S. §§ 260.1, *et seq.*
[4] What is being "waived" in a "waiver program" are the requirements for Medicaid programs set forth in 42 U.S.C. § 1396a.

("CMS") under § 1915(c) of the Social Security Act, 42 U.S.C. § 1396n, and in Pennsylvania by the Department of Human Services ("DHS") (formerly, the Department of Public Welfare) Office of Long Term Living ("OLTL").  55 Pa. Code § 52.1.  The objective of the HCBS waiver program is to provide services to disabled Participant-Employers so that they avoid institutionalization and remain in their homes and communities.  42 C.F.R. § 441.300.  The Independence Waiver Program, one HCBS waiver program administered by OLTL, authorizes "Self-Directed Personal Assistance Services" to Participant-Employers who are between ages 18 and 60 with physical disabilities.  55 Pa. Code § 52.3.[5]  Self-Directed Personal Assistance Services are "designed to allow individuals … to exercise decision-making authority in identifying, accessing, managing and purchasing" the resources that they need.  42 C.F.R. § 441.450 (b).[6]

     *i. Each Participant-Employer Elects at the Outset to Either Act as an Employer or to Have an Agency Serve as an Employer for their DCWs.*

An important threshold decision made by each and every Participant-Employer is whether or not to act as an employer under what is called the Self-Directed Services option or to

---

[5] DHS regulations covering the Independence Waiver Program provide the following definitions, as used in this brief:

    "*Direct Care Worker* – A person employed for compensation by a provider or participant who provides personal assistance services or respite services."

    "*Financial Management Services* – A service which provides payroll, invoice processing and payment, fiscal reporting services, employer orientation, skills training and other fiscal-related services to participants choosing to exercise employer or participant-directed budget authority."

    "*Participant* – A person receiving services through a waiver or the Act 150 program."

    "*Participant-directed budget authority* – The spending authority granted to the participant through a waiver whereby the participant is authorized to spend the amount of money allocated in the participant's service plan on goods and services."

    "*Service Coordination* – Service that assists a participant in gaining access to needed waiver services, MA State Plan services and other medical, social and educational services regardless of funding source."

    "*Service Plan* – The Department-approved comprehensive written summary of a participant's services, TPR and informal community supports."

[6] Self-Directed Personal Assistance Services are provided for in 42 U.S.C. § 1396n (j). The statute requires that the Participant-Employer "exercise choice and control over the budget, planning, and purchase of self-directed personal assistance services, including the amount, duration, scope, provider and location of service provision."  42 U.S.C. § 1396n (j)(5)(A).

have a private third party agency act as the employer to regulate all of the delivery of services, called the 'agency model.'  September 26, 2018 Deposition of Julie Skovera (cited hereafter as "Skovera Dep. ____")[7] (relevant pages attached hereto as <u>Exhibit A</u>), 18:24-20:13.

A number of Participants in the program elect to forgo all of the responsibilities and work involved in becoming an employer and instead elect the agency model where a private, third party agency interviews, hires, assigns the worker, and oversees their performance.  Skovera Dep., 18:24-19:14.  There is no dispute that the agency model is not at issue in this case as PPL does not operate as such an entity and Plaintiffs do not make that claim.

> ii.   *The Federal HCBS Waiver Program and Relevant Regulations Identify the Participant-Employer, Not PPL, as the Employer.*

Those Participant-Employers who do elect the Self-Directed Services option have a firm grasp that they are acting as the employer and can direct the entire employment relationship in every aspect.  Participant-Employer LZ's[8] testimony is illustrative.  When asked if she had an understanding about the self-directed care or agency model she responded: "So my understanding of the waiver, and my choices as consumer directed, were very, very clear to me, that I could either go through an agency that would staff, and then I would work with the individuals that they provided.  Or I would do consumer directed, where I would locate, train and hire the individuals that would take care of me."  November 27, 2018 Deposition of LZ, 16:9-16 (relevant pages attached hereto as <u>Exhibit B</u>).  With this understanding, Participant-Employer LZ decided to elect the Self-Directed Services option.  *Id.*, 16:17:-19 ("Q.  Okay. And you decided to do the consumer directed?  A. I did.").

---

[7] All citations to deposition testimony will follow this form.
[8] To protect the confidentiality of the Participant-Employers, their names are not being used and instead they will be referred to as the "Participant-Employer(s)" or by their initials.

As part of these services, the CMS regulations mandate and describe the authority given to the Medicaid Participant-Employers who elect the Self-Directed Services option as including, at a minimum: recruiting workers, hiring and discharging workers, training workers, specifying workers' qualifications, determining worker duties, scheduling workers, supervising workers, evaluating worker performance, determining the amount paid for a service, and scheduling when services are provided.  42 C.F.R. § 441.450 (b)(1)-(12); *see also* 42 C.F.R. § 441.478.[9]  In a word, all of the functions of an employer are vested by the regulations in the Medicaid Participant-Employer who receives the services.  (In Pennsylvania, the workers hired by the Participant-Employers and providing them services are called "Direct Care Workers" or DCWs. *See supra* footnote 5.)

In addition, the CMS regulations that establish the Self-Directed Services option provide for the development of a:

- "Service Plan," which is a "document that specifies the services and supports (regardless of funding source) that are to be furnished to meet the needs of a participant in the self-directed [Personal Assistance Services] option and to assist the participant to direct the [Personal Assistance Services] and to remain in the community." *Id*. §§ 441.450 (c), 441.468; and a

- "Service Budget," which is "an amount of funds that is under the control and direction of a participant." *Id*. § 441.450 (c); see 55 Pa. Code § 52.3.

The CMS regulations also authorize states to provide (on their own or through third party contractors such as PPL) certain financial management services on behalf of Participant-Employers who elect the Self-Directed Services option.  These fiscal management services include, among other things, processing payroll and collecting and disbursing withholding taxes

---

[9] In addition to giving Participant-Employers the right "to hire any individual capable of providing the assigned tasks," the regulations specify that "Participants … retain the right to train their workers in the specific areas of personal assistance needed by the participant and to perform the needed assistance in a manner that comports with the participant's personal, cultural and/or religious preferences."  Further, "Participants … retain the right to establish additional staff qualifications based on participants' needs and preferences."  *Id*.

as the agent of the Participant-Employers, akin to a private payroll company such as ADP. *Id.* §§ 441.454, 484 (a)(2).  This was PPL's role.

### iii.   OLTL Designates the Participant-Employer, Not PPL, as the Employer.

OLTL submitted an application to CMS for a waiver to provide an array of options under the HCBS waiver program umbrella.  42 U.S.C. § 1396n; 42 C.F.R. § 441.301.  CMS approved the application, and OLTL now administers the options in the Commonwealth.  52 Pa. Code § 52.1.  In particular, OLTL's Application for a § 1915(c) HCBS waiver describes its administration of the program in detail.[10]  *See* Declaration of Michael C. Hale, Exhibits 1, 2 and 3 (a true and accurate copy of which is attached hereto as <u>Exhibit C</u>).

The stated purpose of the HCBS waiver program is to permit a state to furnish "services that assist Medicaid beneficiaries to live in the community and avoid institutionalization." Application p. 1.  OLTL elected to implement the Self-Directed Services option.  *Id.,* pp. 169-180.  The self-directed opportunities for the Participant-Employer are described as follows:

> All participants in the Independence [W]aiver [Program] have the right to make decisions about and self-direct their own waiver services and may choose to hire and manage staff using Employer Authority.   Under Employer Authority, *the participant serves as the common-law employer and is responsible for hiring, firing, training, supervising and scheduling their support workers.*

*Id.*, p. 169 (emphasis added).  Thus, it was OLTL – not PPL – that designated the Participant-Employer as the "common law employer" of DCWs and allocated to the Participant-Employers all of the functions associated with being an employer.  The Participant-Employers are the common law employers by Pennsylvania program design.  It is an integral feature of the Self-Directed Services option that the Participant-Employer be permitted to fully function as the employer of the DCW.

---

[10]  OLTL's Application for a Waiver, pertinent sections of which are attached to the Hale Declaration, will be cited hereafter as "Application p. ___"

      *iv.  The Service Plan Provider, with the Participant-Employer, Sets the Type of Services to be Provided, Amount of Hours, and Schedule.*

PPL also does not exercise any discretion or control over the scope of services, the amount of hours worked per week, or the scheduling of those hours.  The total number of authorized hours of work per week for a DCW is determined by the state-approved funding and the Service Plan that the Participant-Employer creates with their Service Coordinator (a third party, contracted by the Commonwealth, and unaffiliated with PPL).  Declaration of Regina Stewart, ¶ 15 (a true and accurate copy of which is attached hereto as <u>Exhibit D</u>);[11] Skovera Dep., 9:6-14, 91:12-21.  The Service Coordinator is charged with employer-like duties that are far more substantive than PPL's role, but Plaintiffs have chosen not to join them to this lawsuit.  PPL as the payroll agent acts solely at the behest of the Participant-Employer under their Service Plan in making payments to DCWs.  *Id.*  The ultimate discretion for each and every employment action rests with the Participant-Employers themselves in concert with their Service Coordinator.

A Participant-Employer's enrollment in the HCBS waiver program begins when an independent enrollment broker (a third party, contracted by the Commonwealth, and unaffiliated with PPL) does intake to determine if a Participant-Employer is eligible for a waiver and enrollment into the HCBS waiver program.  Skovera Dep., 12:14-23; 13:6-12; *see also* Service Coordination Unlimited, Inc. Response to Subpoena Document I, p. 11 (PPL6730) (attached hereto as <u>Exhibit E</u>).  After OLTL approves the Participant-Employer for the program, the Participant-Employer then chooses a Service Coordinator.  *Id.*, 16:8-14; Stewart Decl.¶ 14.  PPL plays no role in this process.  *Id.*, 98:9-11.

