IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RALPH TALARICO, individually and on behalf Of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PUBLIC PARTNERSHIPS, LLC, d/b/a PCG, PUBLIC PARTNERSHIPS,<br><br>Defendant. | CIVIL ACTION<br>NO. 17-2165 |

**MEMORANDUM**

**Schmehl, J.  /s/ JLS**                                                                                                  **January 28, 2020**

Before the Court is the motion for summary judgment of Defendant Public Partnerships, LLC d/b/a PCG Public Partnerships ("PPL"). Plaintiff Ralph Talarico ("Plaintiff" or "Talarico") has opposed the motion, and PPL has filed a reply. Having read the parties' briefing and after oral argument on the issue, I find that no reasonable jury could conclude that Plaintiff was an employee of PPL. Accordingly, I will grant PPL's Motion for Summary Judgment and dismiss this action in its entirety.

**I.     INTRODUCTION**

Plaintiff filed this Collective Action and Class Action Complaint alleging violations of the Fair Labor Standards Act (29 U.S.C. § 201, *et seq.*) ("FLSA"), the Pennsylvania Minimum Wage Act of 1968 (43 P.S. 333.101 *et seq.*) ("MWA") and the Pennsylvania Wage Payment and Collection Law (43 P.S. 260.1 *et seq.*) ("WPCL"). Specifically, Talarico alleges that PPL failed to pay him and thousands of other similarly situated employees overtime wages to which they are entitled for work performed as direct

care workers in the Federal Medicaid program. PPL contends that it is not Plaintiff's employer, thus, is not in violation of any of the above-referenced statutes.

## II. FACTUAL BACKGROUND

Plaintiff and other similarly situated individuals are thousands of workers who performed services under PPL's contract with Pennsylvania relating to a federal Medicaid program called the Home and Community-Based Services ("HCBS") waiver program. The HCBS waiver program is a Medicaid program administered at the federal level by the Centers for Medicare and Medicaid Services ("CMS") under §1915(c) of the Social Security Act, 42 U.S.C. § 1396n, and in Pennsylvania by the Department of Human Services Office of Long Term Living ("OLTL"). 55 Pa. Code § 52.1. OLTL applied to CMS for a waiver to provide an array of options under the HCBS waiver program umbrella. 42 U.S.C. § 1396n; 42 C.F.R. § 441.301. (JSOF at ¶ 2.) CMS approved the application and OLTL now administers the options in the Commonwealth. 52 Pa. Code § 52.1. One specific waiver program administered by OLTL, the Independence Waiver Program, authorizes "Self-Directed Personal Assistance Services" to Participant-Employers ("PEs") who are between the ages of 18 and 60 with physical disabilities. 55 Pa. Code § 52.3.[1] OLTL's Application for a § 1915(c) Home and Community-Based Services Waiver describes its administration of the HCBS waiver program in detail. (*Id*. at ¶ 3.)

The stated purpose of the waiver program is to permit a state to furnish "services that assist Medicaid beneficiaries to live in the community and avoid institutionalization." (*Id.* at ¶ 4.) A PE's enrollment in the HCBS waiver program begins when an

---

[1] Self-Directed Personal Assistance Services are "designed to allow individuals . . . to exercise decision-making authority in identifying, accessing, managing and purchasing" the resources they need. 42 C.F.R. § 441.450(b).

2

independent enrollment broker (a third party contracted by the Commonwealth) does an intake to determine if a Participant is eligible for enrollment into the HCBS waiver program. (JSOF, ¶ 5.) After OLTL approves the PE for the program, he or she works with a third-party Service Coordinator to prepare a Service Plan and Service Budget. (*Id.*, at ¶ 6.) The Service Coordinator "provides ongoing support and monitoring of the decisions that a participant makes when hiring and firing", "work[s] with the participant to create their service plan", and "work[s] with the consumer to determine what are the needs of this consumer." (*Id.*, at ¶ 7.)

