**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RALPH TALARICO, INDIVIDUALLY AND, ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | } } } | |
| | } | Docket No. 17-2165 |
| Plaintiffs, | } } | |
| | } | |
| v. | } } | Judge Schmehl |
| | } | |
| PUBLIC PARTNERSHIPS, LLC, D/B/A PCG PUBLIC PARTNERSHIPS. | } } } | |
| | } | |
| Defendant. | } | |

---

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND FINAL COLLECTIVE ACTION CERTIFICATION**

---

## **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................1

II. FACTUAL AND PROCEDURAL HISTORY ...............................................2

 A. Procedural History. ................................................................................2

 B. Framework of the Home and Community-Based Services Self-Directed Program. ..................................................................................................2

 C. The Appointment and Role of the Service Coordinator. ........................3

 D. The Individualized Service Plan is Unique to Each Participant-Employer. ...........4

 E. The Programmatic Framework and Uniqueness of Each Individual Service Plan Results in Significant Differences Amongst the Direct Care Workers. ..............................5

  1. Each DCW is Employed by a Different Participant-Employer. .................5

  2. Each DCW Performs Different Duties and/or Services for Each Participant-Employer Pursuant to the ISP. .........................................7

  3. Each DCW Works Different Schedules and Hours as Determined by Each Personalized ISP. ...................................................................7

  4. Each DCW Receives a Different Rate of Pay as Determined by the Participant-Employer. ....................................................................8

 F. Plaintiff Is Not Similarly Situated to 86% of the Conditionally Certified Class. ....9

III. ARGUMENT ...................................................................................................9

 A. Plaintiff Has Not Met the Stringent Requirements for Class Certification Under Either Stage of the Rule 23 Analysis. .................................................................9

  1. Plaintiff Cannot Satisfy Rule 23(a)'s Commonality and Typicality Requirements, or Adequately Represent the Interests of the Purported Class Given the Individualized Defenses. ................................................................10

   a. There is No Common Response to the Question of Joint Liability as each DCW Works under Different Conditions, in Different Locations, Performs Different Duties, and is Supervised by a Different Participant-Employer. ..............................................11

    i. *There is No Overtime Policy Adopted by PPL. Only the Participant-Employer and Service Coordinator Determine Overtime, not PPL.* ...................................... 14

i

ii.    *The Lack of a Uniform Overtime Policy Prevents Certification.* ................................................................... 17

b.    Plaintiff is Not Typical of the Class and he has Not Suffered the Same Injury as DCWs Who Work for Just One Participant-Employer. ..... 20

c.    Plaintiff Does Not Adequately Represent the Class Interests That Differ from Over 86% of the Opt-in Class. ............................................... 23

2.    Plaintiff Cannot Meet the Predominance or Superiority Requirement of Rule 23(b)(3). ............................................................................................ 24

a.    Individualized Determinations under the *Enterprise* Test are Not Amenable to a Class Action. ..................................................................... 25

b.    Plaintiff Also Cannot Meet the Superiority Requirement. .............. 27

i.    *Affirmative Defenses Will Effectively be Precluded from Trial, Prejudicing PPL.* .................................................................. 27

ii.    *Joint Employment Determinations Require Evaluation of Specific Work Conditions for Each DCW.* ..................................... 29

iii.    *Damages are Not Readily Susceptible or Determinable Based on the Information in PPL's Payroll Database.* .................. 31

B.    FLSA Certification is Inappropriate Under Section 216(b) Because the Putative Collective Plaintiffs Cannot Prove That They Are Similarly Situated. ............................ 33

1.    The Final Certification Stage Requires a Stringent Analysis. .................. 33

2.    The Putative Collective Plaintiffs Are Not "Similarly Situated" to Talarico. ....................................................................................................... 35

a.    The DCWs are Not Employed in the Same Department, Division, or Location. ..................................................................................................... 36

b.    The DCWs Advance Similar Claims and Seek Similar Relief Only in the Broadest Possible Sense. .................................................................. 38

c.    The DCWs Do Not Have Similar Salaries or Circumstances of Employment. ............................................................................................... 39

3.    PPL's Individualized Defenses Weigh in Favor of Decertification. .......... 42

4.    Fairness and Procedural Issues Weigh in Favor of Decertification. .......... 43

IV.    CONCLUSION .................................................................................................. 44

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ........................................................................................ 10

*Anderson v. Cagle's, Inc.*,
   488 F.3d 945 (11th Cir. 2007) ....................................................................... 37

*Andrako v. U.S. Steel Corp.*,
   788 F. Supp. 2d 372 (W.D. Pa. 2011) ........................................................... 35

*Arnold v. Directv, LLC*,
   2017 WL 1251033 (E.D. Mo. 2017) .............................................................. 42

*Balderrame-Baca v. Clarence Davids and Co.*,
   318 F.R.D. 603 (N.D. Ill. 2017) .................................................................... 23

*Blades v. Monsanto Co.*,
   400 F.3d 562 (8th Cir. 2005) ......................................................................... 10

*Boes v. Applied Analysis Corp.*,
   2020 WL 1526635 (E.D. Pa. 2020) ......................................................... 34, 41

*Brinker Rest. Corp. v. Super. Ct.*,
   53 Cal. 4th 1004 (2012) ................................................................................. 26

*Brown v. Electrolux Home Products, Inc.*,
   817 F.3d 1225 (11th Cir. 2016) ..................................................................... 10

*Camesi v. Univ. of Pittsburgh Med. Ctr.*,
   2011 WL 6372873 (W.D. Pa. 2011) ................................................. 41, 43, 44

*Campbell v. City of Los Angeles*,
   903 F.3d 1090 (9th Cir. 2018) ....................................................................... 39

*Collins v. Rocha*,
   7 Cal. 3d 232 (1972) ...................................................................................... 25

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ......................................................................................... 10

*Costello v. BeavEx, Inc.*,
   810 F.3d 1045 (7th Cir. 2016) ....................................................................... 25

*Dailey v. Sears, Roebuck & Co.*,
   214 Cal. App. 4th 974 (2013) ........................................................................ 28

*De La Fuente v. Stokely-Van Camp, Inc.*,
   713 F.2d 225 (7th Cir. 1983) ......................................................................... 20

*Deutschman v. Beneficial Corp.*,
   132 F.R.D. 359 (D. Del. 1990) ...................................................................... 20

*Duran v. U.S. Nat'l Bank Assn.*,
   59 Cal. 4th 1 (2014) ................................................................................ passim

*East Tex. Motor Freight Sys., Inc. v. Rodriguez*,
   431 U.S. 394 (1977) ....................................................................................... 22

100287855.1

*Erie Ins. Exch. v. Erie Indem. Co.*,
    722 F.3d 154 (3d Cir. 2013) ........................................................................ 10

*Ferreras v. Am. Airlines, Inc.*,
    946 F.3d 178 (3d Cir. 2019) ................................................................... 10, 14

*General Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) ................................................................................... 20

*Hayes v. Wal-Mart Stores, Inc.*,
    725 F.3d 349 (3d Cir. 2013) ........................................................................ 10

*In re Aluminum Phosphide Antitrust Litig.*,
    160 F.R.D. 609 (D. Kan. 1995) .................................................................. 22

*In re Enterprise Rent-A-Car Wage & Hour Emp't Pracs., Litig.*,
    683 F.3d 462 (3d Cir. 2012) ................................................................. passim

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008) ................................................................... 10, 11

*Jacob v. Duane Reade, Inc.*,
    289 F.R.D. 408 (S.D.N.Y.), *on reconsid. in part*, 293 F.R.D. 578 (S.D.N.Y. 2013) ......... 18, 19

*Jiminez v. Domino's Pizza, Inc.*,
    238 F.R.D. 241 (C.D. Cal. 2006) ................................................................ 13

*Karlo v. Pittsburgh Glass Works, LLC*,
    2014 WL 1317595 (W.D. Pa  2014), *aff'd*, 849 F.3d 61 (3d Cir. 2017) ............... 34, 42

*Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*,
    2011 WL 6372852 (W.D. Pa. Dec. 20, 2011) ...................................... 36, 39, 42, 43

*Layton v. DHL Express, Inc.*,
    686 F.3d 1172 (11th Cir. 2012) .................................................................. 42

*Lindsey v. Normet*,
    405 U.S. 56 (1972) ..................................................................................... 30

*Lockheed Martin Corp. v. Super. Ct.*,
    29 Cal. 4th 1096, 1108 (2003) ................................................................... 25

*Lusardi v. Xerox Corp.*,
    118 F.R.D. 351 (D.N.J. 1987) ..................................................................... 44

*Lusby v. Gamestop, Inc.*,
    297 F.R.D. 400 (N.D. Cal. 2013) ............................................................... 20

*Luviano v. Multi Cable, Inc.*,
    2017 WL 3017195 (C.D. Cal. 2017) ........................................................... 14

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012) .......................................................... 9, 10, 11, 24

*Marlo v. United Parcel Serv., Inc.*,
    251 F.R.D. 476 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011) ......... 15, 16, 18

*Martinez v. Mecca Farms, Inc.*,
    213 F.R.D. 601 (S.D. Fla. 2002) ................................................................ 23

*Messner v. Northshore Univ. HealthSys.*,
    669 F.3d 802 (7th Cir. 2012) ..................................................................... 25

*Meyer v. U.S. Tennis Ass'n*,
   297 F.R.D. 75 (S.D.N.Y. 2013)...................................................................... 18, 19

*Moore v. Int'l Cosms. & Perfumes, Inc.*,
   2016 WL 7644849 (C.D. Cal. 2016) .................................................................. 25

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001)............................................................................... 11

*O'Brien v. Ed Donnelly Enters.*,
   575 F.3d 567 (6th Cir. 2009)............................................................................. 34

*Philip Morris U.S.A. v. Williams*,
   549 U.S. 346 (2007) .......................................................................................... 30

*Rosario v. Livaditis*,
   963 F.2d 1013 (7th Cir. 1992)...................................................................... 23, 24

*Prise v. Alderwoods Grp., Inc.*,
   817 F. Supp. 2d 651 (W.D. Pa. 2011) .............................................................. 41

*Reinig v. RBS Citizens, N.A.*,
   912 F.3d 115 (3d Cir. 2018)......................................................................... 35, 36

*Retired Chicago Police Assn. v. City of Chicago*,
   7 F.3d 584 (7th Cir. 1993)................................................................... 20, 23, 24

*Reyes v. Netdeposit, LLC*,
   802 F.3d 469 (3d Cir. 2015).............................................................................. 10

*Rindfleisch v. Gentiva Health Servs., Inc.*,
   2012 WL 12873772 (N.D. Ga. 2012)........................................................... 31, 32

*Rodriguez v. National City Bank*,
   726 F.3d 372 (3d Cir. 2013).............................................................................. 10

*Ruehl v. Viacom, Inc.*,
   500 F.3d 375 (3d Cir. 2007).............................................................................. 42

*Ruffin v. Avis Budget Car Rental, LLC*,
   2014 WL 294675 (D.N.J. 2014) ........................................................................ 38

*San Jose v. Super. Ct.*,
   12 Cal. 3d 447 (1974)........................................................................................ 26

*Sav-On Drug Stores, Inc. v. Super. Ct.*,
   34 Cal. 4th 319 (2004)....................................................................................... 26

*Sloane v. Gulf Interstate Field Servs., Inc.*,
   2017 WL 1105236 (M.D. Pa. 2017)................................................................... 44

*Spencer v. Cent. States, Se. & Sw. Areas Pension Fund*,
   778 F. Supp. 985 (N.D. Ill. 1991) ..................................................................... 20

*Symczyk v. Genesis Healthcare Corp.*,
   656 F.3d 189 (3d Cir. 2011), *rev'd on other grounds*, 569 U.S. 66 (2013) ....................... 34, 41

*Talarico v. PPL*,
   837 F. App'x 81 (3d Cir. 2020).......................................................................... 19

*Vinole v. Countrywide Home Loans, Inc.*,
   246 F.R.D. 637 (S.D. Cal. 2007)............................................................. 12, 17, 27

