## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| RALPH TALARICO, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) | |
| Plaintiffs, | ) ) | Docket No. 17-2165 |
| v. | ) ) | Judge Schmehl |
| PUBLIC PARTNERSHIPS LLC, | ) ) | |
| Defendant. | ) ) ) | |

### DEFENDANT'S POST-TRIAL BRIEF

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 1

II.  FACTS ...................................................................................................................... 4

III. ARGUMENT .............................................................................................................. 4

   A.  Plaintiff Failed to Show PPL Acted as a Joint Employer Under the *Enterprise* Test. ......... 4

     1.  Factor 1: PPL Does Not Have the Authority to Hire or Fire DCWs. .............................. 6

       a.  PPL Has No Authority to Hire a DCW, and Never Did So ........................ 6

         i.  Plaintiff's Arguments on DCW Hiring are Unpersuasive. ....................... 7

       b.  PPL Has No Authority to Fire a DCW, and Never Did So. .......................... 9

     2.  Factor 2: PPL Does Not Promulgate Work Rules or Assignments, or Set the DCWs' Conditions of Employment – Compensation, Benefits, or Work Schedules for DCWs...................................................................................................... 10

       a.  PPL Did Not Promulgate Work Rules ..................................................... 10

       b.  PPL Did Not Have Authority to Determine Job Duties and Hours, and Did Not Do So. ....................................................................................... 15

       c.  PPL Had No Authority to Set DCW Work Schedules and Did Not Do So ............... 16

       d.  PPL Had No Authority to Set DCW Compensation and Did Not Do So .................. 17

         i.  PPL Did Not Set the DCW Wage Rate....................................................... 17

         ii.  PPL Did Not Determine Whether a DCW Received Overtime Pay  ................. 18

       e.  PPL Was Not Authorized to Provide Benefits to a DCW, and Did Not Do So......... 19

     3.  Factor 3:  PPL Had No Involvement in the Day-to-Day Supervision of the DCWs, including any DCW Discipline. ..................................................................... 21

     4.  Factor 4:  PPL Does Not Have Actual Control of All Critical Employee Records....... 21

   B.  Under the *Enterprise* Test, Contractual Language by Itself Does Not Weigh in Favor of a Finding of Joint Employment. ..................................................................... 23

   C.  District Courts in Other Circuits Have Concluded that Fiscal Agents in Self-Directed Medicaid HCBS Waiver Programs, Like PPL, are Not Joint Employers. .............................. 26

     1.  *Peel v. Palco, Inc.*, Case No. 4:19-CV-00795-BSM, 2022 WL 320933 ........................ (E.D. Ark. Feb. 2, 2022)................................................................................ 27

     2.  *Abel v. Bridgeway Advantage Sols. Inc.*, No. CV-17-01248-PHX-GMS, 2019 WL 160439 (D. Ariz. Jan. 10, 2019)..................................................................... 30

   D.  Numerous Administrative Agency Decisions Have Found That There is No Employment Relationship Between PPL and the Providers in Other Self-Directed Medicaid HCBS Waiver Programs..................................................................................... 32

   E.  In the Alternative, If the Court Finds PPL Liable as a Joint Employer, PPL's Actions Were Not Willful, and PPL Acted With a Good Faith Belief That Its Actions Were Lawful. ....................................................................................................... 35

i

IV.  CONCLUSION .................................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abel v. Bridgeway Advantage Sols. Inc.*,
  No. CV-17-01248-PHX-GMS, 2019 WL 160439 (D. Ariz. Jan. 10, 2019) ..........26, 30, 31, 32

*Abel v. Bridgeway Advantage Sols. Inc.*,
  Case No. CV-17-01248-GMS, ECF No. 74-1 (filed June 8, 2018) ........................................32

*Bonnette v. Cal. Health & Welfare Agency*,
  704 F.2d 1465, 1470 (9th Cir. 1983) ............................................................................5, 30, 31

*Carlton v. JHook Invs., Inc.*,
  No. 4:17-cv-00076 KGB, 2019 WL 4784801 (E.D. Ark. Sept. 30, 2019) .............................27

*City Cab Co. of Orlando, Inc. v. NLRB*,
  628 F.2d 261 (D.C. Cir. 1980) ...............................................................................................25

*Commonwealth v. Stuber*,
  822 A.2d 870 (Pa. Commw. Ct. 2003), *order aff'd*, 859 A.2d 1253 (Pa. 2004) ......................5

*Davis v. Abington Mem'l Hosp.*,
  817 F. Supp. 2d 556 (E.D. Pa. 2011) .......................................................................................4

*DiFlavis v. Choice Hotels Int'l, Inc.*,
  Civ. A. No. 18-3914, 2020 WL 610778 (E.D. Pa. Feb. 3, 2020) .........................11, 12, 13, 14

*Donovan v. DialAmerica Mktg., Inc.*,
  757 F.2d 1376 (3d Cir. 1985) .................................................................................................26

*In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.*,
  683 F.3d 462 (3d Cir. 2012) ....................................................................................................5

*Falk v. Brennan*,
  414 U.S. 190 (1973) ...............................................................................................................25

*Gallagher v. Cerebral Palsy of Mass., Inc.*,
  86 N.E.3d 496 (2017) ........................................................................................................17, 26

*Goldberg v. Whitaker House Coop., Inc.*,
  366 U.S. 28 (1961) ...................................................................................................................5

*Gonzalez v. Bustleton Servs.*,
  Civ. A. No. 08-4703, 2010 WL 1813487 (E.D. Pa. Mar. 5, 2010) .........................................35

*Hardgers-Powell v. Angels in Your Home LLC*,
  330 F.R.D. 89 (W.D.N.Y. 2019).........................................................17

*Hodgson v. Griffin & Brand of McAllen*,
  471 F.2d 235 (5th Cir. 1973) ...........................................................25

*Hughes v. Family Life Care*,
  117 F. Supp.3d 1365 (N.D. Fla. 2015)..............................................25

*Mackereth v. Kooma, Inc.*,
  Civ. A. No. 14-04824, 2015 WL 2337273 (E.D. Pa. May 14, 2015) .......................5

*McKenna v. Healthease, Inc.*,
  Civ. A. No. 10-3940, 2013 WL 1702639 (E.D. Pa. Apr. 19, 2013) .......................21

*Mogel v. City of Reading*,
  Civ. No. 5:20-cv-04464-JMG, 2021 WL 4989842 (E.D. Pa. Oct. 27, 2021) ........................35

*Nagel v. Ram Indus. Servs.*,
  Civ. No. 1:20-CV-840, 2022 WL 17721083 (M.D. Pa. July 21, 2022)......................23, 24, 25

Peel v. Palco, Inc., Case No. 4:19-CV-00795-BSM, 2022 WL 320933
  (E.D. Ark. Feb. 2, 2022) ...........................................................26, 27

*Scantland v. Jeffry Knight*,
  721 F.3d 1308 (11th Cir. 2013) .......................................................25

*Sturgeon v. Pharmerica Corp.*,
  438 F. Supp. 3d 246 (E.D. Pa. 2020) ..................................................32

*Torres-Lopez v. May*,
  111 F.3d 633 (9th Cir. 1997) .........................................................30

*Yue Yi v. McGrath*,
  597 F. App'x 62 (3d Cir. 2014) .......................................................10

## Statutes

29 U.S.C. § 203(e)(1)....................................................................4

29 U.S.C. § 255(a) ......................................................................35

42 U.S.C. § 1396n (j)(5)(A)..............................................................2

Fair Labor Standards Act (29 U.S.C. §§ 201-219) .........................................4, 18

Pennsylvania Minimum Wage Act of 1968 (43 P.S. §§ 333.101-333.115) .......................4, 5

55 Pa. Code § 52.3 ......................................................................2

**Other Authorities**

29 C.F.R. 552 ..........................................................................................................................19

42 C.F.R. § 441.450(b)(1)-(13).............................................................................................2

42 C.F.R. § 441.478(a)-(c) ....................................................................................................2

78 Fed. Reg. 60454 .............................................................................................................19

Defendant Public Partnerships LLC ("PPL") hereby submits this Post-Trial Brief in conjunction with its Proposed Findings of Fact ("FOF") and Proposed Conclusions of Law ("COL"), pursuant to the Court's Order dated February 5, 2024. (ECF Doc. No. 342). For the reasons stated herein, PPL respectfully requests that this Honorable Court enter judgment in its favor and against Plaintiff, Ralph Talarico, individually and on behalf of all others similarly situated ("Plaintiff"), on all counts in the First Amended Collective Action and Class Action Complaint.

Plaintiff has failed to prove by a preponderance of the evidence that PPL is a joint employer of Direct Care Workers ("DCWs") in the Self-Directed Services model ("Self-Directed Services model")[1] of the Pennsylvania Home and Community Based Services Medicaid waiver programs that deliver supportive services to Participant-Employers ("PEs") in their home (hereafter called the "HCBS Waiver Programs"). Therefore, PPL cannot be held liable for the overtime pay claims asserted by Plaintiff.

## I.    INTRODUCTION

Plaintiff's claims are based on a single allegation – that PPL failed to pay the DCWs overtime pay in violation of federal and state law. Plaintiff's claims fail for a single, fundamental reason: PPL is not and has never been an employer of the DCWs. PPL never had authority nor economic power over the DCWs' employment, including whether to pay DCWs overtime. Fundamental to the Self-Directed Services model under the HCBS Waiver Programs, Medicaid members who choose to participate in the program are the sole employers of the DCWs. PPL is the "fiscal agent" contracted by the Commonwealth of Pennsylvania to support

---

[1] The Self-Directed Services model allows the PE complete employer authority over the DCWs they hire to provide them home care services. (FOF, at ¶¶ 7, 19, 20).

the PEs[2] with payroll and tax services, similar to a payroll company's support of employers in the private sector.

