**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RALPH TALARICO, INDIVIDUALLY AND, ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) | |
| Plaintiffs, | ) ) | Docket No. 17-2165 |
| v. | ) ) | Judge Schmehl |
| PUBLIC PARTNERSHIPS LLC, | ) ) ) | |
| Defendant. | ) ) ) | |

**<u>PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

# TABLE OF CONTENTS

Page

Summary of Evidence Presented at Trial................................................................. 1

Proposed Findings of Fact ....................................................................................... 5

I.      Plaintiffs and Claims ..................................................................................... 5

II.     Overview of HCBS Medicaid Program ......................................................... 7
        A.      The Individualized Service Plan Outlines Participants' Service Needs. ................. 8
        B.      Participants Have the Same Control Under the Agency and PDS Models........... 10

III.    PPL Actively Partnered With the State to Manage the PDS Program............................. 12

IV.     PPL Jointly Employed DCWs ..................................................................... 17
        A.      PPL Exercised Control Over DCWs' Compensation ........................................... 17
                i.      PPL Established DCWs' Maximum Rates. ............................................. 17
                ii.     PPL Impacted Participants' Decisions Regarding DCWs' Rates. ............ 26
                iii.    PPL Partnered with the State in Developing Overtime Rules for
                        DCWs............................................................................................. 32
                iv.     PPL Made Other Decisions Impacting DCWs' Overall
                        Compensation. .................................................................................. 42
                v.      DCWs Economically Relied Upon PPL. ............................................... 44
        B.      PPL Shared Control Over the DCWs' Hiring Process........................................... 44
                i.      PPL Partnered with the State in Developing DCWs' Hiring
                        Paperwork. ....................................................................................... 44
                ii.     PPL's Enrollment Specialists Assisted Participants with the DCW
                        Hiring Process. ................................................................................. 49
                iii.    PPL Controlled When DCWs Could Start Working................................ 51
                iv.     PPL Assisted Participants in Selecting a DCW. ................................... 57
        C.      PPL Shared Control Over DCWs' Work Rules and Conditions of
                Employment. ............................................................................................... 59
                i.      PPL Partnered with the State to Develop the DCWs' Terms of
                        Employment....................................................................................... 59
                ii.     PPL Developed and Carried Out DCWs' Mandatory Orientation........... 61
        D.      PPL Shared Control Over DCWs' Day-to-Day Supervision. .............................. 67
                i.      PPL Developed and Implemented Mandatory Training for
                        Participants....................................................................................... 67
                ii.     PPL Exercised Control Over DCWs' Timesheet Submission and
                        Approval. .......................................................................................... 69
                iii.    PPL Regularly Engaged in HR-Type Interactions with DCWs............... 72
        E.      PPL Controlled DCWs' Employee Records. ....................................................... 74

# TABLE OF CONTENTS

Page

V.    PPL Recklessly Disregarded the Law and Did Not Act in Good Faith ........................... 76

Proposed Conclusions of Law ................................................................................................ 80

VI.   The Fair Labor Standards Act and Pennsylvania Minimum Wage Act........................... 80
      A.    The FLSA and PMWA Recognize Employees May Have More Than One
            Employer......................................................................................................... 83
      B.    Economic Realities Determine an Entity's Status as Joint Employer ................. 85
      C.    Factors Considered in Evaluating Joint Employer Status................................... 86

VII.  PPL Jointly Employed DCWs ................................................................................... 89
      A.    PPL Shared Control Over DCWs' Compensation ............................................. 90
            i.     PPL Significantly Impacted DCW Pay Rates, a Strong Indicator of
                   Employer Status. ...................................................................... 90
            ii.    PPL Shared Control Over Payment of Overtime ................................... 94
      B.    PPL was Substantially Involved in the DCW Hiring Process. ............................ 96
      C.    PPL Set Work Rules and Conditions of Employment. ....................................... 98
      D.    PPL Exerted Influence Over Day-to-Day Supervision. .................................. 100
      E.    PPL Controlled and Maintained All DCW Employment Records. .................. 103

VIII. PPL Partnered with the State to Shape the PDS Program ............................................ 105

IX.   PPL Owes Plaintiffs Lost Overtime Wages and Damages ........................................... 110
      A.    Because PPL is a Joint Employer, Neither State Nor Federal Overtime
            Exemptions Apply. ........................................................................................ 110
      B.    PPL Willfully Violated the Law. .................................................................... 110
      C.    Plaintiffs Are Entitled to FLSA and Rule 23 Overtime Damages.................... 112
      D.    Plaintiffs Are Entitled to FLSA Liquidated Damages. .................................... 112

Proposed Order ...................................................................................................................... 114

# TABLE OF AUTHORITIES

Page

**Cases**

*Ace Doran Hauling & Rigging Co. v. NLRB,*
  462 F.2d 190 (6th Cir. 1972) ............................................... 106

*Acosta v. Osaka Japan Rest., Inc.,*
  No. 17-1018, 2018 WL 3397337 (E.D. Pa. July 12, 2018) ................... 105

*Aimable v. Long & Scott Farms,*
  20 F.3d 434 (11th Cir. 1994) ......................................... 83, 84

*Antenor v. D & S Farms,*
  88 F.3d 925 (11th Cir. 1996) ......................................... 85, 89

*Barfield v. N.Y.C. Health & Hosps. Corp.,*
  537 F.3d 132 (2d Cir. 2008) ............................................. 100

*Barrentine v. Ark.-Best Freight Sys., Inc.,*
  450 U.S. 728 (1981) .................................................. 80, 88

*Barrientos v. Taylor,*
  917 F.Supp. 375 (E.D.N.C. 1996) .................................... 90, 93

*Baum v. AstraZeneca LP,*
  605 F.Supp.2d 669 (W.D. Pa. 2009), *aff'd*, 372 F.App'x 246 (3d Cir. 2010) ........ 81

*Bayada Nurses, Inc. v. Commonwealth, Dep't of Lab. & Indus.,*
  607 Pa. 527, 8 A.3d 866 (2010) ........................................... 81

*Baystate Alt. Staffing, Inc. v. Herman,*
  163 F.3d 668 (1st Cir. 1998) .................................. 84, 101, 103

*Bonnette v. Cal. Health & Welfare Agency,*
  704 F.2d 1465,1470 (9th Cir. 1983) ................................. 90, 101

*Caiarelli v. Sears, Roebuck & Co.,*
  616 Pa. 38, 46 A.3d 643 (2012) (McCaffery, Todd, JJ., dissenting) ........... 81

*Charles v. Burton,*
  169 F.3d 1322 (11th Cir. 1999) .......................................... 87

*Commonwealth, Dep't of Lab. & Indus., Bureau of Lab. L. Compliance v. Stuber,*
  822 A.2d 870 (Pa. Commw. Ct. 2003), *aff'd*, 580 Pa. 66, 859 A.2d 1253
  (2004) ............................................................ 81, 84

# TABLE OF AUTHORITIES

Page

*Donovan v. DialAmerican Mktg., Inc.*,
   757 F.2d 1376 (3d Cir. 1985)......................................................................87, 103

*Echvarria v. Williams Sonoma, Inc.*,
   No. 15-6441, 2016 WL 1047225 (D.N.J. Mar. 16, 2016) ....................................98

*In re Enter. Rent-A-Car Wage & Hour Emp't Pracs. Litig.*,
   683 F.3d 462 (3d Cir. 2012)................................................................... *passim*

*In re Enter. Rent-A-Car Wage & Hour Emp't Pracs. Litig.*,
   735 F.Supp. 277 (W.D. Pa. 2010) ........................................................................85

*Falk v. Brennan*,
   414 U.S. 190 (1973)......................................................................................89, 103

*Field v. DIRECTV LLC*,
   No. 14-4427, 2015 WL 13620424 (E.D. Pa. Aug. 21, 2015) ..............................98

*Ford v. Lehigh Valley Rest. Grp., Inc.*,
   No. 14CV3227, 2015 WL 13779474 (Pa. D. & C. Apr. 24, 2015) .......................81

*Garcia v. Nunn*,
   No. 13-6316, 2015 WL 5585451 (E.D. Pa. Sept. 23, 2015)..........................98, 100

*Godlewska v. HDA*,
   916 F.Supp.2d 246 (E.D.N.Y. 2013), *aff'd*, 561 F.App'x 108 (2d Cir. 2014).....................105

*Goldberg v. Whitaker House Coop., Inc.*,
   366 U.S. 28 (1961)................................................................................................85

*Green v. 712 Broadway, LLC*,
   No. 17-991, 2018 WL 2754075 (D.N.J. June 8, 2018).......................................100

*Hardgers-Powell v. Angels in Your Home LLC*,
   330 F.R.D. 89 (W.D.N.Y. 2019)............................................................... *passim*

*Harris v. Med. Transp. Mgmt.*,
   300 F.Supp.3d 234 (D.D.C. 2018) ......................................................................106

*Hodgson v. Griffin & Brand of McAllen, Inc.*,
   471 F.2d 235 (5th Cir. 1973) ...............................................................................90

*Home Care Ass'n of Am. v. Weil*,
   78 F.Supp.3d 123 (D.D.C.), *rev'd*, 799 F.3d 1084 (D.C. Cir. 2015).......................32

# TABLE OF AUTHORITIES

Page

*Hughes v. Family Life Care*,
   117 F.Supp.3d 1365 (N.D. Fla. 2015)....................................................................106

*Jewell Ridge Coal Corp. v. Loc. No. 6167, United Mine Workers of Am.*,
   325 U.S. 161 (1945)..................................................................................................80

*Jimenez v S. Parking, Inc.*,
   No. 07-23156-CIV, 2008 WL 4279618 (S.D. Fla. Sept. 16, 2008)........................102

*Karr v. Strong Detective Agency, Inc.*,
   787 F.2d 1205 (7th Cir. 1986) ...............................................................................110

*Keating v. Pittston City Hous. Auth.*,
   No. 17-CV-465, 2018 WL 1414459 (M.D. Pa. Mar. 21, 2018) ...............................94

*Lopez v. Silverman*,
   14 F.Supp.2d 405 (S.D.N.Y. 1998)..........................................................................87

*Martin v. Cooper Elec. Supply Co.*,
   940 F.2d 896 (3d Cir. 1991).....................................................................................113

*McCoy v. Transdev Servs., Inc.*,
   No. 19-2137, 2022 WL 951996 (D. Md. Mar. 30, 2022) ..........................................97

*McKenna v. Healthease, Inc.*,
   No. 10-3950, 2013 WL 1702639 (E.D. Pa. Apr. 19, 2013), *aff'd*, 573 F.App'x
   190 (3d Cir. 2014)....................................................................................................108

*Narayan v. EGL, Inc.*,
   616 F.3d 895 (9th Cir. 2010) ..................................................................................106

*Nerviano v. Cont. Analysis Sys.*,
   No. 17-4907, 2018 WL 2240533 (E.D. Pa. May 16, 2018)............................94, 104

*New York v. Scalia*,
   490 F.Supp.3d 748 (S.D.N.Y. 2020).........................................................................83

*NLRB v. A Duie Pyle*,
   606 F.2d 379 (3d Cir. 1979)....................................................................................106

*NLRB v. Deaton, Inc.*,
   502 F.2d 1221 (5th Cir. 1974) ................................................................................106

*Rapczynski v. DIRECTV, LLC*,
   No. 14-CV-2441, 2016 WL 1071022 (M.D. Pa. Mar. 17, 2016) ..............................97

## TABLE OF AUTHORITIES

Page

*Richardson v. Bezar*,
  No. 15-0772, 2015 WL 5783685 (E.D. Pa. Oct. 5, 2015) ....................................108

*Rood v. R&R Express, Inc.*,
  No. 17-cv-1223, 2022 WL 1082481 (E.D. Pa. Apr. 11, 2022)..............................113

*Rutherford Food Corp. v. McComb*,
  331 U.S. 722 (1947)..............................................................................................88

*Salinas v. Com. Interiors, Inc.*,
  848 F.3d 125 (4th Cir. 2017) ..........................................................83, 85, 89, 110

*Savakus-Malone v. Piramal Critical Care, Inc.*,
  No.18-05063, 2019 WL 2897697 (E.D. Pa. July 3, 2019) ......................95, 100, 105

*Scantland v. Jeffry Knight, Inc.*,
  721 F.3d 1308 (11th Cir. 2013) ..........................................................................105

*Sec'y United States Dep't of Lab. v. Am. Future Sys., Inc.*,
  873 F.3d 420 (3d Cir. 2017)................................................................................113

*Senne v. Kan. City Royals Baseball Corp.*,
  591 F.Supp.3d 453 (N.D. Cal. 2022) ....................................................................97

*Souryavong v. Lackawanna Cnty.*,
  872 F.3d 122 (3d Cir. 2017)................................................................................111

*Stone v. Troy Constr. LLC*,
  935 F.3d 141 (3d Cir. 2019)........................................................................111, 112

*Sullivan-Blake v. FedEx Ground Package Sys., Inc.*,
  No. 18-01698, 2020 WL 2572273 (W.D. Pa. May 21, 2020) ........................86, 109

*Sutton v. Cmty. Health Sys., Inc.*,
  No. 16-cv-01318, 2017 WL 3511757 (W.D. Tenn. Jan. 12, 2021) ........................87

*Tenn. Coal, Iron & R.R. Co. v. Muscoda Loc. No. 1232*,
  321 U.S. 590 (1944)........................................................................................80, 88

*Thompson v. Real Est. Mortg. Network*,
  748 F.3d 142 (3d Cir. 2014)..................................................................................84

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
  471 U.S. 290 (1985)..............................................................................................88

# TABLE OF AUTHORITIES

Page

*Torres-Lopez v. May*,
   111 F.3d 633 (9th Cir. 1997) .........................................................................83, 84

*Walling v. Portland Terminal Co.*,
   330 U.S. 148 (1947).............................................................................................107

*Walsh v. TriMED Healthcare, LLC*,
   No. 20-4308, 2022 WL 3155406 (E.D. Pa. Aug. 8, 2022) ...................................112

*Williams v. Tri-County Growers, Inc.*,
   747 F.2d 121 (3d Cir. 1984)...............................................................................113

*Yue Yu v. McGrath*,
   597 F.App'x 62 (3d Cir. 2014) ..................................................................100, 103

*Zheng v. Liberty Apparel Co.*,
   355 F.3d 61 (2d Cir. 2003)...................................................................................85

**Statutes**

43 Pa. Cons. Stat. Ann. § 333.105(a)(2) .........................................................81, 109

29 U.S.C. § 203(d) .....................................................................................................80

29 U.S.C. § 216(b) ...................................................................................................112

29 U.S.C. § 255(a) ...................................................................................................114

29 U.S.C. § 260............................................................................................112, 114

**Rules and Regulations**

78 Fed. Reg. 60454-01 (Oct. 1, 2013) ..........................................................9, 32, 33, 42

80 Fed. Reg. 65646 (Oct. 27, 2015).........................................................................32

Fed. R. Civ. P. 52 .........................................................................................................5

Fed. R. Civ. P 54 ......................................................................................................114

Recission of Joint Employer Status Under the Fair Labor Standards Act Rule,
   86 FR 40939-10, 2021 WL 3207510 (2021) ........................................................83

52 Pa. Code § 52.1 ......................................................................................................7

## TABLE OF AUTHORITIES

Page

55 Pa. Code § 52.20 ...............................................................................................................56

## SUMMARY OF EVIDENCE PRESENTED AT TRIAL

The Court held a seven-day bench trial in this matter from October 16 to October 24, 2023. The Court heard live testimony from a total of sixteen witnesses, including six Direct Care Workers ("DCWs"), three Participants,[1] three Service Coordinators ("SCs"), three corporate witnesses, and one witness from the State of Pennsylvania's Office of Long-Term Living ("the State" or "OLTL"). The Parties submitted deposition designations for four additional Participant witnesses. The following exhibits[2] were admitted into evidence: Plaintiff's Exhibit ("Px") Nos. 1-93 and 96-100, Defendant's Exhibit ("Dx") Nos. 101-225, 229, 246, 257-258, 263, 265-267, 269, 271, 273, 275-277, 281, 284, 393, and 300-305, Joint Exhibit ("Jx") Nos. 325-398, and Plaintiff's Rebuttal Exhibit ("Rebuttal Px") No. 1.

The evidence introduced at trial confirms PPL jointly employed DCWs in Pennsylvania. Indeed, extensive evidence shows PPL acted as a joint employer in exerting significant control over DCWs' compensation, hiring, work rules and conditions of employment, day-to-day supervision, and employment records.[3]

---

[1] Participants are also referred to by PPL as "Common Law Employers" or "CLEs."

[2] All exhibits cited for the first time herein are cited by their exhibit number, a description, and Bates number (if applicable). All subsequent cites to the same exhibit are shortened to include only the exhibit number and Bates number (if applicable). In cited exhibits bearing PPL Bates numbers, page references have been shortened to exclude the "PPL00000" for ease of reference and shorter cites; the few documents with a different prefix have the prefix included to avoid confusion.

[3] While control over a worker's pay falls under the second factor of the Third Circuit's *Enterprise Test*, Plaintiff addresses it first in both the Proposed Findings of Fact and Proposed Conclusions of Law because it is "fundamental to the ultimate question of economic dependence." *See* Jx 376 at 2371 (U.S. Dept. of Labor, Wage & Hour Div., Administrator's Interpretation No. 2014-2 ("AI2014-2") (June 19, 2014) guidance on the FLSA's application to home care services stating "any entity that sets a wage rate will likely be considered an employer").

First, PPL exercised control over several elements of DCWs' compensation. PPL, not the State, set the maximum hourly wage rate for DCWs. Specifically, while the State set maximum reimbursement rates, PPL established the DCWs' maximum hourly wage rate by subtracting the following costs from the State's published reimbursement rate: workers' compensation insurance rates, unemployment insurance rates, and employer's share of taxes. The evidence presented at trial, including PPL's own internal documents and contracts with the State, demonstrated that PPL's discretionary decisions impacted all three of these costs and thus directly impacted the maximum hourly wage rate for DCWs. This control over costs, and thus the maximum wage rate, is critical because while PPL argues Participants could select a wage rate within a pre-set range, the witnesses at trial—including PPL's own witnesses—all confirmed the range for wage rates was not meaningful. Rather, Participants had to pay DCWs the maximum or close to the maximum hourly wage rate to be able to secure workers. PPL further exercised control over DCWs' compensation by paying DCWs their pre-transition payrate, barring Participants from requesting rate changes for a period after transition, never obtaining rate sheets signed by Participants for transitioning DCWs, training Participants on how to set rates and requiring they submit any rate change requests to PPL for review, choosing when to raise or lower DCWs' maximum hourly wage rates, partnering with the State to determine whether DCWs were entitled to overtime, and deciding (without any involvement from the Participant) how much to pay DCWs for training and hazard-related compensation. In sum, while the funds to pay DCWs came from the State, PPL directly impacted the compensation that DCWs economically relied upon and its control over DCWs' compensation weighs heavily in favor of joint employer status.

Second, PPL was actively involved in the hiring process. It partnered with the State to develop enrollment forms—such as the DCW Agreement and DCW Qualification Form—which

DCWs had to complete prior to providing paid services. Participants neither participated in drafting the enrollment forms nor had authority to change them. Importantly, PPL also used enrollment specialists to assist Participants in hiring and onboarding DCWs. Specifically, during pre-hire in-person meetings, PPL's enrollment specialists provided Participants and DCWs with an orientation, helped fill out enrollment forms, explained how to submit service hours, and answered any questions. PPL further exercised control over the hiring process by facilitating Participant's identification and selection of DCWs. Through its CLE Handbook, PPL methodically instructed Participants on how to advertise for a DCW, how to screen potential candidates, and how to interview candidates. PPL also controlled how Participants found DCWs by creating and hosting the MyChoice4Care.com provider directory, requiring DCWs provide certain hiring-related information to create a profile. Finally, and critically, PPL controlled when DCWs could start working. Indeed, while a Participant could "select" a DCW, that selection was meaningless until the DCW received PPL's "good-to-go" to start providing paid services. To be approved as good-to-go by PPL the DCWs had to successfully complete PPL's enrollment packet, undergo a criminal background check that PPL required DCWs to complete before hire rather than within 30 days of hire as contractually required by the State, and complete PPL's orientation. PPL was also responsible for deciding whether DCWs met the required qualifications.

Third, PPL exercised control over DCWs' work rules and conditions of employment. PPL instructed DCWs on their job duties and conditions of employment from the outset of their employment. Before receiving the good-to-go to provide paid services DCWs had to attend an orientation created and carried out by PPL and its subcontractor. The orientation—which lasted three-and-a-half hours—taught DCWs their role and directed them on what to do and what not to

do in interacting with Participants. PPL also exercised control over DCWs' conditions of employment by partnering with the State to develop the DCW Agreement, which in PPL's own words, "tells [DCWs] the policies, qualifications, and duties of the direct care worker." DCWs had to sign the DCW Agreement to be approved as good-to-go and, unlike PPL who regularly added terms from year to year, neither Participants nor DCWs could alter the agreement's terms.

Fourth, although PPL did not directly oversee DCWs' work, it indirectly influenced day-to-day supervision by training Participants on how to schedule and supervise workers, controlling DCWs' timesheet submission and approval, and regularly engaging in HR-type interactions with DCWs. PPL instructed DCWs to reach out to it with questions regarding enrollment forms, payment-related issues, unemployment compensation, and for verification of employment letters.

Finally, PPL had primary responsibility and control over DCWs' employment records. PPL maintained complete employment files for each DCW. These files did not simply include enrollment forms but rather included a substantial number of employment-related documents such as copies of worker's time sheets, copies of all DCW rate sheets, verification of DCW orientation, tax forms, copies of completed documentation regarding any FICA refunds processed, copies of documentation of requests for verification of DCW wages requested by federal and state agencies, copies of documentation of any workers' compensation insurance claims filed by DCW or documentation that the VF/EA FMS made every attempt to obtain such documentation, copies of DCW Termination Forms, and copies of any completed PA DL&I Reason for Separation Notice.

In sum, far from simply acting as a payroll provider or agent as PPL contends, PPL acted as a joint employer in sharing control over each aspect of DCWs' employment. PPL introduced

no credible evidence at trial to refute this conclusion. Instead, PPL spent significant time painstakingly walking through each document in which a DCW or Participant "agreed" PPL was not an employer. But, as the U.S. Supreme Court has made clear, such evidence is immaterial. PPL's attempt to paint everyone else—the Participants, the Service Coordinators, the State—as potential employers likewise fails. Indeed, at the core of the "joint employment" concept is the fact that the control one entity exercises over an employee does not negate the control exercised by another. The Court should enter judgment in favor of Plaintiff, the FLSA collective and Pennsylvania Rule 23 class, and award unpaid overtime compensation and damages pursuant to the parties' stipulation, Dkt. 316.

## PROPOSED FINDINGS OF FACT

Rule 52 of the Federal Rules of Civil Procedure provides that a court conducting a bench trial "must find the facts specially and state its conclusions of law separately," and that "[j]udgment must be entered under Rule 58." Fed. R. Civ. P. 52(a)(1). In a bench trial, the Court acts as the finder of fact and is entitled to make credibility findings as to witnesses and testimony. Therefore, the Court considers among other things, the witnesses' appearance and manner of testifying, whether the witness had anything to gain or lose from the outcome of the case, whether the witness provided truthful answers or rather slanted testimony in their favor, and whether a witness's testimony was supported or contradicted by other testimony or evidence, particularly documentary evidence that the Court found to be credible. Based on a review of the exhibits, trial testimony, and the record in this matter, the Court hereby enters the following findings of fact and conclusions of law.

## I.    PLAINTIFFS AND CLAIMS

1.    Ralph Talarico, the Named Plaintiff in this litigation, is a sixty-five-year-old former Direct Care Worker ("DCW") now residing in Harrisburg, Pennsylvania. He worked for

Public Partnerships, LLC ("PPL") from 2013 to 2018, providing services to four different Participants: E.W., M.J., E.J., and K.S.[4]

2.      Mr. Talarico regularly worked more than 40 hours combined across the four Participants in 2013 and 2014. Tr. Vol. 1, 130:6-15 (Talarico).[5] In 2015, Mr. Talarico was not paid overtime compensation for any hours over 40 per week. Tr. Vol. 1, 170:19-172:6 (Talarico); Jx 340 at TAL009 (paystub). While PPL began paying Mr. Talarico overtime pay in 2016, it only paid him overtime pay for hours he worked over 40 per week for Participant E.W. and counted the hours he worked for Participant M.J. during that same workweek separately and did not pay him overtime compensation for those hours. *Compare* Jx 340 at TAL0028 (listing hours worked over 40 for E.W. paid at overtime premium), *with* Jx 340 at TAL0027 (hours worked over 40 during same pay period for M.J. paid at regular rate).[6]

3.      Mr. Talarico, on behalf of a Rule 23 Pennsylvania class and FLSA collective, alleges PPL jointly employed all DCWs, and that as such, was required to pay DCWs overtime compensation at time-and-a-half (1.5) their regularly hourly rate for any hours over 40 per week during any week between May 11, 2014, through July 23, 2022. The class and collective specifically includes DCWs who were denied overtime compensation based on (a) PPL's failure

---

[4] For privacy purposes, the Parties agreed to refer to Participants who did not testify at trial by their initials.

[5] Plaintiff cites to the official transcript of the bench trial as follows: "Tr. Vol. #, Transcript Page:Line Number-Line Number (Last Name of testifying witness)." *See* ECF No. 339 (designating Lexitas version of transcript as official transcript).

[6] For example, in a typical workweek in 2017, Mr. Talarico would work 60 hours for E.W. and 6 hours for M.J., for a total of 26 overtime hours per workweek. PPL, however, only paid him overtime pay for the 20 hours with E.W. rather than for the combined 26 overtime hours between E.W. and M.J. Tr. Vol. 1, 131:6-132:14 (Talarico); Jx 340 at TAL0919-20 (January), TAL0923-24 (February), TAL0927-28 (March), TAL0939-41 (April), TAL0942-44 (May), TAL0948-49 (June), TAL0954-55 (July), TAL0959-60 (August), TAL0966-67 (September), TAL0970-71 (October), TAL0974-75 (November).

to pay any DCWs overtime before January 1, 2016; (b) PPL's failure to pay DCWs overtime because they lived in the same home as their Participants; and (c) PPL's failure to pay DCWs overtime compensation for the combined hours they worked across numerous Participants.

## II.   OVERVIEW OF HCBS MEDICAID PROGRAM

4.      Mr. Talarico, along with all of the DCWs in the class and collective, provided services to individuals participating in the Participant Directed Services ("PDS") program, part of the Medicaid-funded Home and Community Based Services ("HCBS") waiver programs. The program allows individuals who would otherwise be institutionalized to stay in their home and receive long-term services in their home. Tr. Vol. 3, 493:11-19 (Barge).[7]

5.      The HCBS waiver program is a Medicaid program administered federally by the Centers for Medicare and Medicaid Services ("CMS") under § 1915(c) of the Social Security Act, 42 U.S.C. § 1396n, and in Pennsylvania by the OLTL. The State submitted an application for the HCBS program, which CMS granted. Tr. Vol. 3, 493:20-25 (Barge); Dx 107 (application for HCBS waiver); Jx 396 (application for HCBS waiver).

6.      OLTL oversees and administers the HCBS Waiver[8] program within Pennsylvania, including oversight of vendors and the development and distribution of regulations and policy bulletins related to waiver operations. Tr. Vol. 3, 504:1-24 (Barge); 52 Pa. Code § 52.1. The State contracted with an enrollment broker to both identify individuals financially and functionally eligible for services under the HCBS programs and provide them with a list of

---

[7] Kimberly Barge was called by PPL. She began working with OLTL in 2011 and has been a division director since 2019. Tr. Vol. 3, 490:24-492:2 (Barge).

[8] Some witnesses referred to the "Independence Waiver" program, which is the name the State gave in its HCBS Waiver application. Dx 107 at p. 3; Jx 396 at TAL0240; Tr. Vol. 1, 35:9-21 (Skovera, familiar with HCBS waiver, specifically the Independence Waiver).

available Service Coordinators ("SCs"). Tr. Vol. 1, 37:12-38:6 (Skovera);[9] Tr. Vol. 3, 497:4-23 (Barge).

       **A.**      **The Individualized Service Plan Outlines Participants' Service Needs.**

    7.     SCs are employees of third-party entities whose role is to "facilitate, coordinate and assess the services that are offered [to Participants] through the state-funded waiver program." Tr. Vol. 4, 752:4-22 (Gainer);[10] *see also* Tr. Vol. 1, 39:14-41:3 (Skovera, testifying Participant chose their service coordination entity); Dx 153 at 5512 (description of service coordinator role).

    8.     Once the potential Participant selected a SC, they met with them to develop an Individualized Service Plan ("ISP"). Tr. Vol. 3, 498:1-9 (Barge).

    9.     The ISP identified the tasks and activities a Participant needed help with and allocated the number of hours per week for which assistance would be authorized. Tr. Vol. 3, 498:16-499:5 (Barge).

    10.    DCWs did not have access to their Participant's ISP unless their Participant decided to share it with them. *See* Tr. Vol. 1, 225:5-19 (Talarico, testifying that he never saw several of his Participant's ISPs); Tr. Vol 5, 954:17-22 (Seeley,[11] testifying "I mean, for Courtney, I never seen her ISP"); *see also* Tr. Vol. 4, 812:5-16 (Gainer, service authorization form not sent to DCW).

---

    [9] Julia Skovera is a former service coordinator supervisor at Abilities in Motion who worked with the HCBS waivers that PPL facilitated. Tr. Vol. 1, 32:21-33:11, 35:9-21 (Skovera).