As detailed in the Application, the Service Coordinator has a wide range of responsibilities: (1) facilitates access in helping to locate and coordinate and monitor needed

---

[11] Cited hereafter as "Stewart Decl. ¶ _."

services for the Participant-Employers; (2) develops and performs the assessment of needs in accordance with OLTL requirements; and (3) monitors the delivery of services and supports to the Participant-Employers' through onsite visits, phone calls and verification that timesheets were received.  Application pp. 158-59; *see also* Skovera Dep., 92:22-93:22; *see also* Service Coordination Unlimited, Inc. Response to Subpoena Document D (October 14, 2016 DHS OLTL Bulletin Number 59-16-13 "Individual Service Plan Development, Review and Implementation") (PPL6659-6672).

In addition, the Service Coordinator "provides ongoing support and monitoring of the decisions that a [Participant-Employer] makes when hiring and firing", "work[s] with the [Participant-Employer] to create their service plan", and "work[s] with the [Participant-Employer] to determine what are the needs of this [Participant-Employer]."  Skovera Dep., 9:16-14.  First, the Service Coordinator, meets with the Participant-Employer and conducts an intake which "is basically an overview of the program with the [Participant-Employer] in their home and creation of their plan of care, which would include services that they are in need of."  *Id*., 17:5-14.  The Service Plan, created by the Service Coordinator and the Participant-Employer, dictates how many units of service a Participant-Employer is permitted to receive.  *Id*., 31:23-32:2; 32:24-33:2; 91:12-21; October 5, 2018 Deposition of MJ, 26:4-1, 52:14-23 (relevant pages attached hereto as <u>Exhibit F</u>).  During the creation of the Service Plan, the Service Coordinator and the Participant-Employer work together to determine whether the Participant-Employer needs over 40 hours a week of services; in such a situation, overtime would need to be authorized in the Service Plan.  *Id*., 123:2-9; 124:6-10.  OLTL then reviews the Service Plan, including any request for overtime, and approves or denies it.  *Id*., 124:18-125:4.

As for PPL's role with respect to the Service Plan:

- PPL does not receive a copy of the Service Plan and is not involved in its creation, planning, or oversight.  Stewart Decl. ¶¶ 14, 16; Skovera Dep., 105:9-11, 121:24-122:22, which was further confirmed by Participant-Employers.  *See* LZ Dep., 17:19-20:24; 22:6-15; 23:12-23; November 27, 2018 Deposition of EW (relevant pages attached hereto as <u>Exhibit G</u>), 15:9-15; MJ Dep., 23:21-24:6.

- PPL has no role in determining the number of units a Participant-Employer receives in his or her Service Plan.  LZ Dep., 22:6-10, 55:23-56:4 (testifying that PPL does not have discretion to pay hours/units beyond what is provided in Service Plan).  The Service Coordinator, with input from the Participant-Employer, is the ultimate arbiter of the number of units that a Participant-Employer is entitled to receive in his or her Service Plan.

The Service Coordinator also explains to Participant-Employers that it is the Participant-Employers' "responsibility, **as the employer**, to be reviewing the timesheets, to make sure they are accurate and that if they are signing them, they are signing off saying these services were provided in accordance with the hours that were authorized on their [Service Plan]."  Skovera Dep., 54:7-17 (emphasis added).  Another major responsibility of the Service Coordinator is to monitor the Service Plan once it is implemented.  *Id*., 92:12-15.  Service Coordinators are required to complete face-to-face visits with Participant-Employers at least two times a year and generally they conduct at least quarterly oversight events.  Skovera Dep., 62:20-63:7; LZ Dep., 18:15-19:18.  If the Participant-Employers' needs change, he or she must work with the Service Coordinator to amend the Service Plan.  Stewart Decl. ¶ 18.  Again, PPL plays no role in this process; rather, PPL is merely informed of the eligibility of the Participant-Employer and the allowable hours of permitted services.  *Id*.  In fact, a witness for the Service Coordinator, Abilities in Motion, testified that it is a "common misconception" among DCWs that the Service Coordinator is their employer.  Skovera Dep., 130:7-11.

v.  *PPL's Role as Payroll Fiscal Agent to the Participant-Employer.*

Pursuant to its Grant Agreement, a state contract with OLTL, PPL "serves as a fiscal intermediary and provides Financial Management Services" to Medicaid-eligible individuals

who qualify for home care under HCBS waiver programs, *i.e.,* the Self-Directed Services option. Stewart Decl. ¶¶ 3-4, Ex. A, pp. 2, 14.  The role of PPL as a payroll agent under the Self-Directed Services option is detailed in the Application and limited to providing or facilitating payroll and financial functions, tax services, background checks, insurance coverage assistance, some record maintenance, and processing services only to the Participant-Employer as its agent. PPL's role in providing payroll fiscal management services[12] is also similarly described and defined under its state contract.  Stewart Decl. ¶¶ 3-4.[13]  None of PPL's contracted services involve any of the functions reserved to and ordinarily exercised by employers, which are otherwise ascribed to the Participant-Employers under the regulatory framework.  Other functions described above are reserved for the independent enrollment broker, Service Coordinators, or the Commonwealth.

## B.  Factual Background

### i.   *PPL Did Not Hire DCWs.*

PPL exercises no discretion and plays no role in the hiring of DCWs.  In early 2013, Pennsylvania segregated out the fiscal management and payroll function from all agencies and consolidated those functions under one state contractor, PPL.  Stewart Decl. ¶ 11.  But it did not hire the DCWs and played no role in the Participant-Employers hiring their DCWs.  For example:

- DCW Talarico, in the last five years, provided Personal Assistance Services in the Lancaster area to four individuals.  Stewart Decl. ¶ 8; May 31, 2018 Deposition of Ralph Talarico (relevant pages and exhibits attached hereto as <u>Exhibit H</u>), 25:14-23, 31:11-32:8, 32:23-33:1, 33:6- 25 (testifying that he worked as a DCW for Abilities in Motion for three to four years

---

[12] All of the relevant agreements refer to this role as the "Vendor Fiscal/Employer Agent (VF/EA)."  *See e.g.,* Stewart Decl. Ex. A; Ex. C, pp. 2-4, 5-7.

[13] As in the Application and pursuant to its contract with OLTL, PPL processes payments to the DCWs for the services they provide, with money allocated by OLTL to the Participant-Employer in their Service Budget.  PPL withholds legally required income from the DCWs' pay for tax purposes, and processes the payment of the taxes to the state and federal taxing authorities.  PPL also provides program documentation and instructions to the Participant-Employers regarding such services.  Stewart Decl. ¶¶ 12-13, 19.

providing services for Participant-Employers EW and MJ and that "I was working for Abilities in Motion and [Abilities in Motion] instructed me to go work with [EW]."). Participant-Employer EW met DCW Talarico who lived in the same building and decided to hire him.  EW Dep., 11:25-12:17; 13:6-12.  Participant-Employer MJ was introduced to DCW Talarico by another Participant-Employer who lived in her same building and she hired DCW Talarico for some part-time work.  MJ Dep., 24:14-24, 29:2-30:1; 30:16-19 ("Basically [Talarico] said he was available, so I hired him.").

- DCW Latiesha Santiago worked for the agency "Maxim Home Care" prior to 2012 for her Participant-Employer, RM; through her direct employment with the agency, she was also sent to different Participant-Employers all the time based on assignments offered to her. February 26, 2019 Deposition of Latiesha Santiago (relevant pages and exhibits attached hereto as Exhibit I), 17:13-18:15, 21:12-16; 42:16-25, 43:7-21.  DCW Santiago confirmed that PPL played no role in Participant-Employer RM hiring her in 2014.  She testified that Participant-Employer RM wrote her a letter expressing how much she missed DCW Santiago and asking "[i]f I would be able to work for her."  *Id*., 44:25-46:3.

- DCW Saschelle Simms was hired by her Participant-Employer, her mother JE, after her mother's caseworker informed her that she was eligible to participate in the Independence Waiver Program.  December 14, 2018 Deposition of Saschelle Simms (relevant pages and exhibits attached hereto as Exhibit J), 16:12-17:16; 19:10-17.

- DCW Denise Lang had been working for her Participant-Employer son, DL, since 2007. December 17, 2018 Deposition of Denise Lang (relevant pages and exhibits attached hereto as Exhibit K), 12:3-13:2, Lang Dep., Ex. 15 (PPL65586-562).  DCW Lang began working for her Participant-Employer daughter, SL, after SL hired her.  Lang Dep., 40:22- 42:3. DCW Lang acknowledged that both her Participant-Employers, her son and daughter, could "pick anybody" that they wanted as their DCW.  *Id*., 41:18-42:9; 48:12-22.

- Participant-Employer LZ testified that she "100 percent" recruited all of her DCWs and hired them and that PPL played no role in same.  LZ Dep., 95:25-96:4, 96:9-14; *see also id*., 51:3-12 ("So it was my personal choice whether or not to move forward or to cease working with that individual.").

- Participant-Employer DS unambiguously stated that only he had the authority to hire and fire his DCWs.  February 4, 2019 Deposition of DS (relevant pages attached hereto as Exhibit L), 46:10-16 (A: "I'm the only one that can hire someone as my employee or fire them, yes.").

Even Abilities in Motion, a Service Coordinator, confirmed that PPL has "never partaken in helping a [Participant-Employer] hire, pick and choose who to hire."  Skovera Dep., 120:18-121:3.

      For each of the Participant-Employers and DCWs deposed, both employer and employee confirmed that (i) they understood their role as employer of the DCWs and hired their DCWs

directly without any input from PPL and (ii) that PPL did not identify or recruit their workers,

nor did PPL interview or exercise any discretion about hiring them.  In keeping with the mandate

of the statute and CMS regulations, that power is vested by contract solely in the Participant-

Employers, as the Common Law Employer of the workers and has been exercised by them in

fact.

> 1.  Participant-Employers and DCWs Sign Multiple Agreements
>     Explicitly Stating the Participant-Employer is Their Employer, Not
>     PPL.