When the Service Coordinator meets with the PE, he or she conducts an intake which "is basically an overview of the program with the [Participant] in their home and creation of their plan of care, which would include services that they are in need of." The Service Plan, created by the Service Coordinator with input from the PE, dictates how many units of service a PE is permitted to receive. (*Id.,* at ¶ 8.) If a PE requires more than 40 hours a week of services, such overtime would need to be authorized in the Service Plan. Skovera Dep., pp. 123-124. OLTL then reviews the Service Plan submitted by the Service Coordinator, including the number of hours for which service is authorized, and approves or denies it. (*Id.*, at ¶ 9.) If the PE's needs change, he or she must work with the Service Coordinator to amend the Service Plan. (*Id.*, at ¶ 10.) PPL is not involved in the creation of the Service Plan, nor is it involved in determining the number of units a PE receives in the Service Plan. Skovera Dep., pp. 105, 121-122; LZ Dep., pp. 22- 23, 55-56; EW Dep., p. 15; MJ Dep., pp. 23-24;LZ Dep., pp. 22, 55-56. PPL is informed of the eligibility of the PE and the allowable hours of service. Stewart Decl., ¶ 18.

After CMS approved OLTL's application, OLTL opted to implement the Self-Directed Services option, and describes the self-directed program as follows:

> All participants in the Independence [W]aiver [Program] have the right to make decisions about and self-direct their own waiver services and may choose to hire and manage staff using Employer Authority. Under Employer Authority, the participant serves as the common-law employer and is responsible for hiring, firing, training, supervising and scheduling their support workers.

*See* OLTL Application, ECF No. 158, Exh. C, p. 169. Every participant has the option to act as the employer under the Self-Directed Services option or to have an agency act as the employer and handle all issues relating to the participant's services. (Dep. of Julie Skovera, pp. 18-20.) There is no dispute that the latter model, called the agency model, is not at issue in this case. Rather, Plaintiff takes issue with the Self-Directed Services option.

CMS regulations state that Medicaid Participant-Employers who elect the Self-Directed Services Option have the authority to recruit workers, hire and fire workers, train workers, specify worker qualifications, determine worker duties, schedule workers, supervise workers, evaluate worker performance, determine the amount paid for a service, and schedule when services are provided. 42 C.F.R. § 441.450 (b)(1)-(12). CMS regulations also require that the Self-Directed Services Option provide for the development of a "Service Plan," which is a "document that specifies the services and supports (regardless of funding source) that are to be furnished to meet the needs of a participant in the self-directed [Personal Assistance Services] option and to assist the participant to direct the [Personal Assistance Services] and to remain in the community." *Id.* §§ 441.450(c), 441.468. The

regulations also provide for a "Service Budget," which is "an amount of funds that is under the control and direction of a participant." *Id.* § 441.450(c).

When the Service Coordinator meets with the participant, it is explained to the PE that it is their "responsibility, as the employer, to be reviewing the timesheets, to make sure they are accurate and that if they are signing them, they are signing off saying these services were provided in accordance with the hours that were authorized on their [Service Plan]." Skovera Dep., p. 54. Service Coordinators also monitor the Service Plan once it is implemented. *Id.*, p. 92.

CMS regulations authorize states to provide financial management services on behalf of PEs who elect the Self-Directed Services option. These services include, *inter alia*, payroll processing and the collection and disbursement of withholding taxes. *Id.* § 441.484(a)(2). Further, PPL's Grant Agreement states that "Federal law requires individuals receiving [Personal Directed Services] through the Consumer Directed Model to utilize the services of a Vendor Fiscal/Employer Agent ("VF/EA") which serves as a fiscal intermediary and provides Financial Management Services" to individuals who qualify for home care under HCBS waiver programs. Grant Agmt, ECF No. 158, Exh. D. PEs are required to use PPL if they want to obtain home-care services through the Participant Directed Services Program; they cannot select a different agent or operate without an agent. Horvath Dep., p. 109; MJ Dep., p. 87; DS Dep. p. 51; LZ Dep., pp. 111-112. PPL has Enrollment Specialists who train PEs either in-person or telephonically, and work with service coordinators to provide training to PEs in need of additional employer skills training. *See* Waiver App. at 24-25, 171; Grant Agreement at 759; Stewart Dep., pp. 51, 57, 118.