100287855.1

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................ 9, 10, 11, 30
*Washington Mut. Bank, FA v. Super. Ct.*,
   24 Cal. 4th 906 (2001) .................................................................... 27, 28
*Zavala v. Wal-Mart Stores, Inc.*,
   691 F.3d 527 (3d Cir. 2012) ............................................................ passim
*Ziemack v. Centel Corp.*,
   163 F.R.D. 530 (N.D. Ill. 1995) ............................................................ 22

## Statutory Authorities

42 U.S.C. § 1396n ................................................................................ 3, 4
29 U.S.C. § 216(b) ................................................................................ 34
55 Pa. Code § 52.1 .................................................................................. 3
55 Pa. Code § 52.3 .................................................................................. 3

## Rules and Regulations

42 C.F.R. § 441.300 ................................................................................ 3
42 C.F.R. § 441.450 ............................................................................. 3, 8
42 C.F.R. §§ 441.468 .............................................................................. 8
Fed. R. Civ. P. 23 ...................................................................... 9, 10, 24, 25

## Additional Authorities

59 Am. Jur. 2d Parties § 68 ...................................................................... 26
*Pennsylvania Dept. of Human Services, Office of Long-Term Living Bulletin No.* (issued
   Oct. 14, 2016) ....................................................................................... 4

100287855.1

## I.   INTRODUCTION

Plaintiff Ralph Talarico ("Plaintiff" or "Talarico") (and, together with the putative class members, "Plaintiffs") cannot demonstrate that this case should proceed as either a Rule 23 class action or a collective action under the Fair Labor Standards Act ("FLSA").  As an initial matter, Talarico does not adequately or fairly represent, and is not similarly situated with, the diverse group of current and former Direct Care Workers ("DCWs") who have opted in to this case, many or most of whom worked only for one Participant-Employer ("PE") at a time.  The question of joint employer liability, as well as damages, will require individualized determinations for each of the thousands of DCWs in light of their separate and unique working relationships with each of the PEs.  There is no commonality among the DCWs, including their respective employers, the locations of work, the services provided, the hours worked, and the rate of pay received, making class and collective action certification inappropriate.

In addition, the issue of certification is limited to overtime allegedly owed to DCWs whose work hours are governed by the Individualized Service Plan ("ISP") developed between each PE and his or her Service Coordinator, not Defendant Public Partnerships LLC ("PPL").  PPL, a payroll fiscal agent whose role is statutorily prescribed and limited, indisputably plays no role in the ISP process.  As the ISP process is extremely personalized, there is no commonality among the DCWs' entitlement to overtime.  Thus, no class can be certified here where neither a single Service Coordinator nor PE are named parties to this lawsuit.

For these reasons, and as there is no manageable trial plan to try this case without significant prejudice to PPL, the Court should deny both the requests to certify a Rule 23 class and finally certify the collective action under the FLSA.

1

## II.     FACTUAL AND PROCEDURAL HISTORY

### A.   Procedural History.

Talarico filed a Collective Action and Class Action Complaint against PPL on May 11, 2017, alleging a failure to pay overtime wages under the FLSA, the Pennsylvania Minimum Wage Act ("MWA"), and the Pennsylvania Wage Payment and Collection Law ("WPCL").  PPL filed a Motion to Dismiss on June 16, 2017, which was denied without prejudice by the Court on January 16, 2018, allowing PPL to refile a dispositive motion after the parties conducted discovery.  On August 20, 2018, this Court granted Plaintiff's Motion for Conditional Certification and notices were sent out shortly thereafter.

On March 8, 2019, PPL filed a Motion for Summary Judgment on the ground that PPL is neither the joint employer of Plaintiff nor any of the other DCWs, under the FLSA, the MWA, or the WPCL.  PPL argued it did not exercise any of the economic powers of an employer and its sole role was limited to that of a fiscal agent consistent with its state contract and the statutory dictates in the relevant Medicaid program.  On January 28, 2020, this Court granted PPL's Motion for Summary Judgment in its entirety, concluding that no reasonable jury could find that Plaintiff was jointly employed by his PE and PPL.  On February 27, 2020, Plaintiff appealed to the Third Circuit Court of Appeals, which reversed and remanded the case back to this Court for further proceedings.  Plaintiff now seeks certification of the class under Fed. R. Civ. 23, as well as final certification of the collective action under Section 216(b).[1]

### B.   Framework of the Home and Community-Based Services Self-Directed Program.

The Home and Community-Based Services ("HCBS") program is a Medicaid waiver

---

[1] Dismissal of Plaintiff's state law claim under the WPCL was never appealed to the Third Circuit and that claim has thus now been dismissed entirely from the case.  (Plaintiff's Memorandum in Support of Motion for Class Certification and Final Collective Action Certification ("Memorandum") at 3.)

program administered at the federal level by the Centers for Medicare and Medicaid Services ("CMS") under Section 1915(c) of the Social Security Act, 42 U.S.C. § 1396n, and in Pennsylvania by the Department of Human Services ("DHS") (formerly, the Department of Public Welfare) Office of Long Term Living ("OLTL"). 55 Pa. Code § 52.1. State Medicaid agencies can apply to CMS for waivers from federal requirements that otherwise would apply to a Medicaid program, thereby providing individual states with greater flexibility to meet the needs of their population. *See* 42 C.F.R. § 441.300. The HCBS waiver program provides services to disabled PEs so they can avoid institutionalization and receive needed services in their homes. By way of example, Plaintiff's PE is part of the Independence Waiver Program, one HCBS waiver program administered by OLTL, which authorizes "Self-Directed Personal Assistance Services" to PEs who are between ages 18 and 60 with physical disabilities. 55 Pa. Code § 52.3. Self-Directed Personal Assistance Services are "designed to allow individuals … to exercise decision-making authority in identifying, accessing, managing and purchasing" the personal assistance services they need. 42 C.F.R. § 441.450(b).[2] Critical to this Court's analysis, the Self-Directed programmatic and statutory framework enables the PE as the sole employer. Each PE acts as the employer for services in their own home, requiring specific services designed to meet their individual needs.

C. The Appointment and Role of the Service Coordinator.

After OLTL approves the PE for the program, the PE then chooses a Service Coordinator. *See* Declaration of Regina Stewart, attached hereto as **Exhibit A**, ¶ 14. PPL plays no role in this process. *See* Depo. of Julie Skovera, attached hereto as **Exhibit B**, at 98:9-11. The Service Coordinator (and not PPL) has a wide range of responsibilities: (1) facilitating access in helping

---

[2] Self-Directed Personal Assistance Services are provided for in 42 U.S.C. § 1396n(j). The statute requires that the PE "exercise choice and control over the budget, planning, and purchase of self-directed personal assistance services, including the amount, duration, scope, provider and location of service provision." § 1396n(j)(5)(A).

3

to locate and coordinate and monitor needed services for the PEs; (2) developing and performing the assessment of needs in accordance with OLTL requirements; and (3) monitoring the delivery of services and supports to the PEs through onsite visits, phone calls, and verification that timesheets were received.  **Ex. B**, at 92:12-93:20; *See also Pennsylvania Dept. of Human Services, Office of Long-Term Living Bulletin No.* 59-16-13 (issued Oct. 14, 2016)) attached hereto as **Exhibit C**; 42 U.S.C. § 1396n(j)(5)(C)-(D).[3]

In addition, the Service Coordinator (and not PPL) "provides ongoing support and monitoring of the decisions that a [PE] makes when hiring and firing," "work[s] with the [PE] to create their service plan," and "work[s] with the [PE] to determine what are the needs of this [PE]." *See* Joint Stipulation of Undisputed Materials Facts, attached hereto as **Exhibit D**, at ¶ 7.  The Service Coordinator also explains to PEs that it is the PEs' "responsibility, as the employer, to be reviewing the timesheets, to make sure they are accurate and that if they are signing them, they are signing off saying these services were provided in accordance with the hours that were authorized on their [ISP]."  **Ex. B**, at 54:7-17.

As a result, the Service Coordinator holds employer-like functions far beyond the limited role played by PPL, however, Plaintiff has never added the Service Coordinator as a party to this litigation.[4]

### D.  The Individualized Service Plan is Unique to Each Participant-Employer.

To ensure a PE's service needs are met, the PE, in tandem with assistance from a Service Coordinator, develops the ISP, which provides a comprehensive overview of the specific services a PE requires, including, the number of days and hours a DCW is authorized to work for the PE to

---

[3] The Commonwealth of Pennsylvania utilizes a third-party vendor to act as the Service Coordinator to oversee the development and implementation of the service plan and service budget for a PE.  **Ex. D**, at ¶ 6.
[4] In fact, a witness for one Service Coordinator, Abilities in Motion, testified that it is a "common misconception" among DCWs that the Service Coordinator is their employer.  **Ex. B**, at 130:7-11.

provide the necessary services.  **Ex. B**, at 9:6-14, 91:12-21.  More importantly, and relevant to the instant issue, the ISP also determines whether the DCW is authorized to work overtime hours to provide any services to the PE.[5]  *See* Declaration of Serena Mason, attached hereto as **Exhibit E**, at ¶ 6.  As PPL's role in this program is prescribed and limited to that of a payroll fiscal agent (facilitating the execution of payment based on hours worked and authorized under the ISP, and assisting with related tax filings), PPL plays absolutely no role in the individualized development of each PE's ISP or the allocation or determination of overtime for any DCW.  Instead, PPL solely facilitates authorized payments established in the ISP by the joint efforts of the Service Coordinator and PE.  **Ex. A**, at ¶¶ 12, 14, 15.  Additionally, in its capacity as a state contractor, PPL maintains a database that tracks the PEs, including whether any given, individual PE is authorized to receive overtime hours of services from a DCW, and the exact number of days in a year that any such overtime is authorized.  **Ex. E**, at ¶¶ 9-12.  Given the uniqueness of the ISP, in order to determine the amount of overtime hours authorized for a particular time period requires an individualized analysis to be conducted for each PE.  *Id.* at 13.

> E.   The Programmatic Framework and Uniqueness of Each Individual Service Plan
> Results in Significant Differences Amongst the Direct Care Workers.

> 1.   *Each DCW is Employed by a Different Participant-Employer.*

Consistent with the goal of the HCBS waiver program to provide services to disabled PEs so they can avoid institutionalization, the PE enjoys the opportunity to receive the individualized services they require within their own homes.  As a result, the services being performed by the DCWs are not centralized to a single location, but instead are provided in the individual homes of

---

[5] For purposes of calculating whether a DCW worked more than 40 hours in a week, the workweek dictated by the OLTL runs from Sunday to Saturday.  **Ex. E**, at ¶ 8.

100287872.1

the thousands of PEs enrolled in the program.  Just as these locations differ amongst the DCWs, so do the PEs for whom the DCW provides services.

As the crux of the Self-Directed Services model is the ability for the PE to retain the authority to hire and control the activities of their own particular DCW, each DCW constitutes an individual hire by an individual PE.  Each PE signs a Direct Care Worker Agreement ("DCW Agreement") with their DCW acknowledging that the DCW is employed by the PE and not by PPL.  Depo. of Saschelle Simms, attached hereto as **Exhibit F**, at 60:6-63:18, Ex. 6 (PPL6361-6363); Depo. of Denise Lang, attached hereto as **Exhibit G**, at Ex. 3 (PPL6199-6200), Ex. 5 (PPL6221, 6224, 6225, 6228, 6227); Depo. of Latiesha Santiago, attached hereto as **Exhibit H**, at Ex. 8 (PPL6277-6279), 101:11-102:25.  Each newly hired DCW signs such agreements as the "DCW employee," with each PE specifically designated the "Common Law Employer."  *Id*.

PEs also sign a Common Law Employer Agreement ("CLE Agreement") that reaffirms their role as employer.  The CLE Agreement specifically states that each PE must meet certain criteria under the program including the ability to:  make decisions on how to best meet their needs and use of service and to make changes as needed; collaborate with their Service Coordinator to develop an individualized plan based on needs; determine how their budget will be spent; recruit, hire, manage, and dismiss their DCW; train their DCW to meet the needs of the plan; establish a mutually-agreeable schedule with their DCW; decide how much to pay their DCW within certain guidelines; provide feedback to their DCW; review and approve all timesheets to their fiscal agent; and ensure their DCW works only the hours budgeted or for the amount available under their approved plans and a number of other duties.  *See* CLE Agreement, attached hereto as **Exhibit I**. These criteria are unique to each PE and, therefore, the directives and terms of employment for each DCW are different.  No two DCWs work under identical parameters.