Federal statutes and regulations, Pennsylvania Medicaid program regulations, the administrative authority of the Commonwealth of Pennsylvania Office of Long Term Living ("OLTL"), and the Commonwealth's contract with PPL (the "Grant Agreement") all prescribe and reflect the centrality of the PE's sole employer authority, as well as PPL's non-employer support role. 42 C.F.R. § 441.450(b)(1)-(13); 42 C.F.R. § 441.478(a)-(c); 42 U.S.C. § 1396n (j)(5)(A); 55 Pa. Code § 52.3; JX 357. These statutory, regulatory, program, and contractual authorities expressly define the fundamental role of each entity within the programs, including the Participant-Employer (PE), the Direct Care Worker (DCW), the Service Coordinator, the Enrollment Broker, and OLTL itself, as well as PPL's limited role as the fiscal agent. By reserving employer authority only to the PE, all of these authorities make clear the foundational principle of Self-Direction programs: that the PE is the employer and the only employer of the DCWs providing essential personal care services to the PE in their home.

Every program document within the HCBS Waiver Programs is consistent with, and indeed emphasizes, this important delineation of employer authority. The paycheck stubs and W-2s received by DCWs bear the name of their PE; if they work for more than one PE, they receive separate paychecks and a W-2 for each PE. PPL does not recruit, hire or fire, set the rate of pay, supervise or evaluate performance of the work, set the number of hours, determine work duties or set work schedules, or determine whether to pay DCWs overtime. PPL also does not keep employee records, except to the extent that they are program documents it needs for purposes of the fiscal agent services it was contracted to provide. The Self-Directed Services model of the

---

[2] Medicaid members who choose to participate in the Self-Directed Services model are known as PEs.

HCBS Waiver Programs was purposefully designed in this manner, and to this end – to empower the PE with clear employer authority to control and manage the services to meet their particular care needs at home.

Finally, it is significant to note the economic reality of how the HCBS Waiver Programs are structured eliminates any incentive for PPL concerning the amount of hours worked by a DCW, a DCW's pay rate, or whether or not the DCW receives any overtime.  Under the Grant Agreement, PPL is compensated for the administrative functions it performs as the fiscal agent through a monthly administrative fee, which is paid on a simple "per member, per month" basis. Whether a DCW works under 40 hours in a week, or over 100 hours in a week, PPL is paid the same.  Likewise, the monetary difference between straight time and overtime pay has no impact on PPL's compensation.  In its role as fiscal agent, PPL has no financial interest in avoiding the payment of overtime to the DCWs – the Commonwealth pays PPL the same amount regardless of how much money was paid to DCWs.

Previously, this Honorable Court granted PPL's Motion for Summary Judgment on all of Plaintiff's claims on the basis that PPL was not an employer of the DCWs.  *See* Memorandum dated Jan. 28, 2020, ECF No. 203.  Now, after a seven-day trial, and a fully developed factual record, the evidence is even stronger that PPL was not, at any time, an employer of the DCWs. Consequently, PPL is not liable to Plaintiff for overtime payments under applicable law.[3]

---

[3] Plaintiff's claims, if successful, also could upset the settled expectations of tens of thousands of Pennsylvania Medicaid members who have chosen the self-direction program option for their in-home personal care needs, to the extent that they affect the Medicaid members' ability to control hiring, firing, work rules, scheduling, hours, overtime, and other employment matters relating to their DCWs and reserved to them today.  (FOF, at ¶ 40).

## II.    FACTS

PPL has filed contemporaneously herewith its Proposed Findings of Fact and Proposed Conclusions of Law.  PPL hereby incorporates by reference the facts and supporting evidence cited therein as if fully set forth here, and respectfully refers the Court to those documents for each section of the argument below.

## III.    ARGUMENT

Plaintiff has failed to prove by a preponderance of the evidence that PPL's role as the fiscal agent for PEs in the Pennsylvania HCBS Self-Directed Services model of the HCBS Waiver Programs fulfills <u>any</u> of the factors in the governing *Enterprise* test for joint employment.  The trial evidence also confirms that PPL had no authority or economic power over the DCWs' employment, including, specifically, whether to pay overtime to the DCWs. These conclusions are further supported by applicable caselaw and administrative decisions that have analyzed the role of fiscal agents, such as PPL, supporting Self-Directed Services in HCBS Waiver Programs.  Therefore, Plaintiff has failed to prove its claims under the Fair Labor Standards Act (29 U.S.C. §§ 201-219) ("FLSA") (Count I) and the Pennsylvania Minimum Wage Act of 1968 (43 P.S. §§ 333.101-333.115) ("MWA") (Count II), and judgment should be entered on behalf of PPL on both claims.

## A.    <u>Plaintiff Failed to Show PPL Acted as a Joint Employer Under the *Enterprise* Test.</u>

"The basic prerequisite for any FLSA lawsuit is an employment relationship between the plaintiffs and defendant."  *Davis v. Abington Mem'l Hosp.*, 817 F. Supp. 2d 556, 563 (E.D. Pa.  2011) (citing 29 U.S.C. § 203(e)(1)).  Whether an employer-employee relationship exists for purposes of the FLSA rests on the "economic reality rather than the technical concepts." *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961) (internal quotation marks

4

omitted); *Mackereth v. Kooma, Inc.*, Civ. A. No. 14-04824, 2015 WL 2337273, at \*15 (E.D. Pa.

May 14, 2015).  The U.S. Court of Appeals for the Third Circuit has set forth a four-factor test to

determine if an entity is a joint employer of an employee for purposes of the FLSA:

> When faced with a question requiring examination of a potential joint employment
> relationship under the FLSA, we conclude that courts should consider: 1) the
> alleged employer's authority to hire and fire the relevant employees; 2) the alleged
> employer's authority to promulgate work rules and assignments and to set the
> employees' conditions of employment: compensation, benefits, and work
> schedules, including the rate and method of payment; 3) the alleged employer's
> involvement in day-to-day employee supervision, including employee discipline;
> and 4) the alleged employer's actual control of employee records, such as payroll,
> insurance, or taxes.

*In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 683 F.3d 462, 469 (3d Cir. 2012).

There is no specific number or combination of factors that conclusively determines whether an

alleged employer is a joint employer, and the test cannot be "blindly applied."  *Id.* at 469

(quoting *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)).

Whether an alleged employer is a joint employer depends on the "total employment situation and

the economic realities of the work relationship."  *Id.* (quoting *Bonnette*, 704 F.2d at 1470).

Pennsylvania law follows the FLSA in many respects, including how the existence of an

employer or joint employer relationship for the Pennsylvania Minimum Wage Act is determined.

*Commonwealth v. Stuber*, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003), *order aff'd*, 859 A.2d 1253

(Pa. 2004).  Consequently the same test applies to each set of claims in this case.

Plaintiff has failed to prove that PPL meets any of the *Enterprise* factors; therefore, PPL

cannot be a joint employer of the DCWs and is not liable under any claim asserted by Plaintiff.

1. ***Factor 1: PPL Does Not Have the Authority to Hire or Fire DCWs.***

   a. *PPL Has No Authority to Hire a DCW, and Never Did So. (See FOF, at ¶¶ 129-195; COL, at ¶¶ 26-42)*

The DCWs consistently testified that they were hired by their PEs, not by PPL. In fact, several DCWs testified that they were hired by and began working for their PE before PPL became the fiscal agent. DCWs who were hired after PPL became the fiscal agent testified that the PE was the only party involved in meeting with, interviewing, and ultimately choosing to hire them. PE witnesses confirmed through their testimony that they were solely responsible for finding, interviewing, and hiring their DCWs. There is no evidence that PPL ever had the authority to hire a specific DCW or that it ever did so. Nor is there any evidence that PPL ever decided that a PE could not hire a particular DCW of their choosing.

Instead, PPL's role was limited to processing the HCBS Waiver Programs' enrollment paperwork for DCWs that had already been selected by the PE. PPL became involved only when a PE notified PPL that they had hired a new DCW so that PPL could assist in enrolling the newly hired DCW in the HCBS Waiver Programs and set up payroll processing for the newly hired DCW on behalf of the PE. In response to such notification from a PE, PPL simply sent out a pre-packaged enrollment packet containing forms originated, required, and approved by OLTL for the Self-Directed Services model within the HCBS Waiver Programs.

All of the program documents, including DCW Agreements, enrollment packet forms, qualification forms, and transition documents, are required by the Commonwealth and were developed and used before PPL became the fiscal agent. (FOF, at ¶¶ 139, 214, 215, 218). The Commonwealth dictates what is included in the enrollment packets and the specific language and terms included in the program documents. *Id*. While PPL provided input on the content of program forms, any edits to forms were under the express instruction and direction of OLTL, and

6

not a single change could be made to a program form without prior approval from OLTL.  (FOF, at ¶¶ 15, 218).

> i.    Plaintiff's Arguments on DCW Hiring are Unpersuasive.