    [10] PPL called as a witness Ms. Gainer, a Service Coordinator. Tr. Vol. 4, 752:1-3.

    [11] Kathy Seeley worked as a DCW in Pennsylvania from 2016 to 2021, providing services for one Participant from 2016 to 2020, and for a different Participant for several months in 2021. Tr. Vol. 5, 929:17-931:5 (Seeley). She lived with the first Participant but did not live with the second Participant. Tr. Vol. 5, 931:6-16 (Seeley).

11.    Participants had a set number of hours for which they were approved to receive services—they did not have control over a budget of money for services.[12] Tr. Vol. 6, 1414:24-1417:18 (Horvath);[13] Tr. Vol. 1, 43:4-44:17 (Skovera). The ISP's hours of service per week were expressed in terms of 15-minute units. Tr. Vol. 3, 529:8-19 (Barge). The ISP did not dictate an hourly pay rate for the DCWs. Tr. Vol. 1, 68:6-11 (Skovera).

12.    SCs met with Participants twice per year, including for an annual review of the ISP. Tr. Vol. 4, 752:10-753:2 (Gainer); Tr. Vol. 1, 85:9-86:2 (Skovera). While a DCW could happen to be present at some of the meetings, the SCs primarily interacted with Participants. Tr. Vol. 2, 318:2-319:9 (Cotto,[14] "they mostly interacted with the participant"); Tr. Vol. 4, 726:1-8 (York,[15] "the meetings with the service coordinator were for my mother"); Tr. Vol. 5, 955:13-15 (Seeley, testifying she never met one of her participant's service coordinators); Tr. Vol. 1, 244:4-9 (Talarico, testifying he never met the service coordinator for two of the participants for whom he provided services); Tr. Vol. 5, 1044:14-19 (Zoccola,[16] "my caretakers don't have access to my

---

[12] The only program that provides a money budget to Participants is the Services My Way program. It includes a very small number of Participants; the vast majority of Participants use the participant-directed services model where they are allocated a set number of hours for services. Tr. Vol. 3, 655:1-656:7 (Barge).

[13] David Horvath worked for PPL from December 2006 until June 30, 2022. Tr. Vol. 7, 1396:11-17. He held the position of Senior Director of Policy and Regulation position from approximately January 2021 until June 30, 2022, when he ended his employment with PPL. Tr. Vol. 7, 1396:18-24. At PPL he was involved in the interpretation and application of the final home care rule issued by the U.S. Department of Labor. Tr. Vol. 7, 1396:25-1397:10. He also served as one of PPL's FLSA Working Group members. Jx 386 at 3461 (Roadmap for Client Engagement on FLSA slideshow).

[14] Christine Cotto worked as a DCW in Pennsylvania from January 2013 until 2022. Tr. Vol. 2, 289:18-21, 291:8-10 (Cotto). She provided services to one Participant with whom she lived. Tr. Vol. 2, 290:8-24 (Cotto).

[15] Sheila-Rea York is a former DCW and PPL forum moderator PPL called as a witness. Tr. Vol. 4, 701:3-9, 720:11-22 (York).

[16] Linsey Zoccola was a Participant in the HCBS waiver program since before the

service coordinator"); Tr. Vol. 1, 62:2-7 (Skovera, service coordinators' questions "would have been directed at the participant").

**B.      Participants Have the Same Control Under the Agency and PDS Models.**

13.      In addition to developing an ISP, the SC discussed the Participant's options for receiving services. Tr. Vol. 3, 498:1-9 (Barge). Those options included receiving personal assistance services from DCWs through an agency or through the PDS program. Tr. Vol. 1, 44:19-45:8 (Skovera).

14.      While the Participant was deemed an employer or co-employer[17] of the DCW in the PDS model, and the agency was deemed the employer of the DCW in the agency model, regardless of model there was little practical difference in the Participant's role and choices. Deposition of D.S.[18] ("D.S. Dep.") 30:5-33:13 (testifying there was no practical difference between when his DCW was employed by an agency versus through PPL).

15.      Regardless of agency or PDS model, Participants received the same number of hours of service and the same services from DCWs. Tr. Vol. 1, 45:15-23; 47:8-17; 49:5-9 (Skovera).

16.      While the PDS model permitted a Participant to select their DCW, the agency model also allowed the Participant to request, and the agencies would hire, specific individuals as DCWs. Tr. Vol. 1, 199:4-201:16 (Talarico); D.S. Dep. 48:19-49:14 (D.S. knew his DCW as a

---

program transitioned to PPL in 2013. Tr. Vol. 5, 1022:2-5. She was called as a witness by PPL.

[17] Notably, the State's HCBS waiver application noted that in the PDS model "[t]he Participant may function as the common law employer *or* the *co-employer* of workers." Jx 396 at TAL0411 (emphasis added); Tr. Vol. 3, 660:8-661:2 (Barge).

[18] D.S. was a Participant in the HCBS waiver program since before the program transitioned to PPL in 2013, who submitted a declaration in support of PPL, and was subsequently deposed by Plaintiffs. D.S. Dep. 18:14-19:20, 28:16-29:11; Decl. of D.S., PPL000006602.

friend before he started providing services and asked the Agency to hire him); Deposition of K.H.[19] ("K.H. Dep.") 136:23-137:22; *see also* Tr. Vol. 4, 748:14-24 (York).

17.    Moreover, similar to how a Participant could terminate their DCW in the PDS model, the agency model permitted Participants to reject a DCW the agency proposed or change their mind about a DCW they previously asked the agency to hire. Tr. Vol. 1, 46:3-47:2; 47:18-24 (Skovera); D.S. Dep. 47:9-20; Tr. Vol. 3, 656:8-658:2 (Barge, acknowledging that participants could always refuse any DCW whom the agency suggested, and that in fact that agencies hire people who participants request as their DCWs).

18.    Moreover, under both models Participants had the same ability to direct their DCWs' day-to-day activities and schedule. Tr. Vol. 1, 48:4-24 (Skovera); D.S. Dep. 31:18-32:7.

19.    If Participants chose the PDS program rather than the agency model, Participants had to go through PPL to obtain services. Participants did not have the ability to choose a different VF/EA. Tr. Vol. 1, 52:23-53:4 (Skovera); Jx 342 (enrollment flowchart); Tr. Vol. 1, 52:2-8 (Skovera); D.S. Dep. 51:4-10 (when the waiver program transitioned to PPL, Participants did not have a choice in which company would perform payroll services); K.H. Dep. 143:11-24 (same); Deposition of M.J.[20] ("M.J. Dep.") 87:10-25 (same); Tr. Vol. 2, 354:10-24 (Ross,[21] same).

---

[19] K.H. is a former participant in the HCBS waiver program administered by PPL. K.H. Dep. 17:1-20. She has also been an advocate for independent living for individuals with disabilities since 1989 and served on PPL's advisory council as a consumer receiving services. K.H. Dep. 11:18-13:2; 125:18-126:20.

[20] M.J. was a Participant in the HCBS waiver program since before the program transitioned to PPL in 2013. She was one of Mr. Talarico's Participants and was deposed by PPL. Tr. Vol. 1 114:21-115:8 (Talarico); M.J. Dep. 4:10-13.

[21] Toni Ross is a Participant in the HCBS waiver program and has been receiving services from a DCW since 2014. Tr. Vol. 2, 354:10-24 (Ross).

20.     Although Participants in the PDS model technically "appointed" PPL as their agent, there was no true principal-agent relationship because Participants were not able to direct PPL's decisions or activities. Tr. Vol. 2, 356:14-21, 430:6-12 (Ross); Jx 363 at 1015 (Common Law Employer Informational Packet); D.S. Dep. 56:16-19; K.H. Dep. 147:11-148:2; M.J. Dep. 90:4-11; Deposition of E.W.[22] ("E.W. Dep.") 75:13-23.

## III.    PPL ACTIVELY PARTNERED WITH THE STATE TO MANAGE THE PDS PROGRAM

21.     While the State could have had OLTL or another state entity manage the PDS program, including functions such as ensuring DCWs were qualified and deciding when they were "good-to-go" to provide services, it chose to contract with another entity—ultimately PPL—to assume those responsibilities. Tr. Vol. 3, 582:5-22; 585:13-589:3 (Barge).

22.     When the State requested proposals from vendors (the "RFP"), PPL submitted a response to the request for application ("RFA"), and the State ultimately awarded PPL the contract. Dx 152 (RFA); Tr. Vol. 6, 1080:15-20 (Stewart).[23] The State agreed to pay PPL a monthly administrative fee for each Participant, for each month for its management of the PDS

_____

[22] E.W. was a Participant in the HCBS waiver program since before the program transitioned to PPL in 2013. He was one of Mr. Talarico's Participants until 2018, and was deposed by PPL. Tr. Vol. 1 125:15-23 (Talarico); E.W. Dep. 5:2-5.

[23] PPL employed Regina Stewart as a Senior Account Manager from July 2012 to September 2018, with her serving as the project manager for the contract between PPL and the State of PA during that time period. Tr. Vol. 6, 1078:13-1079:4 (Stewart). Ms. Stewart was PPL's primary contact with the State with respect to the OLTL contract. Tr. Vol. 6, 1080:11-14 (Stewart). Prior to working at PPL, Ms. Stewart was the Director of Finance with Abilities in Motion (AIM), a former vendor fiscal employer agent in Pennsylvania. Tr. Vol. 6, 1079:5-20 (Stewart). Ms. Stewart consistently refused to answer Plaintiffs' counsel's questions directly. *See*, *e.g.,* Tr. Vol. 6, 1179:1-15 (the Court, overruling asked and answer objection recognizing that Ms. Stewart would not answer questions directly, stating 'they're not being answered directly so that's why you have to ask them three times. So overruled"). The Court overruled numerous "asked and answered" objections throughout Ms. Stewart's adverse cross-examination and re-cross-examination testimony. *See, e.g.,* Tr. Vol. 6, 1104:2-7, 1132:2, 1156:22, 1177:13, 1203:1, 1215;10, 1222:10; Tr. Vol. 7, 1351:13, 1356:1.

program. Tr. Vol. 3, 513:19-25 (Barge). As of January 1, 2013, PPL was the only VF/EA for the

PDS program in Pennsylvania.[24]

23.     PPL's RFA promised the State that "beyond meeting the minimum requirements

of this RFA," its goals for the implementation and management of its responsibilities would

include:

> 1. To serve as an **active partner** with DPW in planning and
> implementing a difficult and large scale transition to using our
> systems and experience and continually evaluating and
> **implementing national best practices** that support participant
> direction.
> …
> 3. To **develop, document and update program rules** that balance
> program flexibility and fiscal accountability, ensuring compliance
> with tax and labor laws, service funding rules, and case
> management protocols.

Dx 152 at 3849-50 (RFA) (emphasis added).

24.     PPL met its goal to be an "active partner." *See* Dx 152 at 3823 (representing to

the State that it "would be proud to partner with DPW in support of" the state's effort to provide

consistency across the state's waiver programs.); Dx 152 at 3850 (stating "PPL is committed to

developing an effective partnership with DPW, OLTL, PDA, and ODP and cultivating strategic

relationships with key state and regional stakeholders"). It exercised discretion in carrying out

the tasks it agreed with the State to undertake. Indeed, PPL's own witnesses admitted PPL

collaborated with the State to carry out the program. Tr. Vol. 3, 621:22-622:13 (Barge); *see also*

Tr. Vol. 4, 748:25-749:9 (York, "I guess you can say partnered, yes").[25] While PPL seeks to

---

[24] Prior to PPL taking over as the VF/EA, there were dozens of fiscal agents, including
AIM. Tr. Vol. 6, 1079:21-25 (Stewart). As of April 1, 2022, CHC Waiver Participants
transitioned from PPL to Tempus Unlimited, LLC, while PPL remained the FMS Vendor for
OBRA and ACT 150 Participants. Px 72 at 7468 (2021 Year-End Letter).

[25] Ms. York was not a typical DCW. She did not view caregiving as a job, but rather as a

assign authority to others, the HCBS program requires entities including PPL to "come together to operate the program." Tr. Vol. 3, 494:17-20 (Barge).

25.     As discussed in extensive detail below, PPL partnered with the State on numerous items impacting DCWs' employment, including but not limited to:

- Updating program rules, as PPL proposed in its RFA. *See* Dx 152 at 3849-50; Tr. Vol. 3, 593:17-595:3 (Barge); Tr. Vol. 6, 1199:2-18 (Stewart).

- Developing DCWs' enrollment packet, including making substantive changes to the DCW Qualification form and DCW Agreement. Tr. Vol. 3, 595:8-21 (Barge); Dx 152 at 4111; Tr. Vol. 3, 595:8-605:16 (Barge); Dx 153 at 5570-72, 5584-85 (PA DPW Financial Management Services Amendment #4); Dx 305 at 7964-66, 8004-06; discussed further ¶¶ 122-24, *infra*.

- Developing the CLE Handbook. *See* ¶¶ 196-98, *infra*.

- Developing DCWs' terms of employment. *See* ¶¶ 162-68, *infra*.

- Recommending and implementing enrollment specialists who provided orientation and training to both Participants and DCWs. Jx 368 at 1221 (Targeted Enrollment for Service Level Agreement); Dx 153 at 5326; discussed at ¶¶ 129-35, *infra*.

- Determining how to apply overtime rules to DCWs consistent with its promise to ensure compliance with labor laws. *See* Dx 152 at 3849-50; Tr. Vol. 3, 617:15-618:20 (Barge); discussed further ¶¶ 78-108, *infra*.

26.     As PPL recommended, PPL and the State discussed potential changes to policies and procedures, including those affecting DCWs, during weekly status meetings. Dx 152 at 4098; Tr. Vol. 6, 1087:3-11 (Stewart, acknowledging that the state had the meetings PPL

---

"mission." Tr. Vol. 4, 685:17-686:6 (York, "I didn't even think to list it as a job because, for me, it's more of a mission or just like what you do"). Moreover, in addition to working as a DCW, she also worked as a moderator of PPL's forum and served as a representative for PPL on Quarterly Advisory Group. Tr. Vol. 4, 720:11-721:1; 737:5-24 (York). Unlike other DCWs, Ms. York supervised the DCWs who provided services to her mother, including interviewing them and setting their schedules. Tr. Vol. 4, 695:12-20; 725:12-25 (York, describing herself as the "supervising DCW"); Tr. Vol. 4, 727:9-18. Ms. York believed that "overtime pay was not allowed" and had no understanding that living with her Participant impacted whether PPL paid her overtime. Tr. Vol. 4, 698:1-16 (York).

recommended). The State and PPL were able to conduct these meetings before the transition because the State also accepted PPL's recommendation for a 90-day transition period. Dx 152 at 4165-66; Jx 357 at 758 (Pennsylvania Department of Public Welfare grant agreement); Tr. Vol. 6, 1088:1-3, 1088:18-25 (Stewart).

27.     PPL's partnership with the State continued long past the transition. Indeed, in seeking to extend the contract, PPL promised the State that PPL would work closely with the State, "sharing the lessons [they] have learned in the OLTL program and other statewide programs across the country." Jx 371 at 1824 (OLTL Project Work Plan). PPL and the State further held joint Quarterly Advisory Group meetings "to provide feedback on PPL processes in order to sustain and enhance Participant Directed Services." Dx 151 at 3736 (DCW orientation follow-up meeting notes dated June 14, 2017).

28.     Thus, when PPL witnesses like Ms. Stewart asserted PPL did something because "program rules" required it, that included rules that PPL recommended or helped develop and update.[26]

---

[26] Ms. Stewart's testimony consistently contradicted written documents, including contracts between the State and PPL. *See* Tr. Vol. 7, 1358:2-1360:20 (Stewart, testifying the State required PPL conduct background checks prior to issuing a DCW the good-to-go despite language in the contract between PPL and the State (Px 15 (Appendix N – VF/EA-FMS Special Provider Agreement)) expressly stating background checks only had to be completed within 30 days of the DCW starting to provide services); *see also* Tr. Vol. 7, 1364:17-1366:11 (Stewart, testifying PPL never directed DCWs to call PPL's customer service line despite documentary evidence that PPL did just that); Dx 185 at 7274 (DCW orientation slide noting number and hours for calls to PPL's customer service); Dx 186 at 7398 (DCW orientation handbook with page about how to contact PPL); Jx 356 at 633-34 (timesheet submittal instructions for DCWs stating they can call PPL's customer service); Jx 371 at 1881 ("[t]he DCW has the option of correcting the timesheet or calling Customer Service"); Jx 372 at 1925 (enrollment packet instructions inviting DCWs to call PPL's Customer Service with questions), 1928 ("If you have any questions, please contact one of our Customer Service Representatives at 1-877-908-1750"), 1929 (same); *see also* Tr. Vol. 7, 1361:9-1362:8 (Stewart, testifying PPL does not send enrollment forms to DCWs despite the enrollment forms explicitly being addressed to DCWs);

29.     Similarly, the contract between the State and PPL incorporated the RFA PPL submitted to the State. Thus, when PPL claims it only did what the contract required, in reality, PPL was doing what it told the State should be done. *See, e.g.,* ¶¶ 71, 150 n.54, *infra*.

30.     Incredibly, PPL's position is that if the State decided to use a form PPL developed, the form then became the "State's form." Tr. Vol. 7, 1363:17-1364:4 (Stewart, "[w]e worked with the State to create the packet. It becomes the State's decision and their forms and we send them out if they tell us to do so. If we're talking about ownership, the ownership is the State client"). Thus, when witnesses such as Ms. Stewart testified that various decisions, forms, or requirements were "State" decisions, forms, or requirements, this Court cannot conclude that PPL did not play a significant substantive role in making the decision, creating the form, or establishing the requirements, particularly in light of multiple specific examples of PPL's involvement.

31.     The State recognized PPL would take on employer-related burdens for DCWs as part of its partnership with the State. Indeed, in its HCBS waiver application the State explicitly acknowledged that "FMS [PPL] reduce the employer-related burden for participants while making sure Medicaid and Commonwealth funds used to pay for services and supports as outlined in the participant's individual service plan are managed and dispersed appropriately as authorized." Thus, when Pennsylvania selected PPL to be the sole FMS provider, it tasked PPL with taking on employer burdens and appropriate management of Medicaid funds. Jx 396 at TAL0252; Tr. Vol. 3, 658:3-660:7 (Barge).  When PPL took on employer burdens and powers, it also took on the employer duty to pay overtime.

---

Jx 364 at 1038 (New DCW Enrollment Packet stating "We have sent you this this packet because you…completed the New Direct Care Worker Application Form"); Jx 372 at 1924 (DCW Informational Packet stating "Dear Direct Care Worker").

## IV.   PPL JOINTLY EMPLOYED DCWS

### A.   **PPL Exercised Control Over DCWs' Compensation**

####     i.     PPL Established DCWs' Maximum Rates.

32.     Participants could only pay DCWs an hourly rate within a range from
Pennsylvania's minimum wage up to a maximum rate. Jx 372 at 1932 (Maximum Wage Rate
Breakdown Sheet provided in each initial enrollment packet); M.J. Dep. 72:3-6 (testifying
participants receive a set range of pay rates for their DCW); Tr. Vol. 2, 381:16-21 (Ross) (same);
Tr. Vol. 2, 386:23-387:14 (Ross, testifying if participants tried to fill out wage rate change forms
with a rate higher than the maximum, PPL would lower the rate to what PPL "allotted as the
maximum rate"); Dx 303 at 7956 (DCW Agreement and Qualification Form); M.J. Dep. 72:19-
23, 129:6-130:17.

33.     While the maximum hourly wage rate varied over time and based on geographic
region, as of 2015 the caps for the maximum hourly wage rate, depending on region, ranged
from $11.20–$13.78. Jx 365 at 1096 (DCW Rate Sheet Instructions). Over the next seven years
the maximum only went up a couple dollars. *See* Px 67 at 7191 (New Employer Maximum DCW
Hourly Wage Rate Sheet, maximum ranged from $12.69– $15.55).

34.     The range for DCWs' hourly rates was not meaningful. Participants effectively
had to pay the maximum hourly wage rate because they could not find qualified individuals to
hire as DCWs for anything less than the maximum. *See* Tr. Vol. 2, 382:22-383:19 (Ross); Tr.
Vol. 5, 860:1-861:1 (Tamburo,[27] testifying "I don't think I had any options" and that she "was

---

[27] Joyce Tamburo's husband received home care services through the participant-directed
services Medicaid waiver program from 2007-2018. Tr. Vol. 5, 839:5-10 (Tamburo). During the
time he was in the program, Ms. Tamburo was his designated Common Law Employer. Tr. Vol.
5, 839:14-18 (Tamburo).

not able to find anyone else"); Tr. Vol. 5, 935:24-936:9, 950:13-951:2 (Seeley, testifying she

would not have been willing to work as a DCW for $7.25 per hour and testifying she stopped

providing DCW services through PPL because she could provide the same types of services

through an agency and receive a "better pay rate"); Tr. Vol. 2, 313:11-20 (Cotto); Tr. Vol. 2,

451:16-20 (Mandoza);[28] Tr. Vol. 4, 716:2-17, 723:20-725:11 (York, testifying it helped to attract

DCWs to offer the maximum wage rate and that as a DCW "we always were getting paid the

maximum rate"); *see also* Tr. Vol. 5, 1068:16-1069:19 (Zoccola, testifying there are few DCWs

to choose from because, in part, of low wage rates and caps on pay).[29]

35.     PPL even recognized that most Participants selected a DCW wage rate at or close

to the maximum because Participants struggled with attracting and retaining DCWs at a lower

rate. Tr. Vol. 7, 1402:22-1403:11, 1475:20-23 (Horvath); Tr. Vol. 6, 1134:23-1135:1 (Stewart).

36.     Participants' lack of authority over a "budget," in which they could decide to pay

their DCW a lower hourly wage rate to get more hours of service, further rendered the range

meaningless. Tr. Vol. 6, 1125:5-7 (Stewart). Indeed, if a Participant chose a rate below the

---

[28] Saschelle Mandoza (née Simms) worked as DCW from January 2015 to March 2019, and for one month in January 2021. Tr. Vol. 2, 437:2-16. She provided services for one participant with whom she lived. Tr. Vol. 2, 437:17-25.

[29] PPL argued that Ms. Zoccola testified she would start strangers at a lower rate, showing a real range existed. However, Ms. Zoccola testified that she had always used family, and more recently friends, as her DCWs, and always paid them the maximum. Tr. Vol. 5, 992:5-993:1, 994:12-995:3 (Zoccola testified that "if" she hired a stranger, she would "start a little lower," but that is speculative as she testified that even the newest workers she just hired had been started at the maximum because they were a part of her life before she hired them as DCWs). Ms. Zoccola also repeatedly contradicted herself at trial. For example, Ms. Zoccola clearly testified that everyone who had worked for her as a DCW under the PDS Program had been a family member or a friend. Tr. Vol. 5, 992:5-993:1, 994:12-995:3 (Zoccola). Then, she flatly contradicted her prior testimony in trying to claim she had hired a couple of strangers when she transitioned into the program. Tr. Vol. 5, 1069:20-1070:11 (Zoccola). Tellingly, the file of documents PPL produced regarding Ms. Zoccola confirmed she did not have any DCWs other than her mother and sister after the transition to PPL. Dxs 156-182, Jxs 393-394.

maximum hourly wage rate for their DCW, the difference remained with the State. Tr. Vol. 6, 1125:8-1126:21 (Stewart).

37.     PPL, not the State, calculated the maximum hourly wage rate for each DCW.[30] The State set a maximum *reimbursement* rate, which, critically was the maximum the State would reimburse a vendor, such as PPL, not the maximum hourly wage rate paid to DCWs. Tr. Vol. 3, 650:23-654:1 (Barge).

38.     The State listed maximum reimbursement rates in 15-minute "units." *See* Dx 126 (Notice Announcing Final Fee Schedule Rates). So, to determine the State's maximum hourly reimbursement rate, the rate for the 15-minute unit must be multiplied by four. The State's reimbursement rates for agency-provided services were higher than the rates for the same services provided through the PDS program. Dx 127 (OLTL Home and Community Based Waiver Service Rates); Tr. Vol. 3, 646:23-649:13 (Barge).

39.     To determine the DCWs' maximum hourly wage rate, PPL subtracted the worker's compensation insurance rate, employer's share of payroll taxes, and unemployment insurance taxes from the State's maximum reimbursement rate. Tr. Vol. 6, 1092:21-25, 1095:9-1096:1 (Stewart); *see, e.g.*, Jx 326 at 479; *see, e.g.*, Jx 326 at 479 (2014 Year-End Letter, "How the DCW's Maximum Wage Rate" is calculated); Px 68 at 7215 (2022 New Common Law Employer Handbook). PPL set up a system that automatically recalculated the DCW's maximum hourly wage rate if there were any changes to factors in the formula. Tr. Vol. 6, 1123:13-18

---

[30] The maximum hourly wage rate is unrelated to the Participant's ISP service units or authorized hours. The Participant still has the same number of service hours regardless of the maximum hourly wage rate paid to their DCW. Tr. Vol. 6, 1124:18-25 (Stewart). Only the Participants' approved service hours are listed in the ISP, not any rates, including the maximum hourly wage rate. Tr. Vol. 6, 1125:1-4 (Stewart); *see, e.g.*, Dx 257 (Individual Service Plan for Zoccola).

(Stewart).

40.     Thus, the maximum hourly wage rate PPL would pay DCWs was lower than the maximum reimbursement rate the State set. Tr. Vol. 3, 650:23-654:1 (Barge). For example, Dx 126 shows the State's maximum reimbursement rates effective July 1, 2014. The maximum hourly wage rates PPL permitted Participants to pay DCWs when Dx 126 was in effect are listed in Jx 365 at 1096. For each region, multiplying the unit rate from Dx 126 by four yields an hourly reimbursement rate approximately $2.00/hour more than the maximum hourly wage rates PPL permitted in Jx 365.

41.     All of the factors used to calculate the DCWs' maximum hourly wage rate— workers' compensation, employer taxes, and unemployment insurance—directly impacted the maximum hourly wage rate paid to DCWs. Tr. Vol. 6, 1123:1-12 (Stewart); Jx 326 at 479.

42.     Participants did not control these factors. For example, they could not choose what insurance company they wanted to use for workers' compensation and had no input into the amount of coverage provided or any of the other terms. Tr. Vol. 2, 358:8-25 (Ross); Jx 363; E.W. Dep. 97:7-20; D.S. Dep. 56:21-57:2.

43.     Rather, PPL made decisions that impacted workers' compensation rates, unemployment insurance rates, and employer payroll taxes.

44.     First, PPL secured and maintained a workers' compensation policy. Jx 372 at 1944 ("PPL secures, pays, and maintains a policy on behalf of the program Participant/Common Law Employer"); Px 68 at 7200 (listing "key tasks" performed by PPL, including "procuring a workers' compensation insurance policy for DCWs").

45.     Neither the State nor the Participants were involved in PPL's procurement of the worker's compensation carrier. Tr. Vol. 6, 1098:20-1099:12 (Stewart); Tr. Vol. 6, 1110:8-11

(Stewart). Rather, PPL chose its broker and carrier and did so because of its expertise in providing coverage in PDS programs. Tr. Vol. 6, 1102:10-17, 1388:13-19 (Stewart). Indeed, PPL touted its ability to offer competitive premium rates for workers' compensation. Dx 152 at 4822 (PPL noting in its contract with the State that it offers competitive premium rates for workers' compensation); Tr. Vol. 6, 1098:20-23, 1110:4-14 (Stewart); Jx 357 at 760; Tr. Vol. 3, 590:3-591:2 (Barge); Jx 371 at 1913. PPL negotiated a fee for service agreement with their broker. Jx 371 at 1913. Premium payments were only paid for Participants actually using the PDS program, even though an insurance plan was initiated and available for all enrolled. Jx 371 at 1913. PPL also unilaterally "establish[ed] a list of designated health care providers for a worker to visit if they experience[d] a workplace injury." Px 68 at 7212. PPL provided the "Doctor Panels" which were "listings of medical providers by county" on its website. Px 68 at 7212.

46.     PPL monitored its workers' compensation broker's performance, including how the broker handled claims, and ensured screening for fraudulent claims. Jx 371 at 1913 ("The selected Offeror [PPL] must provide ongoing management and oversight of the selected broker or TPA [third party administrator]."); Tr. Vol. 6, 1106:1-10 (Stewart, agreeing that PPL is responsible for monitoring and oversight); Jx 371 at 1914-17; Px 17 at 1913-17; Tr. Vol. 6, 1103:13-16, 1106:1-10, 1388:20-25 (Stewart). PPL also monitored the enforcement and collection of reimbursement from a liable third-party. Jx 371 at 1915.

47.     PPL took numerous measures to try to lower workers' compensation costs. For example, PPL reviewed claims with dollar valuations and description of the incidents, conducted a trends analysis in loss experience, and centralized quality data which reduced worker's compensation costs for the Participants—a reduction which meant a higher maximum hourly wage rate for DCWs. Jx 371 at 1914; Tr. Vol. 6, 1106:24-1107:11 (Stewart).

48.     In fact, between 2012 to 2016, PPL's method of initial claim review, which benefitted from more accurate vetting and data collection, boasted a 34% reduction in the number of workers' compensation claims submitted to insurers. Jx 371 at 1914 (PPL "reduced workers compensation costs for the CLE," specifically, "[c]laims [were] reduced by 34%; incurred claims costs [were] reduced by 48%; resulting in a rate reduction to the CLE of 42%.").