Each Participant-Employer signed a Direct Care Worker Agreement ("DCW

Agreement") with their DCW acknowledging that the DCW was employed by the Participant-

Employer and not by PPL.  Stewart Decl., Ex. C, pp. 2-4, 14-16; Ex. D., pp. 2-4, 14-16, 23-25;

Ex. E, pp. 2-4, 14-16; Ex. F, pp. 2-4, 14-16; Simms Dep., 60:6-63:18, Ex. 6 (PPL6361-6363);

Lang Dep., Ex. 3 (PPL6199-6200), Ex. 5 (PPL6221, 6224, 6225, 6228, 6227); Santiago Dep.,

Ex. 8 (PPL6277-6279), 101:11-102:25.  Each newly hired DCW signed such agreements as the

"DCW employee," with each Participant-Employer who is specifically designated the "Common

Law Employer."  *Id.*  In fact, DCW Talarico signed a DCW Agreement on no less *than nine*

*occasions* since 2013, as those agreements are renewed every two years or so for each

Participant-Employer.  Stewart Decl. Ex. C, pp. 2-4, 14-16; Ex. D., pp. 2-4, 14-16, 23-25; Ex. E,

pp. 2-4, 14-16; Ex. F, pp. 2-4, 14-16.  Every one of DCWs' employment agreements includes the

following:

14.     I understand and acknowledge that VF/EA [**PPL**] is not my employer.

15.     I understand that the participant or their appointed representative is my
employer.  My employer is not VF/EA [PPL], OLTL, or any other entity involved
with the PDS Program.

16.     I understand that my paychecks will be processed by the Vendor
Fiscal/Employer Agent (VF/EA) [PPL].   The VF/EA [**PPL**] is considered a

Financial Management Service (FMS) Organization. I understand that the VF/EA [**PPL**] is not authorized to pay for any service not approved and authorized in the ISP [Individual Service Plan] or any request that exceeds the participant's budget and funds for the PDS program as stated in the ISP.

Stewart Decl., Ex. C, pp. 3, 15; Ex. D, pp. 3, 15, 24; Ex. E, pp. 3, 15; Ex. F, pp. 3, 15; Simms Dep., 60:6-63:18, Ex. 6 (PPL6361-6363); Lang Dep., Ex. 3 (PPL6199-6200), Ex. 5 (PPL6221, 6224, 6225, 6228, 6227); Santiago Dep., Ex. 8 (PPL6277-6279), 101:11-102:25.

In addition to the DCW Agreement, DCWs filled out and signed several other documents that named the Participant-Employers as their employers:

- Transition Common Law Employer Confirmation of Information Form (Stewart, Exs. C, D, E, F, p. 1; Lang Dep., Ex. 15 (PPL6558-6562);

- DCW Re-Qualification Form (Stewart, Exs. C, D, E, F, pp. 11-13; *Simms Dep., Ex.* 14 (PPL6402-6404), Ex. 17 (PPL6412-6414); Lang Dep., Ex. 8 (PPL6222, 6223, 6226), Ex. 14 (PPL6222-6226);

- Qualified DCW Rate Sheet (Stewart, Ex. D, p. 26; Ex. F., pp. 23-25; Lang Dep., Ex. 6 (PPL6177), Ex. 7 (PPL6178); Santiago Dep., Ex. 11 (PPL6283); *Simms Dep., Ex.* 18 (PPL6416);

- IRS Form W-4s (Simms Dep., 73:15-75:12, Ex. 10 (PPL6368); Lang Dep., Ex. 10 (PPL6209-6210); Santiago Dep., Ex. 12 (PPL6284));

- USCIS Forms I-9 (Stewart, Ex. C, p. 5; Ex. F, p. 5);

- Direct Deposit Applications (*Simms Dep., Ex.* 13 (PPL6395); Lang Dep., Ex. 12 (PPL6174); Santiago Dep., Ex. 14 (PPL6292);

- Residency Certification Form for tax withholding (Stewart, Ex. C, p. 6; Ex. D, p. 6; Ex. F, p. 6; Santiago Dep., Ex. 15 (PPL6289); and

- Application for Tax Exemptions (Stewart, Ex. E, pp. 5-7; Lang Dep., Ex. 11 (PPL6215); *Simms Dep., Ex.* 12 (PPL6378-6380).

Participant-Employers also sign a Common Law Employer Agreement ("CLE Agreement") which reaffirms their role as employer. That form states they accept the responsibility for managing the services provided to them by the DCW and are recognized as the "legal employer of the qualified Direct Care Workers (DCW) hired to provide" the services

identified in their service plans.  Stewart Decl. ¶¶ 30, 50; Ex. D, pp. 17-19; Ex. F, pp. 17-19; *Simms Dep., Ex.* 8 (PPL6491-6493) Lang Dep., Ex. 4 (PPL6572-6574).  The CLE Agreement specifically states that each Participant-Employer must meet certain criteria under the program including the ability to:  make decisions on how to best meet their needs and use of service and to make changes as needed; collaborate with their Service Coordinator to develop an individualized plan based on needs; determine how their budget will be spent; recruit, hire, manage, and dismiss their DCW; train their DCW to meet the needs of the plan; establish a mutual agreeable schedule with their DCW; decide how much to pay their DCW within certain guidelines; provide feedback to their DCW; review and approve all timesheets to their fiscal agent; and ensure their DCW only works the hours budgeted or for the amount available under their approved plans and a number of other duties.  *Id*.

      2.  Participant-Employers Retain the Ultimate Decision to Hire DCWs After Criminal History Background Checks.

PPL exercises no discretion in the hiring of DCWs or conducting OLTL mandated criminal history background checks.  The Criminal History Background Check Participant/CLE Acceptance of Responsibility Form makes it patently clear that Participant-Employers retain the ultimate decision to hire DCWs following a criminal history background record check.  Specifically this form provides as follows:

> Criminal history background checks are mandatory but a participant may still choose to hire a direct care worker even if a worker is found to have a criminal history
> . . .
> As the employer, I have the right to choose to hire a direct care worker with a criminal record.  In doing so, I accept responsibility for my decision and potential consequences of my decision.  I choose to hire the below named Direct Care Worker (DCW).

*See, e.g*., Simms Dep., Exhibit 7 (PPL3605).

Additionally, the DCW Agreement makes it clear that such a determination of whether or not to hire a DCW after a criminal background check does not rest with PPL, but with the Participant-Employer. *See, e.g*., Stewart Decl., Ex. C, p. 37 at ¶ 3.  Section 2 provides that background results are provided to the Participant-Employer, at which point the Participant-Employer can still move forward and exercise his/her discretion to hire the DCW.  *Id*., ¶ 59.  In short, the unambiguous terms of the Criminal History Background Check Participant/CLE Acceptance of Responsibility Form and the DCW Agreement expressly support the fact that Participant-Employers retain the ultimate authority to hire DCWs after a background check.

Despite the fact that DCW Simms was found to have a criminal history, Participant-Employer JE still hired DCW Simms.  DCW Simms acknowledged that PPL did not prevent her from becoming a DCW for Participant-Employer JE due to the criminal background check.  *Id*., 50:22-51:1.  DCW Simms understood that the findings of same could preclude her from working for Participant-Employer JE.  Simms Dep., 50:1-13.  Similarly, Participant-Employer LZ confirmed that when background checks came back with findings of criminal convictions for DCWs she was considering hiring, it was her "personal choice whether or not to move forward or to cease working with that individual."  LZ Dep., 50:17-51:12.  In fact, in those situations where DCWs' criminal background checks came back with findings of criminal convictions, "[o]n all but one [Participant-Employer LZ] made the choice to not hire them or not continue using them, because they were all theft related."  *Id*., 50:17-21.

### ii.   *PPL Could Not Discipline or Terminate DCWs.*

Participant-Employers have the sole discretion and ability to terminate their DCWs.  LZ Dep., 64:12-17; 96:7-14; EW Dep., 30:5-9; Smith Dep., 46:10-16 (A: "I'm the only one that can hire someone as my employee or fire them, yes.");  MJ Dep., 35:21-36:17.  In fact, three (3) of

the four (4) DCWs deposed in this matter were fired by their respective Participant-Employers.

DCW Talarico was terminated by one of his Participant-Employer's, EW, without any

involvement by PPL.  Participant-Employer EW testified that he fired Talarico and he did not

need PPL's permission to do so.  EW Dep., 37:14-38:19.  Participant-Employer EW terminated

DCW Talarico because "he'd go off to his apartment and wouldn't come back up for a while"

and EW "would have to call him numerous times to come back up".  *Id*., 37:17-24; 43:5-16

(testifying that DCW Talarico "didn't always bring [his timesheets] to me to let me see it before

he put in for payment, which – there was sometimes that I didn't get to read his timesheet, so he

put it in and he knew my stamps was up there, so he may have used it and me not know of it.").

DCW Talarico conceded that no one at PPL ever terminated him from working for any of his

Participant-Employers.  Talarico Dep., 276:1-4.

Likewise, DCW Santiago was terminated by her Participant-Employer, RM, without any

involvement by PPL.  *See* Santiago Dep., Exhibit 9 (PPL6299-6300).  On June 1, 2015,

Santiago's Participant-Employer, filled out Direct Care Worker Termination Form.  *Id*., Exhibit

9 (PPL6299).  This form states that Santiago was "[i]nvoluntary [t]erminat[ed]".  *Id*.  Participant-

Employer RM wrote "[e]mployee dismissed (fired) for the following reasons: employee did not

return after 6 weeks of recovery time after surgery.  She did not call or notify me as to when she

would return.  She called once to notify me of her limitations."  *Id*.  Participant-Employer RM

attached correspondence to her Direct Care Worker Termination Form in which she wrote "**I am**

**terminating** [Santiago] due to her lack of clear communication."  *Id*., Exhibit 9 (PPL6300)

(emphasis added).  During her deposition, Santiago conceded that PPL played no role in her

separation from Participant-Employer RM "besides [] paperwork".  *Id*., 166:14-17.  Lastly,

DCW Simms was terminated by her Participant-Employer JE.  Simms Dep., Exhibit 19

(PPL6417).  The Direct Care Worker Termination Form states that Simms was "[i]nvoluntary [t]erminat[ed]" and Participant-Employer JE wrote that "[e]mployee dismissed (fired) for the following reasons: about to have surgery and unable to care for participant.  Also preparing college transfer."  *Id*.  Another DCW, Denise Lang, testified that no one from PPL ever terminated her from performing services for her Participant-Employers - her son and daughter. Lang Dep., 93:16-20.