5

When a Direct Care Worker ("DCW") goes to work for a PE under this program, PPL provides the DCW with an application that must be completed, as well as the DCW Agreement that must be signed; PPL also provides an instruction manual and a customer service helpline for questions associated with the application and agreement. *See* Stewart Dep., pp. 82, 129-130, 126; Santiago Dep., 141. After this initial paperwork is received by PPL, it verifies each DCW's citizenship status and completes a criminal background check and child abuse clearance. Waiver App. at 24-25; Stewart Dep., pp. 154-155. PPL also ensures that DCWs are not on the state's List of Excluded Individuals and Entities; if a DCW is on this list, they are not permitted to be paid as part of this waiver program. *See* New DCW Waiver Packet at 1045; Stewart Dep. pp. 134-135, 143, 312-314; LZ Dep., pp. 138-39; MJ Dep. p. 120; Lang Dep., pp. 102-103. PPL will not pay a DCW for any work performed before all checks are completed. *See* Stewart Dep., p. 323. Once all the approval steps are completed, PPL gives the "good to go," and authorizes the DCW to begin working. Stewart Decl. at C2-4; Stewart Dep., pp. 59, 79, 80, 86-87.

PPL pays DCWs directly and is later reimbursed by the state for those wages. Stewart Dep., pp. 234-236. PPL "is responsible for informing the participant of the established rate" for the services that he or she receives. Waiver App. at 213. PPL calculates the maximum wage rate a PE can pay a DCW and regularly recalculates this rate as the PE's insurance rates change. Stewart Dep., pp. 166, 174, 176, 182. PPL provides guidance to PEs about selecting wage rates through written materials. PPL Handbook at 1267, Stewart Dep., pp. 176-178.

6

DCWs report their time to PPL using timesheets or an online portal. Once PPL receives the timesheets, it reviews and validates them "against the participant's eligibility and service authorization information imported to [PPL's] web portal." Waiver App. at 214; Stewart Dep., pp. 84, 202-205, 210-213, 224, 237, 256-257; JSOF at ¶ 17. PPL tracks time worked by the DCWs to ensure compliance with the number of hours permitted in the PE's Individual Service Plan. Waiver App. at 159; Stewart Dep., pp. 212-213; JSOF at ¶ 18. PPL also reviews timesheets to ensure there is no overlap with time reported from each DCW and any other PE or for that PE and any other DCWs. Stewart Dep., pp. 213, 215-218; Horvath Dep., pp. 89, 92, 96-97; Talarico Dep., pp. 224-225, 213, 215-218.

PPL handles all payroll functions and unemployment and tax withholdings. EW Dep., p. 21. Payroll checks issued to the DCWs bear PPL's name and logo on the check, and PPL also issues W-2 forms listing the employer as "Public Partnerships for PA HH ER Agent for [PE]." Stewart Decl.; Talarico Dep., pp. 146, 149, 151, 171, 186.

PPL plays no role in disciplining any DCW (JSOF at ¶ 12) and uses standardized paperwork to enroll PEs, who must complete the paperwork before PPL will pay their DCWs. (*Id.*, at ¶ 13.) PPL's web portal will provide reports that the State and the Participant's service coordinator can access, which will provide certain information about the PEs use of services and whether timesheets have been submitted for the PEs care. PPL provides an instruction manual and customer service helpline for questions about these applications, agreements, and other forms. (JSOF, ¶ 14.)