2. *Each DCW Performs Different Duties and/or Services for Each Participant-Employer Pursuant to the ISP.*

The creation of the ISP is a highly individualized process during which the Service Coordinator and PE work together to determine what specific services a PE needs, and whether the PE needs more than 40 hours a week of services; in such a situation, overtime would need to be authorized in the ISP. **Ex. B**, at 123:2-9; 124:6-10; **Ex. E**, at ¶¶ 6-7. If the ISP does not provide for any hours over 40 in a given work week, no overtime is available to be worked or paid under program rules. *See* **Ex. E**, at ¶¶ 6-7. OLTL then reviews the ISP, including any request for overtime, and approves or denies it. **Ex. B**, at 124:18-125:4, **Ex. D**, at ¶ 9.

Following its development, the Service Coordinator will continue to monitor the ISP. **Ex. B**, at 92:12-15. For example, Service Coordinators are required to complete face-to-face visits with PEs at least two times a year*,* and generally conduct at least quarterly oversight events. **Ex. B**, at 62:20-63:7; Depo. of LZ, attached hereto as **Exhibit J**, at 18:15-19:18. In the event a PE requires a change in the scope of services to be provided by the DCW, they will work with the Service Coordinator to amend the ISP appropriately. **Ex. A**, at ¶ 16. As such, the ISP essentially operates as a living document that adapts to the specific needs of the PE. As no two ISPs are identical, nor are the duties and services that any two DCWs perform, since these are governed entirely by the needs outlined in each individualized and personalized ISP.

3. *Each DCW Works Different Schedules and Hours as Determined by Each Personalized ISP.*

As the ISP is unique in that it outlines the services needed for a single, specific PE, so too are the DCWs' schedules and number of hours needed to provide those services, all authorized under the ISP. A DCW's work assignments, rules, and conditions revolve around the services they are tasked with performing in their PEs' home care settings, in accordance with the ISP. The ISP,

7

unique to each PE, "specifies the services and supports that are to be furnished to meet the needs of a participant in the self-direct [services] option."  42 C.F.R. §§ 441.450(c), 441.468.

Additionally, the ISP dictates how many units of service (denoted in 15-minute increments) a PE is permitted to receive and identifies the exact services afforded under the ISP.  *See* **Ex. E**, at ¶ 6.  As a result, the putative class members work different days and hours performing services for a PE as these are unique, individualized parameters established entirely by the ISP via the collaborative effort of the PE and Service Coordinator.

4. *Each DCW Receives a Different Rate of Pay as Determined by the Participant-Employer.*

The rate of pay each DCW receives is determined on an individual basis, by each individual PE, subject to the maximum billable rate established by OLTL. **Ex. A**, at ¶¶ 14-15, 58; **Ex. J**, at 80:15-25, 82:19-83:19, 88:9-19, 97:3-6; Depo. of MJ, attached hereto as **Exhibit K**, at 31:22-32:3, 57:3-25; **Ex. G**, at 58:13-17, 91:19-23; **Ex. H**, at 38:23-39:2.  So long as the rate meets minimum wage standards, PEs have discretion and control over the hourly rate to pay their DCWs under the ISP.  **Ex. A**, at ¶ 58; **Ex. J**, at 80:15-25, 82:19-83:19, 88:9-19, 97:3-6.  And OLTL sets the maximum rate that any PE can pay by county.  **Ex. A**, at ¶ 58.  There is no uniformity across the DCWs in terms of rate of pay.

As an example illustrating the rate of pay determinations and subsequent variance amongst the DCWs, PE LZ increased her DCWs' pay when able.  **Ex. J**, at 86:20-87:22.  In some instances, she elected to pay one DCW the maximum pay, but for other DCWs she hired, she would pay them a lower rate at first and then reward them with pay raises if warranted.  *Id.*, at 82:19-83:5.  Other PEs did the same: PE EW unilaterally increased Talarico's hourly rate and PE EJ changed Talarico's hourly rate on three different occasions.  **Ex. A**, at ¶¶ 32, 52.  Thus, across the entirety of the putative class, there are great differences among the rates of pay each DCW received.

F.   Plaintiff Is Not Similarly Situated to 86% of the Conditionally Certified Class.

There are 4,969 opt-ins remaining in the case. **Ex. E**, at ¶¶ 39-40.  Within this total group, each of 4,246 DCWs worked for just one PE, respectively, and are not similarly situated to Talarico who always worked for two or more PEs.  *Id.*  This group represents 86% of the current class as conditionally certified and are entirely dissimilar to Plaintiff.  Thus, of the entire class of 4,969 opt-ins, only 723 (that is, 14%) worked for two or more PEs and are at least in some way similar to Talarico, who also worked for more than one PE.  *Id.*

Additionally, 1,173 of the 4,969 opt-ins were classified as having a live-in exemption ("LIE") for the entirety of calendar years 2016 to 2018.  *Id.*  This means they lived with their PE and were not entitled to any overtime premium payment under the Department of Labor ("DOL") guidance.  Talarico did not have a LIE, making him dissimilar to almost a quarter of the opt-ins and further fracturing the class.

## III.   ARGUMENT

A.   Plaintiff Has Not Met the Stringent Requirements for Class Certification Under Either Stage of the Rule 23 Analysis.

A class action serves as an exception to the rule that plaintiffs must individually litigate their claims.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).  In order for a class to be certified, Plaintiff must meet the stringent criteria set forth under Federal Rule of Civil Procedure 23 which governs class actions.  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012).  "[E]very putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)."  *Id.* at 590 (citing Fed. R. Civ. P. 23(a)-(b)).

Plaintiff first bears the burden of showing that the proposed class satisfies Rule 23(a) by a preponderance of the evidence:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *see Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 184 (3d Cir. 2019).   These four prongs are often referred to as numerosity, commonality, typicality, and adequacy.   *See e.g., Erie Ins. Exch. v. Erie Indem. Co.*, 722 F.3d 154, 165 (3d Cir. 2013).   In addition to these four requirements, Plaintiff must satisfy at least one of the separate requirements of Rule 23(b).   *Dukes*, 564 U.S. at 345.[6]   Here, Plaintiff fails to satisfy Rule 23's requirements of commonality, typicality, and adequacy.

1.   *Plaintiff Cannot Satisfy Rule 23(a)'s Commonality and Typicality Requirements, or Adequately Represent the Interests of the Purported Class Given the Individualized Defenses.*

The decision to certify a class or classes is left to the discretion of the court.   *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008), as amended (Jan. 16, 2009) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 630 (1997) (Breyer, J., concurring in part and dissenting in part) (recognizing that the decision on class certification may implicate "highly fact-based, complex, and difficult matters")).   However, this discretion "does not soften the rule: a class *may not* be certified without a finding that each Rule 23 requirement is met."   *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 356 (3d Cir. 2013) (emphasis added) (internal quotation omitted).

"[T]he requirements set out in Rule 23 are not mere pleading rules."   *Marcus*, 687 F.3d at 591 (alteration in original) (quoting *Hydrogen Peroxide*, 552 F.3d at 316).   "A party's assurance

---

[6] *Accord Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 379 (3d Cir. 2013).   *See Hydrogen Peroxide*, 552 F.3d at 307 ("[A]t the certification stage, the district court . . . must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits— including disputes touching on elements of the cause of action."). *See also Reyes v. Netdeposit, LLC*, 802 F.3d 469, 484 (3d Cir. 2015) (citation omitted).   These strict proof requirements cannot be satisfied merely by reciting the allegations in the pleadings.   *See also Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016); *Blades v. Monsanto Co.*, 400 F.3d 562, 570 (8th Cir. 2005) (denying certification where "plaintiffs *presume* class-wide impact without any consideration of whether [the evidence] actually operated in such a manner so as to justify that presumption") (emphasis in original).

100287872.1

to the court that it intends or plans to meet the requirements is insufficient." *Hydrogen Peroxide*, 552 F.3d at 318. The Third Circuit emphasized that "'[a]ctual, not presumed[,] conformance' with Rule 23 requirements is essential." *Marcus*, 687 F.3d at 591 (alterations in original) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 167 (3d Cir. 2001)). "To determine whether there is actual conformance with Rule 23, a district court must conduct a 'rigorous analysis' of the evidence and arguments put forth." *Id*. (quoting *Hydrogen Peroxide*, 552 F.3d at 316). This "rigorous analysis" requires a district court to "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *Marcus*, 687 F.3d at 590 (quoting *Hydrogen Peroxide*, 552 F.3d at 307, 316).

> a. There is No Common Response to the Question of Joint Liability as each DCW Works under Different Conditions, in Different Locations, Performs Different Duties, and is Supervised by a Different Participant-Employer.

Under Rule 23(a)(2), putative class members' claims must share a common question of law or of fact. *Dukes*, 564 U.S. at 350. However, the inquiry does not end there. To demonstrate commonality, Plaintiff must do more than simply articulate questions of law and fact common to all class members. Instead, Plaintiff must prove that such common questions will yield common answers across all class members. Plaintiff must "demonstrate that the class members have suffered the same injury," because showing "merely that they have all suffered a violation of the same provisions of the law" is insufficient. *Id*. (internal quotation omitted). Plaintiff's claims must elucidate a "common contention" that is "capable of classwide resolution"—meaning that determining its truth or falsity will "resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. Here, Plaintiff vastly oversimplifies the inquiry and only alleges the former (a legal allegation that all DCWs are jointly employed) without any consideration of the latter (the potential for class-wide resolution of the claims). The answer to the latter question

presents thousands of individualized determinations concerning the role of each DCW, their admitted employer (the PE), work conditions as set by that PE, and the respective allocation of overtime set forth in each PE's ISP.[7]  The fundamental flaw in Plaintiff's election of class action mechanism is laid bare on this critical threshold requirement.  Although Plaintiff simply phrases his claims pursuant to the common question of joint employment, the answer to that question is not capable of class-wide resolution through a "representative" approach.

Litigating the joint employment question involves highly variable individual issues because the primary considerations to such an inquiry are how and where employees actually spend their workday.  Each DCW's employment is a fact-intensive, multiple-factored, totality-of-the-circumstances evaluation dependent upon, *inter alia*, actual duties performed, schedule of hours, allocation of overtime, and location at which the services are performed, as well as the role of the PE who hired her.  *In re Enterprise Rent-A-Car Wage & Hour Emp't Pracs., Litig.*, 683 F.3d 462, 469 (3d Cir. 2012) ("a determination of joint employment 'must be based on a consideration of the total employment situation and the economic realities of the work relationship'") (internal quotation omitted).  Thus, Plaintiff's focus on the alleged common question (joint employment), completely ignores the practical, central inquiry that goes into answering the common question.  This approach does not meet the commonality criteria.

Ultimately, courts will not certify class actions where individualized determinations are needed.  *See*, *e.g.*, *Vinole v. Countrywide Home Loans, Inc.*, 246 F.R.D. 637, 641 (S.D. Cal. 2007), *aff'd*, 571 F.3d 935, 946-47 (9th Cir. 2009) ("[W]here exempt status depends upon an

---

[7] The *Enterprise* test sets forth a four-factor test to determine if an entity is a joint employer under the FLSA, which examines: ) the alleged employer's authority to hire and fire the relevant employees; 2) the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; 3) the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and 4) the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.  *Enterprise*, 683 F.3d at 469.