At trial, Plaintiff again advanced the same arguments on hiring authority that they raised unsuccessfully at summary judgment.  Specifically, Plaintiff points to PPL's administrative involvement in two program rules that originate from state and federal law—the state-mandated criminal background check and the federally-mandated Medicaid fraud exclusion list check (the List of Excluded Individuals/Entities, or "LEIE").  Plaintiff also cites another program rule, the "good to go" step in the enrollment process.  None of these arguments suffice to establish any PPL authority to hire any DCW.

The processing of a criminal background check for DCWs is not a PPL requirement.  Rather, criminal background checks are required by state law and by the Waiver Application that OLTL submitted to the Centers for Medicare & Medicaid Services ("CMS") when it first sought approval of the HCBS Waiver Programs.  PPL, as required by its contract with OLTL, simply arranged for the criminal background check of prospective DCWs to be processed by the Pennsylvania State Police and shared the results with the PE.  Moreover, and equally important, PPL has no control or authority over the hiring decision based on the results of a background check.  Instead, such control and authority rests entirely with the PE.  In fact, the criminal background check process underscores the PE's sole authority to hire, and is consistent with the underlying intent and purpose of the Self-Directed Services model to empower PEs to control their care, because PEs have the complete discretion to hire a DCW regardless of whether the criminal background report includes a positive finding.  PPL has no authority to stop the PE from

hiring a DCW in light of a criminal background result, and there was no testimony at trial that PPL had ever done so.[4]

Talarico himself is a prime example of a DCW being hired despite a criminal history. In 2013, Talarico underwent a criminal background check, the results of which his PE (in this case, "EW") received. (FOF, at ¶ 178). Despite the criminal record finding, EW opted to continue to employ Talarico as his DCW. *Id*. In sum, Plaintiff's attempt to rely on PPL's role in arranging for the state-mandated criminal background check does nothing to prove that PPL possesses any authority or economic power to hire a DCW.

The same analysis and conclusion applies to Plaintiff's argument citing the LEIE check. Like the criminal background check, the LEIE check is not a PPL requirement. Medicaid regulations bar a PE from receiving services under the HCBS Waiver Programs from a DCW who appears on the LEIE. This federal Medicaid prohibition cannot be indicative of PPL having any authority or control over hiring or firing. Indeed, PPL has no authority to place an individual on the LEIE or remove an individual from the LEIE. PPL merely runs the DCW name against the LEIE. The exclusion from the HCBS Waiver Programs of any DCWs who are listed on the LEIE is required by the Commonwealth of Pennsylvania and the federal Medicaid program. PPL has no authority to determine whether an individual appearing on the LEIE can work as a DCW

---

[4] This PE authority to hire a DCW despite their criminal record is memorialized by the Participant/CLE Acceptance of Responsibility Form (Plaintiff Exhibit ("PX") 37), which reads, "Participants who choose to be the employers of their direct care workers will be required to have criminal history background checks performed on their workers that they hire. The participant will be informed about his or her responsibilities as an employer for their own personal health and safety in their own homes. The participant will be informed of the results of the criminal history background check. The participant may still choose to hire a direct care worker even if a worker is found to have a criminal history."

or not.  Thus, the LEIE requirement does not demonstrate that PPL has any authority over the hiring of DCWs.[5]

Finally, the "good to go" notification to PEs and DCWs also does not reflect any hiring authority for PPL.  Plaintiff confuses and conflates the actual function and purpose of the "good to go" notification to attempt to cast it as PPL exercising decision-making authority.  In fact, however, the trial record demonstrates that the "good to go" notification is just the completion of a checklist, with each item on the checklist being a mandatory programmatic step required by either the Commonwealth or the federal Medicaid regulations.  "Good to go" means that a DCW has checked all the boxes reflecting the program requirements, not set by PPL, to be paid with Medicaid funds through the HCBS Waiver Programs.  There was no evidence at trial that PPL exercises any decision-making or economic authority in relation to the "good to go" notification.

>           b.   *PPL Has No Authority to Fire a DCW, and Never Did So.  (See*
>                *FOF, at ¶¶ 196-211; COL, at ¶¶ 43-50)*

At trial, just like at summary judgment, Plaintiff presented no evidence that PPL has the authority to fire a DCW or to require a PE to fire a DCW.  The power to fire is reserved exclusively for the PEs.  It is undisputed that each PE who fired a DCW did so without any prior approval or involvement from PPL.  There is no evidence that PPL ever told a PE that they had to fire a DCW.  In fact, when a PE fires a DCW, PPL often does not even hear about it, even though PEs are requested to notify PPL after they have fired their DCW so the payroll record can be updated.  Regardless, the DCW's employment is still terminated by the PE.  There is also no evidence that PPL has ever refused to permit a termination.  PPL has no involvement in firing DCWs.

---

[5] The LEIE requirement merely prevents a DCW from being paid with Medicaid funds in the program.  It does not prevent the same worker to be paid by the same participant outside the program with non-Medicaid funds.

In sum, PPL has no authority to hire or fire a DCW, and therefore the first *Enterprise*

factor falls squarely in PPL's favor.  *See Yue Yi v. McGrath*, 597 F. App'x 62, 65-66 (3d Cir.

2014).  This conclusion is consistent with the Summary Judgment decision and with the decision

of the Third Circuit ("we conclude that PPL does not have the authority to hire and fire

employees and that the first Enterprise factor thus weighs against concluding that PPL is a joint

employer."), Third Circuit Opinion, at 7, and has only been bolstered by the evidence at trial.

The first *Enterprise* factor weighs heavily against joint employment.

> **2.  *Factor 2: PPL Does Not Promulgate Work Rules or Assignments, or Set the DCWs' Conditions of Employment – Compensation, Benefits, or Work Schedules for DCWs.***

The evidence presented at trial materially amplified and clarified the record available at

summary judgment, and demonstrates that PPL did not promulgate any work rules or

assignments in the Self-Directed Services model, or set any conditions of employment.

Therefore, this second factor of the *Enterprise* test weighs heavily against joint employment.

The trial record demonstrates that the PEs themselves set all work rules and work

assignments, and set the conditions under which their DCWs would perform the tasks for which

they were being paid.  The record also showed that the PEs set the compensation of their DCWs

within the ranges that PPL had no discretionary hand in setting.

> a.  *PPL Did Not Promulgate Work Rules. (See FOF, at ¶¶ 212-276; COL, at ¶¶ 51-71)*

With the benefit of a more complete factual record, it is even more evident that PPL never

created any of the work rules set forth in the various program documents, including, specifically,

the DCW Agreement and the DCW Qualification/Re-Qualification Forms.

PPL never promulgated or set the minimum qualifications for a DCW to provide services

in the HCBS Waiver Programs – that they (1) be at least 18 years of age, (2) possess a valid

social security number, (3) possess basic math, reading, and writing skills, (4) demonstrate the capabilities to perform the tasks identified in a PE's Individualized Service Plan ("ISP"), and (5) agree to carry out the services identified in the PE's ISP – all of which are set by federal or state law, by the Medicaid program, and/or by OLTL. (FOF, at ¶¶ 212, 214, 222, 242). In fact, these are Medicaid program requirements, which come directly from OLTL's Waiver Application. They were already finalized as required program rules before PPL was engaged to be the fiscal agent. Other minimum qualifications, such as criminal background checks (*see supra* at 10-12) are mandated by state law.[6]

Plaintiff did not present any evidence showing that PPL created or mandated any of these "qualifications." Indeed, PPL does not have the authority to do this as the fiscal agent. Rather, the credible evidence at trial demonstrates that OLTL always had ultimate authority over all program forms and that OLTL must review and approve the forms before they are used in the program. Any edits proposed by PPL regarding any form were either made at the instruction of OLTL or provided to OLTL for final determination and approval. (FOF, at ¶¶ 15, 212).

Caselaw from this district also undermines Plaintiff's contention that the DCW Agreement and other agreements executed by the DCWs demonstrate that PPL promulgates work rules. Specifically, in *DiFlavis v. Choice Hotels Int'l, Inc*., Civ. A. No. 18-3914, 2020 WL 610778, at *7 (E.D. Pa. Feb. 3, 2020), the court expressly determined that a written agreement

---

[6] Plaintiff's counsel claimed at trial that the fact PPL required criminal background checks to be completed before DCWs could begin work, instead of within 30 days of work starting (as stated in the OLTL Waiver Application), showed PPL was unilaterally making up work rules like an employer. In fact, the credible evidence at trial established that OLTL had directed PPL to complete the background check process, including notice to the PE and the PE's decision to proceed, before work for the PE in the program could begin. (FOF, at ¶¶ 167-168, 170-171). The DCW Agreement, at OLTL's direction, accordingly, included an express acknowledgment by the DCW that "I cannot begin providing services in this program before I have successfully cleared the background checks." (e.g. PX 13 at PPL 779). More generally, the *Enterprise* caselaw makes clear that, in assessing joint employment, economic realities matter more than contract terms inconsistent with that reality. In this instance, again, PPL followed OLTL direction and did not make its own decision as to the program rule on the completion of the background check.

designed for a purpose other than instituting work rules cannot be weighed in favor of a joint employment finding because the written agreement was not related to the employment relationship at issue. In addition, countering another failed argument by Plaintiff in this case, the court in *DiFlavis* disregarded speculative testimony concerning which entity created various documents based solely on the existence of a company logo because the witness did not have any personal knowledge as to how the documents were created. *Id.* at *6.