49.     PPL's drive to lower workers' compensation costs makes sense given it was financially rewarded for doing so.[31] Tr. Vol. 7, 1389:18-1390:19 (Stewart); Dx 153 at 5319 ("In consideration of the Grantee's efforts to obtain savings for the Department, DHS will make a shared savings payment to Grantee consisting of a base payment of $90,000 plus a quarterly payment for calendar year 2015."). The cost savings payment to PPL was calculated "by comparing the Workers' Compensation Insurance value to what the cost would have been under the calendar year 2014 rate of 5%." Dx 153 at 5319.

50.     PPL admits that its selection of a new carrier lowered the workers' compensation rate. Tr. Vol. 6, 1114:4-1115:18 (Stewart, testifying the workers' compensation rate changed because the carrier changed).

51.     PPL also admits that any changes in the workers' compensation rate impacted the DCWs' maximum wage rates. Jx 326 at 479; Tr. Vol. 6, 1107:22-23:2 (Stewart); Px 68 at 7216 ("Any changes to the WC insurance rate could drive the expense up or down and ultimately alter

---

[31] Ms. Stewart initially denied PPL had any financial incentive to ensure workers' compensation savings, but then changed her testimony upon being presented with a contract explicitly stating PPL received a shared savings payment for reducing workers' compensation costs. *See* Tr. Vol. 7, 1389:18-1390:19 (Stewart, testifying "Yes. Now that I see this."). This was a repeated pattern by Ms. Stewart, *see, e.g.*, Tr. Vol. 7, 1379:4-21, 1379:22-1381:1 (Stewart, testifying the pre-PPL and PPL DCW agreements were "very similar," but then later agreeing the pre-PPL DCW agreement only had six terms while PPL's version had nineteen terms); *compare* Px 92 at 240 (Talarico file, pre-PPL DCW Agreement date May 2012) *with* Px 92 at 279-82 (PPL's DCW Agreement).

available money for Wages.").

52.     In addition to impacting DCWs' maximum hourly wage rate through its discretionary decisions over workers' compensation, PPL also impacted DCWs' maximum hourly wage rate through its control over DCWs' unemployment claims.

53.     PPL initially required Participants to sign a Power of Attorney form allowing PPL to handle unemployment claims. Dx 161 at 6440 (Zoccola Power of Attorney form); Tr. Vol. 6, 1118:7-10 (Stewart); Px 52 at 6614-15 (D.S. CLE packet); Dx 183 at 6562 (Program documents for Denise Lang); Dx 153 at 5404 ("Obtain a signed PA Department of Labor and Industry Form PA UC-884, Unemployment Power of Attorney from each common law employer"). While Ms. Stewart testified the Power of Attorney form is "no longer used," PPL continued to handle unemployment claims. Indeed, DCW witnesses' personnel files contain termination forms dated as late as October 2021 stating PPL used the forms to "help determine whether the employee is eligible for unemployment benefits." *See* Dx 302 at 7713 (Seeley file); Px 68 at 7211 ("The information provided on [the DCW Termination form] will help determine whether the Direct Care Worker is eligible for unemployment benefits.").

54.     PPL handled the notices and information requests related to DCWs' unemployment claims. State unemployment offices sent PPL notifications regarding DCWs' terminations, including notifying PPL when DCWs applied for unemployment benefits. Tr. Vol. 7, 1368:17-1369:1 (Stewart); Jx 369 at 1265 (CLE Handbook for PDS); Px 68 at 7211 ("Once Public Partnerships receives notice that the DCW has applied for unemployment benefits, it will provide the required wage and termination history to the regional State Unemployment Insurance office."); Dx 155 at 6396-6401 (Program documents for Saschelle Mandoza, notice from the State Unemployment office regarding claim filed 4/24/16, listing the employer as Public

23

Partnerships, LLC, and addressed to their post office box in Wilkes-Barre, PA), at 6422-27 (similar notice from September 2018, with PPL's response). The notice directed the employer to provide the reason for the termination and the wage history for the person who made the claim. *Id*.

55.     PPL communicated directly with the Department of Labor about DCWs' terminations. Tr. Vol. 7, 1371:11-18 (Stewart). Once PPL received notice a DCW had applied for unemployment benefits, it provided the required wage rate information and employment history to the regional State Unemployment Insurance Office. Jx 369 at 1265 ("Once PPL receives notice that unemployment benefits have been applied for, it will provide the required wage and termination history to the Regional State Unemployment Insurance Office."); Tr. Vol. 6, 1122:7-13, 1369:2-25 (Stewart). PPL had to provide this information within 10 days of receipt of notice of the termination. Tr. Vol. 7, 1370:1-6 (Stewart).

56.     PPL used the termination forms provided by Participants to complete a "Reason for Separation" notice with the Department of Labor and Industry. Tr. Vol. 7, 1370:10-19 (Stewart); Jx 371 at 1837-38 ("[t]he need to complete and submit the Worker Termination Form to the selected Offeror within twenty-four (24) hours of when a qualified DCW ceases working for the CLE so the selected Offeror can complete the 'Reason for Separation' notice from the Department of Labor and Industry within ten (10) days of receipt"); Jx 363 at 1032 (PPL CLE Packet stating the same).

57.     PPL also advised DCWs on how to submit requests for unemployment. Tr. Vol. 2, 456:8-457:2 (Mandoza, "the representative from PPL advised me that I did qualify for unemployment and she advised me that I can submit the information online"); *see also* Tr. Vol. 1, 140:8-19 (Talarico, testifying he received unemployment compensation when listing PPL as

his employer on his unemployment application in 2018); Dx 153 at 5408 ("Informing qualified

DCWs of their right to file unemployment and workers' compensation insurance claims").

58.     PPL determined each Participants' unemployment tax rate and arranged for

unemployment insurance payments to be made. Tr. Vol. 3, 591:6-10 (Barge); Jx 326 at 479.

59.     If PPL mishandled a claim, decided not to contest a claim, or failed to provide

information to the Department of Labor, it could increase the unemployment insurance rate for a

Participant and ultimately reduce available money for wages to be paid to the DCW. Jx 326 at

479; Px 68 at 7215-16 (explaining the state unemployment insurance rate is calculated for each

participant based on turnover of DCWs who then successfully file unemployment claims, noting

"If a DCW is terminated and able to collect unemployment, the Rate for the CLE may increase

which increases the tax expense and ultimately reduces available money for wages. It is

important to review and evaluate DCW's correctly to avoid any misunderstandings around

reasons for termination."). The reason for termination is, as noted above, included on the

termination form submitted to PPL, which is the basis of PPL's report to the state Department of

Labor and Industry. *See* ¶ 56, *supra.*

60.     In addition to impacting workers' compensation and unemployment insurance

rates, PPL further controlled DCWs' maximum hourly wage rate by determining what tax

exemptions applied to DCWs and Participants. Jx 372 at 1941; Tr. Vol. 6, 1111:3-4 (Stewart);

Dx 246 ("PPL will identify workers who qualify for these exemptions"); Px 17 at 1877 (PPL

"requests information used to determine if the qualified DCW is a family member who is exempt

from paying into FICA and/or FUTA ….").

61.     If PPL determined that an individual qualified for a tax emption, it required them

to take it. Jx 372 at 1941 ("If [they] and [their] employer qualify for these exemptions [they]

must take them."); Tr. Vol. 5, 843:7-22 (Tamburo); Dx 304 at 8051 (Tamburo file).

62.     PPL did not give Participants any input into decisions on tax exemptions, even though PPL's determinations about tax exemptions could impact the employer share of payroll taxes—impacting DCWs' maximum wage rate—and could impact DCWs' access to retirement benefits and unemployment compensation. Tr. Vol. 5, 844:2-16 (Tamburo); Dx 304 at 8043-45.

63.     PPL not only established a maximum hourly wage rate for DCWs, it also chose *when* to implement new maximum rates. For example, on July 1, 2014, the State approved a new maximum reimbursement rate. Dx 126, Dx 127; Tr. Vol. 6, 1127:14-1128:3 (Stewart). Yet, PPL did not alert Participants until December 2014, and at that time told Participants to wait until February 1, 2015, or later, to request wage rate changes. Jx 326 at 469-70. Thus, during this seven-month period (July 1, 2014, to February 1, 2015) PPL could have, but chose not to, increase DCW maximum wage rates. *See* Tr. Vol. 6, 1131:4-8 (Stewart, testifying the State did not require PPL to delay in increasing the maximum wage rates that could be offered to DCWs).

               ii.     PPL Impacted Participants' Decisions Regarding DCWs' Rates.

64.     In addition to setting the maximum hourly wage rate, PPL impacted DCWs' rates by training Participants on how to set rates, controlling information regarding the availability of pay increases, requiring Participants submit a request for every requested change in a DCW's rate, and requiring Participants to maintain or lower their DCWs' rates.[32]

65.     First, PPL gave Participants instructions on how to select their DCWs' hourly rate. Jx 369 at 1267. Indeed, the CLE Handbook, that PPL partnered with the State to create, provided Participants with items to consider in setting a DCW's wage rate, such as the DCW's

_____

[32] The Participant's ISP does *not* dictate an hourly pay rate for the DCWs. Tr. Vol. 1, 68:6-10 (Skovera).

experience, credentials and education, the difficulty of the work to be performed by the DCW, and the time and duration of shift. Jx 369 at 1267; Tr. Vol. 6, 1132:11-1133:20 (Stewart).

66.     PPL further exercised control over DCWs' pay by determining whether, and when, to provide information to Participants regarding available pay increases. Indeed, PPL did not alert Participants they could increase their DCW's pay, or tell them about increased maximums, unless Participants contacted PPL, or through occasional mentions in year-end letters. Tr. Vol. 5, 853:4-855:1, 856:2-858:16 (Tamburo, PPL never told her she could increase rates, she had to call PPL); Tr. Vol. 2, 385:2-19 (Ross); Tr. Vol. 2, 311:23-313:20 (Cotto, "We would have to call Public Partnerships, the customer service team, and they would alert us if there was a change in the hourly rate"); Tr. Vol. 5, 936:18-937:7 (Seeley, "I would go on Public Partnerships' website and look at the highest wages"); Dx 304 at 8054-56, 8081; *Compare* Jx 328 (2016 Year-End Letter, no mention of wage rates); Jx 329 (2017 Year-End Letter, no mention of wage rates); Px 69 (2018 Year-End Letter, no mention of wage rates); Px 71 (2020 Year-End Letter, no mention of wage rates); Px 72 (2021 Year-End Letter, no mention of wage rates) *with* Jx 326 (2014 Year-End Letter, mentioning wage increase); Jx 327 (2015 Year-End Letter, instructing Participants to review the maximum wage range); Px 70 (2019 Year-End Letter, mentioning wage increase).

67.     PPL also exercised control over DCWs' rates by requiring DCWs and Participants to submit a DCW Rate Sheet to PPL for initial rates or rate changes. Jx 372 at 1932 ("Any change in rate requires that this form is *signed and provided to PPL*."); Px 68 at 7213 ("A completed rate sheet must be done for each new worker and whenever a worker is receiving an increase or decrease in wage."); Tr. Vol. 2, 310:24-311:11 (Cotto); Tr. Vol. 2, 450:20-24 (Mandoza); Tr. Vol. 5, 937:2-7 (Seeley); Tr. Vol. 5, 1056:14-18 (Zoccola); Tr. Vol. 2, 385:3-6

27

(Ross); Tr. Vol. 5, 921:9-25 (Yonkin,[33] "she had requested an increase").

68.     PPL did not simply approve any rate the Participant listed. Rather, if the Participant failed to enter a wage on the rate sheet, then PPL paid the DCW the state minimum wage. Dx 185 at 7276. If the Participant listed a rate above the maximum rate, PPL only paid the DCW what PPL calculated to be the maximum. Dx 303 at 7956 ("If wage entered is more than allowed, then the maximum rate will be entered."). Moreover, PPL sometimes sent DCW rate sheets out with the rate already pre-set on the form, asking the Participant to simply sign. Tr. Vol. 2, 387:16-388:7 (Ross, testifying PPL pre-set the DCW's hourly rate on rate sheet); Dx 303 at 7948 (Ross DCW rate sheet showing rate pre-set); Px 88 at 5 (M.J. DCW requalification and transfer rate sheet showing rate pre-set); Dx 301 at 7742 (Cotto file showing rate pre-set).

69.     PPL also failed to timely implement requested raises, directly impacting the amount of money DCWs received. *See, e.g.*, Dx 215 at 7644 (fax evidencing PPL's failure to implement a rate change previously submitted and received by certified mail, stating despite PPL receiving the request on April 30, 2013, it still not gone into effect as of July 10, 2013).

70.     While PPL required a new rate sheet be completed every time a DCW was hired or there was a change in existing rate, as discussed above at ¶ 67, when PPL took over as the sole VF/EA in January 2013, it did *not* collect any rate sheets for determining pay. Tr. Vol. 6, 1136:5-1138:4 (Stewart); Jx 372 at 1932.

71.     Instead, PPL simply continued paying DCWs at the same rate they were paid by their prior VF/EA or agency employer, without asking for input from Participants. For example,

---

[33] David Yonkin worked as a DCW for PPL in Pennsylvania from 2013 until Tempus took over in April 2022. Tr. Vol. 5, 902:18-903:1 (Yonkin). He provided services for one participant, with whom he lived, throughout the entire time, and provided services to one additional participant, with whom he did not live, from 2014 to 2019. Tr. Vol. 5, 902:4-17 (Yonkin).

Mr. Talarico testified that at the time of transition to PPL, there was a lot of required paperwork to sign, but nothing established his pay rate. *See* Tr. Vol. 1, 157:10-16, 158:2-12 (Talarico); *see also* Jx 334 (M.J. CLE file); Tr. Vol. 5, 851:6-22 (Tamburo); D.S. Dep. 98:21-99:17. PPL certainly had the ability to send out and collect rate sheets—indeed, it sent out other paperwork such as a W4 form, a DCW Agreement, and an Applicable Tax Exemption Form. *See* Dx 305. Ms. Stewart testified the State decided to continue paying DCWs at the same rate. Tr. Vol. 6, 1138:5-14. Yet, Ms. Stewart also testified that every time the state approved a PPL form or recommendation, that became a "State form" or "State requirement." *See* ¶ 30, *supra* (re: forms), ¶ 150 n.54, *infra* (re: timing required for background check). Given the evidence of PPL's collaboration with the State, and Ms. Stewart's misattribution of other PPL actions to the State, this Court does not credit Ms. Stewart's testimony on this point. Rather, the Court finds that PPL fulfilled its promise to "minimize delays in payments to providers that can occur during large-scale transitions" by paying DCWs at the same rate upon transition. Jx 371 at 1772-73.

72.     In addition to deciding to continue paying DCWs their prior rates, PPL also prohibited Participants from changing DCWs' hourly rates during the transition period. Dx 213 (Transferring Qualified DCW Rate Sheet stating: "Enter the wage rate which the direct care worker is currently being paid by the existing F/EA…"); Tr. 731:4-733:12 (York, testifying prior agency set her hourly pay rate and PPL required her to keep that rate upon transition).

73.     Not only did PPL decide to pay DCWs a prior rate and prohibit Participants from changing their DCWs' rates following PPL's takeover, even after the transition period PPL *never* followed up to ask Participants to provide a rate sheet indicating what rate they wanted their DCWs to be paid. For example, PPL never received or processed a rate sheet setting Mr. Talarico's rate for his work for Participants M.J. or K.S. and did not have a rate sheet setting his

wage rate for his work for Participant E.W. until November 2016—almost four years after PPL took over the waiver program. Tr. Vol. 1, 163:17-164:9 (Talarico); Jx 334 (M.J. file, no rate sheet for Talarico); Jx 335 (K.S. file, no rate sheet for Talarico); Jx 341 at 825 (E.W. file, no rate sheet for Talarico until November 2016); Tr. Vol. 1, 165:15-166:16 (Talarico, testifying E.W. did not instruct PPL as to his rate).[34] Thus, PPL set Mr. Talarico's pay rate from 2013-2016, or longer.

74.     After the transition period, PPL further determined that many DCWs' hourly rates were too high and required they be reduced. Tr. Vol. 6, 1141:7-1145:4 (Stewart); Tr. Vol. 3, 654:10-25 (Barge). Specifically, PPL notified Participants in June 2014 that the hourly rates for their DCWs would be reduced effective July 1, 2014. Jx 350 (Rate Reduction Letter); Tr. Vol. 6, 1142:24-1143:5 (Stewart). According to the letter PPL sent, "[w]hen participant and DCW records were transferred to . . . PPL, it was discovered that some of the former financial management service providers allowed participants to pay their DCW's above the maximum service rate." Jx 350 at 543 (emphasis added).[35] PPL informed participants they had to lower the rates and that their DCWs would not be paid until a new rate sheet with PPL's selected lower rate was signed and submitted to PPL. Id.

75.     As of June 2014, PPL had been running the PDS program for one-and-a-half years. Tr. Vol. 6, 1145:19-23 (Stewart). During those one-and-a-half years, PPL approved pay increases for DCWs. Tr. Vol. 6, 1113:5-11, 1145:24-1146:6 (Stewart); Jx 337 at 921, 922 (E.J. file); Tr. Vol. 6, 1148:6-11 (Stewart, testifying that PPL reviewed Mr. Talarico's rate sheet and

---

[34] PPL maintains copies of all rate sheets. Tr. Vol. 6, 1197:16-19 (Stewart)

[35] While PPL's letter blamed the issue on prior financial management providers, this issue did not occur with a prior fiscal agent. Tr. Vol. 6, 1142:13-17 (Stewart, testifying that she had not been notified by the state during the time period right before she left AIM and transitioned to PPL that the maximum rate had been exceeded).

approved it as being consistent with the maximum hourly rate cap). Despite approving DCW pay increases for one-and-a-half years, PPL subsequently reduced them. For example, PPL approved two hourly rate increases for Mr. Talarico in 2013. Jx 337 at 921; Jx 337 at 922. Yet, after implementing both of these increases, PPL subsequently reduced Mr. Talarico's hourly rate on July 14, 2014. See Jx 337 at 923; Jx 350; Tr. Vol. 1, 167:19-169:7 (Talarico explaining that E.J. requested and received approval for rate increases in May and October 2013, and then was required by PPL to lower his rate in July 2014); *see also* Tr. Vol. 2, 313:21-315:3 (Cotto, explaining how in August 2013 PPL lowered her hourly rate by about $0.30); Dx 301 at 7741 (January 12, 2013 rate sheet with hourly rate of $11.80), 7742 (August 13, 2013 rate sheet with pre-set hourly rate of $11.51); Jx 337 at 921-23; Dx 305 at 7983, 8003 (showing DCW Williams's rate was approved at $12.83 in July 2013, but in June 2014, at the time of the mass rate-reduction letter noted above, PPL reduced Ms. Williams rate to $12.60); M.J. Dep. 131:3-132:5 (complaining PPL reduced some of her DCWs' pay rate).

76.     PPL exercised its authority to reduce DCWs' hourly rates, and ordered Participants to go along, or go without DCW services. Tr. Vol. 6, 1150:2-10 (Stewart), *see* ¶ 74, *supra*.

77.     In sum, PPL directly impacted Participants' decisions relating to their DCWs' rates by training them on how to set the rates and requiring they submit rate requests to PPL for review and approval. PPL further directly decided the rate to pay DCWs at the time of transition and did not thereafter seek any approval or direction from Participants regarding the pay rate set by PPL. When Participants did become aware of the opportunity to increase rates, and did so, PPL then required a large number of them to later reduce their DCWs' hourly pay rates, again exercising direct control over the rates paid to DCWs.

iii.    PPL Partnered with the State in Developing Overtime Rules for DCWs.

78.    PPL exercised control over whether DCWs were entitled to overtime pay. Indeed, in its contract with the State PPL promised it would ensure that DCW hourly wage rates were "in compliance with federal, state, and PA Department of Labor and Industry wage and hour rules" and noted that PPL had "policies, procedures, and internal controls to pay qualified DCWs in compliance with federal and state Department of Labor wage and hour rules for regular ***and overtime pay***." Dx 152 at 4126 (emphasis added); Px 17 at 1877 (emphasis added); Tr. Vol. 3, 617:15-618:20 (Barge).

79.    PPL was responsible for determining whether "DCW staff fall under the Fair Labor Standards Act Companionship Exemption." Dx 152 at 4126. It further worked to "ensure that Participants and direct support staff fully underst[ood] minimum wage and overtime requirements." Dx 152 at 4126-27.

80.    Prior to January 1, 2015, employees who provided companionship services, such as DCWs, did not have to be paid overtime under the FLSA. However, in October 2013, the U.S. Department of Labor issued a Final Rule concerning domestic service workers under the Fair Labor Standards Act (FLSA). 78 Fed. Reg. 60454-01 (Oct. 1, 2013) ("Home Care Rule"). Pursuant to the Home Care Rule, effective January 1, 2015,[36] federal overtime rules changed and

---

[36] The DOL Home Care Rule had an effective date of January 1, 2015. The rule was challenged in *Home Care Ass'n of Am. v. Weil*, 78 F.Supp.3d 123 (D.D.C.), *rev'd*, 799 F.3d 1084 (D.C. Cir. 2015). When *Weil* was resolved in October 2015, the DOL announced that it would not enforce the Home Care Rule until thirty days after the D.C. Circuit's ruling, allowing DOL enforcement beginning in November 2015, and would subsequently "exercise prosecutorial discretion" as to enforcing the rule through December 2015. 80 Fed. Reg. 65646 (Oct. 27, 2015). Because of this, PPL, and the State, treated the Rule's effective date as of January 1, 2016. However, as the Court has already addressed (*see* Dkt. 265 and ¶ 251 n.64, *infra*), this Court finds the effective date for enforcement by private plaintiffs is January 1, 2015, as the Rule intended.

some DCWs became eligible for overtime pay who had not previously been eligible.[37] Tr. Vol. 3, 534:7-18 (Barge).

81.     The State looked to PPL to evaluate its overtime obligations. Tr. Vol. 7, 1427:8-1428:12 (Horvath). Indeed, far from taking the State's direction in implementing the new overtime rules, PPL had in fact identified the "path forward" before even engaging with the State. Tr. Vol. 7, 1443:3-7 (Horvath); Jx 389 at 3614 (PowerPoint on the Changes in USDOL Application of the FLSA) ("PPL has identified a viable option (path forward) that addresses concerns and meets needs of majority of clients").

82.     PPL performed numerous evaluations and created numerous reports to be able to advise its clients, including the State, on the new overtime rules. It evaluated which of its client states/programs allowed DCWs to work over 40 hours but did not pay overtime rates and developed reports addressing "the costs of paying overtime," "how many providers would qualify for the live-in exemption," and "the costs of paying travel time." Jx 389 at 3612; Jx 384 at 3256 (PowerPoint re: DOL Final Rule on Application of FLSA to Domestic Service).

83.     PPL also had its internal lawyers prepare its program managers, such as Regina Stewart, on the new Home Care Rule so they could engage with their clients on how to implement the rule. Tr. Vol. 7, 1429:22-1430:2 (Horvath); Tr. Vol. 6, 1200:8-25 (Stewart); Jx 386 (Roadmap for Client Engagement on FLSA).

84.     PPL's internal training of program managers focused on how to advise state

---

[37] As discussed below at ¶ 249, Pennsylvania's state wage and hour law had long required overtime be paid to DCWs and others who provided domestic services to people in their homes, if there was a third-party joint employer. However, federal law only adopted this principle effective January 2015 when it expanded overtime protections for homecare workers by removing the "companionship care" and "live-in" overtime exemption for third-party joint employers, and narrowing the companionship care exemption for recipients of care.

clients, including topics such as "increas[ing] readiness to analyze programs and determine

impact," "increas[ing] readiness to engage clients and begin planning," "anticipat[ing] client

questions and concerns," and "present[ing] clients viable options for preserving self-direction

without bankrupting programs." Jx 389 at 3600, 3614 ("PPL is in a position to provide guidance

to and accept direction from our clients"); Jx 384 at 3228 (PPL stating it would add value to the

state clients by projecting cost implications, reviewing pay controls in PPL's systems, and

providing training to the state). PPL trained its program managers on the different options

available to states in terms of how to implement the new rule. Tr. Vol. 7, 1431:18-1432:16;

1441:13-19 (Horvath, "they could look to us for options").

    85.    PPL expected its program managers to "understand the issues relative to their

programs, assess the potential impact, engage the client, and participate in preliminary planning."

Jx 389 at 3599; Tr. Vol. 7, 1438:15-1439:1 (Horvath). PPL also expected its program managers

to meet with their clients to review the risks of joint employment and discuss strategies to reduce

it. Tr. Vol. 7, 1445:18-1446:2 (Horvath). PPL developed a six-step client engagement

framework, including the following steps: 1) internal program analysis and impact assessment;

2) client engagement and preliminary planning; 3) client policy decisions and program redesign;

4) PPL systems configuration and testing; 5) communication and implementation plan; and 6)

evaluation and revision. Jx 391 at 3723; Tr. Vol. 7, 1432:17-1433:25, 1434:17-1436:23

(Horvath).

    86.    In addition to developing internal reports and presentations to educate its own

program managers, PPL also developed extensive trainings, talking points, and reports to educate

its clients on the new rule and how to implement it. Tr. Vol. 7, 1437:12-1438:2 (Horvath); Jx 385

(64-slide PowerPoint Presentation addressing how the final rule impacted the PDS program); Tr.

1445:13-17 (Horvath); Jx 349 (Dec. 2, 2014 FLSA Implementation Agenda); Jx 381 (PPL's

"FLSA Talking Points" for its clients); Jx 386; Jx 389 at 3612 (detailing overtime impact costs

assessments performed by PPL); Jx 391 (PPL's Approach to Assessment of Program Impacts

Due to Changes in USDOL Application of the Fair Labor Standards Act to Domestic Service).

87.     PPL also developed numerous tools and resources related to the new FLSA rule.

*See* Jx 386 at 3461 (listing PPL's tools and resources); Px 18 (FLSA Implementation Work

Plan). For example, PPL developed a timeline for the implementation of changes related to the

new overtime rule. Jx 389 at 3620.

88.     The State admits PPL used its experience and expertise to assist the State in

deciding how to address the new overtime changes. Tr. Vol. 3, 637:4-25 (Barge); *see also* Jx 390

(PPL's Guidance for Operating Fiscal/Employer Agent Programs with Participant/Representative

as Sole Employer, stating that "[i]f a program is not operated as intended there is a risk that an

entity other than the Participant could be a third party joint employer" and advising that "the

following practices should be observed" to "uphold the Participant as the sole employer"); Tr.

Vol. 6, 1206:23-1207:2 (Stewart); Jx 348 (Documentation of PPL Client Engagement on FLSA

for OLTL, dated October 2, 2014); Tr. Vol. 7, 1393:21-1394:7 (Stewart, testifying PPL was part

of the communication and implementation plan for the new overtime rule and was also part of

the evaluation and revision of the State's overtime rules).

89.     One way PPL identified that overtime obligations could be reduced was to

position the Participant as a "sole employer" instead of a joint employer along with either the

State or PPL. Jx 391 at 3725 ("focus[] on promoting sole employer"); 3721 (discussing

implications of new rule, including that "in joint employment programs, the third party is liable

for overtime"); Jx 390; Jx 386 at 3468 (Roadmap for F/EA Clients, instructing that "if client has

a number of risk factors [for joint employment], inform the client that PPL would like to review with them and discuss strategies to reduce the risk in subsequent meetings"); Jx 348 at 522 (PPL informed the State that it would like to "discuss strategies to reduce the risk" related to joint employment); Jx 381 at 2741 (evaluating live-in exemption and companion care exemptions where Participant is sole employer). If a Participant were a sole employer, then the companion care and live-in exemptions could still apply. *See* Jx 391 at 3720 ("Third party employers are not permitted to claim either the companionship exemption or the live-in domestic service exemption.").

90.     PPL also designed a joint employer worksheet for the State. Tr. Vol. 6, 1209:23-1210:9 (Stewart); Jx 392 (Joint Employment USDOL Economic Realities Test Worksheet). PPL's program manager, Regina Stewart, worked with the State to complete the worksheet. Tr. Vol. 6, 1209:23-1210:9 (Stewart). Significantly, despite knowing it was important to complete the worksheet correctly, PPL erroneously checked the "Setting a Wage Rate" factor as a "weak" indicator of joint employer status even though it knew Participants had no budget authority in the PDS program.[38] Tr. Vol. 6, 1210:3-1210:24 (Stewart, admitting Participants in the PDS program do not have a "choice in how to spend unused funds that are available as a result of using a lower wage rate on other authorized Medicaid expenditures"); Jx 392 at 3729. PPL should have marked indicator of joint employer status as "strong," given that in the State's PDS program there is a "cap/range that essentially functions as a wage rate, leaving the consumer little discretion to actually set a wage," and the consumer did not have budget authority. Jx 392 at 3729. Thus, PPL not only directed the State as to how to treat DCWs for purposes of overtime, but in fact

---

[38] Budget authority "allows a [Participant] choice in how to spend unused funds that are available as a result of using a lower wage rate on other authorized Medicaid expenditures." Jx 376 at 12.

misdirected them—directly impacting DCWs' compensation.

91.     PPL also identified that one-to-many employer relationship [when one CLE served multiple Participants as the CLE for their DCWs] had additional overtime costs under the new rule and communicated that to their clients. Tr. Vol. 7, 1444:7-25 (Horvath); Jx 389 at 3616 ("most costly to employer and program"). PPL "research[ed] FLSA rules related to one employer/multi participants and overtime." Jx 349 at 527.