Moreover, DCWs were never disciplined by PPL while working for their respective Participant-Employers.  *See*, *e.g.,* Simms Dep., 107:15-22; Lang Dep., 93:12-14; Talarico Dep., 276:7-13.  Oversight and performance of DCW duties, lies with the Participant-Employer and the Service Coordinator who do quarterly oversight events.  Skovera Dep., 62:20-63:7; EW Dep., 14:21-15:8.  Not only do the applicable statutory edicts proscribe PPL's limited role, Participant-Employers and DCWs confirmed that PPL had no authority to and did not discipline or terminate DCWs.  Pursuant to the HCBS waiver program dictates, and in fact, Participant-Employers, not PPL, had the ultimate and sole discretion to discipline and terminate DCWs.

> iii.   *Participant-Employers Perform All the Employer Duties and PPL Lacks Discretion or Authority to Exert Control Over Any DCW.*

After the Participant-Employers hired DCWs, they in fact performed all of the employer duties consistent with the federal and state statutory and regulatory schemes under the HCBS waiver programs.  The Participant-Employers:

- Established the hourly wage rate for DCWs;
- Decided how many service hours would be worked, in conjunction with the Service Coordinator;
- Determined the schedule for DCWs;
- Paid the employer taxes from his/her budgeted funds, through his/her agent, PPL;
- Covered DCWs under workers' compensation insurance;
- Directed and supervised the work of DCWs;
- Provided DCWs with a place to work and any necessary supplies;
- Had the authority to discharge or discipline DCWs; and

- Performed the payroll functions, including withholding and payment of employer taxes, through his/her agents, PPL.

    *See* Stewart Decl. ¶¶ 27-56.

PPL did not perform any employer functions relating to DCWs; it provided Financial Management Services to the Participant-Employers as their payroll fiscal agent.[14]  PPL's employees never travelled to or appeared at the residence of the Participant-Employers to observe, provide direction, control, or evaluate the services of any DCW.  *Id*. ¶ 61.

## IV.    ARGUMENT

### A.  Applicable Legal Standards

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  To avoid summary judgment, the opposing party must point to specific, affirmative evidence and not rely on mere allegations, conclusory statements, or general denials in the pleadings.  *Celotex*, 477 U.S. at 324.

### B.  DCWs' Claim under the FLSA Fails

---

[14] The Participant-Employers determined how many hours DCWs would work and sent information to PPL each pay period reflecting the number of actual hours worked for that pay period.  *Id*. ¶ 26. PPL then processed the payments to Plaintiffs for those hours by direct deposit to Plaintiffs' bank account.  *Id*. ¶ 27. As the duly authorized IRS payroll fiscal agent for the Participant-Employer, PPL withheld payroll taxes, FICA and FUTA assessments, as well as state and local income taxes from DCWs' pay, and paid that money to the respective tax authorities.  *Id.*

DCWs do not have a colorable claim that PPL is their joint employer.  As a matter of law, PPL did not alone or jointly employ DCWs and is not liable for the overtime pay claims they assert.  There is no genuine dispute of any material fact concerning the status of the Participant-Employers as DCWs' sole employer.  As such, this Court should enter judgment in favor of PPL on Count I of DCWs' First Amended Complaint because PPL is not their joint employer.

       *i.*     *The Participant-Employers are the Sole Employers of DCWs.*

The FLSA does not define the term "employer," except to state that it "includes any relation to an employee …."  29 U.S.C. § 203(d).  An "employee" is "any person acting directly or indirectly in the interest of an employer in relation to an employee …."  29 U.S.C. § 203(d).  An "employee" is "any individual employed by an employer."  *Id*. § 203(e).  To "employ includes to suffer or permit to work."  *Id*. § 203(g).  One need not look beyond this very general statement of the standard for determining employer status, which encompasses hiring, firing, and providing work, to determine that the Participant-Employers are the sole employer of DCWs.  Most importantly, the Participant-Employer is the person that receives the services of DCWs, logs the hours that DCWs have worked, and creates the timesheets that support the compensation of DCWs.

It is undisputed that the statutory and regulatory framework under the HCBS waiver program mandates that the Participant-Employers are the DCWs' employers.  The Self-Directed Services option derives from the Social Security Act.  Congress clearly stated its intention that the Participant-Employer be empowered to control the delivery of services as the employer of the individual providing the service.  This is particularly apt since the DCW is in the home performing intimate and integral support services for his or her Participant-Employers.  Thus, the Social Security Act requires that the Participant-Employer "exercise choice and control over the budget, planning, and purchase of self-directed personal assistance services, including the

amount, duration, scope, provider and location of service provision."  42 U.S.C. § 1396n

(j)(5)(A).

The applicable CMS regulations are even clearer: "A self-directed PAS [personal

assistance services] option is designed to allow individuals … to exercise decision-making

authority . . . .  This authority includes, at a minimum, all of the following:

1) The purchase of PAS and supports for PAS.[15]
2) Recruiting workers.
3) Hiring and discharging workers.
4) Training workers.
5) Specifying worker qualifications.
6) Determining worker duties.
7) Scheduling workers.
8) Supervising workers.
9) Evaluating worker performance.
10) Determining the amount paid for a service, support or item.
11) Scheduling when services are provided.
12) Identifying service workers.
13) Reviewing and approving invoices."

42 C.F.R. § 441.450.  Thus, the regulations echo the directive of the Social Security Act—that

the Participant-Employer under the Self-Directed Services option for delivery of services

performs the functions of an employer.

In its administration of the Self- Directed Services option of the HCBS waiver program,

OLTL has closely followed the federal mandate with respect to the role of the Participant-

Employer in the employment of Direct Care Workers.  For example, as evidenced by the

Application, "the participant serves as the common-law employer and is responsible for hiring,

firing, training, supervising and scheduling their support workers."  Application p. 169, *see supra*

Section III.A.  These functions are described in more detail in the OLTL Waiver Application

under the heading "Participant Decision Making Authority."  *Id.*, p. 178.

---

[15] PAS is defined as "Personal Assistance Services."  42 C.F.R § 441.450(c).

Finally, the agreements and other documentation completed and signed by DCWs and their Participant-Employers strictly adhered to the statutory and regulatory model for delivery of self-directed care.  *See*, *e.g*., Simms Dep., 60:6-63:18, Ex. 6 (PPL6361-6363); Lang Dep., Ex. 3 (PPL6199-6121), Ex. 5 (PPL6221, 6224, 6225, 6228, 6227); Santiago Dep., Ex. 8 (PPL6277-6279), 101:11-102:25.  Participant-Employers agreed to be responsible for recruiting, hiring, training, setting the work hours and schedules, supervising, evaluating, determining the pay rate for, disciplining, and discharging DCWs.  *Id*.  There can be no dispute that the Participant-Employers, not PPL, are the employers of DCWs.

       ii.    *PPL Is Not a Joint Employer with the Participant-Employers, Neither by Law, Nor in Fact.*

Plaintiffs also cannot point to any facts or law which support a conclusion that PPL is a joint employer with their Participant-Employers.  For purposes of the FLSA, an individual may have more than one employer, each of which can be "responsible, both individually and jointly for compliance with all of the applicable provisions of the [Act]."  *Olvera v. Bareburger Group*, 73 F. Supp. 3d 201 (S.D.N.Y. July 10, 2014) citing 29 C.F.R. § 791(2)(a)).  "Where two or more employers exert significant control over the same employees … they constitute 'joint employers' under the FLSA."  *N.L.R.B. v. Browning–Ferris Indus. of PA*., 691 F. 2d 1117, 1124 (3d Cir. 1982).  Whether an employer-employee relationship exists for the purposes of the FLSA rests on the "economic reality rather than the technical concepts."  *Goldberg v. Whitaker House Coop., Inc*., 366 U.S. 28, 33 (1961); *Mackereth v. Kooma, Inc*., No. CIV.A. 14-04824, 2015 WL 2337273, at *5 (E.D. Pa. May 14, 2015).

The Court of Appeals for the Third Circuit has set forth a four-factor test to determine if an entity is a joint employer of an employee for purposes of the FLSA:

    When faced with a question requiring examination of a potential joint employment relationship under the FLSA, we conclude that courts should consider: 1) the

alleged employer's authority to hire and fire the relevant employees; 2) the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; 3) the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and 4) the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

*In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litig*., 683 F.3d 462, 469 (3d Cir. 2012).

That one of these factors might be neutral or even favor a finding of joint employment, does not defeat the putative employer's summary judgment motion.  *Id*. at 470-71 ("When a legal standard requires the balancing of multiple factors, as it does in this case, summary judgment may still be appropriate even if not all of the factors favor one party — this is such a case.").  Furthermore, a party may not survive a dispositive motion by pleading boilerplate and conclusory allegations that merely restate the elements of the *Enterprise* test.  *See Keating v. Pittston City Hous. Auth.,* No. 3:17-CV-465, 2018 WL 1414459, at *5 (M.D. Pa. Mar. 21, 2018) (dismissing plaintiff's claim because he made conclusory allegations reciting the elements of the *Enterprise* test but failed to explain how any of the relevant entities were plaintiff's employers).  In this case, DCWs cannot show that there is enough evidence to create an issue of fact as to any one of the four factors sufficient to establish joint employment.