All PEs signed a Direct Care Worker Agreement ("DCW Agreement") with their DCWs that acknowledged that the DCW was employed by the PE and not by PPL. Stewart Dec., Ex. C. pp. 2-4, 24-16; Ex. D., pp. 2-4, 14-16, 23-25; Ex. E, pp. 2-4, 14-16; Ex. F. pp. 2-4, 14-16, Simms Dep. pp. 60-63; Lang Dep., Santiago Dep., pp. 101-102. On this DCW Agreement, the PE was designated as the "Common Law Employer." *Id*. Every DCW Agreement contains the following language:

> 14. I understand and acknowledge that VF/EA [PPL] is not my employer.
>
> 15. I understand that the participant or their appointed representative is my employer. My employer is not VF/EA [PPL], OLTL, or any other entity involved with the PDS Program.
>
> 16. I understand that my paychecks will be processed by the Vendor Fiscal/Employer Agent (VF/EA) [PPL]. The VF/EA [PPL] is considered a Financial Management Service (FMS) Organization. I understand that the VF/EA [PPL] is not authorized to pay for any service not approved and authorized in the ISP or any request that exceeds the participant's budget and funds for the PDS program as stated in the ISP.

Stewart Decl., Ex. C, pp. 3, 15; Ex. D, pp. 3, 15, 24; Ex. E, pp. 3, 15; Ex. F, pp. 3. 15; Simms Dep., pp. 60-64; Lang Dep., Ex. 3, Ex. 5; Santiago Dep., pp. 101-102.

Numerous other forms completed by the DCWs listed the PEs as their employers. PEs also signed a Common Law Employer Agreement ("CLE Agreement") which states that the PEs accept the responsibility for managing the services provided to them by the DCW and that they are the "legal employer of the qualified Direct Care Workers hired to provide" the services identified in their service plans. Stewart Decl. ¶¶ 30, 50; Ex. D, pp. 17-19; Ex. F, pp. 17-19; Simms Dep. Ex. 8, Lang Dep., Ex. 4.

8

PPL completes a criminal history background check on all DCWs that are hired. The Criminal History Background Check Participant/CLE Acceptance of Responsibility Form states:

> Criminal history background checks are mandatory but a participant may still choose to hire a direct care worker even if a worker is found to have a criminal history
>
> . . .
>
> As the employer, I have the right to choose to hire a direct care worker with a criminal record. In doing so, I accept responsibility for my decision and potential consequences of my decision. I choose to hire the below named Direct Care Worker (DCW).

*See, e.g.* Simms Dep., Exh. 7. Further, the DCW Agreement states that the results of the criminal background check are provided to the PE, at which time the PE can still move forward and choose to hire the DCW. Stewart Decl, Ex. C, ¶ 59. LZ, a Participant-Employer, testified that when a background check came back with findings of criminal convictions for DCWs she wanted to hire, it was her "personal choice whether or not to move forward or to cease working with that individual." LZ Dep., pp. 50-51.

### III.   LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. Proc. 56(c). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is

"genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." *Pignataro v. Port Auth. of N.Y. and N.J.*, 593 F.3d 265, 268 (3d Cir. 2010) (*citing Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

## IV. DISCUSSION

Plaintiff filed this collective action pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 210, *et seq*, the Pennsylvania Minimum Wage Act, 43 P.S. §§ 333.103, *et seq*, and the Pennsylvania Wage Payment and Collection Law, 43 P.S. §§ 260.1, *et seq*. PPL moves for summary judgment on all claims brought by Plaintiff, arguing that Plaintiff's claims must fail because PPL is not and has never been Plaintiff's joint employer.[2] For the reasons set forth below, I find that PPL is not the joint employer of Plaintiff. Accordingly, Defendant's Motion is granted and Plaintiff's Amended Complaint is dismissed.

### A. FLSA CLAIMS

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d), and an "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1). The FLSA prohibits an "employer" from failing to pay overtime compensation. 29 U.S.C. § 207(a)(1). "When

---

[2] Plaintiff does not argue that PPL was his sole employer.