100287872.1

individualized determination of an employee's work, and where plaintiffs allege no standard policy governing how employees spend their time, common issues of law and fact may not predominate. In particular, where the variability of class members' duties or hours 'goes to whether an individual class member has any claim at all for misclassification,' class certification has been declined") (quoting *Jiminez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 253 (C.D. Cal. 2006)).  By way of example, compare the duties, schedule, and day to day management with of just these two DCWs:

- Talarico worked for multiple PEs, one of whom, EW, hired and directed him to perform certain services for 60 to 80 hours a week (with specifically designated hours as overtime in his ISP and worked and paid as overtime to Talarico) including: preparing meals; accompanying him to appointments, cleaning the apartment and assisting with personal hygiene.  *See* Depo. of EW, attached hereto as **Exhibit L**, at 13:15-14:13; 30:5-9.  EW stated that he hired Talarico and that it was his responsibility to manage Talarico while in his apartment.  *Id.* at 30:5-9.  Later, EW fired Talarico because he repeatedly would "go off to his apartment and wouldn't come back for a while" and EW "would have to call him numerous times to come back up."  **Ex. L**, at 37:17-24.[8]

- In comparison, PE LZ deliberately chose to be in the Self-Directed program as staffing through an agency would not meet her needs, because there were too many holes in the schedules offered.  **Ex. J**, at 16:17-17:4.  LZ's selected services amounting to 123 hours a week, were determined by her and her Service Coordinator, and included a different set of tasks, including: dressing, assisting with medical issues such as suctioning, transferring on and off a BiPAP machine (medical device that helps breathing) every morning and evening for two or three hours as well as assisting with personal hygiene.  *Id.*, at 20:25-21:8, 23:5-10.  LZ routinely reviewed and updated her ISP which included the hours and duties and stated it was her responsibility to make sure her DCW was providing the required care.  **Ex. J**, at 52:9-20.

In both EW's and LZ's situations, PPL played no role in determining the duties, schedule of work, or day-to-day management of the DCWs, and Plaintiff cannot allege otherwise.  *See* **Ex. L**, at 30:16-20; **Ex. J**, at 52:9-14.

---

[8] Although Plaintiff submitted an affidavit of EW in July of 2017, at this deposition, EW could not remember critical declarations under the affidavit, nor could he confirm that he had signed it.  **Ex. L**, at 53-57.

Also, where claims to overtime compensation depend on employees' actual duties, which differed among employees within the class as is the case here, courts will not certify a class. *Luviano v. Multi Cable, Inc.*, 2017 WL 3017195, *20 (C.D. Cal. 2017) (describing courts' hesitancy "to certify wage and hour classes where key facts could not be discerned through routine business records, such as where claims to overtime compensation depend on employees' actual duties which differed among employee within the class"). A joint employment inquiry will require testimony and proof of a myriad of situations for each and every member of the purported class including the varying duties, varying schedules, and individualized oversight by separate PEs. The Rule 23 commonality element cannot be met here based on the individualized and multiple factored inquiry concerning joint employment for each member of the class.

i. *There is No Overtime Policy Adopted by PPL. Only the Participant-Employer and Service Coordinator Determine Overtime, not PPL.*

This case is limited solely to alleged overtime pay violations, and PPL has played no role whatsoever in the determination or allocation of overtime for any DCW. This is simply not a policy of PPL and cannot factually be attributed to PPL, where the determination of overtime is either made at the time the PE's ISP is put into place or amended by parties not subject to this lawsuit. Any trial held to determine who acted as the DCW's employer on this central claim would involve testimony and facts specific to each PE's ISP, under which all overtime is determined.[9] Each PE has the option to "spend" their allocable portion of funds under the program as they see fit. This is a critical component to the independence and ability of the PE to direct and oversee the DCW work performed in the home in this Medicaid waiver program.[10]

---

[9] Each ISP approved by the Service Coordinator must identify the number of DCWs to perform the work and designate an "emergency back-up DCW" in case the engaged DCW cannot show up for work. *See* **Ex. L**, at 22:7-23:6, Ex. 7.
[10]*See* Brief *Amici Curiae* filed by Self-Direction, LLC, Consumer Direct Care Network, Inc., GT Independence Services, LLC, Metro Solution, Inc. and Acces$ Financial Management Services ("Amicus Brief") at p. 5-10 (*Talarico v. PPL,* Third Circuit, No. 20-413, Doc. 25).

For instance, Talarico worked for multiple PEs, but worked more than 40 hours for just one PE, EW.  *See* Depo. of Ralph Talarico, attached hereto as **Exhibit M**, at 241:8-20, 255:19-256:2.  Talarico was paid overtime for work for EW who wanted to have mainly one DCW working for him.  *Id.* at 249:13-22.  Conversely, some other PEs in the program elect to have more units of time paid for at the straight rate by limiting each DCW to 40 hours or fewer each week; these PEs' ISPs have no specific allocation for overtime.  Regardless of the situation, however, PPL is absent from this equation at every step.[11]  PPL does not help determine or have any input whatsoever as to the total amount of time (units) worked by each PE, let alone overtime for which a PE is eligible under the ISP, which is created and in place before PPL begins to play its payroll fiscal agent role.  **Ex. A**, at ¶¶ 14-16.  PPL never even sees the content of the ISP, including the description of duties and how or why overtime is authorized.  In fact, it is the Service Coordinator, together with the PE, who reviews the PE's need for overtime on a quarterly basis, should the PE's situation and needs change over time.   In the end, allocation of overtime is created, determined, and implemented by the Service Coordinator and PE—never PPL.

The critical question in this case of whether PPL is a DCW's joint employer for purposes of overtime is one that, in light of the Third Circuit's remand, is now a fact-intensive inquiry requiring potentially thousands of witnesses given that each and every DCW works in a different home, under a different PE, performing different services, and sometimes working more than 40 hours under the specific ISP.  *See e.g.*, *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 487 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011) (decertifying a class of supervisors on the

---

[11] Given that this case is limited solely to overtime premium pay damages and does not involve any claims for failure to pay for time worked, PPL's involvement is the most removed from the heart of the claims, yet Plaintiff chose not to pursue any of the related third parties who are intimately involved in overtime determinations.  Simply put, Plaintiff has sued the wrong party entirely and cannot recover from PPL on his theory that overtime is due where PPL has no role in determining the policy of how overtime is allocated.

basis that plaintiff failed to produce common evidence of their overtime exemption).  Whether PPL acts as a joint employer for purposes of overtime allocations for any of these DCWs is a question that implicates individualized inquiries not susceptible to generalized approaches concerning the mere processing and payment of timesheets.  Where deposition testimony demonstrates variations among class members, as has already been established in this case, class action mechanics are inapposite and inappropriate.  As the *Marlo* court stated, where:

> [t]he declarations and deposition testimony … submitted by the parties suggest variations in job duties that appear to be a product of employees working at different facilities, under different managers, and with different customer bases[,] [w]ithout more than this individual testimony, the Court cannot conceive how the overtime exemption will be presented to the jury as a common issue for class-wide adjudication, as opposed to a number of individualized inquiries.

*Id.*, at 486.  Wide variation among class members shows that a joint employment question at trial cannot be resolved by a simple "yes" or "no" answer for the entire class.  *Duran v. U.S. Nat'l Bank Assn.*, 59 Cal. 4th 1, 32 (2014).

To certify a class where such variations exist, the joint employment inquiry would create an unmanageable trial and the proverbial trial-within-a-trial scenario.  As the *Marlo* court warned:

> There is a significant risk that the trial would become an unmanageable set of mini-trials on the particular individuals presented as witnesses … Plaintiff's evidence is essentially individual testimony and an exemption policy. Under the circumstances in this case … Plaintiff had to provide common evidence to support extrapolation from individual experiences to a class-wide judgment that is not merely speculative. Plaintiff has not come forward with common proof sufficient to allow a fact-finder to make a class-wide judgment.

*Id.*  Similarly here, the extrapolation from Talarico's personal situation would be speculation in its rankest form—nor has Plaintiff shown how a representative sample would be any better.  For these reasons alone, Plaintiff fails to meet his stringent burden to show an essential element of Rule 23(a) classification: commonality.

ii.   *The Lack of a Uniform Overtime Policy Prevents Certification.*

Plaintiffs also cannot meet the commonality requirement under Rule 23(a) where there is no uniform policy applicable to the entire class.  In misclassification claims, typically courts are reluctant to certify a class unless there is a strict showing of a uniform policy or uniformity amongst work duties and experience of the class members.  *See, e.g., Vinole*, 246 F.R.D. at 640-41 ("[F]ederal courts have permitted class actions as vehicles to determine whether a class of employees is misclassified as exempt under state and federal law.  In such cases, however, the plaintiffs generally have alleged facts regarding (a) company-wide policies governing how employees spend their time, or (b) uniformity in work duties and experiences that diminish the need for individualized inquiry").  Here, there is neither a uniform policy about overtime, nor uniformity amongst the DCWs' duties and experiences occasioning overtime.

In his Memorandum, Plaintiff alleges that PPL "following its stated policies consistently as to all class members, refused to pay all overtime premiums due when plaintiffs worked over 40 hours in a workweek."  *See* Memorandum at 1-3.  As set forth above, first and foremost, there is no such uniform central PPL policy.  Overtime is determined by the PE and their Service Coordinator as part of the ISP and becomes part of an ISP under varying sets of circumstances; and PPL applies the ISP as directed by its state client.

For example, where a DCW lives with their PE, the LIE applies and the Service Coordinator does not allow any overtime in the ISP.  **Ex. B**, at 123:10-19.  Again, this determination is different from the process of allocating overtime for a DCW based on demonstrated need of their PE where the DCW lives outside the PE's home, as was the case for Talarico and EW.  Talarico worked overtime hours for EW (such hours were designated as overtime under EW's ISP) and Talarico was paid of all of those hours.  **Ex. M**, at 249:13-22.  Moreover, disallowing overtime pay for LIE DCWs, compared with allocation of specifically

17

authorized overtime under a PE's ISP, does not constitute a uniform policy. Determinations for when overtime becomes part of an ISP entirely depends upon the circumstances of the individual PE. For instance, LZ hired a relative who lived in her home. **Ex. J**, at 48:4-7. There is no commonality amongst the class where 1,173 DCWs of the opt-in class were not paid any overtime because they are LIE. *See* **Ex. E**, at ¶ 40. In this situation, the decision to not award specifically authorized overtime in the PE's ISP is not dependent upon the need for hours exceeding 40 in one week. It instead turns upon an entirely different factor of whether the DCW lives in the same home as the PE. Again, PPL plays no role in such determinations and that policy cannot be ascribed to PPL. Another possible situation of claimed overtime involves members of the class who work fewer than 40 hours for one PE, but also work for another PE that when aggregated together exceed more than 40 hours. Ultimately, Plaintiff cannot identify one uniform policy, established by PPL, susceptible to a common answer or inquiry and, thus, cannot meet the strict showing of commonality;[12] this Court should deny any request to certify a Rule 23 class on this basis alone. *See Meyer v. U.S. Tennis Ass'n*, 297 F.R.D. 75, 83 (S.D.N.Y. 2013) (noting that "a generalized, central policy is not alone determinative of class certification or commonality") (quoting *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 415 (S.D.N.Y.), *on reconsid. in part*, 293 F.R.D. 578 (S.D.N.Y. 2013), *aff'd*, 602 F. App'x 3 (2d Cir. 2015)).

Further, Plaintiff does not and cannot allege that the putative class members are uniform in their work duties. At most, Plaintiff alleges that the putative class members have "similar… circumstances of employment" because "PPL… utilized the same mandatory training policies for all DCWs that outlined their job duties and expectations." *See* Memorandum, at 36. This far

---

[12] *See Marlo*, 251 F.R.D. at 484 ("[t]he existence of a uniform policy classifying the [employee] as exempt does not necessarily establish that the policy was misclassification…To show that an exemption policy resulted in widespread misclassification, there has to be some common proof that allows a fact-finder to make a class-wide determination.")

100287872.1

reaching and generalized allegation is entirely unsupported and simply untrue. Such mischaracterization completely ignores that each and every DCW has their own set of prescribed duties, hours for performance, location where they work, and are overseen/managed each and every day on site at the PE's residence.[13]  All of these differences are both germane and directly relevant to any joint employment inquiry.

This is not a case where the situation mitigates in favor of class certification because of a unifying set of duties, location, geographic similarity, or a specified policy uniformly imposed. For instance, the U.S. District Court for the Southern District of New York certified a class of store employees who all held a uniform description of duties in the same job title in a discrete geographic area. *See Jacob*, 289 F.R.D. at 415 (certifying class in misclassification action "[g]iven the uniform classification of ASM [assistant store managers], the uniform description of ASMs' duties, the similarity among DR stores, and the discrete, geographical location of the DR brand"); *see also, Meyer*, 297 F.R.D. at 83 ("Given the uniform classification of [Umpires], the uniform description of [Umpires'] duties, the ... [finite three-week period during which the U.S. Open event takes place once a year], and the discrete, geographical location of the [Open], this Court concludes that Plaintiffs have sufficiently established commonality") (alterations in original) (citing *Jacob*, 289 F.R.D. at 414-15).  Here, there are no such commonalities present, nor any uniformly-imposed policy.  Unlike the classes certified in *Jacob* and *Meyer*, there is no set of uniform duties whatsoever here as each DCW performs their duties overseen by a separate and different individual PE in their own home.  Ultimately, there is a complete absence of any uniformity as part of the legal inquiry and, therefore, Plaintiff cannot show commonality under the first requirement of Rule 23(a).