In *DiFlavis*, the issue was whether a hotel franchisor (Choice Hotels) was a joint employer of housekeepers at a franchised hotel owned and operated by a hotel management company (Rama). *Id.* at *1-2. Plaintiff DiFlavis was briefly employed as a housekeeper at a hotel, which was owned and operated by Rama, *id.*, through a franchise agreement with defendant franchisor Choice Hotels. *Id.* DiFlavis filed a wage and hour action against both Choice Hotels and Rama on behalf of herself and other similarly situated housekeepers. *Id.* Choice Hotels moved for summary judgment on the basis that it was not a joint employer of the housekeepers. *Id.*

DiFlavis argued that the employee handbook and other documents she received bore the Choice Hotels logo, and, therefore, Choice Hotels must have created the documents. *Id.* at *6-7. The court disregarded plaintiff's speculative and conclusory testimony because she did not have any personal knowledge regarding which entity created the documents. *Id.* Like DiFlavis, Plaintiff in the instant case relies heavily on testimony from DCWs regarding the program forms which they <u>believe</u> PPL created and the requirements they <u>believe</u> PPL mandated. This Court should likewise disregard this testimony as not credible because these same witnesses admitted that they have no personal knowledge regarding who created the program forms, why the program forms were created, what contents were required to be included in the program forms,

12

or who determined what must be included in the program forms. The testimony from witnesses that do have personal knowledge of the program forms (e.g., OLTL Division Director Kimberly Barge and former PPL Senior Account Manager Regina Stewart) demonstrates that the forms contain requirements set by OLTL or state and federal law under the HCBS Waiver Programs and were approved for use by OLTL.

Another significant parallel between *DiFlavis* and the instant matter is that DiFlavis argued that, through the franchise agreement, Choice Hotels imposed several work rules upon housekeepers. *Id*. at *7. The franchise agreement in *DiFlavis* contained several "Housekeeping and Maintenance Service Standards," which instructed housekeepers on how to uniformly service all occupied rooms. *Id*. Choice Hotels also created and had Rama distribute paperwork containing general cleaning standards for housekeepers. *Id*. The court, however, concluded that "such familiar hospitality facilities standards are ultimately implemented to maintain the Clarian Hotel *brand*, not to control particular working conditions and responsibilities of housekeepers." *Id.* Thus, the service standards were not indicative of joint employer status. *Id*.

This principle applies here. The DCW Agreement is not tantamount to PPL promulgating work rules. Rather, as demonstrated through the credible trial testimony of Barge and Stewart, the DCW Agreement was a required component of OLTL's HCBS Waiver Programs and Self-Directed Services model years before PPL became the fiscal agent, and largely embodied Medicaid-mandated requirements – just like in *DiFlavis*, it did not impose work rules or conditions of employment upon DCWs. Rather, the DCW Agreement functioned to uphold and maintain the programmatic structure of the HCBS Waiver Programs.

Plaintiff has consistently portrayed the present case narrowly, choosing to ignore the import of the rules of the HCBS Waiver Programs in which the PEs and DCWs participated.

And, unlike in *DiFlavis* where Choice Hotels exercised its discretion with respect to its housekeeping standards, in this case PPL exercised no discretion or authority in distributing the DCW Agreement and the program requirements it contained, as they were imposed by OLTL and federal and state law as a condition of the PEs using Medicaid funds to pay for services received from the DCWs. Contrary to Plaintiff's contention, the credible evidence establishes that the DCW Agreement plays no role in "control[ing] particular working conditions and responsibilities of [DCWs]." *See DiFlavis*, 2020 WL 610778, at *7. To the contrary, that role is exclusively reserved for the PEs. *See supra* at 13-14.

Plaintiff also points to the pre-service orientations presented by the Training and Education Fund and by Frontline, respectively, at OLTL's direction, but they likewise were not evidence of PPL promulgating work rules. As an initial matter, PPL did not create or conduct either pre-service orientation.[7] Further, the pre-service orientation served a purpose completely unrelated to the actual day-to-day work rules of a DCW providing services in the home of a PE. The pre-service orientations acclimated new DCWs to the HCBS Waiver Programs and Self-Directed Services model, in which the DCWs had just become a service provider.[8] The pre-service orientations served to introduce the DCW to the program structure of the HCBS Waiver Programs, not to dictate work rules that the DCWs would adhere to in the performance of their specific job duties for their PE.[9] Indeed, the pre-service orientations could not possibly be

---

[7] Stewart and Thomas testified that PPL simply gave each orientation vendor a number of generic pieces of information for it to include in the presentation.

[8] Beyond a brief three-month pre-service orientation in mid-2017 (implemented and conducted by The Training and Education Fund), the pre-service orientation was instituted in December 2018 at OLTL's mandate, and Frontline determined and created the actual presentation informed by input from OLTL, not PPL. Thus, the pre-service orientation was only attended by a limited number of DCWs, i.e., only those DCWs new to the HCBS Waiver Programs after December 2018. These new DCWs attended the orientation only once because its purpose was to familiarize DCWs with the HCBS Waiver Programs and the Self-Directed Services model. Accordingly, if a DCW was later hired by a second PE they would not need to attend the pre-service orientation again.

[9] To further maintain the programmatic structure, the pre-service orientation repeatedly states that the PE is the employer of the DCWs, not PPL.

designed to train DCWs on how to perform their job duties because neither PPL nor Frontline saw the ISP and thus never learned each PE's specific individualized needs and services. Therefore, they could not possibly know what work rules are needed for each DCW to perform those job duties.

Finally, the rare in-home visits of PPL enrollment specialists to help a small subset of Medicaid members enroll as PEs, during a brief period of time over the life of the program, also do nothing to change the conclusion that PPL did not set employment rules for the DCWs. The duties of the enrollment specialists focused exclusively on (i) helping Service Coordinators work with PEs to understand the enrollment procedures required to participate in the HCBS Waiver Programs and (ii) assisting with the paperwork required to enroll the PE after the PE had hired the DCW. The enrollment specialists had nothing to do with the work rules or conditions of employment of the DCWs.

In sum, neither PPL's distribution and collection of DCW Agreements created and required by OLTL, nor its sporadic activities in the areas of program orientation and enrollment at the direction of OLTL, do anything to suggest that PPL actually created work rules for the DCWs.

> b. *PPL Did Not Have Authority to Determine Job Duties and Hours, and Did Not Do So. (See FOF, at ¶¶ 277-289; COL, at ¶¶ 72-84)*

The testimony from the PEs and Service Coordinators overwhelmingly proves that only the PE, together with their Service Coordinator, determines what services the PE needs from their DCW(s), and that PPL had nothing to do with that. PEs have complete control over what specific services and job duties a DCW will perform for them. The PE and Service Coordinator meet to discuss, at length, the PE's individual needs, what services will be needed to meet those

needs, and how many hours will be required to perform those services. This information is memorialized in the ISP, which is then submitted to OLTL for approval.

It is undisputed in the trial record that PPL never sees or receives the ISP, and never knows what job duties are being performed by the DCW for the PE. PPL is merely informed of the number of authorized hours (in units) permitted under the ISP, so that PPL can process Medicaid payments for authorized hours approved by the PE. Importantly, the total authorized hours can be performed by one DCW or as many DCWs as the PE chooses to employ. In the end, there is no evidence in the trial record that PPL had any involvement with making these decisions.

        *c. PPL Had No Authority to Set DCW Work Schedules and Did Not Do So. (See FOF, at ¶¶ 465-479; COL, at ¶¶ 113-120)*

There is no evidence that PPL ever had the authority to set a work schedule or that it ever did so. Once a total allotment of hours is determined in concert among the PE, Service Coordinator, and OLTL, it is up to the PE <u>alone</u> to schedule their DCW(s) to work the hours they need. A PE could hire one DCW to work all of the hours or they could hire multiple DCWs for that purpose. The PE works with each of their DCWs to set a work schedule around the PE's specific needs.

PPL is made aware of only the total number of hours allotted for services as approved by OLTL. PPL has no authority to set a work schedule and, in fact, has no knowledge of a DCW work schedule. PPL is then subsequently made aware of only the hours worked, as reported in the timesheet completed by the DCW, approved by the PE, and then submitted to PPL for processing.

The trial record is undisputed – PPL does not in any way set the DCWs' schedules. Indeed, this is a core component of the Self-Directed Services model—for the PE to have

absolute control and authority to set a schedule of services that best addresses their particular needs.

### d. *PPL Had No Authority to Set DCW Compensation and Did Not Do So. (See FOF, at ¶¶ 380-444; COL, at ¶¶ 85-104)*

#### i. PPL Did Not Set the DCW Wage Rate

PPL does not set the regular wage rate for DCWs. Rather, the evidence showed that OLTL sets the maximum program rate for Self-Directed Services in the HCBS Waiver Programs by region, and then the PE sets the pay rates for each of their DCWs between that upper limit and the statutorily-mandated minimum wage. Employer-like authority cannot be imputed to PPL where it does not determine or cap the maximum rate a DCW can be paid.[10] PPL simply processes Medicaid payments to DCWs based on the exercise of discretion by the PEs, and in accordance with the applicable HCBS Waiver Programs' rules.[11]

The maximum pay rate that a PE may pay their DCW is determined by a very simple algorithm. It starts with the maximum program rate set by OLTL; subtracts a state-required deduction for the employer contribution to the unemployment insurance fund; and subtracts another state-required deduction, for workers' compensation premiums. PPL has no discretionary role whatsoever in applying the algorithm, determining the costs of the deductions,

---

[10] PPL's role as to the DCW pay rate is like that of the defendant fiscal agent in a Massachusetts Appeals Court decision holding that the fiscal agent in a self-directed Medicaid waiver program was not a joint employer of the plaintiff service provider. *Gallagher v. Cerebral Palsy of Mass., Inc.*, 86 N.E.3d 496 (2017). In *Gallagher*, the pay rate was established by regulation and, like PPL in the present case, the defendant fiscal agent had no authority to set the pay rate. *Id.* at 500. This is a stark contrast to the case of the fiscal agent in a New York case, where the fiscal agent was determined to be a joint employer largely because it was "responsible for 'establishing the *amount* of each [worker's] wages.'" *Hardgers-Powell v. Angels in Your Home LLC*, 330 F.R.D. 89, 109 (W.D.N.Y. 2019) (quoting NYCRR § 505.28(i)(1)(i)). *Hardgers-Powell* is the only case involving a self-directed Medicaid waiver program where the fiscal agent was held to be the joint employer – and this is explainable as it is also the only case where the fiscal agent in fact set the amount of each worker's pay rate.