92.      PPL informed its clients, including the State, that if they did not unwind the one-to-many relationships, they would have to pay overtime. Tr. Vol. 7, 1436:9-23 (Horvath); Jx 348 at 519 (discussing the "implications of one-to-many employer to participant ratio" and advising the State that they "need to be changed to a one-to-one relationship"); Jx 349 at 526, ¶ 4; Tr. Vol. 3, 631:4-10 (Barge). PPL even drafted a document for the State detailing the one-to-one requirement for CLE and Participants and identified individuals who acted as a CLE for multiple Participants in Pennsylvania. Dx 135 (FLSA Work Group Meeting Agenda with Notes for November 24, 2015); Tr. Vol. 3, 644:5-20 (Barge); Px 17 at 1802.

93.     PPL and the State formed an FLSA Work Group, which included PPL staff and OLTL staff, to partner on a solution to the new overtime rules. *See, e.g.,* Jx 349 (December 2, 2014 Agenda on FLSA Implementation); Jx 331 (FLSA Work Group Meeting Agenda with Notes for November 3, 2015); Px 11 (Compilation of FLSA Work Group Meeting Agenda with Notes for November 10, 2015 to December 22, 2015); Dx 134 (FLSA Work Group Meeting Agenda with Notes for November 17, 2015). In addition to at least one meeting in December 2014, Jx 349, the FLSA Work Group met weekly from the fall of 2015 to January 2016 to discuss the implementation of overtime. Tr. Vol. 6, 1220:1-4 (Stewart).

94.     The FLSA Work Group considered various substantive changes to the PDS

program, including tracking Participants who had only one worker, training Participants with one DCW who regularly scheduled that DCW for over 40 hours, and ultimately prohibiting DCWs from working more than 40 hours. The Work Group, with PPL's participation, also discussed whether the State was a joint employer of the DCWs. As of December 2, 2014, the State had not taken a position. Jx 349 at 527. PPL undertook a variety of other "action items" as part of its role in the Work Group, including, as discussed in ¶ 91, *supra*, researching FLSA rules related to the issue of one CLE supporting multiple Participants. Jx 349 at 527; Tr. Vol. 3, 632:1-7, 633:9-25 (Barge).

95.     PPL representatives participated in developing the Work Group's recommendations, which were presented to OLTL leadership. Jx 330 (FLSA Work Group Meeting Agenda with Notes for November 10, 2015); Tr. Vol. 3, 640:13-642:6 (Barge).

96.     PPL took a lead role in evaluating the live-in exemption, including advising the State that the qualifying factor for the live-in exemption was whether the DCW resided at the place of employment. Tr. Vol. 6, 1218:23-1219:10 (Stewart).

97.     PPL further recommended the State use PPL's address match tool to identify which DCWs were live-in workers, a recommendation which the State agreed to. Tr. Vol. 6, 1204:15-1205:7 (Stewart); Jx 371 at 1802 ("Public Partnerships also created a live-in exemption address match tool for legacy DCWs, which identifies any DCWs whose address matches the address of the participant they provide services to"); Jx 331; Tr. Vol. 3, 639:25-640:12; 642:11-643:14; 646:7-22 (Barge); Dx 134; Dx 129 (FLSA Work Group Meeting Agenda with Notes for December 1, 2015). PPL identified 33% of workers as eligible for the live-in exemption and offered to use a "participant/DCW address match to assist in determining (likely) exempt workers." Jx 331 at 717. Using its address match tool PPL identified any DCW whose address

38

matched the address of the Participant, listed them as eligible for the live-in exemption, and

denied them overtime. Px 17 at 1802. PPL took no further steps after using the address match

tool to confirm that the DCW and Participant in fact lived together. Tr. Vol. 6, 1215:14-21

(Stewart).

98.     PPL's use of the address match tool resulted in DCWs being wrongly denied

overtime compensation. For example, PPL unilaterally and wrongly denied Mr. Talarico

overtime because it determined that he lived with his Participant, E.W., and was therefore

ineligible for overtime pay, without asking either him or his Participant if they did in fact live

together. Tr. Vol. 1, 173:21-175:5 (Talarico, testifying he did not live in the same household with

E.W., but simply rented an apartment in the same building); Jx 367 (April 22, 2016, call log

entry).

99.     PPL also created a live-in exemption form to be sent out with new employment

enrollment packets. Jx 371 at 1802 ("Public Partnerships also created an FLSA Live-In

Exemption Form for CLEs and their DCWs to complete and return to confirm if a DCW is or is

no longer exempt from overtime"); Px 17 at 1802; Tr. Vol. 6, 1216:3-1217:17 (Stewart, forms

only sent out with new enrollment packets and to participants "who disagreed with the address

match"); Jx 388 at 3549 (FLSA Program Documentation); Jx 381 at 2741 ("PPL will develop

and disseminate a live-in provider exemption form for the participant-provider pair to attest

under penalty of perjury that the employee meets the FLSA 'residency test'."); Tr. Vol. 7,

1452:2-13 (Horvath, "Q: And so PPL took the lead in developing that form; correct? A: Yes").

100.    PPL required DCWs and Participants who lived together to fill out the form

certifying they qualified for the live-in exemption. Dx 185 at 7278; Dx 302 at 7687; Tr. Vol. 2,

338:13-21 (Cotto); Tr. Vol. 5, 934:24-935:7 (Seeley, "Public Partnerships made me sign a thing

saying that I lived with him and I couldn't get the overtime hours").

101.    PPL tracked DCWs' live-in exemption status in its system and would not pay

overtime if a DCW was so identified by its address tool or by its form.[39] Px 17 at 1802.

102.    To provide some financial benefit to offset the overtime denied pursuant to the

live-in exemption, PPL identified a tax break called the "difficulty of care" exemption and began

including a Difficulty of Care tax exemption form in its enrollment packet. *See, e.g.*, Tr. Vol. 7,

1452:14-1453:2 (Horvath); Jx 381 at 2738 ("Third party wages are eligible for the IRS Difficulty

of Care income exclusion"); Dx 304 at 8085 (Tamburo file shows program documents back to

2013, only includes difficulty of care form starting in 2016); Dx 135 (work group agenda in

which PPL raised the difficulty of care tax exemption off-setting the live-in exemption).

103.    Based upon PPL's advice to the State, DCWs who lived with the Participant for

whom they provided services and DCWs who only worked more than 40 hours for numerous

Participants combined did not receive overtime premiums. Dx 113 at 4 ("a DCW who works for

multiple CLEs and in the aggregate works for more than 40 hours per week must be paid at the

regular hourly rate provided he or she does not exceed 40 hours pay per week with each CLE.");

Tr. Vol. 5, 904:15-905:17 (Yonkin); Tr. Vol. 1, 172:7-173:15 (Talarico, if he worked 60 hours

for E.W. and 6 for M.J., he would only get paid overtime for the 20 hours for E.W.); Tr. Vol. 6,

1202:8-20 (Stewart, testifying that even after 2016, PPL did not make overtime payments to

individuals who were live-ins and only counted overtime hours worked for a single participant).

---

[39] SCs had no control over whether the live-in exemption applied to DCWs, they simply had to communicate that the exemption was required for those DCWs who resided with their Participant. Dx 113 at 5 (OLTL Bulletin on Overtime and Minimum Wage Requirements in Participant-Directed Models of Service, "The VF/EA must identify DCWs who qualify for this exemption and provide a Live-In Employee Exemption form to these individuals…SCEs are required to communicate the requirement").

104.    DCWs falling into these two categories worked significant overtime hours for which they were not paid overtime compensation. Tr. Vol. 2, 291:11-24, 305:13-306:1 (Cotto, testifying she did not receive overtime compensation for the 80-88 hours she worked per week); Tr. Vol. 2, 437:17-25; 452:20-453:2 (Mandoza, testifying that she did not receive overtime despite working 44 hours per week); Tr. Vol. 1, 173:7-15 (Talarico, testifying that if he worked six hours per week for M.J. on top of the 60 hours he worked that week for E.W., he would not be paid time and half for the six hours); Tr. Vol. 5, 934:17-935:7 (Seeley).

105.    Participants had no control over whether these DCWs were paid overtime.[40] Tr. Vol. 2, 315:16-316:11 (Cotto, her Participant could not force PPL to pay her overtime); Tr. Vol. 2, 388:8-389:3 (Ross, she could not require PPL to pay her DCW overtime); Tr. Vol. 5, 863:14-21 (Tamburo, if she had the choice, she would have chosen to pay overtime); Tr. Vol. 1, 67:4-9 (Skovera, testifying PPL will not pay a DCW overtime even if a Participant specifically requests it); Tr. Vol. 6, 1203:7-11 (Stewart, testifying PPL never asked participants if they wanted to pay their Direct Care Workers overtime premiums); M.J. Dep. 139:15-18; Tr. Vol. 5, 861:6-862:5 (Tamburo).

106.    PPL trained its customer service staff to handle questions from Participants and DCWs regarding the changes to overtime. Tr. Vol. 7, 1448:25-1449:9 (Horvath).

---

[40] SCs likewise did not determine whether overtime premiums would be paid for overtime hours. Rather, they determined whether hours were authorized to be worked and simply marked hours over 40 with the "TU" billing code for those whom the State and PPL had already determined were eligible for overtime. Tr. Vol. 7, 1409:8-20 (Horvath); Tr. Vol. 4, 813:19-814:11 (Gainer, testifying that as a SC she input the TU billing code for those eligible overtime but "whoever decides that live-in exemption, that's beyond me"); Tr. 795:4-19 (Gainer, testifying "it falls under the live-in exemption, which may be a labor law. I'm not really sure…that would be a question for Public Partnerships"); *see also* Dx 113 at 4 (OLTL Bulletin, confirming that any DCW who worked over 40 hours for one Participant would be paid overtime and instructing SCs to add the coding so that rule would be implemented).

107.    Starting in January 2016, PPL recognized that Pennsylvania's PDS program did not meet the duties test for the companion care exemption, and thus that DCWs would have to be paid overtime if they worked more than 40 hours for one Participant. Jx 349 at 525 ("OLTL has no companionship service that is eligible for exemption; overtime is applicable to current services"); Tr. Vol. 6, 1218:17-22 (Stewart, testifying "we felt [the companion care exemption] did not apply and they agreed"). However, based on their claim that Participants were the sole employer of a DCW, PPL continued to contend that the live-in exemption could be applied and that DCWs' hours need not be totaled across Participants. *See* Dx 129 (FLSA Work Group decided OLTL not a joint employer and would exercise the live-in exemption rule).

108.    In sum, PPL exercised substantial control over whether DCWs were entitled to overtime pay by advising the State on the "path forward" after the issuance of the Home Care Rule. It did so by researching the issue, creating numerous reports and presentations, internally training its own program managers, advising the State on how to position the Participant as the "sole employer," advising the State on unbundling of the one-to-many CLE relationships, recommending and implementing the use of an address-match tool to identify live-in DCWs so they could be denied overtime, and eventually developing and implementing a live-in exemption form.

iv.    PPL Made Other Decisions Impacting DCWs' Overall Compensation.

109.    In addition to sharing control over DCWs' hourly rate and entitlement to overtime pay, PPL made other decisions directly impacting DCWs' overall compensation. Those decisions include determining DCWs' pay for mandatory orientation and determining DCWs' hazard pay for being frontline workers during COVID-19. Critically, Participants had no involvement or ability to control either of these decisions.

110.    PPL issued DCW's COVID-19 related hazard-pay. *See* Px 97 (W-2 form for

hazard pay, listing "Public Partnership for PA" as employer); Tr. Vol. 5, 937:8-939:16 (Seeley); Tr. Vol. 7, 1484:2-24 (Thomas,[41] testifying that PPL issued hazard payments to DCWs).

111.    PPL and the State partnered together to issue the hazard pay to DCWs. Tr. Vol. 7, 1505:19-1508:2 (Thomas); Rebuttal Px 1 (DCW Hazard Pay, "PPL worked with Office of Long-Term Living to determine the hazard pay amounts for qualifying DCWs"). PPL decided to only issue hazard pay based on DCWs' hours worked up to 40 hours per week, rather than including overtime. Rebuttal Px 1 ("the payment amount is based on hours worked up to 40 hours per week"); Tr. Vol. 7, 1507:1-9 (Thomas). Participants did not have to approve the hazard payments or have any role in deciding the amount their DCW(s) would receive in hazard payments. Tr. Vol. 7, 1507:21-1508:2 (Thomas).

112.    PPL also controlled DCWs' compensation for mandatory training. The State gave PPL the choice to pay[42] "the DCW an hourly wage not to exceed the maximum DCW hourly wage rate" for up to four hours of orientation time. Jx 371 at 1858-59. However, rather than pay the maximum or any amount in-between, PPL directly impacted DCWs' pay by choosing to pay them minimum wage and deciding to limit the orientation, and corresponding pay, to 3.5 hours. *See* Px 44 at TALARICO009 (DCW Pre-Service Orientation, "The DCW will be paid for 3.5 hours at minimum wage for their completed Orientation"); Tr. Vol. 7, 1499:1-15 (Thomas,

---

[41] Colin Thomas is a former PPL employee PPL called as a witness. Tr. Vol. 7, 1480:10-1480:22 (Thomas). He began working for PPL in 2013 and as of 2018 held the title of Senior Account Specialist. *Id.* His job as a Senior Account Specialist for the Pennsylvania program including answering inquiries from the Office of Long-Term Living and from PPL's own customer service employees. Tr. Vol. 7, 1480:23-1481:8 (Thomas.)

[42] DCWs' payments for orientation did not come from the Participant's Medicaid budget, but rather from administrative funding PPL received under its contract with the State. *See* Px 100 at TALARICO007 (PowerPoint for PDS Orientation Sessions for DCWs, "Workers will be paid for completing the orientation session after all new hire paperwork and other requirements are finished"); Tr. Vol. 3, 669:23-670:12 (Barge); Tr. Vol. 5, 1188:25-1189:3 (Stewart, PPL paid DCWs for 3.5 hours of orientation time).

testifying PPL paid DCWs for "only three and a half" hours of orientation); Tr. Vol. 4, 671:21-672:7 (Barge). Participants had no input into the wage paid to their DCW for orientation. Tr. Vol. 4, 671:21-672:7 (Barge). PPL tracked and paid DCW for the pre-service orientation training without any involvement or authorization from Participants or SCs. Dx 153 at 5330.

> v.   DCWs Economically Relied Upon PPL.

113.   DCWs relied on the money PPL paid them for their work. Tr. Vol. 2, 320:19-321:13 (Cotto); Tr. Vol. 2, 457:12-15 (Mandoza); Tr. Vol. 5, 905:24-906:11 (Yonkin); Tr. Vol. 5, 950:6-12 (Seeley); Tr. Vol. 1, 192:2-22 (Talarico). Indeed, DCWs left other careers to provide personal assistant services through PPL. Tr. Vol. 2, 290:3-7 (Cotto).

114.   The Participants were realistically unable to pay for their DCWs' work, and thus could not hire DCWs unless PPL approved them to provide paid services. M.J. Dep. 129:6-16; E.W. Dep. 72:6-10, 82:10-24; Tr. Vol. 1 192:2-22 (Talarico); Tr. Vol. 2, 303:23-304:2 (Cotto); Tr. Vol. 2, 457:3-15 (Mandoza).

115.   As discussed in detail above, while the funds to pay DCWs came from the State, PPL directly impacted the compensation that DCWs economically relied upon by making decisions that impacted workers' compensation and unemployment rates, deciding on DCWs' tax exemptions, controlling when DCWs' rates were increased or decreased, partnering with the State to determine whether DCWs were entitled to overtime, and controlling other forms of compensation such as hazard pay and pay for new-hire training.

**B.   PPL Shared Control Over the DCWs' Hiring Process.**

> i.   PPL Partnered with the State in Developing DCWs' Hiring Paperwork.

116.   PPL admits it had "new hire responsibilities" for DCWs. *See* Dx 185 at PPL7275 (detailing "Public Partnerships New Hire Responsibilities," including "process[ing] all new hire paperwork").

117.    DCWs had to undergo an enrollment process prior to being paid for their

services.[43] As part of that process the DCW had to fill out PPL's new-hire enrollment packets

and be approved by PPL as good-to-go.[44] Jx 372 at 1924 ("all the DCW paperwork must be

signed and returned to PPL before payments can be issued to you"); Px 68 at 7198 ("It means

that Public Partnerships has received and processed all the Participant's employer/employee

paperwork and it is complete and correct."); Tr. Vol. 2, 293:18-22, 295:9-15 (Cotto, "Public

Partnerships is the ones that required the enrollment packet for all new DCWs to be good to go to

provide services"); Tr. Vol. 4, 728:25-730:22 (York); Tr. Vol. 1, 122:9-13 (Talarico); Px 92 at

208; Tr. Vol. 1, 118:21-25 (Talarico, "If I don't sign it, I won't get paid."); M.J. Dep. 95:13-22,

110:4-111:5 (PPL would not pay DCWs unless they filled out all of the forms that PPL

required).

118.    The new-hire enrollment packets included the following employment forms: New

DCW Application form, DCW Agreement, DCW Qualification Form, Qualified DCW Rate

Sheet, Form W-4, USCIS Form-I9, Application for Tax Exemptions Form, PA State Police

Request for Criminal Record Check, Residency Certification Form, and Workers Compensation

Notification Form. Jx 372 at 1924. PPL pre-filled some of these forms. Tr. Vol. 1, 117:25-118:10

(Talarico); Px 92 at 277.

---

[43] PPL's enrollment process for the Participant and DCW included: PPL's enrollment specialists' "Home Visits to the CLE (optional but strongly encouraged) to train on the employer role, business rules, and assist with the completion of enrollment documents, and more," "Calling PPL with DCW new hire information," "Processing background checks," "Completion of the prepopulated DCW packet," and "Processing the packets." Px 44 at TALARICO009; *see also* Dx 185 at 7274 (DCW orientation PowerPoint slide describing the enrollment process); Px 68 at 7201 (description of enrollment steps).

[44] When the PDS program transitioned to PPL in 2013, DCWs who had previously been providing services to their Participants through different agencies also had to fill out new enrollment forms from PPL in order to continue providing those services. Tr. Vol. 5, 841:4-23 (Tamburo); Tr. Vol. 1, 115:25-116:13 (Talarico).

119.    PPL sent DCWs the new-hire enrollment packet and instructions via U.S. mail and required DCWs mail the completed packet back to PPL. Tr. Vol. 2, 291:25-292:10 (Cotto); Jx 372 at 1924 (DCW Informational Packet from PPL addressed to the DCW, stating "Dear Direct Care Worker (DCW)"); *see also* Tr. Vol. 1, 117:15-24 (Talarico); Px 92 at 277; E.W. Dep. 71:20-72:13; Tr. Vol. 2, 301:15-19 (Cotto); Tr. Vol. 4, 727:19-728:18 (York); Tr. Vol. 5, 932:6-23 (Seeley).

120.    PPL, not the Participants, instructed DCWs as to which new-hire forms they had to fill out. Tr. Vol. 1, 117:15-19 (Talarico); Px 92 at 277; M.J. Dep. 94:18-95:10; Tr. Vol. 2, 363:13-20 (Ross); Jx 363.

121.    Critically, neither the Participant nor the DCW had any say in what was included in the new-hire enrollment forms—they neither drafted the enrollment forms nor had authority to change them. Tr. Vol. 2, 296:3-7 (Cotto); Tr. Vol. 4, 727:728:18 (York).

122.    Rather, PPL created the new-hire enrollment packets, with the State's approval. Dx 152 at 3849-50 (promising the state that "beyond meeting the minimum requirements of this RFA" it would "develop, document and update program rules. . ."); *see also* 4111 (touting its experience developing comprehensive, well-organized user-friendly enrollment packets); Px 17 at 1860; Tr. Vol. 3, 593:17-595:3 (Barge); Tr. Vol. 6, 1199:2-18 (Stewart); Dx 152 at 4165-66; Tr. Vol. 6, 1088:1-3 (Stewart, testifying PPL established subgroups to develop final business rules, program policies, a tax approach summary, and enrollment packets during the transition period). PPL's contract with the State in fact gave PPL the responsibility to create an enrollment packet for new DCWs. Dx 152 at 4111; Px 17 at 1860 (2014 PA OLTL RFP). PPL and the State collaborated on the enrollment packet that was used, though the final packet had to be approved by the State. Tr. Vol. 3, 595:8-21 (Barge); Dx 152 at 4111.

123. PPL made substantive changes to the State's sample new-hire enrollment forms. For example, the DCW Agreement PPL used included additional terms, such as paragraph 12 (exclusion of persons on LEIE list) and paragraph 19 (conflict of interest disclosure), that were not included in the State's sample. *Compare* Dx 153 at 5584-85 *with* Dx 305 at 7964-66, ¶¶ 12, 19. PPL continued to add additional paragraphs to the DCW agreement. *See* Px 92 at 221-23 (adding ¶ 5, "I acknowledge that I will not start providing services until I am notified of my Good to Go status by the VF/EA," ¶ 8, "I understand that that I may not submit time records for any time period for which a participant is admitted to a hospital, nursing home, rehabilitation facility or for any period for which the participant is not eligible for waiver services," ¶ 20, "the employee agrees that any payments made for services not performed by the employee will be subject to repayment by withholdings from future paychecks. This includes overpayments made as a result of error or omission. The withholding process will be governed by applicable law. PPL will pursue all legal means to recover the amount of overpayment," and expanding an existing paragraph, ¶ 21, about untruthful submissions to cover submission of any "statements, or documents, or concealment of material facts" to obtain an improper payment). *Compare* Dx 301 at 7731-33 *with* Dx 302 at 7676-78.

124. PPL also added the following requirements to the State's sample DCW Qualification Form: (a) a valid social security number; (b) basic math, reading and writing skills; and (c) capability to perform health maintenance activities specified in the participant's service plan. Tr. Vol. 3, 595:8-605:17 (Barge); *Compare* Dx 153 at 5570-72 *with* Dx 305 at 8004-06. In addition, the DCW Qualification Form PPL used included as part of the "Common Law Employer Attestation" a promise to "submit all required DCW qualification documents to" PPL. Tr. Vol. 3, 595:8-605:17 (Barge); Dx 153 at 5570-72; Dx 305 at 8004-06.

125.     In addition to modifying the sample DCW Agreement and DCW Qualification Form, ¶¶ 123-24, PPL included a fulsome cover letter, checklists, "program requirements information" and "payroll and timesheet information" in its enrollment packet, directly providing significant information and direction to DCWs, none of which the State included in their samples. *Compare* Jx 364 *with* Dx 153 at 5570-85.

126.     PPL also prepared a set of instructions that provided DCWs with a description of each employment form and its purpose. *See* Jx 372; Tr. Vol. 7, 1363:9-1364:4 (Stewart) (admitting that PPL partnered with the State to develop enrollment forms for DCWs). While some of the instructions also appear in the State's sample forms, PPL included additional important information such as PPL's explanation that the purpose of the DCW Employment Agreement is to inform the DCW of "the policies, qualifications, and duties of the DCW." *Compare* Jx 372 at 1929 *with* Dx 153. In its instructions, PPL also invited DCWs to call its Customer Service at a toll-free number with questions, establishing at the outset a direct relationship between PPL and DCWs. *See* Jx 372 at 1925 ("If you need additional help call PPL customer service"); 1928 ("If you have any questions, please contact one of our Customer Service Representatives at 1-877-908-1750"); and 7398; Tr. Vol. 2, 297:16-298:5 (Cotto, testifying she called PPL's customer service line for help filling out the forms).

127.     In addition to developing the enrollment forms and instructions, PPL's representatives conducted phone orientations with DCWs to discuss the enrollment forms and the DCWs' job duties. Tr. Vol. 2, 438:10-439:14 (Mandoza).

128.     As part of the enrollment process PPL further required DCWs to undergo criminal background checks prior to working as DCWs, even if their Participant did not want them to do so. Tr. Vol. 2, 301:11-19, 442:15-443:16 (Cotto); M.J. Dep. 111:24-112:23. *See also* Sec.

IV.B.iii, *infra*. Participants could not instruct PPL to skip the background check even if they believed it was unnecessary. Tr. Vol. 2, 357:15-23 (Ross); Tr. Vol. 5, 841:24-842:7 (Tamburo).

> ii.    PPL's Enrollment Specialists Assisted Participants with the DCW Hiring Process.

129.    In addition to developing enrollment forms, PPL had enrollment specialists who met with Participants and DCWs to assist in the hiring process.

130.    PPL began utilizing enrollment specialists in 2016. Tr. Vol. 6, 1154:14-18, 1372:2-1373:6 (Stewart); Jx 371 at 1834. The enrollment specialist position had not existed previously and PPL, not the State, recommended that the position be created for the PDS program. Tr. Vol. 6, 1152:20-1153:1 (Stewart). PPL based its recommendation to the State on its prior experience with the enrollment specialist position in other state's programs. Jx 368 at 1221 ("In other client programs, PPL provides support broker or enrollment specialist staff to assist with an array of client desired services. In PA, PPL recommends utilization of enrollment specialists who provide home visitation…"). The State agreed with PPL's suggestion and included enrollment specialists in a contract rider. Jx 368; Dx 153 at 5326-29 (Rider 3 to Grant Agreement between State and PPL regarding enrollment specialists).

131.    PPL's enrollment specialists provided phone and home visits to expedite payroll processing, decrease the enrollment timeframe, and provide more hands-on targeted and comprehensive orientation to Participants. Jx 368 at 1221.

132.    The enrollment specialists provided "face-to-face assistance in helping the Participant understand: his or her role as an employer, how to review, approve and submit worker service hours easily, how to report fraud and abuse, how to report workers' compensation claims, how to avoid adverse unemployment costs that impact wage that can be paid to employees, and much more." Jx 368 at 1221.

133.    Enrollment specialists did not just help Participants, rather PPL specifically encouraged Participants to invite their desired DCW to the enrollment specialist's home visit. Dx 153 at 5329 ("Grantee will instruct CLEs to invite their DCW candidates to the home visit so that…any orientation can be provided to the DCW with the CLE present in their home."); Px 68 at 7192 ("You will meet with a Public Partnerships' Enrollment Specialist who will visit with you and the worker(s) you would like to hire."); Tr. Vol. 6, 1155:21-1156:9, 1157:11-1158:20, 1185:20-1186:7 (Stewart); Jx 369 at 1246 ("Once PPL receives your referral from your service coordinator, we will call you to schedule an appointment with a PPL Enrollment Specialist to visit with you and the worker(s) you would like to hire."); Jx 371 at 1863 ("Public Partnerships encourages…the CLE to invite their worker to the visit."). PPL reported that DCWs were often present for the enrollment specialist's in-home training. Px 17 at 1863 ("Often the DCW is present for the in-home training").

134.    PPL had five enrollment specialists whom it expected to meet with a minimum of two to three Participants per day five days a week. Dx 153 at 5320 (the State paid PPL over $400,000 for the five enrollment specialists); 5326 ("Grantee will require each enrollment specialist meet with a minimum of 2-3 participants per day, five days per week"); Tr. Vol. 6, 1185:8-16 (Stewart). A total of two to three home visits per day per enrollment specialist would amount to approximately 2400-3600 visits per year.[45] Dx 153 at 5326-31 (Rider 3). Regardless of the exact number of visits, a substantial number of DCWs met with PPL personnel in the Participant's home for in-person orientation and assistance with hiring before providing services.

135.    During the meetings, in addition to reviewing the PPL CLE Handbook,

---

[45] While Ms. Stewart estimated enrollment specialists conducted "about 500" visits in 2017, she acknowledged that her memory was imperfect given the passage of time. Tr. Vol. 7, 1372:25-1373:8, 1373:16-1374:6 (Stewart).

enrollment specialists reviewed important program information with the Participant and DCW,
answered questions regarding the DCW's new-hire enrollment forms and the PDS program, and
assisted with enrollment, including completing and submitting enrollment packets for both the
Participant and the DCW. Jx 369 at 1246; Jx 371 at 1838; Tr. Vol. 6, 1154:24-1155:10, 1184:6-
14 (Stewart).

                iii.     __PPL Controlled When DCWs Could Start Working.__

136.     DCWs could not provide paid services until PPL approved them as good-to-go.
Tr. Vol. 1, 56:13-23, 57:10-17 (Skovera); Jx 342; Tr. Vol. 2, 375:12-18 (Ross) (if a DCW began
working before PPL approved them as good-to-go, they would not get paid); K.H. Dep. 35:19-
36:11, 163:3-164:12 (K.H. had to wait for "green light" from PPL before her DCW could begin
providing services); Tr. Vol. 2, 301:20-302:6 (Cotto); Tr. Vol. 2, 446:11-23 (Mandoza); Tr. Vol.
5, 933:3-13 (Seeley, "Good-to-go means that I was able to get paid from PPL.").

137.     It could take PPL up to several months to give DCWs the good-to-go to start
working. Tr. Vol. 2, 302:7-11 (Cotto, two months to get the good-to-go from PPL); Tr. Vol. 2,
446:24-447:16 (Mandoza, took three months to get good-to-go); M.J. Dep. 97:2-98:12 (it took
one to two months for her DCWs to receive PPL's good-to-go notification, and she had to call to
follow up); Tr. Vol. 2, 367:19-24 (Ross, waited approximately four to six weeks for PPL to
approve her DCW as good-to-go); *see also* Dx 151 at 3737-38 ("it takes approximately 45 days
for a DCW to become good-to-go"); Tr. 58:20-59:3 (Skovera, testifying Participant expressed
concerns to SCs about delays in their DCWs being deemed good-to-go). M.J. testified that she
would often call PPL to ask "[w]hen are my people going to get paid, what took so long to get
them on payroll, what is taking so long to get this one on payroll." She also testified that despite
her calls, she "never got a satisfactory answer, ever." M.J. Dep. 81:13-82:1.