1.  <u>PPL Has No Authority to Hire and Fire.</u>

With respect to the first factor, PPL has no authority to hire, discipline, or fire DCWs like Plaintiffs.  *See supra*.  PPL does not locate, interview, prescreen, or act in any way to hire DCWs.  DCW Simms was hired by her mother.  Simms Dep., 45:2-48:8.  PPL did not interview or play any role whatsoever in DCW Simms's hire or rehire.  *Id*. at 47:3-6.  DCW Lang informed by someone at the hospital where her son was recuperating about the program and she informed her son that she would be working for him under the program.  Lang Dep., 38:1-5.

After PPL took over as the payroll agent DCW Santiago's former Participant-Employer, RM sent

her a letter.  Santiago Dep., 44:25-46:25.  Participant-Employer RM told her she liked working

with her and wanted to hire her and did.  *Id*.  For DCW Talarico, he was already hired by and

working for the four Participant-Employers he provided services prior to 2013, when PPL first

became the payroll/fiscal agent for the Participant-Employers participating in the program.

Stewart Decl. ¶ 8; Talarico Dep., 25:14-23, 31:11-32:8, 32:23-33:1, 33:6- 25.

Similarly, PPL has not played any role in the firing of DCWs.  DCWs Talarico, Santiago,

and Simms themselves were all terminated by their respective Participant-Employers.  *See*

Section III.B.i.3.  Each of their Participant-Employers elected to exercise this fundamental

employment right without any interference by, input from, or consult with PPL.  There is ample

evidence that Participant-Employers not only understand but fully appreciate and freely exercise

this critical element of the employment relationship including Participant-Employers EW, JE,

LZ, and RM.

As a result, the first factor of the *Enterprise* test cannot be met.  *See Yue Yu v. McGrath*,

597 F. App'x 62, 65-66 (3d Cir. 2014) (affirming decision that "no reasonable jury could

conclude that [plaintiff] was an employee of BMS," noting that BMS "did not have the authority

to hire or fire [her.]"); *Garcia v. Nunn*, No. 13-6316, 2015 WL 5585451, at *4 (E.D. Pa. Sept.

23, 2015) (dismissing FLSA claims against a defendant where, inter alia, "there is no mention in

the amended complaint that Defendant Weis had the authority to hire and fire the plaintiff

employees…"); *Nerviano v. Contract Analysis Sys., LLC*, No. CV 17-4907, 2018 WL 2240533,

at *4 (E.D. Pa. May 16, 2018) (applying *Enterprise* test, court found that ADP, which provided

bookkeeping, recordkeeping, and human resources services, was not plaintiff's employer under

various federal statutes "[a]bsent allegations that ADP had some ability to dictate [plaintiff's] working conditions or played some role in the decision to terminate her").

In *Yue Yu*, the Third Circuit determined that, despite some evidence that could point to a joint employment relationship under other factors, the plaintiff could not prove a joint employment relationship where it was undisputed that the defendant had no authority to hire or fire.  That PPL facilitates a background check on DCWs prior to hiring is not evidence of any role in the hiring process, where: (1) a background check is only performed after the Participant-Employer has determined that he or she would like to hire a prospective DCW, without input from PPL; and, (2) if a background check reveals a criminal record, the Participant-Employer is informed and retains full authority to still hire that particular DCW, if he or she so elects.  *See* Section III.B.i.2.  Here, as in *Yue Yu*, Plaintiffs lack any evidence that PPL had the authority to hire or fire.  Failure to meet this factor by itself precludes the need to address the remaining factors.  But even so, Plaintiffs cannot offer credible evidence to suggest a joint employment relationship under any of the other *Enterprise* factors.

2.  PPL Does Not Promulgate Work Rules, Make Assignments, Set the Conditions of Employment, or Determine the Compensation Rate, Benefits or Work Schedules.

Similarly, DCWs cannot meet the second prong of the *Enterprise* test.  There is no evidence that PPL had any role in determining the type of services that Plaintiffs perform, the rate of pay, hours worked, or the provision of benefits.  *See Richardson v. Bezar*, No. CV 15-0772, 2015 WL 5783685, at *2 (E.D. Pa. Oct. 5, 2015) (granting motion to dismiss FLSA claims).  This is consistent with the CMS mandate and the OLTL Self-Directed Services option, which dictate that these functions are reserved to and performed by the Participant-Employer.

The types of services that Plaintiffs are authorized to perform, *i.e.* Personal Assistance Services, are established by the CMS and OLTL Regulations.  *See* 55 Pa. Code § 52.3.  The

Participant-Employers, not PPL, determine what services are needed for their particular situations.  Stewart Decl. ¶¶ 9, 14-15; Skovera Dep., 91:12-21.  In addition, the individual Service Plan is developed between a Service Coordinator and the Participant-Employer, with no input from PPL.  Stewart Decl. ¶¶ 14-15; *see also* LZ Dep., 17:19-20:24; 22:6-15; 23:12-23; EW Dep., 15:9-15; MJ Dep., 23:21-24:6.  The Service Plan "specifies the services and supports that are to be furnished to meet the needs of a participant in the self-direct [services] option."  42 C.F.R. §§ 441.450(c), 441.468.  PPL did not receive or review a copy of the Service Plans; instead, it is only informed of the total amount of units/hours allotted under the plan for payment purposes and eligibility status.  Stewart Decl. ¶¶ 14-15, Ex. B, p. 1-4; *see also* LZ Dep., 17:19-20:24; 22:6-15; 23:12-23; EW Dep., 15:9-15; MJ Dep., 23:21-24:6.

The Participant-Employers, not PPL, established DCWs' schedules.  EW Dep., 30:11-20; LZ Dep., 96:22-97:2; MJ Dep., 30:22-31:14, 32:16-33:10; Santiago Dep., 115:9-24; Simms Dep., 100:4-19; Talarico Dep., 67:1-14; *see Garcia, supra,* 2015 WL 5585451, at *5 (finding that the defendant had "no authority to set the conditions of employment, including compensation, benefits, and work schedules").

Nor did PPL determine the rate of pay for DCWs.  Stewart Decl., ¶¶ 20, 32, 40, 52, 58; Simms Dep., 87:23-88:17, Ex. 18 (PPL6416); Lang Dep., Ex. 6 (PPL6177), Ex. 7 (PPL6178); Santiago Dep., Ex. 11 (PPL6283). The Participant-Employers decided how much to pay DCWs subject to the calculated maximum billable rate established in the Service Budget developed by the Participant-Employers and their Service Coordinator, not by PPL.  Stewart Decl., ¶¶ 14-15, 58; LZ Dep., 80:15-25, 82:19-83:19, 88:9-19, 97:3-6.  *See also* MJ Dep., 31:22-32:3, 57:3-25, 71:15-73:21; Lang Dep., 58:13-17, 91:19-23; Santiago Dep., 38:23-39:2; 59:12-17.  Otherwise, OLTL provides the maximum rate for a unit of service.  Stewart Decl., ¶ 58; LZ Dep., 80:15-25,

82:19-83:19, 88:9-19, 97:3-6.  The Participant-Employers could pay from their budgeted hours

any wage up to the maximum wage OLTL allows for the region in which the Participant-

Employers resides so long as it also met the minimum wage standard.  Stewart Decl., ¶ 58; LZ

Dep., 80:15-25, 82:19-83:19, 88:9-19, 97:3-6.  By way of example, Participant-Employer LZ

increased her DCW's pay when able.  LZ Dep., 86:20-87:22.  Participant-Employer LZ testified

that PPL had no role in her decision to increase her DCW's pay, and that it was "all either

through peers, being another direct care worker, or through [the Service Coordinator] gave me

that information."  *Id*., 88:9-19.  She elected to pay one DCW the maximum pay, but for other

DCWs she hired, she would pay them a lower rate at first and then reward them with pay raises if

warranted.  *Id*., 88:2-8.  Other Participant-Employers in the program, did the same – Participant-

Employer EW unilaterally increased DCW Talarico's hourly rate and, Participant-Employer EJ

changed DCW Talarico's hourly rate on three different occasions.  Stewart Decl. ¶¶ 32, 52.  PPL

had no involvement, role, or right to review a Participant-Employer's decision to change a

DCWs hourly rate other than implementing the changes per the Participant-Employer's

instructions.[16]

In addition, PPL has no role in the process for determining the need for overtime.  If

overtime services are contemplated at the time of creation of the Service Plan, the Service

Coordinator works with the Participant-Employer to estimate the amount of time needed and that

is reflected in the plan.  Stewart Decl. ¶ 14, Ex. B; Skovera Dep., 123:2-19; 124:6-10, 124:18-

125:4.  It is the responsibility of the Participant-Employers alone to assess whether he or she

---

[16] PPL is aware of a recent decision that supports summary judgment in this case, *Hardgers-Powell v. Angels in Your Home LLC*, No. 16-CV-6612-FPG, 2019 WL 409216 (W.D.N.Y. Feb. 1, 2019) (home care agency held as an "employer" of plaintiffs where NY state regulatory framework required it to go well beyond payroll responsibilities to include screening employees and setting wage rates).  In *Hardgers-Powell*, the company also held itself out as the employer and had authority to set wage rates, in contrast to the applicable regulatory scheme and facts in this matter.

expends the limited allocation of resources on units of overtime.  Stewart Decl. ¶¶ 14-15,

Skovera Dep., 124:6-10; 125:5-8.  That is also reflected in the submission of weekly timesheets

process where DCWs would submit (through the online tracking system) the number of hours

and any overtime, which is then approved by the Participant-Employer for payment.  Stewart

Decl. ¶¶ 24, 35, 44, 54; EW Dep., 32:6-10.

Finally, PPL did not provide DCWs with any benefits, including workers' compensation

insurance coverage.  Stewart Decl. ¶¶ 58, 63.  Instead, PPL's contract with OLTL obligates PPL

only to provide Financial Management Services, one of which is to handle the payroll function

on behalf of the Participant-Employers in the Medicaid HCBS Waiver Participant-Directed Care

programs as their payroll fiscal agent.[17]  In addition, any workers' compensation policy that does

apply is in the name of the Participant-Employers, not PPL.  Stewart Decl. Ex. C, pp. 17-26; Ex.