10

determining whether someone is an employee under the FLSA, the economic reality rather than the technical concepts is to be the test of employment." *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 148 (3d Cir. 2014) (quoting *In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, 683 F.3d 462, 467-68 (3d Cir. 2012)) (internal citations omitted). "A 'single individual may stand in the relation of an employee to two or more employers at the same time under the [FLSA].'" *In re Enterprise*, 683 F.3d at 467 (quoting 29 C.F.R. § 791.2(a)). "A determination as to whether a defendant is a joint employer 'must be based on a consideration of the total employment situation and the economic realities of the work relationship.'" *Id*. at 469 (quoting *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470-71 (9th Cir. 1983)).

In order to determine whether a defendant is a joint employer under the FLSA, courts apply the *Enterprise* test. The *Enterprise* test examines: 1) the alleged employer's authority to hire and fire the relevant employees; 2) the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment; compensation, benefits, and work schedules, including the rate and method of payment; 3) the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and 4) the alleged employer's actual control of employee records, such as payroll, insurance or taxes. *Enterprise*, 683 F.3d at 468-69. At summary judgment, if no reasonable juror could conclude a joint employer relationship existed, the defendant is entitled to summary judgment, even if some of the factors do not favor that defendant. *Id*. at 471.

I will examine each of these factors in turn as it applies to the instant set of facts.

### 1. Does PPL Have Authority to Hire and Fire?

The first factor of the *Enterprise* test examines whether the alleged employer has the power to hire and fire employees. In the instant matter, it is undisputed that PPL does not locate, interview, or recruit DCWs into the program. However, Plaintiff sets forth numerous facts in support of his argument that PPL has the power to hire DCWs. Plaintiff points out that PPL requires DCWs to complete an application, meet certain qualifications, undergo a background check and sign a DCW Agreement. Additionally, Plaintiff argues that although PEs can decide who they want to hire as a DCW, that choice is subject to PPL's approval, and no DCW can be paid until PPL gives the "good to go." Plaintiff further focuses on the fact PPL can bar a PE from hiring a DCW who appears on Pennsylvania's List of Excluded Individuals and Entities as evidence of PPL's alleged power to hire DCWs.

First, I find Plaintiff's argument that DCWs are required by PPL to complete certain documentation before a PE can begin working to be evidence of PPL's control over the hiring process to be unpersuasive. As discussed above, PPL has a contract with Pennsylvania to administer the Self-Directed Services Option and that contract requires PPL to use certain paperwork. PPL does not independently decide what forms need to be completed, nor does it develop those forms. Rather, the state directs PPL in this regard.

Next, as to the fact that PPL performs a criminal background check on all DCWs before they can begin work, the fact that PEs can still opt to hire a DCW following a positive criminal background check is fatal to Plaintiff's argument. The Criminal Background Check Participant/CLE Acceptance of Responsibility Form states that "[c]riminal background checks are mandatory but a participant may still choose to hire a

direct care worker even if a worker is found to have a criminal history." It further states that "[a]s the employer, I have the right to choose to hire a direct care worker with a criminal record." Simms Dep., Exh. 7. Further, section 2 of the DCW Agreement states that background results are provided to the PE, at which point the PE can still exercise his or her discretion and decide to hire the DCW. Stewart Decl, Exh. 3, p. 37 at ¶ 59. PPL cannot forbid a PE from hiring a DCW with a criminal record, and PPL only performs a criminal background check once a PE determines that he or she wants to hire a DCW. As further evidence of this, both LZ, a PE, and DCW Simms testified that in their experience, a PE could choose to hire a DCW who had a criminal background, with no input from PPL. Although PPL reviews DCWs criminal background check, the ultimate hiring decision still rests with the PE.