---

[13] In fact, the Third Circuit under the law of the case has held that PPL does not hire/fire DCWs or play any role in the day to day management of the DCWs.  *Talarico v. PPL*, 837 F. App'x 81, 84 (3d Cir. 2020).

19

        b.  Plaintiff is Not Typical of the Class and he has Not Suffered the Same Injury as DCWs Who Work for Just One Participant-Employer.

Plaintiff's situation is dissimilar to 86% of the class.[14]  **Ex. E**, at ¶¶ 39-40.  Thus, for many of the same reasons why he fails to satisfy commonality, he cannot meet the element of typicality. Typicality, like the commonality and adequacy-of-representation requirements, "is intended as a safeguard to insure that the named plaintiff[s'] interests are substantially coextensive with the interests of the class."  *Spencer v. Cent. States, Se. & Sw. Areas Pension Fund*, 778 F. Supp. 985, 989 (N.D. Ill. 1991) (quoting *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 373 (D. Del. 1990); citing *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)).  Out of the 4,969 opt-in class members, a total of 4,246 of the class worked for one singular PE.  **Ex. E**, at ¶ 40.  Thus, only 719 DCWs are like Plaintiff, in that they worked for two or more PEs.  This distinction is important as the overtime claims are materially different between these two groups and depend entirely upon how many PEs for whom a DCW worked.  *See infra* Section III.A.2.b.iii.  Plaintiff conveniently skips over this distinction hoping the Court will not recognize the implication underlying these differences, *i.e.*, Plaintiff is not similarly situated or typical of the class.  At the very least, typicality requires that Plaintiff share some essential characteristics of the claims of the larger class which, here, he does not.  *Retired Chicago Police Assn. v. City of Chicago*, 7 F.3d 584, 597 (7th Cir. 1993) ("[F]or effective representation of a class, the named representatives' claims must 'have some essential characteristics as the claims of the class at large'") (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).  Where Plaintiff represents less than half of the class, he has not met the typicality requirement.  *Lusby v. Gamestop, Inc.*, 297 F.R.D. 400, 411 (N.D. Cal. 2013) (named plaintiff's claims in a class action lawsuit for failure to pay overtime

---

[14] These figures are taken from the FLSA opt-in class.  Should a state law class be certified, it would likely be even more numerous given the opt-out mechanism of state law class claims.  This means the differences between Talarico and the other class members—and the differences among the class members—will likely be even further exacerbated.

were not typical to half of the class, and, as such, he failed to demonstrate typicality as required by Rule 23).

DCWs working for just one PE have authorized overtime (designated as "TU" authorizations) specifically allocated within the PE's ISP.  **Ex. E**, at ¶ 6.  (The one exception to this rule where the DCW is LIE.)  Where specific authorizations for overtime are considered and built into the ISP, those amounts have been authorized and paid in full.  In fact, hundreds of members in the conditional class must be dismissed as they fall into this category.  Over 86% of the opt-in class worked for just one PE and clearly are not typical of, or similarly situated to, Plaintiff.  In fact, Plaintiff himself worked more than 40 hours for one of his PEs (EW) and that ISP had overtime authorized.  As such, neither Plaintiff, nor any of the hundreds of others similarly situated, could ever have a claim for non-payment of overtime where the ISP included it and it has been paid in full.  This repercussion results directly from an overly-broad formulation of the eligible class and notice provided—all those who worked more than 40 hours in one week.  *See* Dkt. 64-1.  Clearly any DCW who falls into the category described above—a DCW who worked more than 40 hours and was paid overtime—has no claim for overtime that could be legally sustained individually or as a member of a certified class.  This alone reduces dramatically the size of the class.  However, Plaintiff's obligations under Rule 23(a) typicality are still not met.

Plaintiff's assertion of the same legal theory (that PPL is a joint employer) among putative class members is insufficient by itself to demonstrate typicality.  *Spencer*, 778 F. Supp. at 990 ("[M]erely pointing to common issues of law is insufficient to meet the typicality requirement when the facts required to prove the claims are markedly different between class members").  In order to segregate out of the opt-in class those similarly situated to Plaintiff, one can only look to those DCWs who worked for two or more PEs as Plaintiff's theory depends upon the aggregation

21

of hours amongst multiple PEs, not just time spent working for one PE where overtime is included in the respective ISP.  Plaintiff's allegations do not rest on the same facts as the bulk of the opt-in class who only worked for one PE.  *Ziemack v. Centel Corp.*, 163 F.R.D. 530, 534 (N.D. Ill. 1995) ("typicality generally requires that the claims of the plaintiffs stand or fall on the same facts as the claims of the putative class members") (citing *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 394, 403 (1977)).  In addition, Plaintiff's injury is not the same as those DCWs who have already been paid all overtime due because they worked for one PE whose ISP authorized overtime.  *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609, 613 (D. Kan. 1995) ("typicality element requires that the representative plaintiffs possess the same interests and suffer the same injuries as the proposed class members").

The situation even within that directed subset of 719 DCWs who worked for two or more PEs contains additional factual distinctions.  A DCW could work for two PEs and be allocated and paid overtime by one of the PEs and not the other in a particular week.[15]  The aggregated time between the two (or three or more) PEs must total more than 40 hours.  In such situations, a portion of alleged overtime due has been paid; only that remaining portion of allocable overtime to a different PE would be due.  Also, each PE sets a different pay rate for their DCWs, so one would not know which PE's allocated hours that exceed 40 constitute the overtime for purposes of rate of pay due.  These factual distinctions leading to separate and distinct liability theories underscore how Plaintiff is neither typically situated nor representative of the intended scope of the class.

---

[15] This was exactly Plaintiff's situation regarding time worked for EW as compared to time worked for his other PE, MJ.

100287872.1

       c.  Plaintiff Does Not Adequately Represent the Class Interests That Differ from Over 86% of the Opt-in Class.

The vast majority of DCWs opting in to this action chose to work for only one PE (86%) and Plaintiff cannot adequately represent them. **Ex. E**, at ¶ 40.  Rule 23(a)(4) comprises two parts: "the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members."  *Balderrame-Baca v. Clarence Davids and Co.*, 318 F.R.D. 603, 612 (N.D. Ill. 2017) (quoting *Ret. Chicago Police Assn.*, 7 F.3d at 598).  "A class is not adequately represented if class members have antagonistic or conflicting claims."  *Id.* (quoting *Ret. Chicago Police Assn.*, 7 F.3d at 598 and *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)).  Here, the interests of these two distinct groups are divided as the majority of DCWs working for one PE and LIE DCWs diverge from those who work for more than one PE.  Where Plaintiff is not similar enough to the large majority of the class, a court cannot certify a Rule 23 class.  *Martinez v. Mecca Farms, Inc.*, 213 F.R.D. 601, 606 (S.D. Fla. 2002) ("claims of the representative parties need to be similar enough to those of the class so the representatives can represent the class adequately").

    First, if PPL is held to be a joint employer, then no PE will be able to claim LIE status; it disappears for purposes of the Medicaid program.  In effect, given the limited amount of allocable resources to the PE from the government, the PE will decide to hire two different DCWs and not allow either to exceed 40 hours of work in one week.[16]  This would cause their Medicaid allocation under the program to extend the total amount of service hours.  As a result, if Plaintiff is successful, LIE DCWs who Plaintiff seeks to be part of this class, such as the one working for LZ, will see a

---

[16] As articulated by the amici in the Amicus Brief, these variations are a hallmark of the self-directed model.  (Amicus Brief at 14-15.)  To be sure, many PEs want to remain the sole employer of the DCWs in order to best retain control over their own care.  The PEs for whom the putative class members work may exert varying levels of control over their DCWs to accomplish this goal, further complicating the individualized joint employer assessments.

reduction in the amount of time they work and realize *less pay* than what they previously earned.[17]

Second, as only a small subset of DCWs work for more than one PE, the only situation that would permit aggregation of hours to exceed 40 between multiple PEs, requiring all such hours to be additive would mitigate against the interests of DCWs who only work for one PE.   Adequacy is not met where parts of the class have antagonistic claims.  *Ret. Chicago Police Assn.*, 7 F.3d at 598 ("[A] class is not fairly and adequately represented if class members have antagonistic or conflicting claims") (quoting *Rosario*, 963 F.2d at 1018)).  In *Ret. Chicago Police Ass'n*, the Court held the named plaintiff was inadequate and denied certification because class membership was not restricted only to those individuals who had been harmed; rather, members who had actually benefitted from the status quo were also in the putative class.  Similarly, here, the variability of the DCWs' interests and various overtime situations, amply demonstrate that class action is not the proper vehicle for handling such claims.  As such, Talarico cannot adequately represent the interest of 86% of the class.  This is also supported by at least one opt-in member of the class who did not consider that Plaintiff adequately represented her interests and withdrew to pursue her own claim.[18]

> 2.  *Plaintiff Cannot Meet the Predominance or Superiority Requirement of Rule 23(b)(3).*

In addition to meeting all four criteria of Rule 23(a), in order to certify the class, Plaintiff must also show that the proposed class satisfies Rule 23(b)(1), (b)(2), or (b)(3).  *Marcus*, 687 F.3d at 590.   Here, Plaintiff argues that the putative class meets the predominance and superiority requirements of Rule 23(b)(3).  However, Plaintiff cannot meet either prong and the request to certify the class should be denied on this basis as well.

Under Rule 23(b)(3), Plaintiffs must show the following:

---

[17] *See* Amicus Brief at 14-16.
[18] Deborah Knight, a prior member of the opt-in class (*See* Dkt. 102), has since withdrawn from this action (*See* Dkt. 177) and filed a separate action in this district, *Deborah Knight v. Public Partnerships, LLC*, C.A. No. 2:10-cv-02461.

100287872.1

> [Q]uestions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).   "Predominance is satisfied when 'common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication.'"   *Costello v. BeavEx, Inc.,* 810 F.3d 1045, 1059 (7th Cir. 2016) (alteration in original) (quoting *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012)); *see also* Fed. R. Civ. P. 23(b)(3)(A)-(D).   Superiority exists where "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   Fed. R. Civ. P. 23(b)(3).   The question of joint employment cannot be satisfied for each and every class member in one trial and the class action is not a superior vehicle to make such a determination as doing so will deny PPL a fair opportunity to present adequate defenses to the claims made.

      a.   Individualized Determinations under the *Enterprise* Test are Not Amenable to a Class Action.

Courts have held that the "ultimate question" for predominance is whether "the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants."   *See Moore v. Int'l Cosms. & Perfumes, Inc.*, 2016 WL 7644849, *9 (C.D. Cal. 2016); *Duran*, 59 Cal at 28 (citing *Collins v. Rocha*, 7 Cal. 3d 232, 238 (1972) and *Lockheed Martin Corp. v. Super. Ct.*, 29 Cal. 4th 1096, 1104-5, 1108 (2003)).   The answer to this "ultimate question" "hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.'"