[11] Plaintiff fails to account for the fact that the maximum DCW wage rate reflects the amount of Medicaid dollars that can be provided for the services rendered, and that nothing stops the Medicaid member from paying additional amounts from private funds.

or setting the maximum pay rate.  While the two deductions may fluctuate with time and vary among PEs, PPL has no control over such fluctuations, as they vary based on unemployment and workers' compensation claims history, which in turn depend on individual PE decisions and employer history.

The trial testimony confirms that PEs have the sole authority to set their DCW's pay rate at any hourly rate within the range set by the Pennsylvania state minimum wage rate, at the floor, and the maximum wage rate produced by the algorithm, at the ceiling.  *See* FOF, at ¶¶ 380-433; COL, at ¶¶ 85-94.  Indeed, testimony also showed that PEs with more than one DCW would set different rates for different DCWs, further corroborating the central PE role and the absence of any discretionary role for PPL.[12]

      ii.    <u>PPL Did Not Determine Whether a DCW Received Overtime Pay</u> (*See* FOF, at ¶¶ 309-344; COL, at ¶¶ 95-104)

The record is clear that PPL does not possess any authority, and has never exercised any economic power, in determining whether a DCW is paid overtime.  It is never PPL's decision.

The trial record greatly expanded upon the evidence presented on this subject at summary judgment.  As explained at length by Stewart and Barge at trial, OLTL decided to implement overtime in the HCBS Waiver Programs as of January 1, 2016.[13]  OLTL also made the decision,

---

[12] At trial, for the first time as part of this litigation, Plaintiff argued that the wage rate range set by OLTL did not give PEs the discretion to set rates of pay for their DCWs because the range was not "meaningful." To the contrary, the evidence shows that PEs had the discretion to set a DCW wage rate between the state minimum wage rate and a maximum rate that was close to 100% greater than the minimum wage.  There was no testimony at trial (beyond mere speculation) that any PE failed to recruit DCWs because of the maximum rate available, and no testimony that any DCW turned down a position because the maximum rate was too low.  Instead, for example, there was testimony from LZ that she was successful in paying certain DCWs less than the maximum rate to incentivize her workforce to perform well.  Further, Plaintiff himself testified that he worked for MJ for years without receiving the maximum rate of pay.

[13] Published by the Department of Labor on October 1, 2013, and effective January 1, 2015, the Home Care Rule extended the FLSA to home care workers such as the DCWs in this case.  The Home Care Rule abolished the domestic service employee exemption of the FLSA, thereby entitling domestic workers to receive overtime pay at a 1.5 times rate for hours worked above 40 in a week.  *See* Application of the Fair Labor Standards Act to Domestic

as a condition of a DCW's participation in the HCBS Waiver Programs, to require DCWs who live with their PE to take the live-in exemption, rendering them ineligible for overtime under the FLSA.  PPL was not responsible for any of these program payment decisions and followed OLTL's direction.[14]

With respect to the implementation of the Home Care Rule, OLTL adopted a framework that required the PE and the Service Coordinator to include in the ISP whether a PE is permitted to have a DCW perform services in their home for more than 40 hours in a week.  If that overtime is permitted by the ISP, OLTL required the use of a separate service billing code, referred to as "TU authorization," that would authorize overtime and the premium rate of pay as part of a PE's ISP.  Under this framework, PPL could not process overtime payments to a DCW without a TU authorization code.  Only the Service Coordinator and the PE could determine if overtime becomes part of a PE's ISP, and only a PE could decide if and when a DCW will actually work those overtime hours.  The evidence at trial is abundantly clear that PPL has no authority or involvement in determining whether this authorization code is included in an ISP, the number of overtime units in an ISP, the number of overtime hours, the amount of overtime pay, or whether a DCW may be paid at an overtime rate.

    *e.  PPL Was Not Authorized to Provide Benefits to a DCW, and Did Not Do So. (See FOF, at ¶¶ 445-464; COL, at ¶¶ 105-112)*

PPL does not provide benefits to the DCWs.  The DCWs all admitted that PPL does not provide vacation time, vacation pay, sick time, or any other benefits to them for their work as DCWs.

---

Service, 78 Fed. Reg. 60454 (proposed October 1, 2013) (codified at 29 C.F.R. 552).  OLTL implemented the Home Care Rule as of January 1, 2016.  Prior to that effective date, OLTL did not authorize overtime pay to be paid to DCWs for services under the HCBS Waiver Programs.  (FOF, at ¶ 309).

[14] The live-in exemption established by federal law. and implemented by OLTL, prohibits a DCW from receiving an overtime premium when they live with the PE for whom they are providing services.  (FOF, at ¶ 339).

The trial evidence confirmed that PPL, in its fiscal agent role and as agent for each PE, works with a third-party broker to procure workers' compensation insurance policies for each PE, with Medicaid funds, with policies issued in the name of the PE, and as required by the Commonwealth. PPL engaged the same insurance broker who served in this role for the HCBS Waiver Programs before PPL began serving as the fiscal agent. The broker, not PPL, chooses which workers' compensation carrier to use and the specifics of each policy. PPL's workers' compensation role is limited to overseeing the procurement of the policy, through the broker, and PPL plays no role in the actual management or oversight of any workers' compensation policy issued in the name of the PE. (FOF, at ¶¶ 449-451). The same goes for any claims made under those individualized policies, which are handled exclusively between the PE and the insurance carrier. (FOF, at ¶¶ 451-453). Further, PPL never receives notice of any claims brought under the workers' compensation policies, nor did PPL ever participate in or process any such claims. (FOF, at ¶¶ 451-453).

In sum, the voluminous and credible trial testimony establishes that PPL did not promulgate any work rules or assignments, or otherwise set any conditions of employment, including work schedules, compensation rates, or benefits, for DCWs. PPL only processed Medicaid funds, at the direction of OLTL, to DCWs who provided services under the HCBS Waiver Programs, in accordance with applicable Medicaid and program rules and OLTL direction. Consequently, the second *Enterprise* factor strongly weighs against a finding of joint employment.

**3.  *Factor 3:  PPL Had No Involvement in the Day-to-Day Supervision of the DCWs, including any DCW Discipline. (See FOF, at ¶¶ 480-488; COL, at ¶¶ 121-127)***

Plaintiff put forward no evidence to show that PPL had any involvement with the day-to-day supervision of any DCW in any PE home.  In fact, Plaintiff appears to have conceded this factor entirely, and it was recognized on the summary judgement record as well by the Third Circuit.  *See* Plaintiff Closing Argument, Tr. Vol. VII, 1593 ("Participants do get to engage in day-to-day supervision of the Direct Care Workers."); Third Circuit Opinion, at 8-9 ("The third Enterprise factor, however, weighs against concluding that PPL is a joint employer because PPL is not sufficiently involved in the day-to-day supervision of DCWs.").

Indeed, it defies logic that PPL could supervise DCWs in the performance of their work when PPL is not present in the home, does not even know what services are being provided, and (in the case of multiple DCWs for a PE) does not even know who is performing what services for the PE.  *See McKenna v. Healthease, Inc.*, Civ. A. No. 10-3940, 2013 WL 1702639, at *7-8 (E.D. Pa. Apr. 19, 2013) (finding defendant was not a joint employer of the plaintiff where it "did not place any conditions on her employment, nor did it schedule or evaluate her performance").

In sum, there is no evidence in the trial record that PPL had any involvement in the day-to-day supervision of the DCWs, including with respect to any discipline.  Therefore, Plaintiff has failed to satisfy the third factor of the *Enterprise* test.

**4.  *Factor 4:  PPL Does Not Have Actual Control of All Critical Employee Records. (See FOF, at ¶¶ 489-493; COL, at ¶¶ 128-137)***

Finally, based on the evidence presented at trial, the fourth *Enterprise* factor also now weighs against joint employment.  While PPL has control of some "employee records," they are only those records that are needed for PPL to perform the fiscal agent payroll and tax functions, essential to the HCBS Waiver Programs, that OLTL contracted PPL to provide: enrollment

21

paperwork, timesheets, tax records, and the like. For PPL, they are program records that PPL will transfer to the next fiscal agent or to OLTL after its contract with OLTL expires. Importantly, with respect to the PEs, all of these records are available at all times to the PEs, in a secure online electronic file cabinet, and PEs can and do also keep their own paper copies of these records.[15]

Moreover, PPL never sees other records that a real employer would keep in a personnel file, including job descriptions, performance evaluations, disciplinary records, written warnings, resumes, interview notes, and applications. One very significant personnel record that PPL never receives, or even sees, is the ISP, which contains the DCW's job duties, the number of hours to be worked, and, particularly relevant to this case, any and all overtime hours allowed. *See* FOF, at ¶¶ 67, 74-76, 280. This record is kept by the Service Coordinator, by OLTL, and by the PE. Other personnel-related documents that are controlled by the Service Coordinator, and are never seen by PPL, include quarterly assessments, annual review assessments, documentation for backup DCW(s), and all documents identifying the specific services that a DCW provides to a PE.