138.     If Participants directed their DCW to do any work before PPL issued the good-to-

go, PPL would not pay the DCW, and Participants could not make PPL issue the good-to-go more quickly. Tr. Vol. 2, 302:7-303:22 (Cotto); Tr. Vol. 5, 933:14-17 (Seeley); M.J. Dep. 97:2-98:12; Tr. Vol. 2, 367:19-24 (Ross); Tr. Vol. 1, 57:5-9 (Skovera).

139.    SCs likewise had no control over when PPL issued the good-to-go; they could only reach out to PPL on behalf of the Participants.[46] Tr. Vol. 1, 59:11-17 (Skovera). Indeed, even after an ISP had been approved and the State's service authorization date had passed, no DCW could be hired and paid for providing services until PPL declared them good-to-go. Tr. Vol. 3, 661:24-665:20 (Barge).

140.    DCWs had to meet certain minimum mandatory qualifications to be approved as good-to-go to provide paid services. The DCW Qualification Form in PPL's enrollment packet detailed those qualifications. Px 31 at 6281 (DCW Qualification Form).

141.    Participants had no input into the required qualifications. Tr. Vol. 5, 848:6-12 (Tamburo); Dx 304 at 8117; Tr. Vol. 2, 443:17-445:11 (Mandoza); M.J. Dep. 116:7-16; 121:24-122:6; E.W. Dep. 95:16-96:25; Tr. Vol. 2, 363:6-12, 374:10-15 (Ross); *see, e.g.*, Dx 303 at 7920. Rather, as discussed above, *see* ¶¶ 122-24, *supra*, PPL and the State partnered to set the mandatory qualifications for DCWs. Tr. Vol. 3, 595:8-605:17 (Barge).

142.    PPL was also responsible for ensuring DCWs met the qualifications prior to providing paid services. *See* Dx 152 at 3986 (PPL represented it understood the importance of "[e]nsuring that all DCWs … meet required qualifications prior to providing HCBS"); Tr. Vol. 3, 584:2-585:12 (Barge, testifying it was PPL's responsibility to ensure DCWs met qualifications);

---

[46] When Participants first entered the program, SCs proposed a start date for the commencement of services, which the State reviewed and authorized, as part of their ISP. Tr. Vol. 1, 96:13-97:9 (Skovera). However, even with this "authorized start date," a DCW could not begin providing paid services to a Participant until receiving PPL's approval in the form of a good-to-go notification. Tr. Vol. 1, 105:21-107:10 (Skovera).

Jx 396 at TAL0303-304 (HCBS Waiver Application listing mandatory DCW qualifications and listing the entity responsible for "Verification of Provider Qualifications" was "Fiscal Employer Agent/OLTL"); *see also* Tr. Vol. 7, 1351:7-1352:4, 1354:21-1356:9 (Stewart, "we are verifying that those qualifications do exist and they meet the program rules"); Dx 152 at 3986 ("Beyond the formal contractual obligations as stated in this RFA, PPL understands the practical importance of providing quality FMS, including…[e]nsuring that all DCWs, vendors, and small unlicensed providers meet required qualifications prior to providing HCBS").

143.    While PPL argues it relied upon Participants to verify DCWs' qualification by completing the DCW Qualification Form, the record shows numerous instances of PPL approving DCWs as qualified even though a Participant had not initialed that the qualifications were met, as the form directed.[47] PPL routinely sent out both the initial DCW Qualification Form[48] and "re-qualification" forms[49] with pre-printed checkmarks suggesting qualifications had

---

[47] Moreover, PPL did not display any signs of "rubber stamping" documents Participants had signed off on in other respects. PPL routinely demanded revisions to forms it did not believe had been completed correctly. Tr. Vol. 1, 124:12-17 (Talarico); M.J. Dep. 110:22-111:18; Dx 152 at 4114; *see also* ¶¶ 206-09, *infra* (regarding timesheets).

[48] *See, e.g.*, Px 38 at 6329-31 (blank DCW Qualification Form sent with welcome packet that did not have name or address of DCW, but was pre-checked as to qualifications); Px 40 at 6364-65 (Re-Qualification Form for Mandoza); Tr. Vol. 2, 445:21-446:4 (Mandoza); Px 78 at SIMMS-S_0000015 (Mandoza documents); Dx 155 at 6335; Dx 300 at 7793, 7829 (Program documents for David Yonkin); Dx 303 at 7920 (Ross documents).

[49] *See, e.g.*, Px 2 at 182 (Re-Qualification Form signed by E.W. and Talarico); Px 12 at 777 (Re-Qualification Form signed by M.J. and Talarico); Px 27 at 6223 (Re-Qualification Form signed by Denise Lang); Px 40 at 6365; Px 55 at 6635, 6638, 6641 (Re-Qualification Forms signed by D.S.); Px 88 at 2 of 5 (M.J. requalification form); Px 92 at 206, 216, 225, 254, 259, 264, 269 (Re-qualification forms in Talarico file); Dx 118 at 182 (Re-Qualification Form signed by E.W. and Talarico); Dx 182 at 6484 (Re-Qualification Form signed by Diem and Zoccola); Dx 216 at 7650 (Re-Qualification Form signed by York); Dx 219 at 7661 (Re-Qualification Form signed by York); Dx 220 at 7664 (Re-Qualification Form signed by York); Dx 300 at 7842, 7848, 7855; Dx 302 at 7697; Dx 303 at 7944, 7953 (Re-qualification forms for Ross' DCW); Jx 334 at 777; Jx 335 at 856; Jx 337 at 910; Jx 341 at 811, 820.

been met. PPL then accepted these pre-checked forms without Participants' initials. *See* nn.48-49, *supra*. For most of the "re-qualification" forms, there is no earlier document in PPL's file indicating the individual was *ever* qualified by their Participant.[50] Many DCWs transitioned to PPL in January 2013, and their files did not include any documentation of their qualifications. *See, e.g.*, Px 92, Dx 304. Moreover, when PPL sent out DCW Qualification Forms *without* pre-printed checkmarks, it also approved DCWs as qualified despite no initials or other marks filled in by Participants. *See, e.g.*, Dx 301 at 7735.

144.    Ms. Stewart attempted to explain this away by claiming that the qualifications were checked off on PPL's pre-populated forms because the Participant had completed a prior qualification form or the checkmarks were based on the application form, but both explanations fail. Tr. Vol. 6, 1307:2-21, Tr. Vol. 7, 1352:19-1353:14, 1354:7-1355:14 (Stewart). First, the 2014 requalification form for Mr. Talarico was the first time PPL documented anything about his qualifications since he transitioned in January 2013 without a qualification form being required. Px 92 at 206.[51] Without knowing whether anyone had verified anything about Mr. Talarico, PPL pre-printed this form with checkmarks, and accepted it without the Participant's initials. *Id.* Second, other than the social security number and date of birth/age, the application form does not contain information permitting PPL to pre-check the requirements such as reading, writing and math skills, demonstrating capable of performing health maintenance task, or having completed a

---

[50] *See, e.g.*, Px 2; Px 12; Px 27; Px 40; Px 55; Px 88; Px 92; Dx 118; Dx 182; Dx 216; Dx 219; Dx 220; Dx 300; Dx 302; Dx 303; Jx 334; Jx 335; Jx 337; Jx 341.

[51] Stewart claimed that PPL had qualification forms from prior fiscal agents and thus did not need to have such documents completed at transition. Tr. Vol. 7, 1354:13-20. However, none of the DCW files for transitioned employees include a pre-PPL DCW qualification form. *See, e.g.*, Px 92, Dx 304. This is so even though the files *did* include pre-PPL DCW Agreements and tax forms—which PPL required be re-done anyway. *See, e.g.*, Px 92 at 237-240 (from May 2012 re MJ), 243-246 (from July 2012 re EJ), 249-50 (from March 2012 re EW).

background check. *Compare* Dx 303 at 7882-83 *with* Dx 303 at 7888 (DCW Qualification Form was full of pre-printed checkmarks and no initials from Participant Toni Ross who joined the PDS program for the first time in August 2014 and sought to hire her DCW, application does not contain qualification information).

145.     The evidence also confirms Participants were unaware they were supposed to qualify their DCWs. *See, e.g.,* Tr. Vol. 5, 1014:14-1016:7 (Zoccola, testifying that she initialed next to mandatory DCW qualification requirements because she as the Participant met the qualifications, stating "I have Social Security number, I'm over 18, so I was agreeing with those sections");[52] Dx 177 at 6470 (Re-Qualification Form signed by Zoccola); *see also* D.S. Dep. 116:4-118:3 (testifying PPL reviewed and approved DCWs' qualifications, referencing Px 55).

146.     Moreover, requalification is required specifically because qualifications could change. For example, there could be new criminal history, a Participant could have new and different needs, or the DCW's own health might have deteriorated leaving them unable to lift the Participant or perform other required tasks.

147.     Thus, this Court finds that PPL used its discretion in approving DCWs as qualified—a hallmark of employer authority—and did not merely confirm that documents were signed by Participants that verified qualifications.

148.     PPL also exercised control over DCWs' ability to start work by requiring DCWs'

---

[52] PPL's counsel referred to Participant Linsey Zoccola, whom they called as a witness, as the "rock star of the trial" despite her confusion about the DCW Qualification Form and conflicting testimony. *See* Tr. Vol. 7, 1512:21-1513:2 (PPL Closing); *see, e.g.*, Tr. Vol. 5, 1009:7-1012:9 (Zoccola, responding to a question about DCW agreement paragraph 10 regarding DCWs reporting issues such as suspected abuse, neglect, exploitation, or personal injury, illness, or medical emergency to service coordinator stating, "I am the employer, so I would be reporting it to myself."); Tr. Vol. 5, 1033:8-1035:9 (Zoccola, responding that "[t]he answers are the same for both[,]" when asked whether she was verifying her own qualifications or her DCWs' qualifications on the DCW Requalification Form).

criminal background check be completed prior to giving the DCW the good-to-go. PPL went beyond the State's requirement in requiring the background check be completed before issuing the good-to-go. The State—consistent with 55 Pa. Code § 52.20 which permits an employer to hire someone while in the process of obtaining criminal history check, so long as results are received within 30 days of hire—only required DCWs' criminal background checks be completed within 30 days from the date a DCW initiated services for a Participant. Jx 396 at TAL0381 (HCBS Waiver Application stating clearance must be obtained within 30 days *after* employee begins to provide services);[53] Px 15 at 1007 ¶ 4 (Appendix N – VF/EA-FMS Special Provider Agreement, the State and PPL agreed "to obtain written result of criminal history clearances from the Pennsylvania State Police for all administrative staff and direct care employees providing waiver program services within 30 days from the date that the Direct Care Worker employee initiates services to the consumer); *see also* Tr. Vol. 3, 519:5-18 (Barge).

149. Yet, PPL required DCWs to complete the criminal background check *before* receiving the good-to-go. Px 16 at 1583 ("these results are incorporated into the employee's "good to serve" criteria such that an individual will not be able to provide services unless all criminal background check approvals are received and documented"); *see also* Px 16 at 1582 ("[o]ur approach to upfront processing of the DCW background checks supports increased speed of the DCW enrollment process"); Tr. Vol. 6, 1245:18-22 (Stewart); Tr. Vol. 3, 607:6-615:9 (Barge); Dx 303 at 7880 (example of PPL stating that background check had to be completed prior to issuing good to go).

150. PPL benefitted from the stricter standard for timing of criminal background

---

[53] In describing the criminal history check, the Waiver Application specifically refers to the Fiscal Employer/Agent—PPL—as responsible for this process in connection with "hiring workers," indicating that PPL was the entity "hiring workers."

checks, as it relieved it of the burden of tracking DCWs who started work before completing the background check to ensure they completed the check within the required 30 days. However, PPL's application of a stricter criminal background check rule than required by state law or its contract with the State delayed DCWs' ability to start providing paid services.[54] *See* ¶ 148, *supra*.

151.    Starting December 1, 2018, PPL also required DCWs to complete orientation before they could start work. *See* Sec. IV.C.ii, *infra*.

152.    Finally, even after PPL initially approved a DCW as good-to-go, PPL's requalification process further determined whether the DCW could continue to work. Indeed, DCWs had to requalify with PPL every two years to continue to be paid for their work. Tr. Vol. 1, 119:24-120:21 (Talarico); Px 92 at 205; M.J. Dep. 78:12-15; E.W. Dep. 33:4-12, 94:16-25; Tr. Vol. 2, 304:8-20 (Cotto); Dx 185 at 7317-18 ("Every two years, direct care workers are required to be requalified"); Tr. Vol. 2, 375:19-376:8 (Ross). To requalify with PPL DCWs had to complete another DCW Agreement, another DCW Requalification form, and undergo any additional required background checks. Dx 185 at 7317; *see also* Px 2.

          iv.    PPL Assisted Participants in Selecting a DCW.

153.    PPL also assisted Participants in selecting a DCW. Indeed, PPL instructed Participants on how to hire DCWs and created a directory of DCWs available to provide

---

[54] While Ms. Stewart testified that she believed the contract with the State required background checks be completed before the DCW could be hired, the only portion of the contract requiring that timing was PPL's incorporated RFA. Tr. Vol. 6, 1245:18-22 (Stewart); Px 16 at 1582, 1583; Dx 152 at 4115, 4116 (PPL states "an individual [DCW] will not be able to provide services unless all criminal background check approvals are received and documented," and its payroll system will not issue payment to any DCW missing a criminal background check). The relevant portion of the actual contract explicitly permits the later timing. Px 15 at 1007 ¶ 4; Dx 152 at 3999, ¶ 4. Thus, it was PPL who proposed a stricter rule to the State rather than the State requiring PPL to have the rule.

services.

154.    PPL's CLE Handbook provided Participants a "great deal of information" as to how to recruit and hire DCWs. Jx 369 at 1254, ¶ 4; Jx 369 at 1252; Tr. Vol. 6, 1161:13-1162:4 (Stewart).

155.    For example, PPL's Handbook advised Participants to develop a task list for the potential DCWs candidates that clearly defined the necessary services. Jx 369 at 1259; Tr. Vol. 6, 1162:5-10 (Stewart). PPL also advised Participants on how to advertise for a DCW, including placing ads in local newspapers, at local colleges, and on Craigslist, and directed Participants to be sure to include specific information such as the key duties to be performed, days of the week worked, time of day to be worked and wage range. Jx 369 at 1260; Tr. Vol. 6, 1162:11-21 (Stewart). PPL even provided a sample advertisement, and tips and strategies for when to post an advertisement. Jx 369 at 1261.

156.    PPL also provided Participants with specific tips and strategies for screening candidates. Jx 369 at 1261-62. It outlined five specific steps the Participant should take in interviewing DCWs. Px 68 at 7208. It also instructed that "to make the hiring decision" the Participant should "review all information from screening and interviewing," "determine which candidates possess the skills, experience and traits they value," and "choose top candidates and prioritize their hiring preference." Px 68 at 7210.

157.    PPL further created the "MyChoice4Care Provider Directory" to assist Participants in hiring DCWs. Jx 398 (MyChoice4Care screengrab); Jx 369 at 1260; Px 68 at 7207 ("Public Partnerships' provider directory allows Common-Law Employers to search a database of available workers."). The directory permitted Participants to "easily find and hire new direct-care workers." Jx 369 at 1260; Tr. Vol. 6, 1162:23-1163:7 (Stewart).

58

158.    The State did not propose, require, or develop the MyChoice4Care provider directory, rather, PPL created the directory to connect Participants who needed DCWs with DCWs who were available to provide services. Tr. Vol. 6, 1163:8-15, 1163:20-1164:4 (Stewart).

159.    PPL promoted the website through job boards and other sources of potential DCW candidates and provided a link to the website on its portal. Px 16 at 1608-09; Tr. Vol. 5, 940:7-941:5 (Seeley). PPL reported that as of April 2017, 26% of the Participants listing a position had hired a DCW from the directory, and 80% of DCWs hired through PPL's directory were still employed, with utilization of the directory increasing. Px 16 at 1608-09.

160.    To be able to match with a Participant on MyChoice4Care.com DCWs had to set up a profile, including filling out certain requests for information PPL pre-set. *See* Jx 398; Tr. Vol. 5, 941:15-942:17 (Seeley); Dx 185 at 7349 ("Create a profile that tells a little about yourself. List your skills, experience, certification and availability so participants can contact you if there is a match.").

161.    PPL thus actively facilitated the identification and selection of DCWs to work for Participants, directed the DCW candidates as to what information to provide to be considered for hiring, and directed the Participants on how to select among candidates.

**C.     PPL Shared Control Over DCWs' Work Rules and Conditions of Employment.**

   i.     PPL Partnered with the State to Develop the DCWs' Terms of Employment.

162.    PPL's enrollment packet included a DCW Agreement which required DCWs to agree to "terms of [] employment." Dx 301 at 7731; Jx 372 at 1924. DCWs and Participants had to agree to each term in the DCW Agreement for the DCW to be able to provide services. Tr. Vol. 7, 1381:20-25 (Stewart).

163.    PPL required DCWs to sign the DCW Agreement before beginning to work as a

DCW. Dx 301 at 7733 ("I understand I must sign and return this form as a condition of employment in this program, and that I cannot begin working until this form is completed and returned to the VF/EA"); Tr. Vol. 2, 440:3-442:25 (Mandoza, PPL sent her the DCW agreement and required she sign it); Tr. Vol. 1, 122:9-13 (Talarico, if he did not sign the documents in the DCW enrollment packet, he would not be paid); Jx 372 at 1924 (listing required forms); Dx 152 at 4114 (PPL tracked whether required forms had been completed satisfactorily before approving as good-to-go).

164.    In PPL's own words, the purpose of the DCW Agreement is to "tell[] [DCWs] the policies, qualifications, and duties of the direct care worker." Jx 372 at 1929; *see also* Dx 301 at 7731 ("In order to acknowledge the terms of my employment, I agree to the following…"). If DCWs had any questions related to the DCW Employment Agreement, PPL instructed them to contact PPL's Customer Service Representatives. Jx 372 at 1929.

165.    As discussed above at ¶¶ 122-23, PPL collaborated with the State in developing the DCW Agreement and other enrollment forms, and PPL added provisions to the DCW Agreement that were not included in the State's sample.

166.    PPL, partnering with the State, drafted the terms without any input from Participants or DCWs. Tr. Vol. 2, 365:25-366:21 (Ross); Dx 303 at 7916; Tr. Vol. 1, 124:18-24 (Talarico); Tr. Vol. 2, 351:22-25 (Cotto); Tr. Vol. 2, 442:6-14 (Mandoza); Px 92 at 277; D.S. Dep. 63:8-64:17 discussing Px 53 (multiple DCW agreements). Participants could not change or edit any of the requirements included in the DCW agreement. M.J. Dep. 120:22-121:1; E.W. Dep. 94:4-13.

167.    Indeed, neither DCWs nor Participants had the opportunity to negotiate the terms of the DCW agreement, make suggestions for what to include in it, or eliminate terms they

thought were unacceptable. Tr. Vol. 1, 124:25-125:5 (Talarico); Tr. Vol. 2, 300:21-301:2 (Cotto).

168.    In fact, DCWs had to agree to terms of employment that Participants generally disliked, such as to join meetings with PPL, SCs, or others to discuss their Participant and to report certain events, such as personal injury, illness, or medical emergency, to their Participant's SC.[55] *See* D.S. Dep. 80:14-82:11 (testifying there was "no reason for [his DCW] to speak to anybody else but [him]" yet acknowledging that the DCW Agreement require his DCW agree to do so); Tr. Vol. 2, 369:14-370:16 (Ross, testifying she did not want her DCW reporting incidents to her service coordinator, but PPL required her DCW to do so); Tr. Vol. 5, 1044:20-1045:1 (Zoccola, testifying there was a "misunderstanding on the wording" and that all reports by DCWs should come through her, not the service coordinator); M.J. Dep. 116:19-118:8; E.W. Dep. 91:11-16; Dx 303 at 7916; D.S. Dep. 74:10-76:2 discussing Px 53.

    ii.    PPL Developed and Carried Out DCWs' Mandatory Orientation.

169.    In 2017, the State contracted with PPL to conduct a pilot DCW training. Tr. Vol. 6, 1250:8-1251:15 (Stewart). In June 2017, Regina Stewart led a Quality Advisory Group specifically addressing the DCW orientation. *See* Dx 151 at 3736. The meeting addressed concerns that the training would add time to PPL's good-to-go process and result in a delay of services, and questions as to why DCWs would be paid only the minimum wage for the training. Dx 151 at 3737-38. To address delay in services issues, PPL determined to have the enrollment

---

[55] Pointing to a state bulletin contained in Dx 310, PPL argued the State required it to include the reporting provision in the DCW Agreement, but such bulletins were not given to DCWs and the fact sheet that was distributed to DCWs did not require DCWs to report "critical incidents." Px 57 at 7074 (2017 Year-End Letter enclosing fact sheet). Thus, PPL imposed its own obligations on DCWs when it included reporting of "critical incidents" as a term in the DCW Agreement. *See* Dx 310; Px 57 at 7074; Tr. Vol. 3, 665:25-669:4 (Barge).

and training proceed on parallel tracks. Dx 151 at 3740.

170.    PPL hired a subcontractor called the Training and Education Fund to implement the training in 2017, choosing it because of its experience. Tr. Vol. 6, 1176:11-18, 1191:7-23 (Stewart, "We chose the Training Fund because it has the experience, statewide presence, infrastructure, and capacity to orient the large base of PDS DCWs who are hired by individuals now and into the new contract award period"). The initial 2017 training taught DCWs their role and instructed them on what they should and should not do as a DCW. *See* Jx 370 at 1320-1326 (explaining duties of the DCW, including directing DCWs on what they "should do" and what they should consider "refusing" to do).

171.    The initial DCW training ceased after occurring for several months in 2017. Tr. Vol. 6, 1250:8- 1251:15 (Stewart).

172.    The State then later contracted with PPL to establish a mandatory orientation for every DCW hired on or after December 1, 2018, any existing DCW who was newly hired by any Participant and had not previously completed the training, and any DCW who was terminated for any reason for thirty days or longer and subsequently rehired by a Participant. Dx 153 at 5329; Tr. Vol. 3, 669:9-22 (Barge); Jx 371 at 1854-59; Px 44 at TALARICO008; Tr. Vol. 5, 942:21- 943:3 (Seeley); Tr. Vol. 7, 1481:17-1482:25 (Thomas, testifying DCW orientation was re-implemented in December 2018); Tr. Vol. 3, 558:7-562:20 (Barge); K.H. Dep. 35:19-3:11, 82:10-83:12, 96:13-97:13.

173.    PPL was "responsible for implementing the orientation for DCWs." Dx 151 at 3739; Jx 371 at 1854-59; Tr. Vol. 4, 811:22-812:4 (Gainer, testifying PPL administered training and onboarding for DCWs). The State gave PPL the choice to implement the program itself or work with a subcontractor to do so. Jx 371 at 1858 ("the selected offeror may use a subcontractor

to satisfy the preservice orientation experience requirements"). PPL decided to contract with a subcontractor called Frontline to provide the training. Tr. Vol. 7, 1487:18-23 (Thomas); Tr. Vol. 3, 670:18-671:20 (Barge).

174.    PPL remained responsible for the work performed by the subcontractor, and monitored and oversaw the DCW orientation. Tr. Vol. 7, 1488:3-1489:11 (Thomas); Tr. Vol. 3, 670:18-671:20 (Barge). In fact, the State paid PPL $280,000.00 for "implementation of DCW orientation services" and $187,500.00 for "costs to monitor subcontractor providing the DCW orientation." *See* Dx 153 at 5320-21; Jx 371 at 1854-59; Tr. Vol. 3, 669:9-22 (Barge).

175.    PPL worked with its subcontractor to build the orientation curriculum and create the training materials. Px 44; Tr. Vol. 7, 1491:3-11 (Thomas); Dx 185; Tr. Vol. 6, 1179:19-22 (Stewart). PPL even had its own employees attend a "pilot session of the pre-service orientation" for purposes of providing feedback to be incorporated into the orientation. Px 44; Tr. Vol. 7, 1490:4-1491:2 (Thomas, testifying that he and other PPL staff attended the DCW orientation sessions).

176.    The State required PPL to address topics covering ten bullet points in the DCW orientation. Dx 153 at 5330 ("Grantee will provide pre-service orientation, that, at a minimum, covers the following topics…"). The minimum topics the State required for the training included the following: (1) "[o]perational procedures and paperwork," (2) "[r]oles and responsibilities in the independent living system," (3) "[t]ransparency and fraud," (4) "[e]ligibility for public benefits," (5) "[w]orker rights and responsibilities," (6) "[i]ntroduction to a DCW representative," (7) "[t]he role of the Supports Coordinator with respect to the CLE," (8) "[f]ollowing a service plan driven schedule (staying within budgeted units)," (9) "[t]he CLE as the Employer," and (10) "[t]he role of the FMS." *See* Dx 153 at 5330.

177.    PPL exercised discretion in including more than the State's ten minimum topics. Tr. Vol. 7, 1493:18-1497:20 (Thomas); *see generally* Dx 185. Indeed, based on the State's required ten bullet points, PPL developed a 151-slide PowerPoint presentation covering numerous topics, including topics outside of those required by the State such as what they should do and what they should consider refusing to do as a DCW, how to act like a professional, how to resolve disputes related to non-payment of wages, how to use PPL's MyChoice4Care.Com website to find work, and how to prevent infections through proper hand hygiene and proper use of gloves. *See* Dx 185 at 7266-69, 7315, 7349, 7363-7371; Tr. Vol. 7, 1497:12-14 (Thomas).

178.    Importantly, PPL's training specifically instructed DCWs on their job duties and functions. Tr. Vol. 6, 1181:25-1182:7 (Stewart); Dx 185 at 7263-67 (explaining DCWs' role, instructing on what they should and should not do as a DCW, and listing out the types of duties they would perform); Tr. Vol. 5 945:4-950:1 (Seeley). Indeed, PPL's orientation taught DCWs their "role as DCW," including directing them to "assist the Participant so they can live independently," "understand and carry out directions given to [them] by the CLE," and to "communicate clearly." Dx 185 at 7263. The training further described the types of activities of daily living with which DCWs must assist their Participants and instructed DCWs on how to successfully interact with Participants.[56] Dx 185 at 7264-68. It also instructed DCWs on how to be professional and how to de-escalate situations with their Participants. Dx 185 at 7269 ("be on time," "call if you're going to be absent," "only call off if necessary," "be TRUSTWORTHY,"

---

[56] PPL's orientation materials provide at least as much detail on DCWs' job duties as a typical ISP, although PPL argued repeatedly that the ISP constituted a "job description." *Compare* Dx 185 at 7264-65 (ADLs include bathing, grooming, dressing, eating, toileting and continence, transferring and mobility; IADLs include shopping, housework, laundry, preparing meals, managing medication) *with* Dx 257 at UDS401 (LZ "needs full assistance with transfers, personal care, med mgmt, housekeeping, laundry and meal prep").

64

and "submit days you need off in advance"); Dx 185 at 7341 (describing de-escalation

strategies). It further taught DCWs what tasks they should consider refusing to perform. Dx 185

at 7266. Finally, the orientation covered health and safety topics, such as proper handwashing

and how to put on and remove safety gloves. Dx 185 at 7363-7374.

179.    In the DCW training material PPL also instructed DCWs on important work rules

such as that "timesheets must reflect **<u>actual</u>** hours worked" and steps for resolving disputes

related to non-payment of wages. Dx 185 at 7309, 7315.

180.    In addition to the orientation training, PPL also provided DCWs with an

"orientation booklet." Dx 185 at 7280.

181.    PPL not only developed the training, it also informed DCWs of the training

requirement. PPL included the DCW orientation requirement in the packet sent to new

Participants, the packet sent to potential DCWs, and on its website. Tr. Vol. 3, 558:7-562:20

(Barge). PPL also informed DCWs of the orientation requirement through its over-the-phone

enrollment representatives, "message of the day" reminders on its customer service line, and in a

postcard. Px 44 at TALARICO008. PPL also had its subcontractor contact DCWs directly to

schedule the orientation. Px 44 at TALARICO009.

182.    Regardless of how many Participants they provided services for, PPL only

required each DCW attend the orientation once. Px 44 at TALARICO009; Tr. Vol. 7, 1492:9-25

(Thomas, "As long as they took the Direct Care Worker preservice orientation once and they

were hired by another participant employer, they didn't have to take it again").

183.    Participants had no control over whether the DCW had to attend orientation and

could not waive the requirement. Tr. Vol. 5, 944:12-945:3 (Seeley); Tr. Vol. 7, 1503:5-12

(Thomas, testifying the participant could not opt their DCW out of the orientation requirement);

Tr. Vol. 6, 1171:9-15, 1188:4-8 (Stewart).

184.    Participants did not develop the content of the orientation, control how long the

orientation lasted, or control how much the DCW would be paid for the orientation. Tr. Vol. 7,

1500:16-24; 1503:13-1504:3 (Thomas). Participants generally disliked the training because it

impacted the hiring of DCWs. *See* Tr. Vol. 6, 1171:9-19; 1173:11-16 (Stewart, testifying

Participants "weren't fond of somebody else training their Direct Care Workers" and disliked it

because it would make "the whole process of, you know, hiring a Direct Care Worker would just

take longer").