D, pp. 27-40; Ex. E, pp. 17-33; Ex. F, p. 20-22.  Plaintiffs utterly fail to meet the second factor of

the *Enterprise* test.

### 3.   PPL Had No Involvement in Day-to-Day Employee Supervision.

Plaintiffs likewise cannot satisfy the third prong of the *Enterprise* standard.  The

functions of supervision, evaluation, and discipline are the responsibility of the Participant-

Employers, which again is in keeping with the mandate of the CMS Regulations and OLTL

model.  Stewart Decl. ¶¶ 10, 61; Ex. D, p. 17-19, Ex. F, p. 17-19; *Simms Dep., Ex.* 8 (PPL6491-

6493); Lang Dep., Ex. 4 (PPL6572-6574); *see McKenna v. Healthease, Inc*., No. CIV.A. 10-

3940, 2013 WL 1702639, at *7-8 (E.D. Pa. Apr. 19, 2013), *aff'd*, 573 F. App'x 190 (3d Cir.

2014) (determining that Lockheed Martin was not a joint employer of the plaintiff, where it "did

---

[17] This financial safeguard assures that the Medicaid funds are used to pay for the services and that the taxes withheld from the pay are directed to the appropriate taxing bodies.  The role of the payroll fiscal agent is established in the CMS regulations and explicated further in the OLTL Waiver Application, as discussed above.

not place any conditions on her employment, nor did it set her schedule or evaluate her performance."). The services performed by DCW Talarico mainly occurred in the presence and at the residence of Participant-Employers MJ and EW who supervised the work. Stewart Decl. ¶¶ 7, 61; EW Dep., 13:15-14:13; MJ Dep., 28:17-29:1. PPL employees never visited the Participant-Employers' homes to observe the provision of services by DCWs. Stewart Decl. ¶ 61; EW Dep., 15:17-25; Talarico Dep., 76:23-77:13. Here, as in *McKenna*, the alleged employer had no role in the day-to-day supervision of DCWs' work.

### 4. PPL Does Not Control Employee Records.

Since the Participant-Employer creates and maintains all records concerning the hours worked by Plaintiffs, the fourth prong of the *Enterprise* test also cannot be met. The most relevant records under this element are the records of the employee's hours worked. *Godlewska v. Human Development Ass'n, Inc*., 916 F. Supp. 2d 246, 262 (E.D.N.Y. 2013). It is the Participant-Employer who is responsible for compiling, maintaining, and transmitting to PPL the hours worked by Plaintiffs, so that PPL can issue the paychecks on their behalf. Stewart Decl. ¶¶ 24, 35, 44, 54.[18] Consistent with the statute and regulatory schemes, the Participant-Employer has the singular responsibility to authorize the workers' paychecks including the obligation to review, approve, and submit all timesheets to PPL. Stewart Decl., Ex. D, p. 18; Ex. F, p. 18. The Participant-Employers accomplish this online and provide PPL – as would any employer to its payroll company – with the explicit authorization for all time worked, both regular and overtime hours. Stewart Decl. ¶¶ 23, 34, 43, 53.

---

[18] Each paycheck – or if a direct deposit, a visible paycheck on a web portal –provided to a DCW is done on behalf of the Participant-Employer(s), not PPL. *See, e.g*., Santiago Dep., Ex. 5 (SANTIAGO-L_000009 and SANTIAGO-L_000011 and Talarico Dep., Ex. 14 (TAL000009-TAL000028).

PPL did withhold required taxes and process payments based on the records provided by the Participant-Employers and DCWs themselves, but it did so in its statutory capacity as the authorized payroll fiscal agent of the Participant-Employers for those express purposes, similar to any payroll provider who follows the instructions provided by employees in their W-4s and as directed by employers.  26 U.S.C. § 3504; Stewart Decl., Ex. C, pp. 8-10; Ex. D, pp. 6-9; Ex. E, pp. 8-10; Ex. F, pp. 7-10.  Again, PPL's contract with OLTL governs its status and responsibilities—PPL simply provides Financial Management Services to the Participant-Employers as their payroll fiscal agent.  Stewart Decl. ¶¶ 11-12; Ex. A.

Further pursuant to its state contract with OLTL, PPL kept copies of documents signed by the Participant-Employers and DCWs, and other program-related documents such as proofs of payments made to DCWs and timesheets submitted by DCWs.  Stewart Decl. Exs. C, D, E, F. PPL maintains these records solely in its capacity as the payroll fiscal agent of the Participant-Employer, not as an employer of the DCW.  These records are not personnel files, such as an employer would maintain; nor could PPL claim ownership over such documents.  Thus, under traditional agency principles, it is the Participant-Employer that maintains control of the relevant records, much in the same manner as payroll management companies like ADP handle the payroll functions for their principals.  This fourth, and final, factor likewise supports the conclusion that PPL is not the employer of DCWs, but that their employers are the Participant-Employers.  Other courts have held that such fiscal intermediaries who handle payroll are not joint employers under similar regulatory frameworks where they have no right to control the conditions of work.  *See Gallagher v. Cerebral Palsy of Mass., Inc.,* 92 Mass. App. Ct. 207 (2017) (payroll provider could not be deemed a joint employer under state regulatory framework

that defined the employer of in-home Personal Care Assistants as the individual receiving the

care).

> 5.  Every Program Document Designates Participant-Employer as
>     the Employer, Not PPL.

The program documents sent to and executed by the DCWs and Participant-Employers

likewise consistently makes clear that the Participant-Employer is their only employer, not PPL:

- The operative DCW Agreement explicitly states that the Participant-Employer is their sole employer in paragraphs 17 through 19 and as indicated at the signature lines.  *See* Section III.B.i.1.

- All of the tax-related documents the Participant-Employers and DCWs complete and sign plainly identify the employer as the Participant-Employer and the employee as the DCW, including but not limited to the W-4 IRS Form, Santiago Dep., Ex. 12 (PPL6284), and the state tax form REV-419.  Santiago Dep., Ex. 13 (PPL6291).

- The Pennsylvania Residency Certification Form under the heading "Employer Information" references only the *Participant-Employer.  Santiago Dep., Ex.* 15 (PPL6289).  In fact, DCW Santiago filled in the information for her employer on that form as her Participant-Employers has difficulty writing.  Santiago Dep., 139:7-140:13.

- The completed I-9 form is signed by both the DCW as employee and Participant-Employer as employer.  Santiago Dep., Ex. 16 (PPL6285-PPL6286).  Like the other forms filled out by DCW Santiago, she helped fill in the employer information and mistakenly wrote her name in under the block entitled "Employer" crossed that out and her Participant-Employer then signed her name in that section.  Santiago Dep., 143:4-145:25.  In addition, DCW Santiago wrote in the term "Household Employer" because her Participant-Employer instructed her to do so.  Santiago Dep., 146:1-10.  DCW Santiago assumed that the term meant someone who works in the home.  *Id*., 146:11-19.[19]

All other program related forms contain similar information.  For instance, the Direct

Deposit form lists "Employer Information" that contains only the Participant-Employer's name.

Santiago Dep., Ex. 14 (PPL6292).  The line directly under the Participant-Employer's name also

states "Participant/Common Law Employer (CLE) Name" equating the terms, "Participant" and

---

[19] DCW Santiago filled out additional related tax forms identifying her employer as her Participant-Employer and previous employers as "Maxim Healthcare," "Interim Healthcare," and "Sunrise Senior Living."  Santiago Dep., Ex. 17 (PPL6239).  Nowhere does she mention PPL, as her understanding was that Participant-Employer RM was her employer at the time.

"Common Law Employer" with term Employer.  DCW paystubs also clearly identify the

Participant-Employer as the DCW's employer and then also lists their name in full under the

heading "Common Law Employer" dispelling any confusion.  Santiago Dep., Ex. 5

(SANTIAGO-L_000009 and SANTIAGO-L_000011).[20]  Nowhere is PPL ever identified as the

employer in any documentation associated with the program.[21]  Any reasonable reader of these

forms, especially given the number of times and forms that reinforce that the Participant-

Employer is the employer, would understand that at the very least, the Participant-Employer is

their employer.  Moreover, these references are entirely consistent with the actual performance

of all duties by the DCW.  At no time has any DCW predicated their understanding that PPL is

their employer based on any written documentation with the program.  In fact, the Service

Coordinator deposed admitted that many DCWs assume the Service Coordinator is the employer.

Skovera Dep., 130:7-11.

> ### 6. PPL Plays No Role in Allocating or Managing Overtime Performed by a DCW.

Pursuant to the Service Plan process, only the Participant-Employer and their Service

Coordinator, not PPL, determine whether overtime can be worked by any DCW.  *See* Section

III.A.iv.  Integral to the support services provided and tailored to each Participant-Employer's

particular needs, the Service Coordinator at the initial meeting and initial selection by the

---

[20] A number of the forms signed by DCW Santiago were also signed by DCW Talarico, DCW Simms, and DCW Lang; IRS W-4, Lang Dep., Ex. 10 (PPL6209-PPL6210), *Simms Dep., Ex.* 10 (PPL6368), Talarico Dep., Ex. 12 (PPL1051); REV-419, *Simms Dep., Ex.* 5 (PPL6354); PA Residency Certification Form, *Simms Dep., Ex.* 5 (PPL6347), Talarico Dep., Ex.12 (PPL1065); Form I-9, *Simms Dep., Ex.* 5 (PPL6335-PPL6339), Talarico Dep, Ex. 12 (PPL1503-PPL1057) *Direct Deposit, Lang Dep., Ex.* 12 (PPL6147), *Simms Dep., Ex.* 13 (PPL6395), Talarico Dep., Ex. 12 (PPL1069); Pay Stubs, Talarico Dep., Ex. 14 (TAL000009-TAL000028).