Further, Plaintiff argues that PPL has control over hiring because a DCW cannot work or be paid until they get PPL's "good to go." However, I find this argument to be misleading. It is not true that a DCW cannot work or be paid *at all* without PPL's ok. Rather, a DCW cannot work or be paid *under the waiver program at issue* in this case until the program requirements are met. Nothing prevents a DCW from working and being paid by the PE personally prior to receiving the "good to go" from PPL. New DCW Packet at 1045, ¶ 15. DCWs simply cannot be paid with Medicaid funds from this program until PPL gives the go ahead.

The argument that PPL can bar a PE from hiring or require the firing of a DCW who appears on Pennsylvania's List of Excluded Individuals and Entities is also unpersuasive. The exclusion of potential DCWs who are found on this list is required by the Commonwealth pursuant to the relevant waiver program; this is not a policy of PPL.

13

Similarly, PPL's role in reviewing DCW timesheets and determining whether they should be paid is not evidence of an alleged employer relationship. The PEs are the ones who ultimately decide which DCW hours are appropriate for payment. PPL merely reviews timesheets to make sure no hours are double-counted, etc, and processes the checks for the PEs.

Plaintiff also argues that the DCWs are "economically dependent upon PPL" and that the PEs "do not have money of their own to pay workers." ECF No. 165, p. 23. However, this characterization of the relationship between PPL and the DCWs is misleading. PPL is not distributing money to the DCWs from its own funds; rather, PPL is distributing Medicaid money in accordance with the waiver program and the PEs decisions made with the Service Coordinator as to the extent of services necessary. If anything, the DCWs are "economically dependent" upon the government which provides the Medicaid funds in question.

As to PPL's ability to fire the DCWs, there has been no evidence presented that PPL is involved in that process in any way. Multiple PEs testified that they have the sole discretion and ability to terminate their DCWs. In fact, DCWs Talarico, Santiago and Simms were all terminated by their PEs and testified that PPL had no role in their firings. Further, PPL does not handle DCW disciplinary issues. There is absolutely no evidence that PPL has any ability to participate in the firing of DCWs.

A review of the above shows that PPL clearly has no control over hiring and firing DCWs. Accordingly, this *Enterprise* factor weighs against a finding of joint employment in this matter. *See Yue Yu v. McGrath*, 597 F. App'x 62, 65-66 (3d Cir. 2014) (Plaintiff was not an employee of BMS because BMS "did not have the authority to hire or

fire" her); *see also Garcia v. Nunn*, 2015 WL 5585451, at * 4 (E.D. Pa. Sept. 23, 2015)
(dismissing FLSA claims where "there is no mention in the amended complaint that
Defendant Weis had the authority to hire and fire the plaintiff employees.")

> **2. Does PPL Have the Authority to Set Work Rules and Assignments and Set the Conditions of Employment Such as Compensation, Benefits or Work Schedules?**

The second prong of the *Enterprise* test examines whether the purported employer sets work rules, makes assignments and sets conditions of employment such as compensation, benefits or work schedules. Plaintiff argues that PPL establishes work rules through the DCW Agreement, exercises control over DCW compensation, benefits and hours, enforces a limit on the number of hours worked by DCWs, and sets overtime rates. After a thorough examination of the record, I find that this *Enterprise* factor also weighs against a finding of joint employment.

The PE, working in conjunction with his or her Service Coordinator, determines what services are needed from a DCW and documents those services in an individual Service Plan. Stewart Decl., ¶¶ 9, 14-15; Skovera Dep., p. 91. There is no dispute that PPL does not participate in the creation of the service plan. Stewart Decl., ¶¶ 14-15; LZ Dep., pp. 17-20, 22-23; EW Dep., p. 15; MJ Dep., pp. 23-24. Rather, PPL is informed of the total amount of hours permitted under the service plan so that it may properly determine DCW eligibility and payment. In addition, DCW schedules are determined by the PEs, not PPL. EW Dep., p. 30; LZ Dep., pp. 96-97; MJ Dep., pp. 30-33; Santiago Dep., p. 115; Simms Dep., p. 100; Talarico Dep., p. 67. Clearly, PPL has no input as to hours worked by the DCWs, or the job assignment of any DCW.