*Duran*, 59 Cal. 4th at 28 (citing *Sav-On Drug Stores, Inc. v. Super. Ct.*, 34 Cal. 4th 319, 327 (2004)). *See also* 59 Am. Jur. 2d Parties § 68 (citing *Brinker Rest. Corp. v. Super. Ct.*, 53 Cal. 4th 1004, 1022 (2012)). However, "[c]lass treatment is not appropriate 'if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the 'class judgment'" on common issues. *Duran*, 59 Cal. 4th at 28 (citing *San Jose v. Super. Ct.*, 12 Cal. 3d 447, 459 (1974)). "The granting of class certification thus requires a determination that group, rather than individual, issues predominate." *Id.*

In a joint employment case such as this, whether a given employee is considered an employee of PPL depends in large part on the employee's individual circumstances, *not* solely the alleged joint employer's intent.[19]   At the outset, Plaintiff's argument rests on a false assumption, namely, that the practices of PPL in administering its payroll-like functions is determinative evidence of joint employment. A class action is appropriate only if the circumstances of a particular case demonstrate that there *is* common evidence. Here, there is no such common evidence. *See supra* Section III.A.1.a. It is virtually impossible for Plaintiff to prove each DCW is an employee of PPL through representative evidence given the disparities among them. For example, how could the Court properly evaluate whether PPL is a joint employer to each and every of the thousands of the DCWs when is no dispute that each of the thousands of PEs could establish their own distinct and individual work rules and manage the day to day services that each of the thousands of DCWs provided to them? At trial, certain PEs will testify on behalf of PPL and describe circumstances, as some have previously by deposition or affidavit that belie the existence

---

[19] Although the contract between each PE and their DCW demonstrates clear intent that PPL is not their employer, courts look to additional facts beyond the stated language in the contract. Under the *Enterprise* test, factors such as who had day to day control over schedules, work assignments, discipline, hiring, and firing must all be taken into consideration, 683 F.3d at 469, some of which the Third Circuit has already concluded are within the exclusive control of each individual PE and not PPL. Thus, Talarico's personal situation cannot be extrapolated or ascribed to any other DCW.

26

of a joint employment relationship, which scenario alone requires this Court to find Plaintiff has failed to satisfy the predominance requirement.  Misplaced focus on the "common" legal question of joint employment itself while ignoring the multitude of other individualized factors that inform the response to that question compels denial of certification.  Plaintiff's approach to simply ignore those aspects of the case must be rejected.  *See Vinole*, 571 F.3d at 946 (concluding that the Court abused its "discretion in relying on an internal uniform exemption policy to the near exclusion of other factors relevant to the predominance inquiry").

> b.  <u>Plaintiff Also Cannot Meet the Superiority Requirement.</u>

> > i.  *<u>Affirmative Defenses Will Effectively be Precluded from Trial,
Prejudicing PPL.</u>*

In a joint employment context, trial courts deciding whether to certify a class must consider not just whether common questions exist, but also the feasibility of trying a case as a class action. A joint employment claim has the potential to raise numerous individual questions that may be difficult, or even impossible, to litigate on a class-wide basis.[20]  Class certification is appropriate only if these individual questions can be managed with an appropriate trial plan.  Any trial management plan must permit relevant affirmative defenses to be tried.  This turns on individualized facts and circumstances without which PPL will be prejudiced in its ability to defend itself.

"In certifying a class action, the court must also conclude that litigation of individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently."  *Duran*, 59 Cal. 4th at 28-29 (citing *Washington Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906 (2001)). "[W]hether in a given case affirmative defenses should lead a court to approve or reject

---

[20] The dearth of case law on joint employment class actions suggests that joint employment questions are generally not susceptible to Rule 23 class actions due to the complexity and multi-factored inquiry on liability.

certification will hinge on the manageability of any individual issues." *Id.*, at 29 (citing *Brinker*, 53 Cal. 4th at 1054 (Werdegar, J., concurring)). "In wage and hour cases where a party seeks class certification based on allegations that the employer consistently imposed a uniform policy or de facto practice on class members, the party must still demonstrate that the illegal effects of this conduct can be proven efficiently and manageably within a class setting." *Duran*, 59 Cal. 4th at 29 (*citing Brinker*, 53 Cal. 4th at 1033; *Dailey v. Sears, Roebuck & Co.*, 214 Cal. App. 4th 974, 989 (2013)).

Here, Plaintiff alleges predominance of a single common question is met based on whether PPL served as a joint employer. This analysis is wildly oversimplified and fails to meet the stringent requirements under Rule 23(b)(3). *See supra* Section III.A.2. Class certification here would preclude evidence of the role and understanding of the DCWs themselves, the role of the Service Coordinator, and how each of the thousands of individual PEs separately trained or instructed each of their respective DCWs. By allowing class certification, the Court would oversimplify that inquiry by limiting the analysis to only those actions by PPL. *See* Memorandum at 3-14. That approach would cut PPL off at the knees and fail to take into account the multitude of other *Enterprise* factors germane to an inquiry of joint employment. Such trial management issues must be addressed at the time of certification, not later at trial. *Duran*, 59 Cal. 4th at 13.

"While common issues among class members may have been sufficient to satisfy the predominance prong for certification, the trial court also has to determine that these individual issues could be effectively managed in the ensuing litigation" and that a class action is the superior method for handling of such claims. *Duran*, 59 Cal. 4th at 32 (citing *Brinker*, 53 Cal. 4th at 1054; *Sav-On*, 34 Cal. 4th at 334). Simply put, it is not. PPL has numerous affirmative defenses within the context of the joint employment test itself, with respect to those DCWs who are exempt from

overtime under the LIE, and based on the defense that no DCW is owed overtime prior to January 1, 2016.  There is no practical way to address and consider these affirmative defenses under the guise of a class action trial.  For example, as stated above, a full third of the opt-in class currently is LIE-qualified.  However, there are some individual DCWs who could have been LIE for a portion of the year, and then worked for a different PE later in the same year without living in the home; they would qualify under the exemption for only a portion of the year.  Any trial and award of damages would need take into account the multitude of facts, and specific work relationship for a set duration of time for each and every PE for whom a DCW worked.  As that defense cannot be uniformly raised even as to each DCW, the variety of factual situations if not considered in intimate detail will prejudice PPL and deny it the opportunity to rebut such claims.

Without inquiry as to each and every DCW's particular work history (*i.e.,* did they work for more than one PE, did they live with their PE, did they work in the aggregate for multiple PEs and yet have received all overtime pay) PPL is estopped and precluded from raising critical defenses, *e.g.*, DCWs working for one PE who were paid all authorized overtime after January 2016.  This is illustrated by Plaintiff himself who has no claim for overtime hours worked for one of his PEs—EW—because he has been paid in full for such hours.

ii.    *Joint Employment Determinations Require Evaluation of Specific Work Conditions for Each DCW.*

"For purposes of class action manageability, a defense that hinges liability *vel non* on consideration of numerous intricately detailed factual questions . . . is different from a defense that raises only one or a few questions and that operates not to extinguish the defendant's liability but only to diminish the amount of a given plaintiff's recovery."  *Shiferaw v. Sunrise Senior Living Mgmt., Inc.*, 2016 WL 6602411,*9 (C.D. Cal. 2016); *see also Duran*, 59 Cal. 4th at 29 (citing *Brinker*, 53 Cal. 4th at 1054).  Any defense in which *liability itself* is predicated on factual

questions specific to individual claimants poses a much greater challenge to manageability. This is a critical and material distinction. "Only in an extraordinary situation would a class action be justified where, subsequent to the class judgment, the members would be required to individually prove not only damages but also liability." *Duran*, 59 Cal. 4th at 30 (citing *San Jose*, 12 Cal. 3d at 463). There are no fewer than five distinct actors that inform a joint employment question for each DCW: the DCW; their PE (or as with Talarico all of their PEs); the Service Coordinator who determined overtime; PPL; and PPL's own client, Pennsylvania DHS who established the program rules and policies. Presentation of viable defenses cannot be abridged in a class action setting simply because the defense was too cumbersome to litigate in a class action. "A class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims." *Id.*, at *35 (quoting *Dukes*, 564 U.S. at 367). "These principles derive from both class action rules and principles of due process." *Id.* (citing *Lindsey v. Normet*, 405 U.S. 56, 66 (1972); *Philip Morris U.S.A. v. Williams*, 549 U.S. 346, 353 (2007)). PPL must be able to mount defenses that show, given all of the *Enterprise* factors, it is not a joint employer. This would require testimony by individual PEs about the day to day employment conditions applicable to their particular DCW, as well as the PEs' respective Service Coordinator about how and why the DCW was or was not afforded overtime authorizations in the applicable ISP.

Plaintiff cannot show that some generalized proof of how PPL administers its fiscal agent role to process payroll meets the elements set forth under the *Enterprise* test. As the Court in *Rindfleisch* observed:

> Here, the Rule 23 class action portion of Plaintiffs' claims neither lends itself to generalized proof of liability or damages nor to mechanical calculations of each class members' damages… [I]n order to determine liability and damages, the court may have to resort to 'mini trials' that will create 'staggering problems of logistics' that could render this case unmanageable. These concerns further militate against this Court finding that a Rule 23 class action would be superior.

100287872.1

*Rindfleisch v. Gentiva Health Servs., Inc.,* 2012 WL 12873772, *7 (N.D. Ga. 2012). Wide variation among class members is thus a critical factor in establishing that a single class action is not the superior mechanism to engage in the analysis of whether PPL is the joint employer, nor can that inquiry be resolved by a simple "yes" or "no" answer for the entire class.

> iii.   *Damages are Not Readily Susceptible or Determinable Based on the Information in PPL's Payroll Database.*

Even if liability somehow were determined in favor of Plaintiff, which PPL maintains it cannot be, the determination of damages would not be manageable within a class action trial. Here, too, Plaintiff has the burden of showing he meets the superiority requirement, but he does not even address this issue of damages in his brief. Plaintiff's approach conflates the liability phase with the damages phase and must be rejected. In Plaintiff's view, liability to a particular DCW decides *a fortiori* the amount of damages owed. Such an assumption does not reflect the complex issues of determining damages for any one member of any certified class. It becomes all too easy once a court has made a decision on PPL's liability on joint employment to presume such liability as to all class members at the damages phase of any certified class action. Here, the alleged overtime hours to be compensated under a joint employer theory are not carried as overtime within the PPL database. **Ex. E**, at ¶¶ 17-25. Damages calculations would require cross referencing an individual's ISP, the details of why some hours were not paid, and individual timesheets, requiring individualized determinations not susceptible to database manipulation or determination. *Id.*

For instance, just as to Plaintiff himself, at various times throughout his tenure as a DCW he worked for one, then two, three, and at times four separate PEs. During the relevant time period, he worked for two PEs one of whom (EW) he worked 40 and then 60 hours every other week. During this time period, he was also working between eight to 12 additional hours for a different PE, JM. Each and every week would need to be reviewed and examined to reach a final

31

determination of hours for which overtime is due.  When he worked for more than 40 hours for EW after 2016, EW's ISP had overtime allocated within it and Plaintiff was paid for that time.  **Ex. E**, at ¶¶ 31-34; 35-37.  Complicating issues, it is not uncommon that the allocation of overtime is adjusted quarterly or more often and done so in a retroactive way.  *Id.* at ¶ 25.  All history concerning the updating and payment of overtime would need to be reviewed amongst the various DCWs who worked for a particular PE to determine if any overtime would be due to one or more of a PE's DCW.  *Id.* at ¶¶ 23-24.

To determine alleged overtime due Plaintiff if PPL is a joint employer, one would need to cross reference each paycheck with supporting documentation across every PE to determine when a DCW worked for more than 40 hours in a week and at what rate and for whom.  As a result of the uniqueness of the ISP, there is no uniform methodology to determine how many overtime hours were authorized for a particular time period, as any such determination would need to be conducted on an individualized basis. **Ex. E**, at ¶ 13.  This can be done only by examining and comparing the authorized timesheets submitted and applying certain rules to extrapolate the total amount of hours over 40 not yet paid, and then at what rate of pay since a DCW may have worked for two different PEs who paid different rates.  This methodology would not apply to any DCW not similarly situated to Talarico.  For instance, some DCWs worked only under an LIE for a small portion of the year and then worked for a PE whom they did not live with and were paid all overtime so authorized under the ISP in place for that PE.[21]  Such records need to be cross referenced in a way that requires verification against timesheets for each week by the PE.  There are no "representative" damages based on a uniform policy or time frame that apply across the class.  The database maintained pursuant to PPL's role as a fiscal employer agent is replete with numerous and complex

---

[21] In the PPL payroll database, there is no uniform methodology to calculate whether or which DCWs were LIE throughout the entirety of their work or for any designated period of time (*e.g.*, a calendar year).  **Ex. E**, at ¶ 16.