The PE has ultimate control and access to all personnel-related documents, including the subset of program forms and payroll records also controlled by PPL. In addition to the documents that PPL receives, the PE has actual control over the documents described above that PPL never receives or even sees, including all Service Coordinator documents, and those documents that the PE would create and maintain, such as DCW performance evaluations, DCW scheduling documents, and notes of any happenings within the home and the services the DCW is providing.

---

[15] In this regard, PPL's role is no different than that of a private sector payroll company, e.g., ADP, maintaining a subset of personnel records, which remain readily accessible to and downloadable by the employer at any time.

While PPL does control copies of the subset of "employment records" necessary for PPL to perform its limited role as the contracted fiscal agent for the PEs (e.g., timesheets, tax documents), for the duration of its contract, it keeps the records as <u>program</u> records and not as <u>employment</u> records.  It does not control employer records as a true employer would, in scope or in duration.

In sum, Plaintiff has failed to show that PPL controls a complete set of "employee records," or that the program records that PPL does keep include the most significant records that would be included in an employee records file.  Consistent with the economic reality of the employer/employee relationship between the PE and the DCW, the PE at all times has or has access to the complete set of employee records.  Therefore, the fourth *Enterprise* factor now also weighs against a finding of joint employment in this case.

**B.     Under the *Enterprise* Test, Contractual Language by Itself Does Not Weigh in Favor of a Finding of Joint Employment.**

During the trial, Plaintiff repeatedly pointed to the terms of PPL's Response to OLTL's Request for Proposal and asserted that any reserved authority within PPL's Commonwealth contract is, in and of itself, evidence of joint employment.  This argument cannot hold up under the rubric and analysis of the *Enterprise* test itself and must be rejected.  Instead, the Court must look to what functions PPL actually performed as compared to any purported delegation of authority never exercised.  A recent case from the Western District of Pennsylvania, *Nagel v. Ram Indus. Servs.*, Civ. No. 1:20-CV-840, 2022 WL 17721083 (M.D. Pa. July 21, 2022), addresses this point and also illustrates that the actual functions performed by PPL fall far short of those of a joint employer.

*Nagel* involved a claim against a professional employment organization, Insperity PEO Services ("Insperity"), which contracted with other businesses to provide an array of human

23

resources and administrative functions, including payroll, benefits, tax remittance, and related government filings.  2022 WL 17721083, at *1.  One such business was defendant Ram Industrial Services ("Ram").  *Id.*  Plaintiff Monique Nagel ("Nagel") was a former Ram employee who asserted FLSA claims against both Ram and Insperity for unpaid overtime.  *Id.* Insperity argued that it was not a joint employer of Nagel, and the court agreed after applying the *Enterprise* test.  *Id.* at *8-9.

Nagel's failing arguments for a finding of joint employment were echoed by Plaintiff at trial, and they are no more persuasive here.  Specifically, Nagel pointed to a contractual reservation of rights present in an agreement between Insperity and Ram, wherein Insperity reserved the right to perform several employer-related functions with respect to Ram employees that touched on multiple *Enterprise* factors.  *Id*. at *8.[16]  Nagel argued that this reservation of the rights indicated that Insperity was a joint employer of Nagel and other Ram employees.  *Id*.  The *Nagel* court, applying the principle that the evidence must be viewed "through the lens of the economic realities of [a] business relationship", *id*. at *8, rejected Nagel's argument because "[t]he fact that Insperity may have contractually reserved the right to <u>potentially</u> play some larger role in Nagel's employment does not alter the assessment or the economic realities."  *Id*. at *8 (emphasis added).  In other words, the court declined to permit Nagel to "rely upon a contractual reservation of rights which was never exercised by Insperity to set aside the realities of <u>her actual employment by Ram</u>."  *Id*.  (emphasis added).

This principle rebuts Plaintiff's argument at trial that the marketing language contained in PPL's Response to OLTL's Request for Proposal ("Response to the RFP"), most of which OLTL

---

[16] An important factual distinction of the present case that makes the *Nagel* holding even more compelling here is that the HCBS Waiver Programs forms mailed by PPL to all PEs have no such reservation of employer rights to PPL, as compared to the express employer reservation clause present in the Insperity/Ram contract.

did not call upon PPL to actually perform, somehow establishes a joint employment relationship. Specifically, at trial, Plaintiff repeatedly pointed to provisions in PPL's Response to the RFP, including provisions where PPL mentioned that it would be able to use its expertise to improve procedures and that it would increase the number of enrollment specialists available to provide assistance with completing enrollment documents. However, Stewart's testimony confirmed that none of these activities actually occurred. Plaintiff's counsel erroneously relies on these unrealized proposals contained in PPL's Response to the RFP.[17] As in *Nagel*, these proposals cannot "alter the assessment of the economic realities" of the DCWs' "actual employment" by the PEs. *See Nagel*, 2022 WL 17721083, at *8.

Furthermore, the *Nagel* court found that various functions performed by Insperity were not sufficient to find that Insperity was a joint employer of plaintiff. Specifically, Ram employees, such as plaintiff, agreed to abide by Insperity's rules and policies as provided and received benefit plans administered by Insperity. *Id*. at *1-2. Insperity also performed all payroll and tax-related tasks for Ram employees and maintained personnel records for Ram employees. *Id.* However, the court did not find any of these factors sufficient to sway the conclusion in favor of plaintiff when "viewing the evidence through the lens of the economic realities of this business relationship." *Id*. at *8. Insperity played no role in the key employer functions of hiring, supervising and evaluating job performance, defining a work schedule, and deciding to terminate Nagel's employment. *Id.* Instead, Insperity's role was "limited to performing certain

---

[17] At summary judgment and before the Third Circuit, Plaintiff made this same argument and relied upon various cases from outside this circuit for the proposition that the fact that a duty was assigned to an entity by contract does not preclude that entity from being found to be a joint employer. However, none of these cases apply an *Enterprise* analysis of joint employment or address a federal Medicaid program, and they are factually dissimilar to the present case. *See Falk v. Brennan*, 414 U.S. 190 (1973); *Scantland v. Jeffry Knight*, 721 F.3d 1308 (11th Cir. 2013); *City Cab Co. of Orlando, Inc. v. NLRB*, 628 F.2d 261 (D.C. Cir. 1980); *Hodgson v. Griffin & Brand of McAllen*, 471 F.2d 235 (5th Cir. 1973); *Hughes v. Family Life Care*, 117 F. Supp.3d 1365 (N.D. Fla. 2015). These readily distinguishable cases should not influence the Court, especially when they are contradicted by *Nagel*, which is from the Middle District of Pennsylvania, actually applies the *Enterprise* test, and has facts similar to this case.

administrative and payroll functions, tasks which as a matter of law are insufficient to render a[n] [entity] like Insperity a statutory employer under the FLSA." *Id.*

The same is true here, and the evidence presented must be viewed through the particular lens of the economic realities of the Self-Directed Services model of the HCBS Waiver Programs and PPL's role as the statewide fiscal agent contracted by OLTL.  Plaintiff's argument that PPL's role in supporting program requirements, such as the completion of enrollment forms and obtaining a background check, transform it into a joint employer simply cannot prevail as a matter of law.  Indeed, PPL did not play any "substantial role in dictating the terms and conditions of [the DCWs'] employment, and all aspects of [the DCWs'] employment from hiring to firing were dictated by [the PE]."  *See id.*  Therefore, the "actual economic realities" confirm that PPL is not a joint employer.  *See id.*[18]

## C. District Courts in Other Circuits Have Concluded that Fiscal Agents in Self-Directed Medicaid HCBS Waiver Programs, Like PPL, are Not Joint Employers.

Of significance to this case, in addition to the *Gallagher v. Cerebral Palsy of Massachusetts* state appellate case, *supra* note 10, at 20, is the analysis by two district courts in other circuits that have addressed the issue of whether fiscal agents are joint employers, for purposes of FLSA claims, in the unique setting of a state-implemented Medicaid program wherein qualified individuals receive Medicaid-funded care in their homes, from providers they select and hire.  Like *Gallagher*, *Arkansas Peel v. Palco* and *Abel v. Bridgeway Advantage* underscore the merits of what has long been PPL's argument: that its role within the

---

[18] Likewise, there is no evidence that the DCWs are economically dependent on PPL.  Under *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376 (3d Cir. 1985), a case previously cited by Plaintiff, the test for economic dependence is "whether the workers are dependent on a particular business or organization for their continued employment."  *Id.* at 1385.  The trial record clearly demonstrates that the DCWs' "continued employment" is solely in the control and authority of the PE, not PPL.  At any given time, without any notice to or involvement from PPL, a DCW can be terminated by the PE.  PPL indisputably has no authority to terminate a DCW.

Pennsylvania Medicaid HCBS Waiver Programs is limited to that of a fiscal agent which, by virtue of its contractual obligations to the Commonwealth and the requirements of the Medicaid program itself, never rises to the level of a joint employer.