185.    In addition to developing the orientation, PPL had to verify each DCW had

completed the orientation. Jx 371 at 1854; Tr. Vol. 6, 1175:20-1176:10 (Stewart, testifying that

the subcontractor informed PPL through certification of completion or a list identifying which

DCWs have completed orientation); Tr. Vol. 7, 1500:25-1501:3 (Thomas); Dx 151 at 3738; Px

44 at TALARICO009 ("each day, a file listing which DCWs who have completed the orientation

will be sent to Frontline to PPL. This file will update the PPL system to record each worker who

has completed the orientation").

186.    PPL would not approve a DCW as good-to-go to start working without verifying

they had attended the orientation. Tr. Vol. 7, 1502:6-10 (Thomas).

187.    PPL was also responsible for procuring "support brokers" to conduct "functions"

training for DCWs. *See* Px 17 at 1864; Jx 371 at 1864-1865 (PPL would arrange functions

training for qualified DCWs through a knowledgeable and skilled subcontractor). PPL noted it

had experience doing this in other states. *Id.* Specifically, PPL had to procure a support broker to

provide training to DCWs on the following topics: "personal care," "mobility," "nutrition

feeding," "elimination," "correspondence and bill paying," "escorting," "safety," "waste

disposal," and "household tasks." Jx 371 at 1864-65.

188.    PPL made training material on functions such as workplace safety and lifting techniques available online to DCWs. *See, e.g.,* Px 45 (Lifting techniques for Home Caregivers); Px 98 (Workplace Safety); Tr. Vol. 5, 1032:19-1033:7 (Zoccola).

189.    In sum, PPL provided training and direction to DCWs about how to do their jobs through written materials, the orientation program, and additional functions training. PPL also decided how long to make the orientation and how much to pay DCWs for their orientation time. *See* ¶ 112, *supra*.

190.    Even after orientation, DCWs continued to receive employment-related input from a PPL forum. PPL operated an online forum open to Participants and DCWs where they could post about their work and the PDS program. Tr. Vol. 4, 721:17-722:3 (York). PPL controlled the content posted on the forum by hiring and giving guidelines to forum moderators such as Ms. York. Tr. Vol. 4, 733:17-736:21 (York).

**D.     PPL Shared Control Over DCWs' Day-to-Day Supervision.**

i.      PPL Developed and Implemented Mandatory Training for Participants.

191.    PPL implemented an orientation and skills training program for Participants. Tr. Vol. 3, 514:3-19 (Barge); Px 17 at 1834-39.

192.    Participants had to participate in PPL's training. Jx 338 at 1002 (New CLE Enrollment Forms Packet).

193.    PPL trained Participants on their duties as an employer, including hiring, training, supervising DCWs, workplace safety, and setting wage rates. Jx 369 at 1259, 1264-65, 1276.

194.    PPL instructed Participants to contact PPL's customer service department if they "need additional training" and also instructed them to visit PPL's website for "pre-recorded training sessions." Px 68 at 7225.

195.    PPL's enrollment specialists also identified Participants who needed training on how to schedule workers. Jx 371 at 1839 ("Public Partnerships uses best practices to develop criteria to identify a CLE who is in need to additional skills training"). Specifically, PPL identified Participants who were "consistently struggling with scheduling workers for a service" and "Public Partnerships [would] use feedback from [their] customer service team and [their] FOC team to determine if that CLE needs additional training." Jx 371 at 1839.

196.    PPL further partnered with the State to draft the PPL CLE Handbook. Tr. Vol. 6, 1167:3-13 (Stewart). The contents of PPL's CLE Handbook are different than the contents of the State's sample Consumer Guidebook.[57] Tr. Vol. 6, 1167:8-13 (Stewart); *Compare* Px 68 (PPL's CLE Handbook) *with* Dx 153 at 5500 (State's sample Consumer Guidebook). PPL made this Handbook available online. Tr. Vol. 6, 1168:9-11 (Stewart). PPL's enrollment specialists also reviewed the PPL CLE Handbook with Participants during their home visits. Jx 371 at 1838 ("All of the above requirements and documentation are included, in detail, in the Common Law Employer Orientation and Skills Training Handbook, which is reviewed with CLEs by Public Partnerships Enrollment Specialists at the time of the home visit or when over the phone assistance is being provided."); Tr. Vol. 6, 1158:21-25 (Stewart).

197.    PPL designed the Handbook to "orient [Participants] to [their] role as an employer (referred to as Common Law Employer) and provide skills and training that will help [the Participant] be an effective employer." Px 68 at 7192.

198.    In addition to training Participants on recruiting, hiring, and paying DCWs, as

---

[57] Dx 153 at 5500 is the Consumer Guidebook for self-directed service, which was a sample guidebook that was provided by the State in its Request for Proposal ("RFP") to contract for the Medicaid waiver program. Tr. Vol. 6, 1166:17-23 (Stewart).

discussed above, PPL's CLE Handbook also provided Participants with specific advice on how to effectively supervise DCWs once they are hired, including working together with the DCW, being in charge, and taking disciplinary action when needed. Jx 369 at 1265; Px 68 at 7211 (list of steps Participants "need to" take to supervise DCWs); Tr. Vol. 6, 1168:24-1169:4 (Stewart). The CLE Handbook also provided information to assist the Participant with approving DCWs' timesheets and invoices. Jx 369 at 1271-72; Tr. Vol. 6, 1169:5-10 (Stewart).

199.    PPL impacted how DCWs were supervised on a day-to-day basis by directing Participants on how to supervise their DCWs.

ii.    PPL Exercised Control Over DCWs' Timesheet Submission and Approval.

200.    The State contracted with PPL to ensure submitted timesheets conformed to certain rules before PPL approved them for payment. Tr. Vol. 3, 591:11-17 (Barge). This was consistent with PPL's promise to assume certain employer-burdens and ensure appropriate use of Medicaid funds. *See* ¶ III.31, *supra*. PPL only issued payments to a DCW if they met the payment rules configured in PPL's system. Tr. Vol. 7, 1406:25-1408:5 (Horvath, "PPL would process the time sheets approved by the participant employer for payment with the State funds, and yes, those time sheets did fall into a status of pendent, denied or paid").

201.    PPL required DCWs to record their hours worked. Tr. Vol. 2, 306:3-22 (Cotto, describing PPL's paper and electronic timesheets); Tr. Vol. 2, 449:11-24 (Mandoza).

202.    PPL also provided DCWs with instructions on how to fill out their timesheets. Tr. Vol. 1, 141:7-14 (Talarico); Px 5 (timesheet).

203.    After initially using a paper timesheet system, PPL later developed and operated a web portal for DCWs to submit their timesheets online. Jx 356 at 621 ("As a DCW once you are registered you will be able to use the PPL PA OLTL Web Portal to: create timesheets; reviewing

your timesheet payment status"); Dx 185 at 7302 (describing PPL's BetterOnLine web portal); Tr. Vol. 1, 142:8-21 (Talarico direct); Tr. Vol. 2, 379:8-380:8 (Ross Direct); Tr. Vol. 5, 844:20-845:4 (Tamburo Direct); M.J. Dep. 124:8-125:6; Tr. Vol. 2, 309:8-24 (Cotto). Later, PPL created an app for DCWs to use their phones to submit timesheets. Dx 185 at 7282 ("Time4Care Mobile app is the required time entry method for DCWs"). PPL trained DCWs on how to use the application. Tr. Vol. 2, 309:25-310:6 (Cotto).

204.    DCWs used the same PPL portal and same account to submit timesheets even if they worked for more than one Participant. Jx 356 at 626.

205.    PPL instructed DCWs to call PPL's customer service line with any issues related to submitting timesheets. Jx 356 at 633-634; Tr. Vol. 2, 308:11-25 (Cotto, testifying she called PPL's customer service for timesheet issues); Tr. Vol. 4, 726:25-727:3 (York, DCWs knew how to contact PPL with any issues); Tr. Vol. 1, 149:17-151:1; 154:23-155:5 (Talarico, detailing multiple instances he called PPL regarding issues with his timesheets). During orientation PPL further provided DCWs with detailed steps on how to resolve issues related to non-payment of wages. Dx 185 at 7315.

206.    Once a DCW submitted a timesheet, Participants could log into the portal to approve them. K.H. Dep. 40:3-16, 41:8-42:16. PPL then reviews the DCW's timesheets for accuracy and correctness. Tr. Vol. 2, 358:5-7 (Ross); Tr. Vol. 7, 1406:25-1408:18 (Horvath); Px 86 (Talarico timesheets). PPL would only disburse payment to the DCW after reviewing, approving, and marking the timesheet as "good to pay." Tr. Vol. 1, 144:8-145; 147:22-24 (Talarico); Px 86 at 228.

207.    PPL had the authority to withhold payment for a timesheet even if the Participant had approved it. Tr. Vol. 2, 309:1-7; 341:2-10 (Cotto, her participant "approved the time sheets,

but then, ultimately, [she] had to still go through Public Partnerships"); Tr. Vol. 1, 154:17-22

(Talarico, timesheets would not be paid until resubmitted, even if Participant called to verify

timesheet was correct); Tr. Vol. 1, 154:23-156:13 (Talarico, PPL denied his timesheet even

though it was signed off on by Participant before submission); E.W. Dep. 74:13-20.

208.    Participants could not resolve issues related to late payments or rejected

timesheets. M.J. Dep. 125:23-126:12. If PPL rejected a timesheet, a Participant could not

override them to have it approved. E.W. Dep. 98:8-14. The only thing a Participant could do if

PPL rejected their DCW's timesheet or if they had an issue with pay was to call PPL. E.W. Dep.

98:15-99:10. Even then, contacting PPL did not result in PPL fixing the issue or paying DCWs

more quickly. Tr. Vol. 5, 845:23-846:1 (Tamburo).

209.    Indeed, even if a Participant called to verify that a DCW's timesheet was correct,

if there was an issue with the timesheet such as overlapping time with another DCW, PPL would

still not pay. Tr. Vol. 1, 153:18-154:22 (Talarico); Jx 367 (call log entry for 7/28/14).

210.    DCWs could only obtain copies of their timesheets or see whether their

timesheets were approved or not through the PPL portal. Tr. Vol. 1, 143:1-7 (Talarico); Px 86 at

228.

211.    PPL set the schedule for when DCWs submitted their timesheets, requiring

submission no more than two days after the end of the pay period. Tr. Vol. 1, 141:15-22

(Talarico); Px 5. If a DCW failed to submit a timesheet by PPL's deadline, they would not get

paid until the next pay period. Tr. Vol. 1, 141:23-142:1 (Talarico).

212.    Participants could not directly report hours to PPL in order to have their DCWs

paid. Tr. Vol. 1, 142:2-7 (Talarico).

213.    PPL issued payments to DCWs. (Jx 372 at 1948, "direct deposit is the fastest and

safest way to receive payment from Public Partnerships, LLC"); Tr. Vol. 2, 310:7-23 (Cotto); Tr.

Vol. 2, 452:7-19 (Mandoza); Tr. Vol. 5, 935:15-23 (Seeley, received direct deposit from PPL for

her work for both participants).

          iii.      <u>PPL Regularly Engaged in HR-Type Interactions with DCWs.</u>

214.    In addition to training, PPL provided customer service support to both

Participants and DCWs. Tr. Vol. 6, 1191:24-1192:2 (Stewart). As set forth below, this "customer

service" line functioned as typical human resources support for DCWs.

215.    Customer service support for DCWs was not required by the State. Jx 396 at

TAL0261-262 (the F/EA also serves to "establish an accessible customer service system for the

*participant and the Service Coordinator*") (emphasis added); Tr. Vol. 6, 1193:5-9 (Stewart).

216.    Yet, the customer service line was open to DCWs. Jx 371 at 1819. PPL's

customer service representatives reached out to DCWs about paperwork issues, and responded to

calls from DCWs, including questions about how to complete forms, issues with timesheets or

pay, and DCW employment verification. Jx 371 at 1870 ("a Specialist from our Customer

Service Center places an outbound call to the direct care worker…and notifies them a problem

verifying their SSN or FEIN"), 1881 ("the DCW has the option of correcting the timesheet or

calling Customer service"), 1806 ("Customer service also makes follow-up calls to request

paperwork that has not been received").

217.    PPL's customer service "assist[ed] individuals and direct care workers with all

aspects of enrollment," including "providing explanations of the documents in enrollment

packets and employment packets, including each tax form, its purpose, and how it is used and

processed by Public Partnership." Jx 371 at 1820. When a DCW like Mr. Talarico had questions

about the enrollment or requalification forms, he called PPL to ask those questions. Tr. Vol. 1,

124:9-11 (Talarico).

218.    PPL's customer service further provided "direct care workers with answers to questions about payroll, check processing status, withholding amounts, rate of pay, services, and any questions on reports received." Jx 371 at 1819.

219.    PPL had customer service and DCW enrollment representatives available Monday through Friday, between 8 a.m. and 8 p.m. and Saturdays, between 9 a.m. and 1 p.m. Dx 185 at 7274.

220.    PPL kept track of calls to its customer service line. Tr. Vol. 7, 1366:6-16 (Stewart); Jx 371 at 1817 ("Public Partnerships' robust call management resources provide comprehensive reporting and information on every phone interaction."). A large portion of the calls to customer services related to timesheets and enrollment. Jx 371 at 1819 (pie chart categorizing calls to customer service).

221.    Ms. Stewart claimed DCWs were not permitted to call PPL's customer service for help with enrollment forms, and if a DCW called PPL's customer service about a timesheet issue, PPL would tell them that the Participant had to be on the call. Tr. Vol. 6, 1193:5-1195:1. This claim was contradicted by documents and testimony of many witnesses, as demonstrated above. *See* ¶¶ 214-20, *supra*.

222.    To the contrary, Participants did not have to be involved in communications between DCWs and PPL. Tr. Vol. 1, 149:1-16 (Talarico). A log of calls with or concerning just Mr. Talarico shows over 100 calls in which there was a substantive discussion between him and PPL's representative without the Participant being part of the call. *See* Jx 367; *see also* Tr. Vol. 1, 124:9-11, 149:1-16 (Talarico); Jx 372 at 1925 (inviting DCWs to call PPL's Customer Service with questions); Jx 371 at 1820 (PPL's customer service "assist[ed] individuals and direct care workers with all aspects of enrollment"), 1881 ("the DCW has the option of correcting the

timesheet or calling Customer service"); Tr. Vol. 2, 297:16-298:5, 313:15-20, 314:12-19 (Cotto, testifying she called PPL's customer service line for help filling out the employment forms and to figure out if there had been any changes to the maximum rate and that PPL customer service team called to inform her of "an error in the initial amount" approve for her wage rate); Tr. Vol. 2, 447:7-16 (Mandoza, testifying she called PPL to check on the status of her enrollment paperwork).

223.     PPL not only invited and handled telephone calls from DCWs relating to their employment, but also provided them access to a PPL website with additional information relevant to their job. Jx 364 at 1041 (cover letter from PPL to DCWs describing how to access PPL's web portal).

### E.     PPL Controlled DCWs' Employee Records.

224.     Throughout its management of the PDS program, PPL maintained an accurate, complete, secure, and confidential file of each qualified DCW who provided services. Dx 152, at 4160; Tr. Vol. 6, 1196:1-5 (Stewart, acknowledging that PPL built a portal to house all of the documents).

225.     PPL was responsible for maintaining records of employment, including but not limited to:

> [c]opy of the Qualified DCW Employment Enrollment Packet forms … [c]opies of documentation verifying the employee's social security number matches the name and date of birth information provided obtained [sic] through the Social Security Administration's Business Service Online … [c]opies of qualified DCW State Police Criminal Background, FBI Criminal History Clearance, and DPW Child Abuse History Clearance … [d]etermination of qualified DCWs state of residence … [c]opies of filing and payments of out-of-state income tax withholding … [c]opies of worker's time sheets … [c]opy of completed State New Hire reporting documentation … [c]opies of documentation regarding any FICA refunds processed (employee portion) … [c]opies of documentation of requests for verification of DCW

> wages requested by federal and state agencies … [c]opies of
> documentation of any workers' compensation insurance claims
> filed by DCW or documentation that the VF/EA FMS made every
> attempt to obtain the documentation … [c]opy of Qualified DCW
> Termination Form … [and] [c]opy of completed PA DL&I Reason
> for Separation Notice.

Dx 152 at 4160-61; Dx 153 at 5421-22; Jx 371 at 1906-12; Px 16 at 1583 ("copies received are

maintained in Public Partnerships BetterOnline web portal"); Px 17 at 1906-12 (listing records

PPL must maintain); Tr. Vol. 2, 459:22-460:6 (Mandoza, "we had to submit the paperwork to

PPL"); Jx 372 at 1931 ("PPL is responsible to maintain a copy [of DCW Qualification Form] in

participant's file"), 1952 ("it is important for PPL to maintain current and accurate information

for DCW's").

226.   PPL also maintained documentation verifying DCWs' completion of orientation

and copies of rate sheets. Jx 371 at 1855; Tr. Vol. 6, 1197:8-19 (Stewart).

227.   Participants had no control over PPL's issuance of DCWs' tax forms. Tr. Vol. 2,

316:24-317:5 (Cotto); Tr. Vol. 2, 455:1-5 (Mandoza). Rather, PPL issued and maintained

DCWs' tax forms. Tr. Vol. 2, 316:12-317:8 (Cotto); Tr. Vol. 2, 454:19-25 (Mandoza); Tr. Vol.

1, 274:2-23 (Talarico, W-2 form in 2013 listed employer as PPL, with no indication PPL was

filing it as an agent on behalf of a Participant, Px 92 at 283); Tr. Vol. 1, 119:4-13 (Talarico, PPL

sent him tax withholding forms as part of enrollment forms).

228.   PPL made some of the employment records it maintained, such as tax forms and

timesheets, available electronically to DCWs. Jx 356 at 637 ("you do NOT need to print your

timesheet if you don't want to. Timesheets will always be maintained electronically for your

review"); Tr. Vol. 2, 454:19-25 (Mandoza "would go on the PPL portal" to access timesheets);

Tr. Vol. 6, 1197:20-23 (Stewart) (PPL maintains copies of all timesheets it processes).

229.   If DCWs needed a copy of a timesheet, a pay stub, or other records related to their

employment, they would not be able to obtain them from their Participants but would have to go to PPL for such records. Tr. Vol. 1, 143:1-4 (Talarico).

230.    PPL also responded to requests for verification of DCWs' employment. Tr. Vol. 2, 317:9-318:1 (Cotto, listed Public Partnerships for verification of employment for a car loan and apartment); Px 96 (PPL letter providing verification of employment for DCW Dawn Williams).

231.    PPL was further responsible for determining when garnishments would be applied to DCWs' paychecks, such as deducting child support payments from Mr. Talarico's paycheck. Tr. 178:2-9 (Talarico); Jx 340 at 96 (Talarico paystub showing deductions).

232.    PPL did not merely maintain all employment records, but rather, as extensively detailed in sections above, controlled the items that the records related to, such as workers' compensation, unemployment insurance, tax exemptions and reporting, new-hire forms, approving payment of timesheets, creating the orientation program, and so on.

## V.    PPL RECKLESSLY DISREGARDED THE LAW AND DID NOT ACT IN GOOD FAITH

233.    Before PPL applied to Pennsylvania's RFP, PPL reviewed the RFP, asserting it would not respond to the RFP if the RFP planned to have PPL serve as a joint employer.[58] Tr. Vol. 7, 1460:8-1461:1, 1461:16-20, 1465:15-1466:6 (Horvath). However, PPL cited only the label of "fiscal agent" in the HCBS Waiver Application as the basis for its conclusion that it could apply for the contract without concern about being a joint employer. *Id*. Clearly PPL knew

---

[58] Mr. Horvath testified inconsistently about PDS Programs, particularly the Pennsylvania program. At one point he asserted Pennsylvania chose a different model than other states, with the Participant as the sole employer and the vendor (PPL) serving only as a fiscal agent. Tr. Vol. 7, 1398:1-24 (Horvath). He later reversed his position, testifying other states were "very similar to Pennsylvania" because they also designated the Participant to be the sole employer and vendor to be a fiscal agent. Tr. Vol. 7, 1462:2-7 (Horvath).

there was a risk that an entity involved in the PDS Program would end up as a joint employer.[59]

234.    PPL's concern that it would be considered a joint employer was well-founded given the U.S. Department of Labor's ("DOL") guidance stating that "in most, but not all, consumer-directed models,[60] a third party will be a joint employer of a provider." Jx 376 at 2362.

235.    PPL also knew the Center for Medicare and Medicaid Services (CMCS) anticipated that many home care workers in a self-directed program would have a third-party joint employer. Tr. Vol. 7, 1400:16-1401:6 (Horvath); U.S. Dep't of Health & Humans Servs., Ctrs. For Medicare and Medicaid Servs., CMCS Informational Bulletin, at 1 (July 3, 2014), *available at* https://www.medicaid.gov/Federal-Policy-Guidance/Downloads/CIB-07-03-2014.pdf (last visited January 21, 2024) (anticipating "that many states will determine that, for purposes of the FLSA, home care workers in self-direction programs have joint third-party employer(s) in addition to being employed by the beneficiary."). Where a joint employer was found, the CMCS guidance concluded, "the DOL regulation states that all work is subject to minimum wage and overtime requirements." *Id.* at 1. The Bulletin also acknowledged that the economic realities test applies and that a third-party joint employer cannot claim the companionship care exemption. *Id.* at 2.

236.    In fact, the State's HCBS waiver application, in describing the PDS programs, noted "[t]he participant may function as the common law employer *or* the co-employer of

---

[59] PPL's own materials for training DCWs further confirm it knew there was a risk it would be considered a joint employer. *See, e.g.,* Dx 185 at 7262 ("Poll Question: In the Participant Directed Service model, who is your employer?" with one answer being "Public Partnerships, LLC (PPL)"); 7255 ("PPL is NOT your employer!").

[60] Consumer-directed, Self-Directed, and Participant Directed are synonymous. Tr. Vol. 1, 99:4-7 (Skovera, "consumer" and "participant" are used interchangeably in discussing this program); Tr. Vol. 4, 754:3-14 (Gainer, testifying self-directed and consumer-directed are synonymous).

workers." Jx 396 at TAL0411 (emphasis added); Tr. Vol. 3, 660:8-661:2 (Barge).

237.    Despite its knowledge of the risk, PPL did not consult with legal counsel
regarding its potential status as a joint employer in Pennsylvania because it believed it was "far
outside the realm of possibility." Tr. Vol. 7, 1420:7-14, 1421:9-1422:20 (Horvath).

238.    Instead of consulting legal counsel, PPL unreasonably relied on a 2009 letter from
the Pennsylvania Bureau of Labor Law Compliance expressly limited to the issue of recoupment
from the consumer participant, and the facts and circumstances presented in the letter. Tr. Vol. 7,
1425:9-25, 1427:1-7 (Horvath); Jx 352 at 568 ("a third party agency that collects reimbursement
of hours worked from the consumer does not violate the MWA"); 569 ("this letter is only
applicable to this request and may be revised if the Bureau receives information different from
the facts relied upon").

239.    PPL also unreasonably relied on hypothetical number seven contained in the
DOL's guidance, AI2014-2, alleging it described the Pennsylvania program "almost to a T." Tr.
Vol. 7, 1470:11-17 (Horvath); Jx 376 at 2377. Yet, in hypothetical seven the public entity, unlike
PPL, did not design and provide mandatory training. Jx 376 at 2377. Moreover, unlike PPL, the
public entity in hypothetical seven provided for a wide wage rate range—from $10.00 to $24.00
per hour—a range of $14. *Id*. That range was more than double the range between minimum and
maximum given to Participants in Pennsylvania at that time (a range of $3.95 to $6.53 depending
on region). Jx 365 at 1096.[61] Moreover, and critically, in hypothetical seven the Participant had
the ability to choose between three fiscal intermediaries and had a monetary budget to allot for
services—neither of which, as PPL knew, was available to Participants in the PDS program. *Id.*

---

[61] Moreover, Participants and PPL personnel both testified that the range was not
meaningful, as DCWs could not be hired at minimum wage, rather most were paid at or near the
maximum. *See* ¶¶ 34-35, *supra*.

In sum, far from describing the program "to a T," the PDS program differed significantly from hypothetical seven. *Id.* ("any slight change in the specific facts of this hypothetical may change the analysis").

240.    PPL knew the ability to set or influence wage rates was an important consideration in joint employer status and that Participants' lack of budget authority weighed against the Participants being sole employers. Tr. Vol. 7, 1401:24-1402:3 (Horvath).

241.    In particular, PPL recognized that budget authority (i.e., the ability to choose whether to save in one area, such as pay rate, in order to spend in another, such as other authorized Medicaid expenses) was a strong factor in joint employment—specifically recognizing that it would make a third party less likely to be deemed a joint employer if the "participant receives a budget rather than a set number of hours/units of service." Jx 389 at 3613; Tr. Vol. 7, 1404:4-16 (Horvath). Despite knowing that Participants in the PDS program did not have budget authority, PPL still unreasonably concluded that Participants were sole employers. Tr. Vol. 7, 1403:22-1404:3 (Horvath).[62]

242.    PPL's conclusion that Participants were sole employers is further rendered unreasonable by its own admission that that "program-sponsored required training for employees," as required here, was a strong indicator of joint employer status. Jx 389 at 3607.

243.    Finally, PPL's own witnesses admit that getting to choose your own workers, as Participants do here, does not make you "the employer of those workers." Tr. Vol. 7, 1400:3-15

---

[62] Horvath also flip-flopped on whether Participants in the Pennsylvania program had monetary "budget authority" or only the ability to receive a set number of hours of service. *Compare* Tr. Vol. 7, 1403:22-1404:3 (Horvath, testifying Participants did not have budget authority) *with* 1410:12-1411:5 (testifying Participants had a budget), 1412:10-25 (payroll depended on whether there was money in the budget to pay); *see also* Tr. Vol. 7, 1415:2-1416:24 (Horvath, admitting he did not really recall whether Participants had budget authority). They of course do not. *See* ¶¶ 90, 240-41, *supra*.

(Horvath).

244.    In sum, PPL disregarded DOL and CMCS guidance, ignored the reality of PPL's shared control over DCWs, and recklessly failed to consult with counsel regarding its potential status as a joint employer.

## PROPOSED CONCLUSIONS OF LAW

## VI.    THE FAIR LABOR STANDARDS ACT AND PENNSYLVANIA MINIMUM WAGE ACT

245.    The Fair Labor Standards Act ("FLSA") is "remedial and humanitarian in purpose." *Tenn. Coal, Iron & R.R. Co. v. Muscoda Loc. No. 1232*, 321 U.S. 590, 597 (1944); *see Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) ("[T]he FLSA was designed to give specific minimum protections to *individual* workers and to ensure that *each* employee covered by the Act would receive [a] fair day's pay for a fair day's work and would be protected from the evil of overwork as well as underpay." (cleaned up) (emphasis in original)); *Jewell Ridge Coal Corp. v. Loc. No. 6167, United Mine Workers of Am.*, 325 U.S. 161, 167 (1945) (refusing to permit waiver of FLSA rights that would undermine the Act's purpose of "achiev[ing] a uniform national policy of guaranteeing compensation for all work or employment engaged in.") (quoting *Tenn. Coal*, 321 U.S. at 602)).

246.    In accordance with this remedial purpose, the FLSA broadly defines employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Third Circuit has recognized that "[t]he Supreme Court has even gone so far as to acknowledge that the FLSA's definition of an employer is the 'broadest definition that has ever been included in any one act.'" *In re Enter. Rent-A-Car Wage & Hour Emp't Pracs. Litig.*, 683 F.3d 462, 467-68 (3d Cir. 2012) (citing *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945)).

247.     Pennsylvania's Minimum Wage Act ("PMWA"), 43 Pa. Cons. Stat. Ann.

§§ 333.101 *et seq.*, mirrors the FLSA, and therefore "Pennsylvania courts have indicated that it

may be proper to interpret the PMWA in light of federal interpretation of the FLSA, given the

substantial similarity." *Baum v. AstraZeneca LP*, 605 F.Supp.2d 669, 674 (W.D. Pa. 2009), *aff'd*,

372 F.App'x 246 (3d Cir. 2010) (citing *Commonwealth v. Penn. Lab. Rels. Bd.*, 107 Pa.

Commw. 132, 527 A.2d 1097 (1987)). Courts have specifically looked to the FLSA's definition

of "employer" to interpret the PMWA. *Commonwealth, Dep't of Lab. & Indus., Bureau of Lab.*

*L. Compliance v. Stuber*, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003), *aff'd*, 580 Pa. 66, 859 A.2d

1253 (2004). Accordingly, claims under the FLSA and PMWA can be analyzed together.

248.     Similar to the FLSA, "[i]n applying provisions of the PMWA, it should be borne

in mind that the PMWA is remedial legislation which should be interpreted liberally to achieve

its remedial purpose." *Caiarelli v. Sears, Roebuck & Co.*, 616 Pa. 38, 46 n.3, 46 A.3d 643, 647

n.3 (2012) (McCaffery, Todd, JJ., dissenting). "In fact, exemptions to the [P]MWA's minimum

wage and overtime requirements have been interpreted *more narrowly* than the parallel

exemptions contained in the FLSA." *Ford v. Lehigh Valley Rest. Grp., Inc.*, No. 14CV3227,

2015 WL 13779474, at *9 (Pa. D. & C. Apr. 24, 2015) (emphasis added).

249.     The PMWA includes an exemption for "[d]omestic services in or about the

private home of the employer." 43 Pa. Cons. Stat. Ann. § 333.105(a)(2). However, this

exemption does not apply if the domestic services are provided by someone employed or jointly

employed by a third party. *Bayada Nurses, Inc. v. Commonwealth, Dep't of Lab. & Indus.*, 607

Pa. 527, 556–58, 8 A.3d 866, 883–84 (2010) (holding that where home care agency was a joint

employer with the household receiving services, the exemption did not apply, and the joint

employer was required to pay overtime). Thus, throughout the time period covered by this

litigation, if PPL jointly employed DCWs, then there is no exemption from overtime under the PMWA.