[21] PPL acknowledges that a number of DCWs plead ignorance with respect to the titles and references listed above. *See*, *e.g*., Talarico Dep., 147:21-24; Santiago Dep. 139:7-140:16; Simms Dep., 60:19-62:5.  However, ignorance does not create any ambiguity based on assumptions made by a DCW not reflected in the documentation, certainly not a reasonable assumption.  The program documentation and payroll instructions for both Participant-Employers and DCWs universally and unambiguously identifies the Participant-Employer as the employer consistent with statutory dictates.

Participant-Employer into the Self-Directed Services option, determines how many hours per week services are required.  MJ Dep., 14:13-18:23; 52:2-23; EW Dep., 14:21-15:8; LZ Dep., 18:15-24:5; Lang Dep., 27:17-31:14.  If that amount exceeds 40 hours, OLTL requires that such hours be specifically allocated and denoted as overtime.  June 27, 2018 Deposition of Regina Stewart (relevant pages and exhibits attached hereto as Exhibit M), 276:1-18, Exhibit 29 (PPL525-527); Simms Dep., 16:3-19:20; Talarico Dep., 63:24-66:13.

As part of the quarterly review and as needed by the changing condition of each Participant-Employer, the Service Coordinator, in concert with their Participant-Employer, evaluates the need for any overtime hours that becomes part of the Service Plan itself.  As the Service Plan is never shared with PPL, it merely acts as the payroll agent acting within the limits set by the Participant-Employer and as reviewed and approved by the Service Coordinator.

Plaintiffs' trite argument that it matters not with whom the ultimate discretionary power rests to determine and allow overtime is simply wrong.  The legal question of joint employment must consider the entire context in which overtime is determined.  Here, there is no question that the ultimate discretionary power to allocate and even authorize overtime does not lie with PPL.  Objectively and consistent with the statutory scheme, this power lies with the Participant-Employer and their Service Coordinator.  Just as the Participant-Employer must abide by the dictates of the Medicaid program limits, *i.e.* only services within the Service Plan can be performed and paid for, arguing that this power somehow rests with PPL as the payroll agent is not convincing and ignores the facts developed in the record.  There is no evidence that PPL exceeds its role as a payroll agent in any way; instead it faithfully adheres to the limits imposed upon it regarding employer-like determinations of allocating overtime.

First and foremost, when any issue arises about pay in general and overtime payments, PPL advises any inquiring DCW to contact and discuss with their Participant-Employer. *See*, *e.g.*, Santiago Dep., 39:7-24, *Ralph Talarico Support Tickets* 2525700, 2562243, 3041896, 1971562, 2455377, 2496567, 2691890 (PPL1220) (true and accurate copies of which are attached hereto as <u>Exhibit N</u>).  For example, when DCW Santiago began working for her Participant-Employer under the assumption she did not have to complete the program paperwork, she submitted timesheets, but her pay was not processed and PPL told her to discuss with her Participant-Employer.  Santiago Dep., 39:7-24, 69:3-71:9; 77:3-78:2.  Similarly, when DCW Talarico admitted that he submitted incorrect timesheets, he was directed by PPL to discuss with his Participant-Employers.  He submitted a timesheet for Participant-Employer EJ's hours allocated to Participant-Employer KS and vice versa.  Talarico Dep., 273:22-274:16. These timesheets were then authorized as correct by both Participant-Employers EJ and KS.  *Id.*, 275:30-14.  DCW Talarico contacted PPL to explain and PPL advised that he had to resubmit the timesheets and work with his two Participant-Employers to correct the error.  *Ralph Talarico Support Tickets* 2455376, 2455377, 2492495 (PPL1220).  Ultimately, DCW Talarico submitted correct timesheets and discussed the situation with his Participant-Employers who authorized and signed off on the resubmitted timesheets.  PPL plays no role in determining if hours were worked or not – that responsibility lies solely with the Participant-Employers and their DCWs. Like any payroll company, PPL follows the dictates of what the employer tells them regarding limits on hours and overtime hours worked.

Second, PPL is not on site at the home to supervise hours worked.  This responsibility lies with the Participant-Employers and their Service Coordinator alone and cannot be superseded or overridden by PPL.  In fact, any compliance and performance issues regarding the

Service Plan rest with the Service Coordinator.  PPL is informed via weekly electronic file transmission from the Commonwealth of authorized hours, both regular and overtime for every Participant-Employer in the program.  Stewart Dep., 247:4-250:19.  PPL's purely administrative role is limited to whether or not the Service Plan hours set forth therein are met.  It is disingenuous and too far a leap to ascribe that such actions fall within the legal parameters of joint employment actions.

> 7.   PPL Does Not Meet the Economic Realities Test to Qualify as
>      a Joint Employer Under the Department of Labor Guidance.

The U.S. Department of Labor ("DOL") has provided guidance on the employer status of Medicaid participants under Self-Directed Services program like the HCBS waiver program. U.S. Wage and Hour Division Administrator's Interpretation No. 2014-2, SUBJECT: Joint employment of home care workers in consumer-directed, Medicaid-funded programs by public entities under the *Fair Labor Standards Act* (June 19, 2014).[22]  While that guidance focused on the possible joint employer status of the participating state agency, DOL's analysis is, nevertheless, important and helpful in evaluating the joint employer status of a Financial Management Services provider such as PPL.

DOL applied what it characterized as the economic realities factors, the first of which is the power to hire and fire, which is generally considered "a strong indicator of employer status." *Id*., p. 9.  Again, in the present case, PPL did not participate in setting qualifications for hiring or firing DCWs.  Thus, under DOL's analysis, this factor would strongly tend to exclude PPL as a joint employer.  Next, DOL considered another strong indicator of employer status to be the control over wages or employee benefits.  *Id*., p. 11.  Since PPL had no control over DCWs'

---

[22] A copy of the Administrator's Interpretation is attached hereto as <u>Exhibit O</u>.

wages nor does it provide any benefits as set forth above, this factor also strongly tends to exclude PPL as a joint employer.

The third factor that DOL addressed was setting hours worked and scheduling. The guidance notes that in certain consumer-directed programs, a consumer[23] retains complete control (within his/her budget) over scheduling, including the number of work hours, for home care workers. That is the precise situation here in Pennsylvania: the Participant-Employers determined the kind of work to be performed, and the hours and schedule of DCWs. PPL had no role whatsoever in these activities so this factor also tends to exclude PPL as a joint employer.

DOL's fourth factor, which it characterizes as "important," is who supervises, directs, or controls the work. According to DOL, where, as in the present case, the Participant-Employers have sole control over DCWs, the tasks that are performed, how they are performed, and when the tasks are performed, this would be a weak indicator of employer status for the public entity overseeing the program. The Service Coordinator with the Participant-Employers supervise the DCWs under the Service Plan and the Participant-Employers control and direct the DCWs' work on site in their home. Similar to the third factor, PPL plays no role in supervising, directing, or controlling the work done by a DCW and this factor strongly mitigates against any finding of joint employment.

The final factor considered in the DOL guidance is performing payroll and other administrative functions. The Department noted, however, that:

> [i]n many programs … a fiscal management agent performs payroll or other administrative functions on behalf of the consumer. As noted in the Final Rule, functions that are similar to the tasks performed by commercial payroll agents for businesses, such as maintaining records, issuing payments addressing tax withholdings, and ensuring that workers' compensation insurance is maintained for

---

[23] DOL uses the term "Consumer' to refer to the "Participant-Employer."

the worker on behalf of the consumer are *weak* indicators that the entity is an employer.

*Id.*, p. 14 (emphasis added).  PPL performs the functions described in the DOL guidance, which are similar to the services provided by a payroll agent, such as ADP, and, thus, do not provide a basis for a joint employer relationship.  *See, Blake v. Batmasian,* 191 F. Supp. 3d 1370, 1377 (S.D. Fla. 2016) (dismissing payroll company from FLSA suit because the fact that it paid the other defendant's employees was inadequate to plausibly allege that it was, in economic reality, a joint employer).  Weighing the factors identified in DOL's Interpretation results in the same conclusion as under the *Enterprise* factors: PPL is not the joint employer[24] of DCWs.[25]

### C.  PPL is Not DCWs' Employer under the Pennsylvania Minimum Wage Act

For the reasons set forth above supporting a dismissal of DCWs' FLSA claim, their claims under the Pennsylvania Minimum Wage Act ("MWA") should also be dismissed.  Under the MWA, an "employer" is "any individual, partnership, association, corporation, business, trust, or any person or group or persons acting, directly or indirectly, in the interest of an employer in relation to any employee."  43 P.S. §§ 333.103 (g), (h).  Although no reported Pennsylvania case has yet elucidated criteria to determine employer status under the MWA, it is likely that Pennsylvania courts would apply the same "economic realities" test as is used in federal courts under the FLSA.  *Com., Dept. of Labor and Industry, Bureau of Labor Law Compliance v. Stuber*, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003), *order aff'd*, 859 A.2d 1253

---

[24] A finding by this Court that a DCW's Participant-Employer is their only employer is also consonant with the purposes and policy behind the statute and the Self-Directed Services option.  Holding PPL responsible for overtime as a joint employer, would implicate that PPL itself could then regulate and dictate whether overtime could be worked.

[25] *Jackson, et al. v. Public Partnerships LLC*, Civil Action No. 16-cv-04837-HB (E.D. Pa., filed date Sept. 7, 2016) (Bartle, J.) provides additional collateral support for dismissal.  In that case, a complaint similar to the one in this matter was voluntarily dismissed by agreement (without any consideration being provided to plaintiffs on the part of PPL) after PPL filed its motion for summary judgment in lieu of an answer.

(Pa. 2004); *see also Livi v. Hyatt Hotels Corp.,* No. 17-3646, 2018 WL 4944823, at *2 (3d Cir. Oct. 12, 2018).