15

Plaintiff makes much of the rate of pay issue, claiming that PPL "gives participants substantial guidance" on pay rates, must approve any rate or rate change before it goes into effect, and enforces limits on pay rates. ECF No. 165, p. 29. While these facts may be true, this does not mean that PPL sets the compensation rate for the DCWs. Rather, the PEs themselves decide how much to pay DCWs subject to the maximum billable rate established in the Service Budget developed by the PE and their Service Coordinator, not by PPL. Stewart Decl., ¶¶ 14-15, 58; LZ Dep., pp. 80, 82-83, 88, 97; MJ Dep., pp. 31-32, 57, 71-73; Lang Dep., pp. 58, 91; Santiago Dep., pp. 38-39; 59. OLTL provides PPL with the maximum rate for a unit of service provided by a DCW. Stewart Decl., ¶ 58; LZ Dep., 80, 82-83, 88, 97. The PEs could pay from their budgeted hours any wage up to the maximum wage OLTL allows for the region in which the PEs reside, so long as it also met the minimum wage standard. Stewart Decl., ¶ 58; LZ Dep., pp. 80, 82-83, 88, 97. PPL does not develop or set this pay range. Rather, the range is calculated based upon the program requirements.

Despite providing PEs with a range of pay rates, approving rate changes and enforcing limits on pay rates, PPL is not actually *setting* the compensation rate. Rather, it is providing PEs with information and ranges that they are permitted to pay DCWs within the guidelines of the relevant waiver program. This is not setting pay rates. The PEs are the ones who select the rate of pay for their own DCWs within the program limits provided by PPL. *Cf Hardgers-Powell v. Angels in Your Home, LLC*, 2019 WL 409276 (W.D.N.Y. Feb. 1, 2019) (home care agency was held to be employer of plaintiffs where company screened employees and set wage rates).

Similarly, PPL has no part in determining the need for overtime. The decision as to the number of hours a DCW can work for a PE, whether more or less than 40, is set forth in the service plan, after being determined by the PE and the Service Coordinator. Stewart Decl., ¶ 14; Skovera Dep., pp. 123-125.

Plaintiff claims that PPL provides DCWs with Workers' Compensation insurance, but this is incorrect. PPL provides no benefits to DCWs. Stewart Decl., ¶¶ 58, 63. Rather, PPL assists PEs in paying for workers compensation insurance through their Medicare funds. Stewart Decl., Ex. C, pp. 17-26; Ex. D, pp. 27-40; Ex. E, pp. 17-33; Ex. F, p. 20-22. PPL merely facilitates procurement of the policy in question and any workers compensation policy that exists is in the name of the PE. *Id.*

In summary, I find that all the evidence presented by Plaintiff fails to satisfy the second factor of the *Enterprise* test as to PPL's alleged joint employer status. PPL does not tell PEs the amount that they should pay DCWs, does not tell PEs how many hours a DCW can work and has no input as to the necessity of overtime.

### 3. Does PPL Have any Involvement in Day-to-Day Employee Supervision?

Plaintiff cannot put forth any evidence to support this factor of the *Enterprise* test, as PPL clearly has no involvement in the day to day supervision of the DCWs. All functions of supervision, evaluation, and discipline are the sole responsibility of the PEs. Stewart Decl., ¶¶ 10, 61; Simms Dep., Ex. 8; Lang Dep., Ex. 4. PPL never visited PEs homes to observe the DCWs and never monitored the quality of services that were being provided by the DCWs. Stewart Decl., ¶ 61; EW Dep., p. 15; Talarico Dep., pp. 76-77. PPL does not manage the DCWs on a daily basis. *See McKenna v. Healthease, Inc.*, 2013 WL 1702639, at * 7-8 (E.D. Pa. Apr. 19, 2013) (defendant was not a joint employer of

the plaintiff where it "did not place any conditions on her employment, nor did it schedule or evaluate her performance.") Accordingly, Plaintiff also fails to meet this factor of the *Enterprise* test for joint employment.