100287872.1

variables exacerbated by the uniqueness and individuality of the ISPs, and does not allow for a uniform electronic method to be applied across the class to calculate alleged damages for unpaid overtime.  **Ex. E**, at ¶ 17.  For these reasons, a class action trial precludes PPL from entering individual defenses and details about each DCW to limit damages.  Plaintiff's assumption that such information is readily or even feasibly obtained via the database is exactly that, an assumption without any basis in fact.  The Court must consider a trial plan and manageability of the entire case before certifying a class, including the impact and fairness to PPL to be able to mitigate and limit damages where individualized situations have a direct impact on that calculus.

Plaintiff does not even suggest a trial plan or phasing for damages (*e.g.,* representative testimony, random sampling) and in not doing so, subsumes and eradicates the opportunity for PPL to defend itself.  A preliminary assessment should be done to determine the level of variability in the class.  *See Duran*, 59 Cal. 4th at 41-49.  If the variability is too great, individual issues are more likely to swamp common ones and render the class action unmanageable.  In this case, a trial plan that does not consider individual defenses will unreasonably prevent PPL from presenting its affirmative defenses.  Certification is clearly not the superior method to try this case, nor is it availing due to its prejudice to PPL.[22]

    B.  FLSA Certification is Inappropriate Under Section 216(b) Because the Putative Collective Plaintiffs Cannot Prove That They Are Similarly Situated.

        1.  *The Final Certification Stage Requires a Stringent Analysis.*

The FLSA provides that an action may be brought against an employer for a violation of the FLSA "by any one or more employees for and in behalf of himself or themselves and other

---

[22] The importance of avoiding prejudice to PPL and its defenses cannot be overstated in this case.  After all, as the Amicus Brief articulates, an across-the-board finding that PPL is a joint employer of all DCWs in this program would have disastrous consequences, including by ultimately lowering the DCWs' take-home pay in many cases.  (*See supra* Section III.A.1.c. and Amicus Brief at 14-16.)

employees similarly situated."  29 U.S.C. § 216(b).  The statute does not define the term "similarly situated."  However, in *Zavala v. Wal-Mart Stores, Inc.,* 691 F.3d 527 (3d Cir. 2012), the Third Circuit issued authoritative guidance on the legal standards by which district courts must make certification decisions.  The determination is typically made in two stages: so-called conditional certification, followed by a final decision on certification.  *Id.* at 534.

In contrast to the more lenient conditional certification stage, at the final certification stage, courts assess factors relevant to whether the putative plaintiffs are "similarly situated."  *Zavala*, 691 F.3d  at 536-37.  This second stage requires "a more stringent review of the evidence where the court must make a conclusive determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to Plaintiff."  *Boes v. Applied Analysis Corp.*, 2020 WL 1526635, at *2 (E.D. Pa. 2020) (Schmehl, J.).  In making this determination:

> [r]elevant factors include (but are not limited to): whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment.

*Zavala*, 691 F. 3d at 536-37.  Other considerations that may lead to denial of certification are the existence of individualized defenses, fairness and procedural considerations, and the inability to establish claims by relying on common evidence.  *See id.* at 537; *see also Karlo v. Pittsburgh Glass Works, LLC*, 2014 WL 1317595, *17-18 (W.D. Pa  2014), *aff'd,* 849 F.3d 61 (3d Cir. 2017).  Importantly, the Third Circuit held that sharing "common links" such as being subjected to a common employer practice that would help demonstrate a violation of the FLSA is of *"*minimal utility" if "liability and damages still need to be individually proven."  *Zavala*, 691 F.3d. at 538.

Plaintiff bears the burden of demonstrating by a preponderance of the evidence that the opt-in members are in fact similarly situated to the named plaintiff.  *Zavala,* 691 F.3d at 537 (citing *O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 584 (6th Cir. 2009)); *see also Symczyk v. Genesis*

100287872.1

*Healthcare Corp.*, 656 F.3d 189, 193 (3d Cir. 2011), *rev'd on other grounds*, 569 U.S. 66 (2013) (at the second stage, the court "makes a conclusive determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiff.").  This requires a court to evaluate all of the evidence submitted without reading the record in the light most favorable to the non-movants or assuming the truth of their evidence.  *Zavala*, 691 F.3d at 538 n.7.  The final certification decision requires the court to engage in "a specific factual analysis of each employee's claim to ensure that each proposed plaintiff is an appropriate member of the collective action."  *Lugo*, 737 F. Supp. 2d at 299.

If Plaintiff does not satisfy this burden, "the court will decertify the group, dismiss the opt-in plaintiffs without prejudice, and permit any remaining plaintiffs to move on to the trial stage of litigation."  *Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372, 378 (W.D. Pa. 2011) (citing *Lugo*, 737 F. Supp. 2d at 299-300).

The FLSA final certification standard is different than the Rule 23 class certification standard.  *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 131-32 (3d Cir. 2018).  In *Reinig*, the Third Circuit noted that Rule 23 class certification and FLSA collective action certification are "fundamentally different creatures" and that the *Zavala* court had eschewed an approach derived from Rule 23, instead focusing on whether the putative collective plaintiffs are "similarly situated" to the named plaintiffs.  *Id.*

### 2. *The Putative Collective Plaintiffs Are Not "Similarly Situated" to Talarico.*

Talarico's Memorandum is legally deficient as it minimizes the analysis mandated by the Third Circuit.  Instead, the Memorandum inappropriately reframes the "central issue" in an FLSA final certification motion as "whether it is more efficient to try Plaintiff's claims on a collective basis . . . or whether it is more desirable to hold over 4,900 individual trials . . ."  Memorandum,

at 33.  It also contorts the standard into a balancing test, arguing that the similarities between the putative collective plaintiffs "outweigh any differences."  *Id.* at 34.  But this is not the standard.

Rather, *Zavala* requires that courts assess various factors and make case-by-case determinations as to whether plaintiffs have satisfied the similarly situated requirement.  *Zavala*, 691 F.3d at 536-37.  Here, the factors identified by *Zavala* weigh in favor of decertification—especially the one that goes straight to the common-sense understanding of whether all DCWs are similarly situated, that is, whether they have similar circumstances of employment.

a.  The DCWs are Not Employed in the Same Department, Division, or Location.

The very first factor identified by the Third Circuit in determining whether employees are similarly situated—whether they work in the same department, division, and location—could not be more inapposite to the DCWs in this litigation.  *See Zavala* at 537.  Aside from paying lip-service to this factor with the heading "Plaintiffs Are Employed in the Same Department and Location" (Memorandum at 34)—a baffling and disingenuous statement—Talarico does not and cannot seriously argue that he can satisfy this factor.  DCWs separately work in homes located all over the Commonwealth, they work for different PEs (and differing numbers of PEs), and work in different settings.  *See supra*, Section II.E.  Performing different tasks, working in different departments in different geographic locations for different people, and working different shifts results in substantial diversity among the class and supports decertification.  *Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, 2011 WL 6372852, at *5 (W.D. Pa. Dec. 20, 2011) (also noting that the significant number of different supervisors "exponentially compounds the differences and individualized experiences that go to whether there was a violation of the law, rather than creating consistency").

100287872.1

Plaintiff skirts this factor by arguing that the putative plaintiffs share the same job title, are bound by a standardized DCW Agreement, and work in Pennsylvania under the auspices of the HCBS program.  Memorandum, at 35.  These facts have nothing to do with whether the DCWs are alike because they are simply not employed in the same department, division, or location. Perhaps even more to the point, these facts and circumstances are not controlled or dictated by PPL, and they do not inform whether PPL is a joint employer under the *Enterprise* test.  The fact that DCWs participate in a Medicaid program that sets job titles and outlines the most basic circumstances of employment has no bearing on whether, in view of the day-to-day economic reality of their work relationships, PPL is their joint employer.  *See Enterprise*, 638 F.3d at 469; *see also Lugo*, 737 F. Supp.2d  at 301 ("similarities necessary to maintain a collective action under § 216(b) must extend beyond the mere facts of job duties and pay provisions.") (quoting *Anderson v. Cagle's, Inc.,* 488 F.3d 945, 953 (11th Cir. 2007)).

Talarico may argue that the "same department, division, and location" lexicon in *Zavala* is merely figurative.  Even if that is the case, this factor is meant to inform the analysis of whether employees are similarly situated.  As described further in Section III.B.2.c., this litigation revolves around allegedly unpaid overtime, which turns on, among other things, the hours the DCWs work and the rates set by the PEs.  Their "department[s], division[s], and location[s]" for purposes of this case are the individual PEs, and their respective homes, who need certain amounts of service hours and who set pay rates.  Thus, there is no similarity among the putative plaintiffs regarding the issue at the heart of this matter: overtime pay.  *See Anderson*, 488 F.3d at 952 (11th Cir. 2007) (where plaintiffs alleged several defendants were jointly liable for overtime violations, affirming decertification because of "the wide variety of work assignments and varied compensation structures affecting the purported class," "the employers' independent identities, locations, and

37

work forces" and the "various methods by which the putative class members were compensated");
*see also Lugo*, at 316 (noting that variations in schedules and individual routines and behavior
were relevant not only to whether compensation was unlawfully denied, but also to whether a
plaintiff may have been undercompensated at all, weighing against final certification).

Finally, Plaintiff cites only one case in support of this argument, *Ruffin v. Avis Budget Car
Rental, LLC*, 2014 WL 294675 (D.N.J. 2014). *See* Memorandum at 34-35. *Ruffin* is an unreported
district court opinion wholly distinguishable from this litigation on both a factual and legal basis.
Not only did the *Ruffin* plaintiffs perform primarily the same day-to-day job duties, but *Ruffin* did
not even address the *Zavala* factors. *Id.* at *3.

    b.   The DCWs Advance Similar Claims and Seek Similar Relief Only in the
           Broadest Possible Sense.

In considering final certification, courts evaluate whether the putative plaintiffs advance
similar claims and seek similar relief. *Zavala*, 691 F. 3d at 537. Here the DCWs advance similar
claims and seek similar relief only in the broadest possible sense, namely, that they should have
received, but did not receive, overtime pay premiums from PPL. This simple, unremarkable
proposition does not suggest that the DCWs are "similarly situated" for purposes of a collective
action. *See id.* at 538 ("Being similarly situated does not mean simply sharing a common status .
. . Rather, it means that one is subjected to some common employer practice that, if proved, would
help demonstrate a violation of the FLSA.").

Plaintiff ignores the threshold question that would allow the DCWs to advance their claims
against PPL: whether PPL is a joint employer of the DCWs. Pointing to PPL's alleged general
"compensation policies" applicable to DCWs—which policies PPL does not even create—does
not inform this question. Memorandum, at 35-36; *see Camesi*, 2011 WL 6372873, at *5
(defendant's implementation of a particular compensation policy "does not, in and of itself,

warrant final certification"); *Kuznyetsov*, 2011 WL 6372852, at *6 (plaintiffs' argument that dissimilarities in employment circumstances were "'miscellaneous' because there was just one policy" was "inappropriate" because "[i]t is the duty of this court to discuss the differences, vast or otherwise, among the factors at this [final certification] stage.").

Again, as stated above, the DCWs' joint employment claims are not alike, because they necessarily turn on individualized facts. *See Enterprise*, 683 F. 3d at 469. The facts that strike at the heart of Talarico's claim that PPL is a joint employer differ tremendously among the putative plaintiffs. *See supra* Section II.E. DCWs with differing hours, pay rates, circumstances of employment, and even *employers* (*i.e.,* the PEs) do not and cannot have similar claims that PPL is their employer or one of their employers under the FLSA. *See Campbell v. City of Los Angeles,* 903 F.3d 1090, 1114 (9th Cir. 2018) (explaining that the goal of the collective action mechanism can only be achieved "to the extent party plaintiffs are alike in ways that matter to the disposition of their FLSA claims" and that "party plaintiffs must be alike with regard to some *material* aspect of their litigation") (emphasis in original). Here, the material aspect of Talarico's claim is whether PPL exercised the requisite authority to be one of his employers under the *Enterprise* test. PPL played no role in determining the DCWs' overtime compensation, as that "policy" is determined by the PE and his or her Service Coordinator, among others. *See supra* Section III.A.1.a.i.

 c. The DCWs Do Not Have Similar Salaries or Circumstances of Employment.