### 1. Peel v. Palco, Inc., Case No. 4:19-CV-00795-BSM, 2022 WL 320933 (E.D. Ark. Feb. 2, 2022)

Plaintiff devoted nearly the entire trial attempting to dilute the overwhelming evidence that all PPL authority in the HCBS Waiver Programs is assigned by the Grant Agreement and the mandatory Medicaid rules and regulations.  The *Peel* decision confirms that PPL's limited duties performed as the fiscal agent in OLTL's HCBS Waiver Programs simply cannot transform it into a joint employer for purposes of the FLSA.  The case also pierces Plaintiff's years-long focus on the "good to go" mantra that Plaintiff has long cited for the allegation that PPL exercises employer-like authority over the DCW and PE relationship.

In *Peel*, a group of homecare workers brought an FLSA suit against Palco, a fiscal agent in an Arkansas Medicaid program that, as in the present matter, allows participants to select and hire caregivers to provide services in their homes.  *Peel*, 2022 WL 320933, at *1.  Palco received and processed enrollment forms and participant-worker agreements, notified workers when they were able to begin work after completion of the state-mandated enrollment process, processed payroll for program participants based on submitted timesheets approved by participants, and maintained enrollment and program-related documents as required by the state.  *Id.*

District Courts in the Eighth Circuit apply an economic realities test, which bears significant similarity to the Third Circuit's *Enterprise* test,[19] and the *Peel* court determined that

---

[19] District Courts in the Eighth Circuit ask whether a purported employer:  (1) could hire and fire the plaintiff; (2) controlled the plaintiff's schedule or conditions of employment; (3) determined rate and method of payment; and (4) maintained the plaintiff's employment records.  *Carlton v. JHook Invs., Inc.*, No. 4:17-cv-00076 KGB, 2019 WL 4784801, at *12 (E.D. Ark. Sept. 30, 2019).

Palco was not a joint employer of the homecare workers.  *Id.*  In so deciding, the court rejected several arguments that are similar to the arguments raised by Plaintiff in an attempt to establish PPL's joint employment of the DCWs here.  Medicaid HCBS Waiver Programs, particularly Self-Directed Services models, exist in a distinct context, and the roles and responsibilities of the various persons and entities in such a program are equally unique.  Therefore, the court's analysis in *Peel* is illustrative and instructive to the question of joint employment here.

Like OLTL, the Arkansas Department of Health ("Arkansas DHS") created its homecare Medicaid program with the purpose of reserving all employer-related authority to the participants themselves.  *Id.* at *2.  To that end, like OLTL, Arkansas DHS instituted regulations that made program participants responsible for hiring, training, supervising, and firing their own caregivers. *Id.*  Palco, as the fiscal intermediary, contracted with Arkansas DHS to administer, like PPL, enrollment for newly hired caregivers, which included disseminating and collecting enrollment and employment-related forms.  *Id.*  Although caregivers could not begin working until Palco received all completed paperwork, the court opined that this "ma[de] sense" and did not evidence any employer authority by Palco since the state of Arkansas set the minimum requirements for individuals to participate as caregivers in the program, not Palco.  *Id.*  Palco's limited role in overseeing the enrollment process, which mirrors that of PPL's, weighed against a finding of joint employment.  *Id.*  Plaintiff's repeated insistence that the "good to go" notification evidences PPL's joint employment falls flat because, like in *Peel*, the state Medicaid agency, not the fiscal agent for the PE, sets the minimum requirements for DCWs to participate as caregivers in the HCBS Waiver Programs.

Similarly, Arkansas regulations gave program participants full authority to determine "how, when, and where" their caregivers provided assistance.  *Id*. at *3.  While program

participants decided these details, the number of hours a caregiver was approved to work was based on the program participant's service budget set by DHS. *Id.* As a result, the court found that Palco did not set the caregivers' work schedules or conditions of employment, which cut against a finding of joint employment. *Id.* Precisely the same reasoning applies here where DCW hours depend on the PE's allotted hours as set and approved by OLTL in the PE's ISP—a process from which PPL is completely removed.

In addition, the Arkansas Medicaid program and OLTL's HCBS Waiver Programs handled caregiver rates of pay very similarly. The maximum rate of pay was set by Arkansas DHS and based on an algorithm specific to the program participants. *Id.* While Palco processed payments for program participants receiving funds through Arkansas DHS, Palco had no authority to adjust the hours caregivers were approved to work, authorize caregivers to work overtime, or compensate them in a manner different from the hourly rate structure dictated by DHS. *Id.* at *4. This factor was found to weigh against joint employment. *Id.* PPL similarly has no authority to adjust the hours DCWs were approved to work, authorize any DCW to work overtime, or compensate them in a way that is inconsistent with the rate ranges set by OLTL.

The court recognized that Palco's role as the fiscal agent to the Arkansas Medicaid program, which was specifically prescribed by regulation, simply did not satisfy the economic realities test for joint employment. Palco was not and could not be a joint employer of the caregivers, who were employed by the program participants as intentionally designed by Arkansas DHS.[20] The same should hold true for PPL.

---

[20] The court in *Peel* makes reference to the Third Circuit decision in the instant matter, but incorrectly describes the substance and weight of that decision. The Third Circuit, while reversing this Court's order granting summary judgment, reached no joint employment conclusion on the record before it and held only that there was a genuine dispute as to whether PPL is a joint employer.

2.    ***Abel v. Bridgeway Advantage Sols. Inc.***, No. CV-17-01248-PHX-GMS, 2019
WL 160439 (D. Ariz. Jan. 10, 2019)

The *Abel v. Bridgeway Advantage Sols. Inc.* decision undercuts not only Plaintiff's
argument about "good to go" notifications, but also Plaintiff's attempt to extrapolate very limited
home visits by PPL representatives to argue that PPL handled matters beyond fiscal
management. The *Abel* decision tackles these types of home visits head-on, with facts mirroring
those presented by PPL at trial: that such visits were extremely limited in number and were
limited to the participant's onboarding process (consistent with PPL's contracted fiscal agent
role), and therefore not indicative of joint employment of the DCWs. (FOF, ¶¶ 372-379).

Similar to the DCWs in this matter, the plaintiff in *Abel* worked in a self-direction
Medicaid waiver program, established by the Arizona Medicaid agency. 2019 WL 160439, at *1.
The defendant, referred to as "CCD," was a "fiscal employer agent" for that program. *Id.* CCD
performed its fiscal employer agent services in the specified "self-directed attendant care"
model, which mirrors OLTL's Self-Directed Services model in its HCBS Waiver Programs, in
that the services are directed by the program participant receiving services. *Id.* at *1. CCD's
responsibilities as a vendor to the program included providing initial training materials,
processing payments to plaintiff and other homecare workers according to hours approved by the
participants, procuring workers' compensation policies, and various other payroll-related
functions. *Id.* at *2.

To answer the question of whether CCD was a joint employer of Abel, the court applied
the Ninth Circuit's *Bonnette* factors,[21] which closely track the Third Circuit's *Enterprise* factors,

---

[21] To determine whether an entity qualifies as a joint employer, the Ninth Circuit applies an "economic reality" test.
*See Torres-Lopez v. May*, 111 F.3d 633, 639 (9th Cir. 1997). That test looks to the "circumstances of the whole
activity," and specifically examines four factors. *Bonnette v. Cal. and Welfare Agency*, 704 F.2d 1465, 1469-70 (9th
Cir. 1983). Courts ask "whether the alleged employer: (1) had the power to hire and fire the employee[], (2)

and like the *Enterprise* test, are to be examined as a "whole." *Id*. at *3. The plaintiff in *Abel* made several arguments like those raised by Plaintiff in the instant matter, and none were successful. Specifically, Abel argued that CCD's role in processing enrollment-related forms and its issuance of an "approval to begin work" evidenced its hiring authority. *Id*. at *4. The court rejected this argument because none of these administrative functions actually evidenced a power to hire or fire a care worker, a power that all program documents and agreements reserved exclusively to the participants. *Id*. at *5. The same is true here, where PPL's processing of enrollment-related forms and issuance of the "good to go" notification simply do not, in any way, confer authority to hire or fire upon PPL.

Similarly, the court found that CCD did not supervise or control plaintiff's work schedules or conditions of employment. *Id*. Indeed, the program agreements, like the many program forms here, explicitly stated that the participants have responsibility over scheduling, managing, and directing the day-to-day work performed by the service providers. *Id*.

Abel, like Plaintiff here, attempted to make much of CCD's initial onboarding visits that it sometimes conducted in the participant's home. *Id*. But the court did not find this persuasive in establishing any employer-related authority because, after the initial visit, the worker's contact with CCD was limited to payroll-related questions—not typical employer-employee subjects like the performance of duties or when a worker would be absent from work. *Id*. The same is true here. While Plaintiff attempts to establish PPL's supposed employer authority through evidence related to sporadic and short-lived enrollment specialist visits—which no DCW or PE testified they attended—and to pre-service orientations instituted by OLTL, it is undisputed that such visits and orientation occurred only as a program onboarding process and never continued after

---

supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.*

the DCW began work.  After the DCW began performing services for their PE, contact with PPL was limited to payroll-related issues.

Another significant similarity between CCD and PPL is the role that each played (or, rather, did not play) with respect to the pay rate of the care providers.  In *Abel*, CCD would inform participants of the state-set pay range, from which participants could choose any rate within the range for their workers.[22]  *Id*. at *6.  This was not sufficient to prove that CCD had employer authority to set compensation, as it was the program participants who "ultimately determined how much Abel would be paid for his work."  *Id*.  Similarly, PPL informing PEs of the available pay range set by OLTL, a much wider range than that in Arizona, does not evidence authority or control over wages for purposes of joint employment.  After examining the evidence, the court found that the economic reality of the Medicaid program under which CCD acted as the fiscal employer agent demonstrated that CCD was not Abel's joint employer.  *Id*.