250.    The FLSA also has two overtime exemptions at issue in this case: the "companionship care" and "live-in" exemptions. The companionship care exemption covers provision of fellowship and protection for someone who is elderly or disabled, as well as assistance with activities of daily living.[63] 29 C.F.R. § 552.6. The live-in exemption applies to those providing any domestic services who reside in the home of their employer. 29 C.F.R. § 552.102. However, since January 1, 2015, neither exemption may be claimed by third-party joint employers like PPL. 29 C.F.R. § 552.109(a), (c) (2015). Thus, since January 1, 2015, the FLSA has followed the same rule as the PMWA has since at least 2010, in finding that a third-party employer or joint employer cannot take advantage of otherwise potentially applicable overtime exemptions.

251.    Prior to January 1, 2016, PPL had a consistent policy of denying overtime to any DCW. After January 1, 2016, PPL paid overtime to DCWs who worked over 40 hours for one Participant, but continued to deny overtime premiums to DCWs it claimed qualified for the live-in exemption, and also did not total hours across Participants in calculating overtime due to a DCW. *See* Sec. IV.A.iii, *supra*.[64]

252.    This Court is tasked with deciding whether PPL jointly employed DCWs, was

---

[63] As of January 1, 2015, assistance with activities of daily living cannot account for more than 20% of the hours worked, or the exemption is lost. 29 C.F.R. § 552.6

[64] PPL previously moved to alter the claim start dates of the PWMA class period from May 11, 2014, and of the FLSA collective from January 1, 2015, to January 1, 2016. Dkt. 249. This Court denied PPL's motion, rejected its arguments, and sided with most other courts who "overwhelmingly have found that the Rule's effective date is January 1, 2015." Dkt. 265 at 4 (citing cases finding a January 1, 2015 effective date). This Court also found that "the PMWA required overtime payments starting three years prior to the filing of the Complaint" in May 2017. Dkt. 265 at 5.

therefore unable to claim any exemption, and thus is liable for unpaid overtime. Both FLSA case law and federal entities tasked with enforcing and interpreting the FLSA acknowledge that third-party entities like PPL in consumer-directed Medicaid program models are typically joint employers. Jx 376 (AI2014-2).[65] The evidence introduced at trial confirms PPL is no exception.

A.   **The FLSA and PMWA Recognize Employees May Have More Than One Employer**

253.   Courts have long recognized that a single worker may be an employee to two or more employers simultaneously. *Enterprise,* 683 F.3d at 467; *see also Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 133 (4th Cir. 2017) (recognizing "that '[a] single individual may stand in the relation of an employee to two or more employers at the same time under the Fair Labor Standards Act'") (quoting former 29 C.F.R. § 791.2(a)); *Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997) (same); *Aimable v. Long & Scott Farms*, 20 F.3d 434, 438 (11th Cir. 1994) (same).[66]

_____

[65] Although this guidance was withdrawn effective March 10, 2020, the DOL has made clear that the withdrawal does not change "any of the Department's long-standing regulations and associated case law." U.S. Dep't of Labor, Wage & Hour Div., Administrator Interpretations Letter – Fair Labor Standards Act, https://www.dol.gov/agencies/whd/opinion-letters/administrator-interpretation/flsa#foot2 (last visited February 4, 2024). Additionally, the parties have equally continued to rely on this guidance to shape their arguments for or against joint employment. *See, e.g.,* Jx 376 (AI2014-2). Therefore, the Court will continue to consider this guidance as persuasive authority.

[66] The courts in these cases quoted former 29 C.F.R. § 791.2. That rule was in effect from 1958 until it was replaced by the 2020 "Joint Employer Status Under the Fair Labor Standards Act" rule. That new regulation was promptly stricken as inconsistent with the APA and the plain text of the FLSA. *New York v. Scalia*, 490 F.Supp.3d 748, 774 (S.D.N.Y. 2020). The DOL subsequently rescinded the 2020 rule, eliminating § 791.2 in the process. Recission of Joint Employer Status Under the Fair Labor Standards Act Rule, 86 FR 40939-10, 2021 WL 3207510, at *40954 (2021) (noting that "part 791 of title 29 of the Code of Federal Regulations would be removed in its entity and reserved," and that rather than replacing it with new regulatory guidance, the DOL "will continue to consider legal and policy issues relating to FLSA joint employment before determining whether alternative regulatory or subregulatory guidance is appropriate."). Nonetheless, as the *Scalia* court recognized when striking down the new joint

254.     A worker has joint employers when "the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly[.]" *Enterprise*, 683 F.3d at 467 (quoting former 29 C.F.R. § 791.2(b)); *see, e.g.*, 29 C.F.R. § 500.20(h)(5) ("The term joint employment means a condition in which a single individual stands in the relation of an employee to two or more persons at the same time.").[67]

255.     Joint employers are responsible, both individually and jointly, for FLSA compliance, including paying overtime compensation for all hours worked during the work week. *Thompson v. Real Est. Mortg. Network*, 748 F.3d 142, 148 (3d Cir. 2014) (in a joint employment relationship, both employers remain jointly and severally liable for violations of the FLSA they commit and those committed by other joint employers); *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998) ("The FLSA contemplates several simultaneous employers, each responsible for compliance with the Act.").

256.     Given that courts look to the FLSA to interpret the PWMA, *see* ¶ 247, *supra*, the "economic realities" test controls the question of whether PPL is a joint employer of DCWs under the PMWA, just as it does under the FLSA. *Stuber*, 822 A.2d at 873.

---

employer rule in 2020, the principles of the old rule are long established. *Scalia*, 490 F.Supp.3d at 757 ("For more than eighty years, the Department of Labor…has recognized that multiple employers may qualify as "joint employers" under the Fair Labor Standards Act[.]"). While this regulation may no longer be effective, courts have long incorporated the text and meaning of that regulation into caselaw, and both parties have cited to the former regulation. *See* Dx. 102.

[67] While 29 C.F.R. § 500.20 is an Migrant and Seasonal Agricultural Worker Protection Act ("MSAWPA") regulation, "Joint employment under the Fair Labor Standards Act is joint employment under the [MSAWPA]." 29 C.F.R. § 500.20(h)(5)(i); *see also Aimable*, 20 F.3d at 438 (analyzing joint employment under both the FLSA and [MSPA]); *Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997) (same).

### B. Economic Realities Determine an Entity's Status as Joint Employer

257.    When deciding if a third-party entity such as PPL is a joint employer, the Court will base its decision "on a consideration of the total employment situations and the economic realities of the work relationship," without resorting to "narrow legalistic definitions." *Enterprise*, 683 F.3d at 467-69 (citations omitted); *see also Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961) (the touchstone is "economic reality").

258.    Whether an entity is a joint employer, "although dependent on the facts, is a question of law, because it requires the court to draw a legal conclusion from the facts." *In re Enter. Rent-A-Car Wage & Hour Emp't Pracs. Litig.*, 735 F.Supp. 277, 338 n.21 (W.D. Pa. 2010); *see also Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 76 (2d Cir. 2003) (characterizing "the ultimate decision as to whether a party is an employer" as a "legal conclusion"); *Hardgers-Powell v. Angels in Your Home LLC*, 330 F.R.D. 89, 109 (W.D.N.Y. 2019) (quoting *Zheng*, 355 F.3d at 76).

259.    Importantly, PPL's status as a joint employer does not turn on a showing that it controls every aspect of employment to the exclusion of the Participant. *See Antenor v. D & S Farms*, 88 F.3d 925, 932 (11th Cir. 1996).

260.    Rather, a showing of shared control, even indirect, is sufficient: "where two or more employers exert significant control over the same employees…[where] they share or co-determine those matters governing essential terms and conditions of employment—they constitute 'joint employers' under the FLSA." *Enterprise*, 683 F.3d at 468 (quoting *NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982)); *see also Salinas*, 848 F.3d at 141 (joint employment test asks whether two or more entities "share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of the worker's employment."); *cf. Hardgers-Powell*, 330 F.R.D.

at 111 (finding fiscal agent was joint employer of care workers where employer responsibilities were shared with participant, and the two "work in tandem" to exercise authority over employee).

261.    In sum, the fact that the program at issue was titled "Participant-Directed Services," and the Participant was in fact—and undisputed by the parties—*an* employer of their DCWs, does not require a finding that the Participant is the *sole* employer. The very concept of "joint employment" *requires* that there are multiple entities that share control. Thus, in evaluating whether PPL exercised control, the question is not whether it exercised control to the exclusion of the Participant or any other entity; the question is whether PPL shared control with the Participants, or others,[68] over key elements of the DCWs' employment.

### C.    Factors Considered in Evaluating Joint Employer Status

262.    The Third Circuit has articulated four factors to use as a "starting point" for considering joint employer status, including whether the alleged employer has:

> (1) authority to hire and fire employees; (2) authority to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (3) day-to-day supervision, including employee discipline; and (4) control of employee records, including payroll, insurance, taxes, and the like.

*Enterprise*, 683 F.3d at 469.[69] The DOL used these same factors to analyze joint employment in the context of this Medicaid program but divided the second factor into two separate items: (a)

---

[68] As discussed in Sec. III, *supra,* in addition to sharing control with the Participants, PPL also shared control over DCWs' employment with the State. There can be multiple joint employers and a plaintiff need not sue all joint employers. *Sullivan-Blake v. FedEx Ground Package Sys., Inc.*, No. 18-01698, 2020 WL 2572273, at *11 (W.D. Pa. May 21, 2020) ("[a] plaintiff is also not required to sue every entity or individual which may be considered its joint employer.").

[69] The Court is aware of a recently adopted NLRB rule concerning joint employment. 29

establishing wages and benefits, and (b) setting hours and scheduling. Jx 376 at 2369-74 (AI2014-2).[70]

263.    The Court must consider both direct and indirect control in each area when analyzing these factors. *Enterprise*, 683 F.3d at 467-69.

264.    Importantly, "these factors *do not constitute an exhaustive list* of all potentially relevant facts[.]" *Enterprise*, 683 F.3d at 467-69 (emphasis added). Because the ultimate question is whether the worker is economically dependent on the alleged employer, the factors are not considered as a checklist, but are instead evaluated qualitatively. *See Charles v. Burton*, 169 F.3d 1322, 1329 (11th Cir. 1999) (considering all of the joint employer factors as "guidance, with 'the weight of each factor [depending] on the light it sheds on the [workers'] economic dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case'") (quoting *Antenor*, 88 F.3d at 932-33); *Lopez v. Silverman*, 14 F.Supp.2d 405, 414-17 (S.D.N.Y. 1998) (noting that when evaluating for joint employment, "no one aspect of the relationship may be treated as dispositive"); *see also* 29 C.F.R. § 500.20(h)(5)(iv). The test for economic dependence is "whether the workers are dependent on a particular business or organization for their continued employment." *Donovan v. DialAmerican Mktg., Inc.*, 757 F.2d

---

C.F.R. § 103.40. PPL cited to an earlier draft of this rule in one of its motions *in limine.* Because the Third Circuit standard for joint employment under the FLSA is clear, the Court does not consider the new NLRB rule. *Cf. Sutton v. Cmty. Health Sys., Inc.*, No. 16-cv-01318, 2017 WL 3511757, at *3 (W.D. Tenn. Jan. 12, 2021) (looking to NLRB rules because the Sixth Circuit "has not formulated or identified a test for determining whether a joint employment relationship exists in the context of the FLSA"). Nevertheless, there is also nothing in the NLRB rule which would lead this Court to a different conclusion, even if it were applied to this case.

[70] The DOL's guidance examines the potential existence of a joint employment relationship between home care workers in consumer-directed, Medicaid-funded programs—like the one at issue here—and the third-party entities that administer those programs. In particular, the guidance examines "how the most relevant factors of the economic realities test weigh when considering various types of consumer-direct programs," and classifies those factors as weak/moderate/strong indicators of a joint employment relationship. Jx 376 at 2362 (AI2014-2).

1376, 1385 (3d Cir. 1985).

265.    Determining whether an employer-employee relationship exists does not depend on "isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). Indeed, no individual *Enterprise* factor or element of an *Enterprise* factor is determinative of employer status, and the Third Circuit has cautioned against emphasizing one factor over another. *Enterprise*, 683 F.3d at 469.

266.    None of the *Enterprise* factors considers agreements between the alleged employer and employee or between joint employers as a factor to be considered in determining employer status. Yet, PPL relies heavily on the various agreements presented to both Participants and DCWs in which both purport to acknowledge that the Participant, not PPL, is the DCW's employer. Px 25 at 6224, ¶¶ 17-18. Of course, the fact that the Participant is *an* employer of the DCW does not preclude a finding PPL is an employer as well. As to the DCW Agreement's disclaimer that PPL is not an employer of the DCW, such contractual labels are not indicative of employer status. *See Barrentine,* 450 U.S. at 740 ("This Court's decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act. Thus, we have held that FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate."); *Tenn. Coal*, 321 U.S. at 602-03 (contract "cannot be utilized to deprive employees of their statutory rights").

267.    As articulated by the Supreme Court, contract labels do not control whether there is an employer relationship. *See Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985) (holding that workers were employees, despite their insistence they were volunteers, because "these protestations, however sincere cannot be dispositive. The test of employment

under the Act is one of 'economic reality'"); *Falk v. Brennan*, 414 U.S. 190, 193, 195 (1973)

(despite agreement designating one entity as the employer, economic realities test showed both

entities were joint employers); Jx 376 at 2365 (AI2014-2) (an employment analysis is necessary

regardless of the name used by the third party (e.g., fiscal/employer agent)).

268.    Further, recognizing the employer status of an entity does not preclude

recognizing the same in another, as "the question in 'joint employment' cases is not whether the

worker is more economically dependent on [one potential joint employer or another], with the

winner avoiding responsibility as an employer." *Antenor*, 88 F.3d at 932 (internal quotation

omitted). Rather, as the Third Circuit said in *Enterprise*, evaluating joint employment means

asking whether one or more potential joint employers "share or co-determine…essential terms

and conditions of employment[.]" *Enterprise*, 683 F.3d at 468 (internal quotations omitted); *see

also Salinas*, 848 F.3d at 151 (finding joint employment where two entities "share, agree to

allocate responsibility for, or otherwise codetermine—formally or informally, directly or

indirectly—the essential terms and conditions of the worker's employment.").

269.    This Court will follow the standard set by the Third Circuit in *Enterprise* to

determine whether PPL jointly employed DCWs, considering whether PPL (along with other

entities) shared responsibility for or co-determined, directly or indirectly, the elements of

employment, with no one factor determinative in deciding joint employer status.

## VII.    PPL JOINTLY EMPLOYED DCWS

270.    Considering the full breadth of the *Enterprise* factors detailed above, as well as

the totality of the circumstances and evidence presented by both parties at trial, this Court finds

PPL was the DCWs' joint employer under both federal and state law.

271.    The evidence shows that PPL explicitly acknowledged and considered its

potential liability as a joint employer before engaging with the State to administer this program.

*See* Sec. V, *supra*. PPL then worked with the State to create a role for itself where it shared control in setting wage rates, determining whether to pay overtime, hiring, establishing the work rules governing DCWs' employment, and maintaining employment records. Such a role is one of a joint employer.

**A.     PPL Shared Control Over DCWs' Compensation**

272.    The evidence shows that PPL exerted significant control over DCW's pay rates, and over the decision of whether to pay them overtime. Together, these elements are significant indicators of PPL's joint employer status. Indeed, PPL's "power over the employment relationship by virtue of [its] control over the purse string was substantial," which weighs heavily in favor of finding an employment relationship. *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465,1470 (9th Cir. 1983).

i.     PPL Significantly Impacted DCW Pay Rates, a Strong Indicator of Employer Status.

273.    The DOL considers setting a wage rate to be "so fundamental to the ultimate question of economic dependence that any entity that sets a wage rate will likely be considered an employer." Jx 376 at 2371 (AI2014-2). Courts agree that control over pay rates is a strong indication of employer power. *See Barrientos v. Taylor*, 917 F.Supp. 375, 383 (E.D.N.C. 1996) (finding joint employment where farm labor contractor was so dependent on cash from the farm owner that "[e]ssentially, the [farm owner] dictated what plaintiffs would receive"); *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235, 238 (5th Cir. 1973) (finding that defendant set the workers' pay, determined whether to pay on an hourly or piece-rate basis, and deducted Social Security contributions, all of which weighed strongly in favor of finding a joint employment relationship).

274.    PPL argues Participants had sole control over pay rates. Not so. The facts show

that PPL exercised significant discretion over multiple areas impacting DCWs' pay rates. Indeed, PPL set DCWs' pay rates *directly* in several circumstances, including: (1) when PPL took over the PDS program in 2013, it continued paying at the same rate set by a previous employer, without seeking input from Participants, and continued to do so indefinitely, never asking Participants to sign a rate sheet unless Participants specifically requested an increase (*see* ¶¶ 70-73, *supra*); (2) PPL decided which DCW work hours to consider in allocating COVID-19 related hazard pay (*see* ¶¶ 109-11, *supra*); (3) PPL decided the pay rate and the number of hours of pay for DCWs during mandatory training (*see* ¶ 112, *supra*); and (4) after determining that some DCW rates exceeded the maximum, after accounting for the cost of workers' compensation, unemployment, and employer taxes, PPL directed a number of Participants to reduce the wage rate for their DCW to the specific amount PPL chose (*see* ¶¶ 74-75, *supra*).

275.    Even when not deciding directly how much DCWs would be paid, PPL, not the State, established the cap on DCW hourly wage rates. PPL's maximum hourly wage rates for DCWs varied significantly from the reimbursement rates published by the State because PPL subtracted from the State's maximum reimbursement rate the amounts that PPL determined would be spent for workers' compensation insurance, unemployment insurance, and the employer's share of taxes. *See* ¶¶ 37-41, *supra*. Significantly, PPL did not merely make a mathematical calculation—PPL exercised discretion over these factors, impacting how much was deducted for each category. *See* ¶¶ 43-63, *supra*. PPL influenced workers' compensation rates by procuring and overseeing a workers' compensation insurance policy,[71] a process that involved neither the State nor the Participants. PPL even took steps to lower workers'

---

[71] While Participants' names may appear on the policy itself, Participants had no input into the carrier, plan, or level of coverage. *See* ¶ 42, *supra*.

compensation costs so it could receive a cost savings payment from the State. *See* ¶¶ 44-51, *supra*. PPL also communicated directly with the state DOL regarding unemployment claims, collecting information from termination forms PPL directed Participants to complete, and providing the reason for termination, along with the DCW's wage and employment history to the unemployment commission. These actions impacted Participants' unemployment tax rate. *See* ¶¶ 52-59, *supra*. Finally, PPL determined what tax exemptions applied to DCWs and Participants, directly impacting the amount of the employer's share of payroll taxes, and further impacting the DCWs' maximum hourly wage rate.[72] *See* ¶¶ 60-62, *supra*. Thus, PPL's decisions directly impacted the wage rate paid to each DCW.

276.    PPL was also significantly involved in nearly every aspect of Participant's so-called authority over setting DCWs' pay rates. First, PPL trained the Participants on setting rates. *See* ¶ 65, *supra*. Second, as it stated on rate sheets, PPL would not pay the rate listed on the rate sheet if it was above the maximum that PPL calculated and would automatically enter and pay the minimum wage if the Participant left the rate blank. *See* ¶ 68, *supra*. Finally, PPL reviewed all rate change requests submitted by Participants and could alter them. *See* ¶¶ 67-68, *supra*. Therefore, even when Participants exerted influence in this area, PPL exercised the ultimate authority to set DCWs' pay rates.

277.    Participants did not have meaningful discretion over the pay rate. The wage range PPL provided to Participants was illusory because—as Participants testified, and PPL acknowledged—Participants could not effectively hire DCWs at a rate much lower than the maximum. *See* ¶ 34, *supra*. PPL witnesses acknowledged that DCWs were generally paid at or

---

[72] PPL's determination on the tax exemption also determined whether the DCW would be eligible for benefits such as unemployment or social security. Dx 304 at 8043-45; ¶ 62, *supra*.

near the maximum, meaning that PPL's decisions that impacted the maximum hourly wage rate effectively set DCWs' pay rates. *See* ¶ 35, *supra*.

278.    The DOL's guidance notes that the setting of a wage *range* can also be a factor in an economic realities analysis. Jx 376 at 2372 (AI2014-2). The DOL's guidance presents two requirements for a true cap/range that, if fulfilled, would be only a weak indicator of a third-party entity's employer status: (a) Participant must have meaningful discretion over the pay rate; *and* (b) Participant must have the choice to spend unused funds available as a result of selecting lower rate on other Medicaid-eligible expenses. *Id.* Here, as PPL ultimately acknowledged, Participants have neither. *See* ¶¶ 240-41, *supra*. Thus, where, like here, the range is not meaningful, or the Participant cannot spend unused funds, the factor is a strong indicator of third-party employer status. Jx 376 at 2372 (AI2014-2).

279.    Because "the consumer has little discretion to actually set a wage," PPL's published maximum hourly wage rates are "more similar to a predetermined wage rate, and thus…[is a] strong indicator of employment status of the public entity." Jx 376 at 2372 (AI2014-2); *cf. Barrientos*, 917 F.Supp. at 382-83 (farm owner held to be joint employer because it effectively determined plaintiffs' pay rates where farm owner paid farm labor contractor a fixed hourly rate for the workers provided, and labor contractor determined individual workers' payment based on the amount received from the farm owner). Moreover, Participants do not have any budget authority where they can "save" by choosing a lower wage rate for their DCW, in order to spend the savings on other approved services or equipment. *See* ¶ 90, *supra*. Because Participants cannot spend unused funds on other Medicaid expenses, *id.*, PPL cannot establish the second requirement for a true cap/range.

280.    For the foregoing reasons, the Court concludes that PPL's role in setting pay rates

is a strong indication of its joint employer status.

ii.   PPL Shared Control Over Payment of Overtime

281.   In addition to finding that PPL exercised substantial control over wage rates, the Court concludes that PPL shared control over the overtime rates at the center of this litigation with the State, but not Participants. *See Keating v. Pittston City Hous. Auth.*, No. 17-CV-465, 2018 WL 1414459, at *5 (M.D. Pa. Mar. 21, 2018) (in evaluating joint employer issue, the joint control should be linked to the alleged wrongdoing); *Nerviano v. Cont. Analysis Sys.*, No. 17-4907, 2018 WL 2240533, at *3-4 (E.D. Pa. May 16, 2018) (noting there were no allegations of control in support of joint employer claim against ADP, and specifically singling out lack of ADP's involvement in the termination decision challenged).

282.   From the start of its engagement with the State, PPL bragged that it had "policies, procedures, and internal controls" in place to ensure it complied with applicable state and federal rules for overtime pay. *See* ¶ 78, *supra*. In particular, PPL stated that it would determine if DCWs fell under any applicable FLSA exemptions. *See* ¶ 79, *supra*.

283.   PPL assumed that DCWs were not due overtime under state law. *See* ¶¶ 237-38, *supra*. However, when DOL adopted regulations in January 2015 limiting the companionship services and live-in exemptions, PPL actively worked with the State in determining the implications of this change on the Medicaid waiver program. *See* ¶¶ 80-86, *supra* (PPL developed materials internally in order to advise state clients on the new rule including extensive trainings, talking points, and reports, to instruct clients on new rule and how to implement it); ¶ 88, *supra* (the State admits it relied on PPL's expertise to address how to deal with new overtime changes).

284.   When advising the State on these decisions, PPL was explicitly aware of the potential ramifications of its joint employer status, and therefore created a strategy to frame its

involvement as solely that of a fiscal/employer agent to a sole employer Participant. It advocated for this framing so that exemptions could still apply, and it need not total hours worked by a DCW for multiple Participants. *See* ¶¶ 89, 96, 107, 233-35, *supra*. PPL and the State even formed a working group to consider substantive changes to the program to avoid paying DCWs overtime. PPL helped the State consider whether *the State* was a joint employer, and ultimately decided it was not. *See* ¶¶ 94, 107, *supra*. Critically, PPL never seriously considered whether *it* was a joint employer of the DCWs. After making this determination, PPL and the State further worked together to operationalize changes to the program that would ultimately bar many DCWs from being paid overtime, including making determinations—at times incorrectly—that DCWs were live-ins ineligible for overtime under the live-in exemption, 29 C.F.R. § 213(b)(21); *see supra* ¶¶ 93-104, *supra*.

285.    These facts demonstrate that not only did PPL have significant control over whether individual DCWs would receive overtime or be deemed a live-in, but also exerted substantial influence over the State's decision regarding the application of various DOL rules for overtime and overtime exemptions. This amount of control and influence over overtime rates, a factor the DOL considers very "fundamental to the ultimate question of economic dependence," is a strong indicator of PPL's joint employer status. Jx 376 at 2371 (AI2014-2); *see also Savakus-Malone v. Piramal Critical Care, Inc.*, No.18-05063, 2019 WL 2897697, at *4 (E.D. Pa. July 3, 2019) ("where one company provided rules and regulations calculating the employees' pay," that may be sufficient exercise of control to support a joint employer finding).

286.    PPL argues that because it did not control whether a DCW worked over 40 hours, it cannot be responsible for overtime. However, having a DCW work over 40 hours a week does not violate the FLSA or PMWA. The legal violation arises from not paying time and a half for

hours worked over 40 a week, and it was that key decision that PPL controlled. This level of control over the decision of whether to pay DCWs overtime rates, despite the Participants' ability to control whether DCWs work overtime hours, is another key *indicia* of employer control.

287.     The Court concludes that PPL's level of control over overtime rates weighs strongly in favor of finding it liable as a joint employer. *Hardgers-Powell*, 330 F.R.D. at 109-12 (noting that fiscal agent who was found to be joint employer made compensation decisions, including whether to pay at overtime rate).

### B.     PPL was Substantially Involved in the DCW Hiring Process.

288.     As Plaintiff acknowledges, Participants had control over important elements of the hiring process, such as the ability to select which DCW they wanted to work for them. PPL, however, also exercised significant control. *See* Sec. IV.B, *supra*. More than one employer can share control over the hiring process—or other conditions of employment—and all who share that control may be considered a joint employer. *Enterprise*, 683 F.3d at 468.

289.     PPL's substantial role in hiring included: recommending adding enrollment specialists who met with Participants and DCWs to assist DCWs through the enrollment process (*see* Sec. IV.B.ii, *supra*); modifying the DCW Agreement and DCW Qualification Form, adding provisions to the samples provided by the State (*see* Sec. IV.B.i, *supra*); sending cover letters with new-hire enrollment paperwork that instructed DCWs on how to complete the paperwork and on other aspects of employment, such as how to log on to PPL's portal to get more information, and how to contact PPL's customer service line with questions, much like any HR Department (*see* ¶ 125, *supra*; Jx 364); and, significantly, ensuring that prospective DCWs met the required qualifications (*see* ¶¶ 142-43, 147, *supra*). In sum, until PPL approved them, a DCW was not "hired." *See generally* Sec. IV.B, *supra*.

290.    PPL's control over these elements of the hiring process weighs in favor of finding PPL is a joint employer. *See Rapczynski v. DIRECTV, LLC*, No. 14-CV-2441, 2016 WL 1071022, at *5 (M.D. Pa. Mar. 17, 2016) (where defendant required workers to obtain certifications before being assigned to work for it and imposed quality standards, inference that defendant had authority over hiring was reasonable); *Senne v. Kan. City Royals Baseball Corp.*, 591 F.Supp.3d 453, 518 (N.D. Cal. 2022) (finding that baseball clubs selecting players and signing player contracts is not of "particular significance," since the league, as joint employer, drafts the contracts and must approve each contract before players are permitted to play).

291.    PPL further required that DCWs complete the criminal background check *before* they were permitted to begin work, even though the State only required the process be completed within 30 days *after* they began work (*see* ¶¶ 148-49, *supra*). In doing so PPL went beyond the minimum required by the State contract. *See* ¶ 150 n.54, *supra*; *see McCoy v. Transdev Servs., Inc.*, No. 19-2137, 2022 WL 951996, at *10 (D. Md. Mar. 30, 2022) (finding that defendant's supervision of drivers going beyond simply double checking its compliance with government contracts was an indicator of joint employer status).

292.    As noted above, there were delays of 6-8 weeks on average between a Participant and DCW submitting enrollment paperwork and PPL authorizing the DCW to begin working. *See* ¶ 137, *supra*. Thus, PPL's decision on timing of the background check, as well as its review of qualifications and approval of the DCW, combined to cause meaningful delay in when a DCW could be hired.

293.    In addition, PPL provided Participants substantial guidance on how to select a DCW and developed an online directory to assist Participants in locating DCWs.

294.    The Court finds these facts demonstrate that PPL shared authority over hiring. *See*

*Field v. DIRECTV LLC*, No. 14-4427, 2015 WL 13620424, at *2 (E.D. Pa. Aug. 21, 2015) (joint

employment relationship could be shown where one company set hiring criteria, while another

implemented and enforced those criteria, and other control factors were similarly shared).

295.    Given PPL's significant shared authority over hiring, as well as over other factors

discussed below, the Court finds inapplicable cases mentioning lack of hiring authority as one of

*many* factors that were lacking in rejecting joint employment status. *See, e.g., Garcia v. Nunn*,

No. 13-6316, 2015 WL 5585451, at *4 (E.D. Pa. Sept. 23, 2015) ("[N]o mention in the amended

complaint that Defendant Weis had the authority to hire and fire the plaintiff employees, that it

trained the employees, that it paid the employees directly, or that it set the employees' conditions

of employment in terms of compensation, benefits, and work schedules, including the rate and

method of payment.").