In *Stuber*, the Commonwealth Court held that it would borrow the federal rule of decision under the FLSA for determining whether an individual was an employee or an independent contractor for purposes of the MWA, stating:

> In the past, this Court has indicated that it is proper to give deference to federal interpretation of a federal statute when the state statute substantially parallels it. [Citation omitted] Therefore, because the state and federal acts have identity of purpose, we hold that federal case law, and the "economic reality" test employed by the federal courts, is the appropriate standard to use.

*Id*. at 873.[26]  It follows that the Pennsylvania courts would likely apply the same FLSA test analyzed herein.[27]  Without repeating the evaluation under the economic realities test here, for the reasons previously set forth above, PPL is not the employer of DCWs under the MWA.

The recent Pennsylvania Supreme Court decision in *Markham v. Wolf* is compelling precedent, because it characterized the relationship between the Participant-Employers and DCWs as employer/employee.  190 A.3d 1175, 1178-1188 (Pa. 2018) (noting that "[h]ome care services are typically directed by the participants who receive personal care and domestic services where they reside, and they recruit, hire, and manage the DCWs who render the services in their home . . ." and further that "the participants are the employers of the DCW").  The Commonwealth Court opinion preceding the decision, although overturned on other grounds by the Supreme Court, also described that:

---

[26] The "economic realities" test for determining whether one is an independent contractor or an employee of an entity is not sufficiently similar to the test for determining which entity or entities is the employer of someone who admittedly is an employee.

[27]  *Itterly v. Family Dollar Stores, Inc*., 606 F. App'x 643, at *2 n.4 (3d Cir. 2015) ("Pennsylvania courts have looked to federal law regarding the FLSA for guidance in applying the PMWA."); *Lehman v. Legg Mason, Inc*., 532 F. Supp. 2d 726, 733 n.4 (M.D. Pa. 2007) ("The definition of 'employer' under Pennsylvania wage and hour laws is substantially similar to this definition in the FLSA… For purposes of this motion, the court need not examine each").

> As employers, participants have federal employer identification numbers, are subject to workers' compensation and unemployment requirements, and pay relevant employer taxes.  Under Act 150, participants have the "right to make decisions about, direct the provision of and control … [home] care services.' [Citation omitted]. Thus, participants' control over their care is unfettered other than compliance with home care service regulations."

*Markham v. Wolf*, 147 A.3d 1259 (Pa. Commw. Ct. 2016), *vacated on other grounds*, 190 A.3d 1175 (Pa. 2018).  As these decisions have found that the relationship between the Participant-Employers and the DCWs was a key element, Pennsylvania courts, evaluating the status of PPL and these Participant-Employers under the MWA, would likely find that PPL is not an employer of DCWs.

This conclusion is further supported by the Governor's Office of General Counsel, which has provided an opinion letter to OLTL advising that under the MWA, Direct Care Workers, such as Plaintiffs, are employed by the Participant-Employers and not the payroll fiscal agent, Stewart Decl. ¶¶ 64, Ex. G.  Finally, three collateral administrative decisions outside the Commonwealth have held that PPL was not the employer in analogous factual situations. (Copies attached hereto as <u>Exhibit P</u>).

### D.  DCWs Cannot State a Claim under the Pennsylvania WPCL.

For the reasons set forth above and because there is no enforceable contract between DCWs and PPL, this Court should dismiss her claim for violation of the Pennsylvania Wage Payment and Collection Law ("WPCL").  *See Reyes v. XPO Last Mile, Inc.,* No. 15-2792, 2016 WL 4063454, *3 (E.D. Pa. Jul. 28, 20160 (Finding that plaintiffs lacked standing because they had no contract with defendant); *Ahmed*, 2014 WL 6473375, *3 (E.D. Pa. Nov. 18,2 014) (no contractual obligation to pay overtime); *DeJohn v. Pitt Ohio Exp*., LLC, No. CIV.A. 3:13-1417, 2015 WL 4356064, at *12 (M.D. Pa. July 14, 2015) (granting defendant's motion for summary

judgment because plaintiff did not allege that defendant had a contractual obligation to pay him

overtime).

      The WPCL provides, in pertinent part, that:

> Every employer who by agreement ... agrees to pay or provide fringe benefits or
> wage supplements[] must ... pay or provide the fringe benefits or wage
> supplements, as required, within 10 days after such payments are required to be
> made directly to the employee, or within 60 days of the date when proper claim
> was filed by the employee in situations where no required time for payment is
> specified.

43 P.S. at § 260.3.  Although severance pay and other fringe benefits constitute wages under the

WPCL, the statute does not create a substantive right to compensation.  *Sendi v. NCR Comten,*

*Inc.,* 619 F. Supp. 1577, 1579 (E.D. Pa. 1985), *aff'd*, 800 F.2d 1138 (3rd Cir. 1986) (citations

omitted).  Put another way, before wages are due under the WPCL, one must first be

contractually entitled to them.  *Id*. (citations omitted).  In the instant case, no contract exists

between the parties to sustain a WPCL claim, and the First Amended Complaint does not allege

that one exists. *See White v. Ciber, Inc.,* No. 1:07-CV-1483, 2007 WL 3491272, at *3 (M.D. Pa.

Nov. 14, 2007) (describing private right of action where wages owed "pursuant to an

employment contract.").

      Furthermore, PPL is not the employer of DCWs for purposes of the WPCL.  An

"employer" under the WPCL is "every person, firm, partnership, association, corporation,

receiver or other officer of a court of this Commonwealth and any agent or officer of any of the

above-mentioned classes employing any person in this Commonwealth."  43 P.S. § 260.2a.  In

order to state a claim under the WPCL against an "agent" of the employer, Pennsylvania courts

"require a plaintiff to plead and prove that the officer or agent charged took an 'active role' in

corporate advising, policy-making or decision-making that led to the alleged violation of the

WPCL before a corporate officer or agent may be considered an 'employer' and subject to

liability." *White*, 2007 WL 3491272, at *3 (citing cases).  In *White*, the court dismissed the

plaintiff's WPCL claim, stating:

> It follows that an officer or agent who does not have decision-making or policy-making authority, but instead carries out decisions made by others is not an "employer" under the WPCL … "Absent some indication that he exercised a policy-making function in the company, [an officer or agent] is not among the class of persons who may be liable under the WPCL."

*Id*. (omitting citations).

PPL has no decision-making or policy-making authority, and cannot be either an

employer or agent for purposes of WPCL.  In comparable factual circumstances, a WPCL claim

against Automated Data Processing (ADP) was dismissed.  *See Silfee v. Automated Data

Processing, Inc*., No. 3:CV-15-23, 2015 WL 1137526, at *4-5 (M.D. Pa. Mar. 12, 2015).

According to the court, the plaintiff "fail[ed] to allege any facts to support his contention that

ADP, an entity distinct from his employer that was contracted for the provision of payroll

services, had an active role in decision-making on issues relating to wage and compensation

decisions at [the plaintiff's employer]." *Id*., at *4.  Accordingly, DCWs cannot set forth any

facts by which PPL is an "employer" or "agent" pursuant to the WPCL, and therefore, cannot

enforce a right which they do not possess.

## V.    CONCLUSION

The evidence in the record establishes that there can be no genuine dispute with respect

to the fundamental question before the Court:  PPL is and was not the employer, or the joint

employer, of any Direct Care Workers in this Medicaid program.  The DCWs' actual employers,

the individual Participant-Employers, are the ones who hired, fired, and supervised them,

directed their work, and oversaw each and every aspect of the performance of their services.  In

light of the governing legal framework and irrefutable facts, PPL is entitled to summary

judgment on all counts of the First Amended Complaint.

Respectfully submitted,

PUBLIC PARTNERSHIPS LLC,


By its attorneys,

*/s/ Walter M. Foster*
Walter M. Foster (admitted *pro hac vice*)
Eckert Seamans Cherin & Mellott, LLC
Two International Place, 16th Floor
Boston, MA  02110
Telephone: 617.342.6800
Facsimile:  617.342.6899
wfoster@eckertseamans.com

Dated: March 8, 2019

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

RALPH TALARICO, INDIVIDUALLY AND, }
ON BEHALF OF ALL OTHERS SIMILARLY }
SITUATED, }
 }  Docket No. 17-2165
    Plaintiffs, }
 }  Judge Schmehl
v. }
 }
PUBLIC PARTNERSHIPS LLC, D/B/A PCG }
PUBLIC PARTNERSHIPS, }
 }
    Defendant. }

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 8, 2019, I electronically filed the foregoing document using the CM/ECF system, and that I served the same by electronic filing via ECF, pursuant to the administrative procedures of the United States District Court for the Eastern District of Pennsylvania governing the filing and service by electronic means, upon all counsel of record as follows:

> Richard A. Katz, Esquire
> Arnold, Beyer & Katz
> 140A King Street
> Lancaster, PA 17602
> (717) 394-7204
> rkatz@arnoldbeyerkatz.com
>
> Christine E. Webber, Esquire *pro hac vice*
> Miriam R. Nemeth, Esquire *pro hac vice*
> Cohen Milstein Sellers & Toll PLLC
> 1100 New York Ave., N.W. Suite 500
> Washington, DC 20005
> (202) 408-3645
> cwebber@cohenmilstein.com
> mnemeth@cohenmilstein.com

{K0779542.1}

Rachhana T. Srey, Esquire *pro hac vice*
Robert L. Schug, Esquire *pro hac vice*
Nichols Kaster, PLLP
4600 IDS Center, 80 South 8th Street
Minneapolis, MN  55402
srey@nka.com
schug@nka.com

*Attorneys for Plaintiff*

Respectfully submitted,

PUBLIC PARTNERSHIPS LLC,
By its attorney,

*/s/ Walter M. Foster*
Walter M. Foster (admitted *pro hac vice*)
Eckert Seamans Cherin & Mellott, LLC
Two International Place, 16th Floor
Boston, MA  02110
Telephone: 617.342.6800
Facsimile:  617.342.6899
wfoster@eckertseamans.com

Dated: March 8, 2019