### 4. Does PPL Control Employee Records?

Lastly, under the *Enterprise* test, courts examine whether the alleged employer controls employee records. PPL keeps copies of documents signed by the PEs and DCWs, proofs of payment made to DCWs and DCW timesheets. Stewart Decl., Exs. C, D, E, F. Plaintiff argues that PPL "maintain[s] all employment records," but presents no real evidence in support of this argument, other than the fact that PPL produced "complete files" for each DCW and payroll data, while none of the DCWs had those records in their possession. Plaintiff fails to elaborate on exactly what those "complete files" contained, but there is no evidence that PPL maintained any employee records outside of the payroll records that it contracted with the Commonwealth to handle. Plaintiff presented no evidence that PPL maintained employee performance reviews, employee disciplinary records or the like. I find this fourth factor to be neutral as to the analysis of joint employment, as PPL does maintain *some* employee payroll records, but there is no evidence that it maintains any other types of employment records regarding the DCWs.

After a thorough review of the record in this matter and an analysis of the four *Enterprise* factors, I conclude that no reasonable jury could find that Plaintiff was an employee of PPL. This conclusion is further supported by all of the program documents in this matter, which all state that the PE is the employer of the DCW, not PPL. See DCW Agreement, ¶¶ 17-19; Santiago Dep., Exs 12-16. All evidence points to the conclusion that PPL is merely a fiscal agent for the PEs for payroll purposes only, as contemplated in

PPL's contract with OLTL. Accordingly, Defendant's motion for summary judgment is granted and Plaintiff's FLSA claims are dismissed.

## B. PENNSYLVANIA MINIMUM WAGE ACT

Plaintiff also alleged that PPL committed violations of the Pennsylvania Minimum Wage Act. As stated by Plaintiff, "the parties agree that Pennsylvania follows the FLSA in many respects, including determining the existence of an employer or joint employer relationship for the Pennsylvania Minimum Wage Act." ECF No. 165, p. 39; see *Com., Dept. of Labor and Industry, Bureau of Labor Law Compliance v. Stuber,* 822 A.2d 870, 873 (Pa. Commw. Ct. 2003), *order aff'd,* 859 A.2d 1253 (Pa. 2004). As discussed above, our finding is that PPL is not Plaintiff's employer under the economic realities test contained in the FLSA. Therefore, PPL is also not Plaintiff's employer under the Pennsylvania Minimum Wage Act and Plaintiff's MWA claims are dismissed.

## C. PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW

To recover under the WPCL, a plaintiff may seek unpaid wages if a contract or agreement entitles him to wages, or if a separate statute requires certain wages to be paid. Plaintiff alleges that he has an implied contract with PPL as his employer, which creates a factual issue that will survive summary judgment. This argument fails because Plaintiff has presented no evidence whatsoever that supports the existence of an implied contract with PPL.

Plaintiff also argues that some courts have recently held that a plaintiff may use the WPCL to enforce their rights to recover unpaid wages owed to them under another statute such as the FLSA without a written contract. Accordingly, Plaintiff argues that his WPCL claims against PPL are appropriate despite the lack of a contract with PPL. This argument

must fail, as several courts in this district have found that "a contractual obligation remains necessary for a WPCL claim." *Drummond v. Herr Foods, Inc.*, 2014 WL 80729, at *2-3 (E.D. Pa. Jan. 9, 2014); *see also Reyes v. XPO Last Mile, Inc.*, 2016 WL 4063454, at *2 (E.D. Pa. July 29, 2016). Accordingly, as no contract exists between Plaintiff and PPL, the WPCL claim must be dismissed.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted and Plaintiff's Amended Complaint is dismissed in its entirety.