The third *Zavala* factor is whether plaintiffs "have similar salaries and circumstances of employment." *Zavala*, at 537. As to the latter element of this factor, the DCWs have very different circumstances of employment for the reasons described in detail in Section II.E. As to the former element, "similar salaries," the rate of pay each DCW receives is determined by each individual PE in concert with their Service Coordinator, subject only to the Commonwealth's minimum wage

100287872.1

laws and programmatic maximum rate.  *See supra* Section II.E.4.  There is no uniformity across the DCWs in terms of rate of pay.  Indeed, among the mere handful of DCWs deposed during discovery alone, the rates of pay varied between $11 and $13 per hour.  *See* **Exhibit N** (DCW Rate Sheets).  In fact, Talarico himself had different rates of pay for each of his PEs.  **Ex. A**, at ¶¶ 32, 52.  PPL does not receive a copy of the document setting forth compensation parameters, the ISP, and PPL has no role in approving or monitoring this document.  *See supra* Sections II.D. and II.E.

This litigation revolves around the DCWs' claims for unpaid overtime, claims that necessarily begin with whether the DCW worked more than 40 hours per week, and if so, how many.  This, in turn, dictates the overtime premium pay to which the DCW is entitled, which, in turn, dictates the DCWs' compensation.  The contours of overtime hours, overtime rates, and thus compensation (or, in *Zavala* terms, "salaries") differ tremendously among the nearly 5,000 putative plaintiffs.  This is because each PE and his or her Service Coordinator determine in the ISP not only the rate of pay, but whether the PE requires over 40 hours per week of direct care services and whether overtime is authorized.  Additionally, as described above in Section III.A.1.b. and c., the putative plaintiffs worked for varying numbers of PEs, each of whom had a different ISP that could have authorized a different amount of overtime hours and rate.  In practice, determining the amount of overtime pay to which a DCW working for multiple PEs is entitled requires a convoluted, manual analysis.  At minimum, this would involve collating and cross-referencing various documents for each PE they worked for on a weekly basis, including determining, among other things, whether and when the DCW was LIE, the authorized overtime hours for each PE and when such hours were authorized, and the various pay rates at issue.  **Ex. E**, at ¶¶ 21-26.  This is a far cry from the "similar salaries" required by this factor of the analysis.

Plaintiff's argument that PPL "promulgated a standardized payroll system and policies governing pay for DCWs" misses the mark.  Memorandum, at 36.  Besides the fact that such policies were at the direction of PPL's client or created by Pennsylvania DHS or CMS, to be sure, many if not most businesses implement a standard payroll system.  This does not make wages "similar" for purposes of the *Zavala* analysis such that collective action treatment is warranted.

Finally, to satisfy the "similarly situated" standard, courts have required plaintiffs to show "whether each plaintiff who has opted in to the collective action is in fact similarly situated *to Plaintiff*."  *Boes*, at *2 (Schmehl, J.) (emphasis added); *see also Symczyk*, 656 F.3d at 193 (same).  Here, Talarico cannot carry his burden of showing that nearly 5,000 DCWs are similarly situated to him, including for purposes of the joint employer analysis, further underscoring the variegation among the putative plaintiffs.  As described above in Section III.B.1.b. and c., Talarico worked for three PEs at the same time and worked more than forty hours per week for only one of those PEs (and that one paid him for all of the overtime he worked).  Approximately 86% of the putative plaintiffs differ from Talarico in this regard.[23]  Additionally, Talarico did not live in the same home as any of his PEs, whereas over 1,100 putative plaintiffs did live in their PEs' homes from 2016-2018, qualifying them for the LIE and negating their eligibility for overtime premiums.  **Ex. E**, at ¶ 41.  These dissimilarities matter for both liability and damages purposes, *e.g.*, calculating hours worked for each "employer" and whether certain putative plaintiffs are entirely exempt from overtime based on their live-in status.[24]  *Id.* at ¶ 39; *see Lugo*, 737 F. Supp. 2d 291 at 316 (E.D. Pa. 2010) (refusing to assume that a plaintiff's "experience can be fairly imputed to all plaintiffs").

---

[23] Talarico and several other putative plaintiffs worked for multiple PEs.  Thus, factors relevant to the joint employment analysis differ not only among DCWs, but for each DCW viewed in isolation.  This further supports decertification.  *See Camesi v. Univ. of Pittsburgh Med. Ctr.*, 2011 WL 6372873, *3 (W.D. Pa. 2011) (citing *Prise v. Alderwoods Grp., Inc.*, 817 F. Supp. 2d 651, 680 (W.D. Pa. 2011)).

[24] As described *supra* in Sections III.A.1.b and III.A.1.c, these dissimilarities also establish that Talarico does not meet the typicality requirement, and is not an adequate class representative, for purposes of the Rule 23 analysis.

3.   *PPL's Individualized Defenses Weigh in Favor of Decertification.*

As the Third Circuit noted, plaintiffs in FLSA collective actions may "be found dissimilar based on the existence of individualized defenses." *Zavala*, at 537 (citing *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 388, n.17 (3d Cir. 2007)); *see also Karlo*, 849 F.3d at 86 (reaffirming *Zavala*'s holding that individualized defenses and procedural concerns can weigh against final certification). As Talarico's Memorandum acknowledges, this factor assesses whether a defendant's defenses require proof of individualized facts.  Memorandum, at 37.  When, at trial, a defendant would be "unable to delve into the specifics of an individual [p]laintiff's situation, supervisor's behavior, etc. . . . [t]his hardly promotes the efficiency contemplated by collective actions." *Kuznyetsov*, 2011 WL 6372852, at *7.

PPL's primary defense is that it is not a joint employer to any of the DCWs under the *Enterprise* test.  Proving this defense requires analysis of the day-to-day realities of the work DCWs performed for thousands of PEs in thousands of homes across the Commonwealth.  As courts have noted, "[b]ecause the joint employer analysis is 'inherently fact intensive,' the varying employment circumstances of the collective class members create individual defenses which make this issue unsuitable for collective treatment." *Arnold v. Directv, LLC*,  2017 WL 1251033, *2 (E.D. Mo. 2017); *see also Dang v. Inspection Depot, Inc*., 2015 WL 11598702,*3 (S.D. Fla. 2015), *report and rec. adopted*, 2015 WL 11621118 (S.D. Fla. Nov. 12, 2015) (holding that the plaintiffs did not carry their burden of proof on a motion for decertification because of ambiguities as to the plaintiffs' economic independence from, and whether they were "directly employed by," the putative employer) (citing *Layton v. DHL Express, Inc.* 686 F.3d 1172, 1172 (11th Cir. 2012)).  The paucity of cases finally certifying joint employment claims on a collective basis suggests that such claims are simply too individualized and fact-intensive to be treated collectively under Section 216(b).

42

Also, common links among the proposed class "are of minimal utility" if "[l]iability and damages still need to be individually proven." *Zavala*, at 538.  In addition to the inherently individualized nature of the joint employment analysis, another example of an individual defense is the LIE.  Given PPL's status as a non-employer, the LIE applies to a significant portion of the putative plaintiffs, meaning these individuals are not entitled to unpaid overtime premiums.  *See Camesi*, 2011 WL 68372873 at *9 (noting that "whether individual opt-ins were exempt from the FLSA for any relevant period of time" was an individual defense favoring decertification).

Talarico makes much ado over the fact that the information needed to calculate each DCW's alleged damages can be found in PPL's records.  Memorandum, at 37.  But PPL's database does not allow for a uniform methodology to calculate damages.  **Ex. E**, at ¶¶ 18-26.  And in any event, a centralized repository from which successful plaintiffs could calculate damages does not negate the fact that both liability *and* damages still need to be proven on a per-person basis.  If Talarico's argument is to be credited, any given group of employees, no matter how heterogeneous, would have an argument for proceeding collectively against their employer simply because the alleged employer maintained centralized payroll records.  As described above, joint employer liability and entitlement to overtime pay turns on individualized facts and circumstances, including each DCW's work performed for each PE and the rate of pay each PE set for each DCW.

4.   *Fairness and Procedural Issues Weigh in Favor of Decertification.*

In analyzing this factor, courts typically assess whether the benefits of class certification, allowing multiple plaintiffs to bring small claims in one proceeding and the judicial economy of holding a single trial, outweigh any unfairness or case management issues entailed by a collective action under the circumstances of the case.  *See Kuznyetsov,* 2011 WL 6372852, at *7-8 (W.D. Pa. 2011).  This "requires the district court to consider whether the litigation 'would require inquiry into the employment situation of each plaintiff rather than on a broad scale approach to the

43

employment situation of the group.'" *Sloane v. Gulf Interstate Field Servs., Inc.*, 2017 WL 1105236, *10 (M.D. Pa. 2017) (quoting *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 360 (D.N.J. 1987)).  Although pooling resources to pursue claims generally reduces plaintiffs' litigation costs, this factor is not the only consideration.  *Camesi*, 2011 WL 6372873 at *9.

Here, the benefits to the plaintiffs of trying this case in one proceeding are substantially diminished by the fact that most of the issues, as discussed above, cannot be tried by representative testimony, for reasons already discussed.  *See* Section III.A.2.b. regarding lack of superiority of the class action vehicle.  The only way to adjudicate and manage this matter in a fair and sensible matter is to consider the particular employment situations of thousands of DCWs—an undertaking that cannot be accomplished by collective action treatment.

## IV.    CONCLUSION

The undeniable differences amongst the putative class of DCWs defeat Plaintiff's ability to demonstrate the commonality, typicality, adequacy, superiority, and predominance requirements necessary to certify a Rule 23 class, or that the members of the putative class are similarly situated to merit final certification under the FLSA.  PPL respectfully requests that the Court deny Plaintiff's Motion for Class Certification and Final Collective Action Certification.

Respectfully submitted,

PUBLIC PARTNERSHIPS LLC,
By its attorneys,

*/s/ Walter M. Foster*
Walter M. Foster (admitted *pro hac vice*)
Eckert Seamans Cherin & Mellott, LLC
Two International Place, 16th Floor
Boston, MA  02110
Telephone: 617.342.6800
Facsimile:  617.342.6899
wfoster@eckertseamans.com

Dated: May 5, 2021

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RALPH TALARICO, INDIVIDUALLY AND, ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | } } } | |
| | } | Docket No. 17-2165 |
| Plaintiffs, | } | |
| | } | Judge Schmehl |
| v. | } | |
| | } | |
| PUBLIC PARTNERSHIPS LLC, D/B/A PCG PUBLIC PARTNERSHIPS, | } } | |
| | } | |
| Defendant. | } | |

## CERTIFICATE OF SERVICE

I hereby certify that, on May 5, 2021 I electronically filed the foregoing document using the CM/ECF system, and that I served the same by electronic filing via ECF, pursuant to the administrative procedures of the United States District Court for the Eastern District of Pennsylvania governing the filing and service by electronic means, upon all counsel of record as follows:

> Richard A. Katz, Esquire
> Arnold, Beyer & Katz
> 140A King Street
> Lancaster, PA 17602
> (717) 394-7204
> rkatz@arnoldbeyerkatz.com

> Christine E. Webber, Esquire *pro hac vice*
> Miriam R. Nemeth, Esquire *pro hac vice*
> Cohen Milstein Sellers & Toll PLLC
> 1100 New York Ave., N.W. Suite 500
> Washington, DC 20005
> (202) 408-3645
> cwebber@cohenmilstein.com
> mnemeth@cohenmilstein.com

45

Rachhana T. Srey, Esquire *pro hac vice*
Robert L. Schug, Esquire *pro hac vice*
Nichols Kaster, PLLP
4600 IDS Center, 80 South 8th Street
Minneapolis, MN  55402
srey@nka.com
schug@nka.com

*Attorneys for Plaintiff*


Respectfully submitted,

PUBLIC PARTNERSHIPS LLC,
By its attorney,

*/s/ Walter M. Foster*
Walter M. Foster (admitted *pro hac vice*)
Eckert Seamans Cherin & Mellott, LLC
Two International Place, 16th Floor
Boston, MA  02110
Telephone: 617.342.6800
Facsimile:  617.342.6899
wfoster@eckertseamans.com

Dated: May 5, 2021

46