In total, weighing all the trial evidence, and consistent with the caselaw analyzing the unique context of self-directed Medicaid HCBS Waiver Programs, the economic realities clearly weigh in favor of a finding that the PE is the sole employer and PPL is not a joint employer of any DCW.

**D.    Numerous Administrative Agency Decisions Have Found That There is No Employment Relationship Between PPL and the Providers in Other Self-Directed Medicaid HCBS Waiver Programs.**

Administrative agencies in other states with similar self-directed Medicaid HCBS Waiver Programs, and considering the joint employment question in a variety of contexts – unpaid

---

[22]  Significantly, the pay range available in Arizona spanned the state minimum wage of $8.05 to the state-set maximum rate of $10.90, is a far more restrictive range than that in Pennsylvania*, where available hourly rates span $7.25 to $15.55 -- a differential of more than 100%.  *See* Def. Bridgeway Advantage Sol. Inc.'s Statement of Uncontroverted Material Facts in Support of Motion for Summary Judgment, *Abel v. Bridgeway Advantage Sols. Inc.*, Case No. CV-17-01248-GMS, ECF No. 74-1, at 134 (filed June 8, 2018) (of which the Court can take judicial notice (*see Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 257 (E.D. Pa. 2020)); FOF, at ¶ 411.

wages; unemployment; workers' compensation; and employment discrimination – have consistently determined that PPL, as the fiscal agent, is not a joint employer of the direct care worker.

The New Jersey Department of Labor and Workforce Development dismissed a complaint against PPL for unpaid wages because PPL was the fiscal agent and not the employer of the claimant, who was a direct care worker in the New Jersey Self-Directed Medicaid HCBS Waiver Program.  *See Sautter*, Case No. WC-188-0320-WAL (N.J. Dep't of Lab. and Workforce Dev. Sept. 28, 2022), at 37-40 (a courtesy copy of the transcript/decision is attached hereto as Exhibit 1).

The Tennessee Department of Labor and Workforce Development Workers' Compensation Division denied compensability in a workers' compensation claim attempting to name PPL as the employer.  *See Chatman*, State File No. 35078-2012 (Tenn. Dep't of Lab. and Workforce Dev., Workers' Comp. Div., Jul. 25, 2012) (available at ECF No. 158-2, Exhibit P, pp. 7-10).  PPL served as the fiscal agent in Tennessee's version of OLTL's HCBS Waiver Programs for participants self-directing their receipt of Medicaid services in their homes.  *Id*. at 7.  The Tennessee hearing officer found that "[o]ther than the tax and payroll function, all other attributes and control corresponding to an employer are <u>specifically not</u> with [PPL]," but rather exclusively lie with the claimant's participant, who in this case happened to be the claimant's mother.  *Id*. at 8-9 (emphasis added).

Similarly, the Virginia Workers' Compensation Commission ("VWCC") has dismissed claims inappropriately brought against PPL, recognizing that PPL's role as fiscal agent in the Virginia Medicaid homecare program does not make PPL an employer of the homecare workers. *Johnson*, Juris. Claim No. VA02000009443, U06271313 (Va. Workers' Comp. Comm'n Dec. 30,

2013) (available at ECF No. 158-2, Exhibit P, pp. 11-16).  Specifically, in *Johnson*, the VWCC found that PPL was not an employer of the claimant, who worked as a direct care worker in Virginia's homecare Medicaid program, because her job duties, her schedule, and all other components of the employment relationship were established by the participant receiving Medicaid services.  *Id.* at 14-16.  The VWCC noted that PPL's only role relative to the employment relationship was to process the payments for the claimant with Medicaid funds for the hours that she worked for her participant.  *Id.* at 16.  Likewise in another claim brought before the VWCC by a direct care worker in the Virginia program, the VWCC found that PPL was not an employer of the direct care worker, noting that while the claimant contacted her participant when she became injured, she never contacted anyone at PPL to report her injury. *Allgood*, Juris. Claim No. VA02000000485 (Va. Workers' Comp. Comm'n Dec. 22, 2014) (available at ECF No. 158-2, Exhibit P, pp. 2-6).

Finally, the Colorado Civil Rights Division of the Department of Regulatory Agencies dismissed a discrimination complaint against PPL, finding the agency lacked jurisdiction because PPL was not the employer of the complainant, who was providing personal care services in Colorado's HCBS Waiver Programs.  *See Rogers*, Charge No. FE2019375168 (Colo. Dep't Reg. Agencies, Colo. Civ. Rights Div. Nov. 5, 2019) (a courtesy copy of the decision is attached hereto as Exhibit 2).  In reaching this determination, the agency considered that PPL was never responsible for hiring, scheduling, managing, training, disciplining, or discharging the complainant, and any employment agreements were executed exclusively between complainant and program participants.  *Id.* at 1-2.  These employment agreements bear some of the same language as that in the Pennsylvania DCW agreement:  an express acknowledgement that PPL is not the employer of the DCWs (known as the Personal Care Attendant in Colorado).  *Id.*  Based

on these factors, the agency determined that no employment relationship existed between the complainant and PPL. *Id.*

These varied administrative decisions have consistently recognized PPL's fiscal agent role in the Medicaid Self-Directed Services framework for what it truly is—a support role, directed by the Medicaid agency, to process payroll and performing limited other functions on behalf of Medicaid members who have elected to employ and directly manage the personal care providers who will be working in their homes—and each of the decisions has concluded that this role does not make PPL a joint employer. These decisions further support the conclusion that PPL is not a joint employer of DCWs in the Pennsylvania Self-Directed Services model of the HCBS Waiver Programs, and is not liable to Plaintiff in this case for overtime payments.

**E.** **In the Alternative, If the Court Finds PPL Liable as a Joint Employer, PPL's Actions Were Not Willful, and PPL Acted With a Good Faith Belief That Its Actions Were Lawful. (***See* **FOF, at ¶¶ 533-542; COL, at ¶¶ 138-166)**

As described above, Plaintiff has failed to prove that PPL was the joint employer of the DCWs in this case under the governing *Enterprise* test, and thereby has failed to show that PPL was liable for overtime payments to the DCWs in this case. In the event that the Court decides otherwise, however, PPL respectfully refers the Court to PPL's above-referenced proposed findings of fact and conclusions of law on the questions of willfulness and bad faith.[23]

---

[23] *See* 29 U.S.C. § 255(a); *Gonzalez v. Bustleton Servs.*, Civ. A. No. 08-4703, 2010 WL 1813487, at *5 (E.D. Pa. Mar. 5, 2010) (noting that it is the plaintiff's burden to prove that the defendant's actions were willful for purposes of extending the statute of limitations period); *Mogel v. City of Reading*, Civ. No. 5:20-cv-04464-JMG, 2021 WL 4989842, at *5 (E.D. Pa. Oct. 27, 2021) (citing 29 U.S.C. § 260 (if an employer "shows to the satisfaction of the court" that it acted in "good faith" and had a "reasonable basis" for maintaining a compensation scheme that violated the FLSA, then the court can deny or reduce liquidated damages (quoting 29 U.S.C. § 260)). The "employer must at least demonstrate that it made some effort to ascertain the [FLSA]'s requirements." *Id.* (citing *Williams v. Tri-Cnty. Growers*, 747 F.2d 121, 129 (3d Cir. 1984) (holding that an employee was entitled to liquidated damages where the record was "silent to any efforts" made by the employer "to ascertain and follow the dictates of the FLSA") (emphasis in original)).

There is simply no evidence that PPL acted willfully, recklessly, or in bad faith on the question of any legal obligation to pay overtime as a joint employer.  To the contrary, PPL concluded and understood in good faith and consistent with ample precedent that it was not the employer or the joint employer of program DCWs, and therefore would not be liable for the payment of overtime wages.

## IV.    CONCLUSION

For all of the foregoing reasons, PPL respectfully requests that this Honorable Court enter judgment in its favor with respect to all of Plaintiff's claims.  PPL is prepared to participate in any further hearing or oral argument to address any questions the Court may have or to assist the Court in reaching a decision in this matter.

Respectfully submitted,

Defendant,

**PUBLIC PARTNERSHIPS LLC**,

By its attorneys,

*/s/ Walter M. Foster*

Walter M. Foster (admitted *pro hac vice*)
Trevin C. Schmidt (admitted *pro hac vice*)
Carson M. Shea (admitted *pro hac vice*)
Laura A. Cottington (PA ID 328831)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Two International Place, 16th Floor
Boston, MA  02110
Phone: (617) 342-6800
Fax: (617) 342-6899
Email: wfoster@eckertseamans.com
          tschmidt@eckertseamans.com
          cshea@eckertseamans.com
          lcottington@eckertseamans.com

Dated: February 12, 2024

36

## **CERTIFICATE OF SERVICE**

I hereby certify that, on February 12, 2024, I electronically filed the foregoing document using the CM/ECF system, and that I served the same by electronic filing via ECF, pursuant to the administrative procedures of the United States District Court for the Eastern District of Pennsylvania governing the filing and service by electronic means, upon all counsel of record.

Dated:  February 12, 2024                    */s/ Walter M. Foster*
                                             Walter M. Foster