296.    Even if PPL did not exercise the same level of control over firing as it did hiring,

a lack of control in firing does not outweigh the significant control PPL exercises over hiring.

*See Echvarria v. Williams Sonoma, Inc.*, No. 15-6441, 2016 WL 1047225, at *6 (D.N.J. Mar. 16,

2016) (denying summary judgment where defendant exercised significant control over hiring by

conducting background checks, requiring applicants to fill out its paperwork, and barring the

hiring of applicants who do not meet its standards, even though another entity also made hiring

and firing decisions).

297.    This Court concludes that PPL and the Participants both exercise a degree of

control over the hiring process. Given PPL's substantial involvement and shared control over

hiring, this Court finds that this factor weighs in favor of finding PPL to be a joint employer.

C.      **PPL Set Work Rules and Conditions of Employment.**

298.    Plaintiffs have demonstrated that PPL sets and controls many terms and

conditions of DCWs' employment. PPL dictated employment agreement terms, established

various work rules, and provided orientation to DCWs covering important aspects of their job duties. While Participants had control over their DCW's specific schedule, PPL controlled other substantial terms, and this factor overall weighs in favor of finding PPL is a joint employer.

299.     At the outset, when DCWs first fill out PPL's enrollment paperwork, PPL provides a cover letter to DCWs that not only instructed them on how to fill out the paperwork, but also detailed the program requirements, and provided details about payroll. *See* ¶ 125, *supra*.

300.     The main terms of DCWs' employment are set forth in the "DCW Agreement" that all DCWs and Participants were required to agree to before DCWs could begin providing services; several of those terms were added by PPL. *See* Sec. IV.C.i, *supra*. Participants did not have any input into the drafting of the DCW agreement, or opportunity to negotiate the terms included in the DCW Agreement. *See* ¶ 167, *supra*. There were even some terms included in the DCW Agreement that Participants explicitly disapproved of. *See* ¶ 168, *supra* (detailing requirement DCWs join meeting with PPL, the Participant's SCs, or others regardless of Participant's wishes, and requiring DCWs to report certain events, such as injuries, illness, or other medical events to their Participant's SC even if the Participant did not want them to do so).

301.     PPL also developed and carried out mandatory orientation training for DCWs. *See* Sec. IV.C.ii, *supra*. While PPL used a subcontractor to conduct the training, it remained responsible for the work performed by the subcontractor and monitored and oversaw the training, as well as contributed to its development. *See* ¶¶ 170-74, *supra*. While the State required PPL to address certain topics in the orientation training, PPL exercised significant discretion in including more than the minimum required by the State. *See* ¶¶ 176-77, *supra*. Importantly, this training instructed DCWs on their job duties and functions. *See* ¶ 78-79, *supra*. Participants had no input into the training. *See* ¶¶ 183-84.

302.    Participants' control over scheduling DCWs' hours is akin to that exercised by companies who contract with staffing agencies where the client-company, not the staffing agency, controls when the work is completed. Courts have nonetheless found those staffing agencies to be employers because the client's control neither suggests that the client is the sole employer nor divests the staffing agency of its employer status. *See, e.g., Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 144, 147 (2d Cir. 2008) (finding hospital and staffing agency qualified as joint employers even though hospital had control over hours and tasks assigned); *Yue Yu v. McGrath*, 597 F.App'x 62, 64-66 (3d Cir. 2014) (plaintiff was employee of staffing agency, not of client that controlled work assignments); *Garcia*, 2015 WL 5585451, at *4 (finding that defendant's control over schedule for cleaning services did not make it a joint employer).

303.    PPL's control over several elements of DCWs' terms and conditions of employment—in contrast to Participant's control over the one element of scheduling hours worked in the home—weighs strongly in favor of finding PPL a joint employer. *See Savakus-Malone*, 2019 WL 2897697, at *4 (an entity that trains employees thereby exercises control over work rules and conditions); *see also Green v. 712 Broadway, LLC*, No. 17-991, 2018 WL 2754075, at *5 (D.N.J. June 8, 2018) (holding that where defendant trained plaintiff and was listed as payor on plaintiff's pay stubs, that presented evidence defendant was joint employer).

**D.    PPL Exerted Influence Over Day-to-Day Supervision.**

304.    PPL has presented sufficient evidence to demonstrate that Participants largely directed DCWs on tasks to be completed. This level of supervision, however, does not mean that PPL exercised no control over other elements of DCWs' daily supervision or that PPL was not a joint employer. The facts demonstrate that PPL created and implemented mandatory training of Participants, directing them as to how to act as day-to-day supervisors, (*see* Sec. IV.D.i, *supra*),

controlled DCW timesheet submission and approval (*see* Sec. IV.D.ii, *supra*), and engaged in HR-type interactions with DCWs (*see* Sec.IV.D.iii, *supra*).

305.    Participants supervised DCWs on a day-to-day basis, much as someone who obtains temporary workers from a staffing agency is able to direct work on their premises. *See, e.g., Baystate*, 163 F.3d at 676 (finding "that the absence of direct, on-site supervision does not preclude a determination that [staffing agency is] the employers of the [workers] within the broad definition of the FLSA."). Indeed, in PDS programs like this one, entities that are similarly removed from day-to-day supervision nonetheless are found to be joint employers. *See Bonnette*, 704 F.2d at 1470 (finding that the recipients of domestic in-home services were responsible for day-to-day supervision of chore workers but that public social service agencies were still joint employers); *Hardgers-Powell*, 330 F.R.D at 108-12 (finding fiscal intermediary is a joint employer even though program participants are responsible for hiring and supervising home care workers).

306.    While *on-site* supervision of tasks comes from Participants, PPL engages in routine supervision of DCWs with respect to various employment matters. For example, PPL provides basic HR support to DCWs under the nomenclature of "customer service," such as providing telephonic assistance with how to fill out required forms (*see* ¶¶ 216-17, *supra*); assistance with resolving issues with timesheets or payroll (*see* ¶ 218, *supra*); and numerous other matters like providing proof of employment as needed for DCWs applying for credit (*see* ¶ 229, *supra*), and providing information about applying for unemployment to DCWs who are terminated (*see* ¶ 57, *supra*).

307.    Approving timesheets for payment also falls under this factor. Plaintiffs have demonstrated that even after a Participant approved a timesheet, PPL could decline to pay the

timesheet and require changes and re-submission of new timesheets before DCWs would be paid. *See* ¶¶ 207-09, *supra* That PPL had to approve timesheets, not simply issue paychecks once a Participant approved them, is also an indicator of joint employer status. *Contra Jimenez v S. Parking, Inc.*, No. 07-23156-CIV, 2008 WL 4279618, at *2 (S.D. Fla. Sept. 16, 2008) (describing employer sending written log of employees' hours to ADP which then issues checks). PPL further decided when or if it was appropriate to garnish DCWs' wages based on its review of documentation submitted, not based on consultation with Participants. *See* ¶ 231, *supra*.

308.    Participants' approval is necessary, but not sufficient, for DCWs to be paid. The DOL recognizes that a strong indicator of joint employment is where workers clock in and out directly with a third-party entity that processes the timesheets, and hours verification from the Participant is not required. Jx 376 at 2373 n.10 (AI2014-2). A moderate indicator that the third-party entity is an employer is where Participants retain "ultimate responsibility" for verifying or approving timesheets, and the third party merely provides an electronic verification system for purposes of auditing or processing payroll. *Id.* Here, PPL's authority lies somewhere in-between these scenarios as Participants are responsible for verifying and signing off on DCWs' timesheets, DCWs report their hours using PPL's online portal, PPL has to *also* approve the timesheets before issuing payment, and PPL could and did reject many timesheets that Participants had approved. *See* ¶¶ 206-07, *supra*. Because PPL, not the Participant, retains the "ultimate authority" for verifying and approving timesheets, the Court finds that this is a strong indicator that PPL is a joint employer.

309.    When a staffing agency or government contractor provides workers, verifying hours worked at the client's location is considered a normal client action that does not undermine

the staffing agency or contractor's status as an employer or joint employer, nor does that verification ability alone establish the client's role as a sole employer. *Yue Yu*, 597 F.App'x at 66 (client approved timesheets, but agency, not client, was employer). Indeed, the fact that PPL did not visit Participant homes to review DCWs' work should be given little weight given that the work is performed in individual homes rather than a common workplace. *DialAmerica*, 757 F.2d at 1384.

310.     In considering the overall circumstances, PPL's influence over DCWs' day-to-day activities is significant enough to conclude that this factor weighs in favor of finding PPL is a joint employer. *See Baystate*, 163 F.3d at 676 (applying similar factors to the Third Circuit's *Enterprise* test, finding that staffing agency is a joint employer despite client's day-to-day supervision over workers, given all of the other direct and indirect control the defendant exercised).

### E.     PPL Controlled and Maintained All DCW Employment Records.

311.     Plaintiffs have presented ample evidence demonstrating that PPL carried out the core employer function of maintaining complete files for each qualified DCW who provided services in the PDS program, (*see* ¶ 224, *supra*), copies of records such as results of background checks, tax forms, workers compensation claims filed, (*see* ¶¶ 225-27, *supra*), and responses to requests for verification of DCWs' employment (¶ 230, *supra*).

312.     This is not an instance where PPL acted as the agent for Participants, who wielded true employer power; at best, PPL was nominally acting on behalf of Participants, while actually exercising significant control over the terms and conditions of DCW's employment, circumstances which support finding PPL is a joint employer. *See Falk*, 414 U.S. at 192, 195 (finding defendant apartment management company was joint employer of apartment maintenance personnel along with building owners where defendant was under the "nominal

supervision" of building owners, but actually exercised "substantial control of the terms and conditions" of employment).

313.    PPL was not in a typical agent-principal relationship with Participants, as PPL argues, because PPL gave instructions to Participants rather than the other way around. Participants were told they had to authorize PPL to handle employer functions as a condition of receiving PDS services. For example, Participants were not permitted to decide whether to claim the live-in exemption or any overtime exemption or whether to subject a new worker to training, decisions that employers typically have discretion to control. *See* ¶¶ 62, 183-84, *supra.*

314.    PPL failed to introduce any evidence that any Participant has affirmatively directed PPL to engage in such activities on their behalf; PPL's argument fails because the record is clear that none of the Participants had any control over the employer tasks that PPL undertook. *See Hardgers-Powell*, 330 F.R.D. at 108-12 (holding fiscal agent was joint employer along with participants, based in part on fiscal agent carrying out same duties as PPL does here).

315.    PPL maintained discretion over employer duties delegated by the State that go far beyond the powers that payroll processors such as ADP possess. *Cf. Nerviano*, 2018 WL 2240533, at *4 (dismissing ADP from case where there were no allegations that ADP exercised any control over termination or any other aspect of employment). For example, in *Nerviano*, ADP "did not create an employer/employee relationship by handling record keeping," and therefore, "[a]bsent allegations that ADP had some ability to dictate [] working conditions," the court concluded that ADP should be dismissed from the case as joint employer. *Id.* In comparison, here, the record demonstrates that PPL both handled record-keeping and had significant ability to dictate DCWs' working conditions.

316.    PPL maintained files for each qualified DCW, and DCWs would ask PPL, not

Participants, when they needed a copy of their documents. *See* ¶¶ 228-29, *supra*; *Godlewska v. HDA*, 916 F.Supp.2d 246, 262 (E.D.N.Y. 2013), *aff'd*, 561 F.App'x 108 (2d Cir. 2014) (noting that all employment records were maintained by home care agency, which weighed in favor of the agency being the employer); *Acosta v. Osaka Japan Rest., Inc.*, No. 17-1018, 2018 WL 3397337, at *16 (E.D. Pa. July 12, 2018); *Savakus-Malone*, 2019 WL 2897697, at *5. Here too, since PPL maintains these records and makes them available to DCWs, this weighs in favor of finding PPL as a joint employer.

## VIII.   PPL PARTNERED WITH THE STATE TO SHAPE THE PDS PROGRAM

317.    PPL has argued that many of its actions were taken in compliance with contractual obligations, and that nothing PPL did out of contractual obligation can be considered evidence that PPL was a joint employer. PPL's argument that it carried out employer functions only because it was required to do so via contract fails for two reasons.

318.    First, it is factually inaccurate. PPL was involved in and influenced the State in making decisions, advising on how to structure the PDS program, and recommending what the State should "direct" PPL to do. *See generally,* Sec. III, *supra*. PPL had particular influence on decisions related to tax exemptions, wage and hour rules, and who would be paid overtime. *See* Sec. IV.A.iii, *supra*. Further, any actions that PPL proposed and the State subsequently accepted, cannot simply be attributed to a "state decision." *See* ¶¶ 26-28, *supra*. In short, PPL did not simply follow the State's orders, but instead was an active participant and decisionmaker in every aspect of its employer functions.

319.    Second, it is legally unsound. As numerous courts have explained, the joint-employer inquiry requires an examination of "the nature and degree of the alleged employer's control, not *why* the alleged employer exercised such control." *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1316 (11th Cir. 2013) (emphasis added) (rejecting argument that the control

exercised over workers was due to the nature of the business and thus could not lead to employer status); *see also Hardgers-Powell*, 330 F.R.D. at 109-11 (citing to regulations requiring defendant fiscal agent to undertake various responsibilities as proof that defendant had exercised such control, *favoring*, rather than undermining, joint employer status); *Narayan v. EGL, Inc.*, 616 F.3d 895 (9th Cir. 2010) (holding that control exercised pursuant to a contract or government regulation is itself affirmative evidence of an employment relationship, rejecting defendant's argument that its exercise of control should be disregarded because it was due to government regulations, business reasons, and customer requests, rather than its own discretion); *Hughes v. Family Life Care*, 117 F.Supp.3d 1365 (N.D. Fla. 2015) (actions defendant took to comply with contract nonetheless demonstrate it acted as employer); *Harris v. Med. Transp. Mgmt.*, 300 F.Supp.3d 234, 245 (D.D.C. 2018) (joint employer claim stated against company despite its argument that its activities were "implementation and enforcement of the [government's] contractually-imposed standards" and thus should not count towards joint employer analysis).

320.    The reasons an entity has employer authority are irrelevant—if the entity has such authority, it qualifies as a joint employer. In fact, the Third Circuit, and others, have long held that an entity exercising employer control in order to ensure compliance with government regulations supports, rather than undermine, employer status. *NLRB v. A Duie Pyle*, 606 F.2d 379, 385 (3d Cir. 1979) (holding that government mandated controls are "a relevant part of the totality of circumstances from which the 'employee' determination (is) properly made.") (citation omitted); *see also NLRB v. Deaton, Inc.*, 502 F.2d 1221, 1226 (5th Cir. 1974) ("we cannot ignore or discount the items that are requirements imposed by federal regulations" and finding them sufficient to establish employer relationship); *Ace Doran Hauling & Rigging Co. v.*

*NLRB*, 462 F.2d 190, 194 (6th Cir. 1972) (finding truck drivers were employees based on "both 'additional controls' and the control and supervision exercised pursuant to [government] requirements").

321.   Moreover, the HCBS waiver application and regulations governing the program do not support finding the Participant to be the sole employer at the expense of finding PPL a joint employer. The Commonwealth of Pennsylvania acknowledged that the Participant may be a joint employer in the HCBS waiver program, noting that "[t]he Participant may function as the common law employer *or the co-employer* of workers." Dx 104 at 170 (emphasis added). *See* U.S. Dep't of Health & Humans Servs., Ctrs. For Medicare & Medicaid Servs., *Application for a § 1915(c) Home and Community-Based Waiver: Instructions, Technical Guide and Review Criteria, Appendix E-2: Opportunities for Participant Direction* at 223-24 (Jan 2019), available at https://wms-mmdl.cms.gov/WMS/help/35/Instructions_TechnicalGuide_V3.6.pdf (last visited January 30, 2024) ("there are two ways in which to position the participant to direct staff who provide supports to the participant," and that co-employment is an option that fully satisfies the PDS directive to provide for Participant control.).

322.   Even if the Medicaid regulations did state that the Participant is the sole employer for Medicaid purposes—which they do not—the Supreme Court has held that "employer-employee classification under other statutes are not of controlling significance" in determining employer status under the FLSA. *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150 (1947).

323.   In fact, however, there is simply no evidence that any relevant authority has required the Participant in a PDS Program to serve as the *sole* employer. Rather, all government agencies related to this PDS program have explicitly contemplated that a third-party entity such as PPL could be a joint employer under the "consumer-directed model" at issue here. *See* ¶¶ 234-

107

35, 321 *supra*. Even the Grant Agreement between Pennsylvania and PPL contemplated that the overtime provisions of the FLSA might be found to apply to workers providing services through the consumer-directed program. Jx 357 at 760-61.

324.    In sum, Plaintiff has established that PPL exerts significant control over hiring, pay rates and overtime compensation, conditions of employment, day-to-day supervision, and employment records. When considering the economic reality of the situation, and taking into account the totality of the circumstances, the *Enterprise* factors weigh in favor of finding that PPL jointly employed the DCWs along with the Participants. In particular, and relevant to the issue at the center of this case, Plaintiffs have established that PPL exercised a significant share of control over wage rates and overtime premiums, a factor that the DOL considers to be "so fundamental to the ultimate question of economic dependence that any entity that sets a wage rate will likely be considered an employer." Jx 376 at 2371 (AI2014-2). Plaintiffs have also established that PPL must approve the hiring of DCWs.

325.    PPL may be able to point to authority where a third-party entity was found not to be a joint employer due to their failure to meet one of the *Enterprise* factors. However, in those circumstances, it was not the absence of one factor that led to not finding the entity a joint employer, but the absence of most or all factors. *See Richardson v. Bezar*, No. 15-0772, 2015 WL 5783685 (E.D. Pa. Oct. 5, 2015) (complaint dismissed for failing to allege that defendant played a role in any of the *Enterprise* factors); *McKenna v. Healthease, Inc.*, No. 10-3950, 2013 WL 1702639, at *7 (E.D. Pa. Apr. 19, 2013), *aff'd*, 573 F.App'x 190 (3d Cir. 2014) (alleged joint employer did not engage in any day to day supervision, but also had no control over any other *Enterprise* factor). Here, Plaintiffs presented evidence that PPL played a substantial role under each factor, albeit moreso in some factors than in others.

326.     PPL has also suggested that if any entity is a third-party joint employer, it would be the Service Coordinator entities. Dkt. 228 at 4. The role of SCs, and their potential as another joint employer is irrelevant to PPL's status as a joint employer. *See Sullivan-Blake*, 2020 WL 2572273, at *11. Similarly, while PPL partnered closely with the State, and the State could also have been alleged to be a joint employer (*see* Jx 376 (AI2014-2), frequently evaluating whether states will be found to be joint employers in PDS programs), just as with the SCs, the existence of other potential joint employers does not change the analysis of PPL as a joint employer.

327.     Determining joint employer status is not dependent on finding that one entity exercised greater control at the expense of the other. If that were the case, then there could never be a joint employer because once on party exercised some control over a factor, then any other entity could not be a joint employer. The fact that Participants also have some control over certain aspects of DCW's employment merely confirms that PPL is a joint employer, not the sole employer. The evidence does not support a finding that Participants are the sole employer of DCWs. *Hardgers-Powell*, 330 F.R.D. at 111-12 (analyzing the same type of Medicaid waiver program in New York, concluding that the so-called "fiscal intermediary" and the program participant "work in tandem to control each [DCW's] working conditions and to ensure the delivery of home health care services"). The level of shared control that PPL and the Participants exert over the DCWs make PPL, as a fiscal intermediary, a joint employer. *Id.*

328.     Considering all of the factors discussed above in which PPL exercises substantial control, the economic reality is that PPL jointly employed DCWs under the FLSA. Since the parties agree that the PMWA follows the FLSA in many respects, including determining the existence of an employer or joint employer relationship, PPL is also liable as Plaintiffs' employer with respect to PMWA claims.

IX.    **PPL OWES PLAINTIFFS LOST OVERTIME WAGES AND DAMAGES**

A.    <u>**Because PPL is a Joint Employer, Neither State Nor Federal Overtime Exemptions Apply.**</u>

329.    Because the Court finds that PPL is a third-party joint employer of the DCWs, PPL cannot claim the domestic services exemption under PMWA. 43 Pa. Cons. Stat. Ann. § 333.105(a)(2).

330.    Because the Court finds that PPL is a third-party joint employer of the DCWs, PPL cannot claim the companionship services exemption from the FLSA's overtime requirement. 29 C.F.R. § 552.109(a).

331.    The live-in exemption, like the companionship services exemption, does not apply to third-party joint employers, and is thus inapplicable here as well. 29 C.F.R. § 552.109(c) (live in exemption cannot be claimed by third-party joint employer, only by individual receiving services).

332.    Finally, as a joint employer, PPL is liable for paying DCWs overtime rate for *all* hour worked over 40 per week, regardless if they were for one Participant or spread across multiple Participants. *See Salinas*, 848 F.3d at 134 ("[T]he hours an individual works for each joint employer in a single workweek must be aggregated to determine whether and to what extent the individual must be paid overtime to comply with the FLSA."); *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1208 (7th Cir. 1986) (aggregating hours worked for separate joint employers to determine overtime requirements under FLSA).

B.    <u>**PPL Willfully Violated the Law.**</u>

333.    In order for the extended three-year limitations period to apply to FLSA claims, Plaintiffs must demonstrate that PPL acted willfully in violating the FLSA. An employer willfully violates the FLSA when it either knew its conduct was prohibited by the FLSA or

showed reckless disregard for the matter. *Souryavong v. Lackawanna Cnty.*, 872 F.3d 122, 126 (3d Cir. 2017).

334.    However, willfulness does not require egregious behavior. *Stone v. Troy Constr. LLC*, 935 F.3d 141, 147 (3d Cir. 2019) (district court applied an "overly burdensome standard for showing willfulness under the FLSA" that was "worse than the recklessness identified in *McLaughlin*").

335.    The evidence shows that PPL tried to assess whether it would be a joint employer before bidding on the contract with Pennsylvania, indicating its awareness of the risk. *See* ¶¶ 233-34, *supra*. Indeed, PPL's first contract with the State had a specific provision for what would happen if PPL to have violated the FLSA by not paying overtime. Jx 357 at 760-61. PPL was certainly aware of the standards for the companionship care exemption and other exemptions—it's response to RFA specifically touted its expertise in the relevant wage and hour rules and proclaimed that PPL would decide if DCWs were covered by the companionship care exemption. *See* ¶¶ 22-24, 88, *supra*. Moreover, PPL was aware of changing FLSA regulations related to the exemptions at issue, and actively worked with the State in developing a plan for how PPL would address these exemptions going forward. *See* ¶ 107, *supra.* Despite being aware of these risks PPL did not consult with outside counsel regarding its status as a joint employer and has provided no details regarding its internal lawyers' alleged analysis.

336.    In sum, PPL made efforts to ascertain the implications of its role as a joint employer, and then engaged with the State to craft a role for itself that violated the FLSA. PPL agreed to take on employer burdens and authority to make numerous employer decisions, yet did not accept its joint employer status, and thus did not pay overtime due, despite committing to the State that PPL would ensure compliance with wage and hour laws. At a minimum, PPL acted

recklessly. *Cf. Stone*, 935 F.3d at 148 (where employer calculated overtime differently for in-state versus out-of-state employees, and only confirmed its in-state calculations complied with the FLSA, the court inferred that employer recognized the FLSA implications for its out-of-state calculation despite employers' "professed ignorance" that its out-of-state calculations violated the FLSA). While PPL did make efforts to understand its obligations, it chose not to consult with legal counsel about its potential status as a joint employer because it didn't consider that as within "the realm of possibility." *See* ¶ 237, *supra*; *Walsh v. TriMED Healthcare, LLC*, No. 20-4308, 2022 WL 3155406, at \*4-5 (E.D. Pa. Aug. 8, 2022) (denying summary judgment for defendant on willfulness where employer testified she implemented new pay structure "on the advice of counsel," and after contacting OLTL and "peers in the industry").

337.    Therefore, the Court concludes that PPL willfully violated the FLSA, and that Plaintiffs are entitled to a three-year FLSA statutory period.

### C.    Plaintiffs Are Entitled to FLSA and Rule 23 Overtime Damages.

338.    In their joint pre-trial filing, Dkt. 316, the parties stipulated to a summary damages chart, pending the Court's determination of PPL's liability. Given that the Court has found PPL liable for all of Plaintiffs' claims, the Court orders damages in the following amounts:

FLSA Unpaid Overtime (Three-Year FLSA Statutory Period): **$44,854,461.97**

Rule 23 Unpaid Overtime with Prejudgment Interest (assessed through trial date): **$207,257,160**

TOTAL: **$252,111,621.97.**

### D.    Plaintiffs Are Entitled to FLSA Liquidated Damages.

339.    When an employer violates the FLSA, it is liable for both the payment of lost wages and an equal amount of presumptively mandatory liquidated damages. 29 U.S.C. § 216(b).

340.    If the employer seeks to avoid payment of liquidated damages, the burden is on

the employer to "show[] to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that [it] had reasonable grounds for believing that [its] act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages[.]" 29 U.S.C. § 260. "The good faith requirement is 'a subjective one that requires that the employer have an honest intention to ascertain and follow the dictates of the Act.'" *Sec'y United States Dep't of Lab. v. Am. Future Sys., Inc.*, 873 F.3d 420, 433 (3d Cir. 2017) (quoting *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3d Cir. 1991)). Whereas the reasonableness requirement "imposes an objective standard by which to judge the employer's conduct" and "[i]gnorance alone will not exonerate the employer under the objective reasonableness test." *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984) (internal citations omitted).

341.     The employer bears the "plain and substantial" burden of demonstrating that it is entitled to relief from liquidated damages. *Cooper Elec.*, 940 F.2d at 907 (citing *Williams*, 747 F.2d at 128-29). To carry this burden, the employer must show they took affirmative steps to ascertain the Act's requirements, but nonetheless, violated its provisions. *Id.* This burden is a "difficult one to meet." *Rood v. R&R Express, Inc.*, No. 17-cv-1223, 2022 WL 1082481, at *9 (E.D. Pa. Apr. 11, 2022). Double damages are the norm, and single damages are the exception. *Cooper Elec.*, 940 F.2d at 908.

342.     As discussed above, while PPL was well aware of precisely the FLSA obligations at issue here, it did *not* take sufficient steps to ascertain if, given all that it was doing, it was acting as a joint employer, because it considered that "outside the realm of possibility." All of its attention was directed at analyzing the question of whether the State might be a joint employer, and it did not make a serious assessment of whether PPL itself was a joint employer. Further,

there is no evidence that PPL had an honest intention to follow the dictates of the Act, because it repeatedly made clear that it planned to follow instructions from the State—even if the instructions from the State were initiated by PPL itself—and accept no responsibility for its actions. Therefore, the Court finds that PPL has not carried its burden to demonstrate that it acted objectively reasonable as well as subjectively in good faith, and awards Plaintiffs liquidated damages.

343.    As the parties stipulated, Plaintiffs are therefore awarded an additional $44,854,461.97 in liquidated damages, Dkt. 316.

## PROPOSED ORDER

Accordingly, the Court FINDS and ORDERS as follows:

1. PPL jointly employed Plaintiff, the Rule 23 class members, and the FLSA collective action members from January 1, 2013, through July 23, 2022;

2. As a joint employer, PPL was responsible for and failed to pay overtime for all authorized hours worked over 40 per week per DCW, including all hours worked by one DCW, regardless of the number of Participants that DCW provided services to, under the PMWA for the entire class period beginning May 11, 2014 through July 23, 2022, and under the FLSA for a period beginning three years prior to the date that the individual DCW opted-in to the this Collective Action through July 23, 2022;

3. PPL failed to show that it acted in good faith in denying overtime, entitling FLSA collective action members to liquidated damages pursuant to 29 U.S.C. § 260.

4. PPL's conduct was a willful violation of the FLSA, thus providing for a three year rather than two-year statute of limitations pursuant to 29 U.S.C. § 255(a).

5.  Plaintiff, the Rule 23 class members and the FLSA collective members are awarded damages in the amount of $296,966,083.94, to be paid per the parties' stipulated agreement of damages;

6.  Plaintiff, the Rule 23 class members and the FLSA collective are further awarded their reasonable attorneys' fees and costs, to be petitioned for pursuant to Fed. R. Civ. P 54; and,

7.  Judgment is entered in favor of Plaintiff, the Rule 23 class members, and the FLSA collective.

February 12, 2024

Respectfully submitted,

*/s/Christine E. Webber*

Christine E. Webber (DC #439368)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600
cwebber@cohenmilstein.com

NICHOLS KASTER, PLLP
Rachhana T. Srey, MN Bar No. 340133
H. Clara Coleman, MN Bar No. 0401743
4600 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Fax: (612) 215-6870
srey@nka.com
ccoleman@nka.com

ARNOLD, BEYER & KATZ
Richard Katz, PA Bar No. 20702
140A East King Street
Lancaster, PA 17602
Telephone: (717) 394-7204
Fax: (717) 291-0992
rkatz@arnoldbeyerkatz.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2024, I electronically filed the *Plaintiff's Proposed Findings of Fact and Conclusions of Law* with the Clerk of the Court using the CM/ECF, who in turn sent notice to all counsel of record:

Dated:    February 12, 2024            */s/ Christine E. Webber*
                                        Christine E. Webber