IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RALPH TALARICO, INDIVIDUALLY AND, ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiffs, <br><br> v. <br><br> PUBLIC PARTNERSHIPS, LLC, D/B/A PCG PUBLIC PARTNERSHIPS. <br><br> Defendant. | Docket No. 17-2165 <br><br> Judge Schmehl |

**DEFENDANT'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS**

## I. INTRODUCTION

Defendant Public Partnerships LLC ("PPL"), pursuant to Rule 52(c) of the Federal Rules of Civil Procedure,[1] moves this Honorable Court for entry of judgment on partial findings in its favor on all counts in the First Amended Collective Action and Class Action Complaint (the "First Amended Complaint") of Plaintiff Ralph Talarico, individually and on behalf of all others similarly situated ("Plaintiff"). PPL is not a joint employer of the DCWs and therefore cannot be liable under any claim asserted by Plaintiff.

## II. RULE 52(c) STANDARD

Rule 52(c) of the Federal Rules of Civil Procedure provides that, "[i]f a party has been fully heard on an issue during a nonjury trial, and the court finds against the party on that issue,

---

[1] The proper vehicle for moving for judgment in a bench trial in federal court is a motion for judgment on partial findings, pursuant to Fed. R. Civ. P. 52(c). *See* Fed R. Civ. P. 52(c) advisory committee's note (Rule 52(c) "parallels the revised Rule 50(a), but is applicable to non-jury trials"); Fed. R. Civ. P. 41(b) advisory committee's note ("A motion to dismiss under Rule 41 on the ground that a plaintiff's evidence is legally insufficient should now be treated as a motion for judgment on partial findings as provided in Rule 52(c)").

1

the court may enter judgment against the party on a claim . . . that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c). "A court may grant a Rule 52(c) motion . . . at any time during a bench trial, so long as the party against whom is to be rendered has been fully heard with respect to an issue essential to that party's case." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.2d 142, 272 (3d Cir. 2010). A plaintiff is "fully heard" on all factual issues on which they bear the burden of proof at the conclusion of their case-in-chief. *See DLJ Mortg. Capital Inc. v. Sheridan*, 975 F.3d 358, 367 (3d Cir. 2020) ("Rule 52(c) motions may be granted either for or against the plaintiff at the conclusion of plaintiff's case-in-chief"). Although Rule 52(c) motions are most commonly brought at the close of the plaintiff's case-in-chief, the defendant need not wait until the plaintiff rests its case-in-chief to move for a judgment on partial findings. *See id.* at 366-67 (interpreting Rule 52(c) as operating more broadly than its predecessor Rule 41(b) because "the court need not wait until [the plaintiff] rests its case-in-chief to enter judgment pursuant to Rule 52(c)").

In considering whether to grant judgment under Rule 52(c), courts apply the same standard of proof and weigh the evidence as they would at the conclusion of trial. *EBC, Inc.*, 618 F.3d at 272. Therefore, the court is "not to draw any special inferences in the nonmovant's favor nor concern itself with whether the nonmovant has made out a *prima facie* case." *Giant Eagle, Inc. v. Fed. Ins. Co.*, 884 F. Supp. 979, 982 (W.D. Pa. 1995) (quoting Charles A. Wright and Arthur R. Miller, *Federal Practice and Civil Procedure: Civil 2d*, § 2573.1). The court, instead, is tasked with "weigh[ing] the evidence, resolv[ing] any conflicts in it, and decid[ing] for itself where the preponderance lies." *Id.* The objective of Rule 52(c) "is to conserve time and resources by making it unnecessary for the court to hear evidence on additional facts when the result would

not be different even if those additional facts were established." *EBC, Inc.*, 618 F.3d at 272 (citations omitted).

### III.   ARGUMENT

The Court of Appeals for the Third Circuit has set forth a four-factor test to determine if an entity is a joint employer of an employee for purposes of the FLSA:

> When faced with a question requiring examination of a potential joint employment relationship under the FLSA, we conclude that courts should consider: 1) the alleged employer's authority to hire and fire the relevant employees; 2) the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; 3) the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and 4) the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

*In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litig.*, 683 F.3d 462, 469 (3d Cir. 2012). There is no specific number or combination of factors that conclusively determines whether an alleged employer is a joint employer, and the test cannot be "blindly applied." *Id.* at 469 (quoting *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)). Whether an alleged employer is a joint employer instead depends on the "total employment situation and the economic realities of the work relationship." *Id.* (quoting *Bonnette*, 704 F.2d at 1470) (quotation marks omitted).

Plaintiff has failed to present sufficient evidence to prove that PPL meets any of the *Enterprise* factors and, therefore, PPL cannot be a joint employer of the direct care workers ("DCWs"). As a result, Plaintiff has failed to prove its claims for violation of the Fair Labor

Standards Act (FLSA) (Count I) and violation of the Pennsylvania Minimum Wage Act (Count II), and those claims should be dismissed.[2]

**A.     PPL Does Not Have the Authority to Hire or Fire DCWs.**

The testimony at trial from all witnesses is consistent – PPL does not have the authority to hire or fire DCWs. Rather, the evidence is clear that the functions of hiring and firing their DCWs are solely within the discretion and authority of the Participant-Employer ("PE").

   *1.     PPL Does Not Hire DCWs for the PEs*

All of the DCWs testified at trial that it was the PE that hired them. In fact, many of the DCWs testified that they began working for the PE prior to PPL becoming the vendor fiscal agent. Even the DCWs who began working for the PE after PPL became the vendor fiscal agent confirmed that the PE was the only party involved in recruiting, meeting with, interviewing and ultimately choosing to hire their DCW. In fact, the DCWs consistently testified that PPL never told the PE to hire a specific DCW at any time.

Consistent with the testimony from the DCWs, the PEs testified that they were solely responsible for finding, interviewing, and hiring their DCWs. Furthermore, PEs who sought to hire a DCW with a positive finding on their criminal background report still can and do choose to hire that DCW. PPL has no authority to stop it. This was demonstrated by the testimony of Ms. Mandoza who had been charged with and convicted of crimes that were on her criminal background report, and her PE still chose to hire her. Ms. Mandoza testified that PPL did not do anything to stop her from being hired because of her criminal record. This PE authority to hire a DCW despite their criminal record is memorialized by the Participant/CLE Acceptance of

---

[2] Plaintiff's claim for violation of the Pennsylvania Wage Payment and Collection Law (Count III) was dismissed at summary judgment and Plaintiff did not contest the dismissal of that claim on appeal before the Third Circuit. Accordingly, this claim is not before the Court at trial.

Responsibility Form (Plaintiff Exhibit 37) in which the PE acknowledged that the DCW had a criminal record, that the PE had been informed about their responsibilities as an employer for their own personal health and safety, that the PE accepted the responsibility for their decision and any potential consequences of that decision, and that they still chose to hire the DCW despite the DCW's criminal record.

Finally, "Good to Go" is merely a determination as to whether the checklist of qualifications, required by Pennsylvania's Office of Long Term Living ("OLTL") and the waiver program, are satisfied before a DCW can be *paid under the waiver program*. DCWs can still work and be paid without a Good to Go; they simply cannot receive the Medicaid funds through the program, a distinction confirmed by the testimony of a DCW witness, Sheila-Rea York. Indeed, if the PEs had sufficient income, the PE could have paid the DCWs with their own personal funds. Most importantly, the DCW would never need to fill out the enrollment packet or meet the checklist of qualifications to be Good to Go had the PE not already decided to hire the DCW and informed PPL that the DCW needed to be added to PPL's payroll service.

    2.    *PPL Does Not Have the Authority to Fire (Terminate) DCWs*

The record is also undisputed that PPL does not have the authority to fire DCWs – that power is reserved for the PEs. The PEs all testified that when they chose to fire a DCW, they did so without any prior approval from PPL. <u>After</u> firing the DCW, the PE merely submits a form notifying PPL that the DCW is no longer employed. Some PEs do not even list a reason for terminating the DCW – PPL processes the termination notice regardless. Often times, PPL was not sent a termination notice and therefore never found out that a PE had terminated a DCW. There was never a situation where a PE desired to terminate a DCW and PPL refused to permit

the termination. Conversely, PPL never informed a PE that the PE was required to terminate their DCW.

**B.    PPL Does Not Promulgate Work Rules, Make Assignments, Set the Conditions of Employment, or Determine the Compensation Rate, Benefits or Work Schedules.**

*1.    Job Duties and Hours*

The testimony from the PEs and service coordinators is clear that only the PE, together with their service coordinator, determines what services the PE needs from their DCW, and therefore, have complete control over what specific services and job duties the DCW will perform. This is memorialized in the ISP (or PCSP). Moreover, the PE and service coordinator are solely responsible for monitoring and updating the ISP as the PE's needs change based on their physical condition. There is no evidence that PPL participated in the creation or updating of the ISP. The ISP also sets forth the number of hours that are required for a DCW to perform the needed services and, therefore, the ISP dictates the number of hours the DCW works. PPL is merely informed of the number of authorized hours (in units) permitted under the ISP so that PPL can issue paychecks for only authorized hours approved by the PE. The ISP likewise governs authorized overtime hours, and PPL merely receives the number of authorized overtime hours, if any (as a different unit with a distinctive authorization code) approved by the PE. PPL never receives a copy of the ISP and is unaware of the specific services that the DCW performs for the PE. Indeed, PPL could never instruct a DCW to perform specific services for a PE because PPL is not permitted to see the PE's ISP and the individualized needs contained therein. Thus, PPL has no input on specific job duties that a DCW performs or the number of hours that a DCW is authorized to work.

### 2. Work Schedules

PEs, alone, set the work schedule for the DCWs. The DCWs consistently testified that their PE told them what their schedule would be. Further, the PEs testified that they created the schedule for their DCW based on their individualized needs and the hours allotted to them in the ISP by the service coordinator. PEs with multiple DCWs possessed the sole authority to allocate hours and determine specific schedules for each DCW that they employed. PPL was merely notified of the total number of hours permitted to be worked in the ISP for payroll purposes. PPL did not participate in setting, or even have knowledge of, the DCW's work schedule. PPL only becomes aware of the hours worked by a particular DCW after those hours are actually worked and a timesheet is approved and submitted for processing by the PE. What is clear after the trial testimony is that PPL does not in any way set the DCWs' schedules. Indeed, this is the entire purpose of the Participant-Directed Services Program – for the PE to have absolute control and authority to set a schedule of services that best addresses their needs.

### 3. Compensation Rate

The evidence at trial makes clear that the Participant-Directed Services program offers a broad pay rate range for DCWs. OLTL sets the maximum reimbursement rate, which dictates the maximum pay rate. The minimum pay rate is the minimum wage in Pennsylvania. The testimony is undisputed that the PE has the sole authority to set the DCW's pay rate at any hourly rate between the minimum and maximum rates. This is highlighted by LZ who deliberately selected different pay rates for different DCWs. Specifically, LZ chose to pay family and friends the maximum rate. Conversely, LZ chose to pay strangers lower than the maximum, so that she could provide raises as an incentive for her DCWs to provide quality services and continue working under LZ's employ. PPL merely provides the pay rate range, as set by OLTL, to DCWs

and PEs who ask what the current range is and ensures that the pay rate that the PE chose to pay their DCW does not exceed the maximum rate or fall below the minimum rate.

4. *Benefits*

PPL does not provide benefits to the DCWs. The DCWs all admitted that PPL does not provide vacation time, vacation pay, sick time, or any other benefits. PPL, as the agent for the PE, assists PEs in obtaining and paying for workers' compensation insurance using their Medicaid funds. Tellingly, the workers' compensation policies that PPL obtains for the PEs are in the name of the individual PEs.

5. *Conditions of Employment*

Plaintiff spent significant time at trial eliciting testimony concerning the contents of the DCW Agreement and DCW Qualification/Re-Qualification Forms. However, PPL did not create the contents of the forms or any "qualifications" contained therein. Rather, the content of these forms is required by law, by the Medicaid program, and/or by OLTL. Significantly, OLTL has ultimate authority over all program forms and must review and approve the forms before they are used in the program. Indeed, Ms. Hertzog, a PE who has been instrumental in the development of the Consumer-Directed Program, including creation of the program forms, made clear that these forms have existed for years – even before PPL's involvement. These program documents simply do not show that PPL exercises any authority or control over the terms and conditions of the DCW's employment.

Likewise, the orientation that the DCWs underwent was limited to learning how the program operated, who played the various roles, how to complete the enrollment packet required by OLTL, and then how to properly submit their time for their PE to approve and PPL to process and issue their paychecks. OLTL mandated certain requirements for this orientation, and PPL's

subcontractor, Frontline, developed and conducted the orientation. Furthermore, PPL did not conduct any trainings of the DCWs. LZ's testimony made clear that the PE was solely responsible for training their DCWs on how to meet their unique physical needs. Indeed, it is impossible for PPL to develop or conduct training as to specific services because PPL never learns what specific needs and services are contained in the ISP.

### C. PPL Had No Involvement in Day-to-Day Supervision of the DCWs.

Plaintiff apparently has conceded that PPL is not involved in the day-to-day supervision of the DCWs. Plaintiff failed to introduce any evidence that PPL has involvement in the day-to-day supervision of the DCWs. To the contrary, the evidence demonstrated that all functions of supervision, evaluation, and discipline are the sole responsibility and authority of the PEs. PPL never visited the PEs' homes, never observed the DCWs performing services for the PEs, and never monitored the quality of services that the DCWs provided to the PEs. PPL does not provide any feedback or performance evaluations concerning the DCWs' performance of services for the PEs. PPL does not manage the DCWs on a daily basis. PPL does not even know the services that are being rendered by DCWs to their PEs. In short, there is no evidence that PPL had any involvement in the day-to-day supervision of the DCWs.

### D. PPL Does Not Control Employee Records.

PPL merely maintains copies of the program-required enrollment documents and timesheets, which are made available to and can be accessed at any time by the PEs as the employers of the DCWs. The PEs are also required under the program to maintain copies of these same documents. Moreover, PPL does <u>not</u> maintain copies, or ever receive copies of, documents that are typically maintained by an employer, including, but not limited to, disciplinary records, written warnings, performance evaluations, resumes, interview notes, or

other typical employee records. PPL never receives, and is not permitted to receive, a copy of the PE's ISP. The PE, as the sole employer, receives a copy of the ISP, which is the basis for the job duties that the PE must ensure the DCW is trained and able to perform. Plaintiff has failed to introduce any evidence that PPL maintains employee records outside of the payroll records that it contracted with the Commonwealth of Pennsylvania to handle as the vendor fiscal agent and agent for the PE. Accordingly, this factor weighs against concluding that PPL is a joint employer.

**E.     PPL Acted in Good Faith and Did Not Violate the FLSA, Willfully or Otherwise.**

Plaintiff failed to meet its burden of proving that PPL's actions were willful for purposes of extending the FLSA statute of limitations period. *See* 29 U.S.C. § 255(a); *Gonzalez v. Bustleton Servs.*, No. 08-4703, 2010 U.S. Dist. LEXIS 23158, at *14 (E.D. Pa. Mar. 5, 2010) (it is the plaintiff's burden to prove that the defendant's actions were willful for purposes of extending the statute of limitations period). A violation is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Lugo v. Farmer's Pride*, 802 F. Supp. 2d 598, 617 (E.D. Pa. 2011) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132 (1988)). If the employer acted "reasonably," or even if the employer acted "unreasonably, but not recklessly, in determining its legal obligation," then those actions are not considered "willful." *Id.* When an employer is simply mistaken about the requirements of the FLSA, courts generally find that such a violation is negligent rather than willful, and reject a plaintiff's request to extend the FLSA damages period to three years. *See Gonzalez*, 2010 U.S. Dist. LEXIS 23158, at *42-45 (evidence that employer was "cavalier" about and "annoy[ed]" at his potential obligations to pay overtime under the FLSA was not

10

sufficient to establish a willful violation) (citing *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 702-703 (3d Cir. 1995) (erroneous interpretation of FLSA not willful)).

There is simply no evidence that PPL acted willfully or recklessly in determining its legal obligation to pay overtime as a joint employer. To the contrary, the evidence shows that PPL acted in good faith in its determination that it was not a joint employer and therefore not liable for overtime. *See Mogel v. City of Reading*, No. 5:20-cv-04464-JMG, 2021 U.S. Dist. LEXIS 206989, at *13 (E.D. Pa. Oct. 27, 2021) (citing 29 U.S.C. § 260 (if an employer "shows to the satisfaction of the court" that it acted in "good faith" and had a "reasonable basis" for maintaining a compensation scheme that violated the FLSA, then the court can deny or reduce liquidated damages)). The employer must at least demonstrate that it made <u>some effort</u> to ascertain the FLSA's requirements. *Id.* (citing *Williams v. Tri-County Growers*, 747 F.2d 121, 129 (3d Cir. 1984) (holding that an employee was entitled to liquidated damages where the record was "silent to any efforts" made by the employer "to ascertain and follow the dictates of the FLSA")).

The trial evidence shows that PPL went beyond the requirements to make "some effort" to ascertain the FLSA's requirements. In fact, PPL underwent an in-depth, multi-month internal analysis of the FLSA and the legal guidance available from multiple sources. Specifically, PPL reviewed and analyzed guidance from the United States Department of Labor (USDOL) which provided a blueprint for applying the new rule as to self-directed home care programs. PPL also reviewed and analyzed numerous webinars and resources from the National Resource Center directed specifically at analyzing joint employment in self-directed services industries. Based on this thorough analysis, PPL concluded that it was not a joint employer of the DCWs in the Pennsylvania Participant-Directed Services program. This in-depth analysis showed that PPL

conducted a good faith analysis of whether it was a joint employer. As such, Plaintiff cannot recover liquidated damages or extend the FLSA's two-year statute of limitations to recover a third year of damages.

## IV.     CONCLUSION

For all the foregoing reasons, PPL respectfully requests that this Honorable Court grant this Motion, dismiss all counts in Plaintiff's First Amended Complaint, and enter judgment on partial findings in PPL's favor on all counts in the First Amended Complaint.

Respectfully submitted,

Defendant,

**PUBLIC PARTNERSHIPS LLC**,

By its attorneys,

*/s/ Walter M. Foster*
Clare M. Gallagher (PA ID 47178)
Laura A. Cottington (PA ID 328831)
Walter M. Foster (admitted *pro hac vice*)
Trevin C. Schmidt (admitted *pro hac vice*)
Carson M. Shea (admitted *pro hac vice*)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Two International Place, 16th Floor
Boston, MA  02110
Phone: (617) 342-6800
Fax: (617) 342-6899
Email: cgallagher@eckertseamans.com
           lcottington@eckertseamans.com
           wfoster@eckertseamans.com
           tschmidt@eckertseamans.com
           cshea@eckertseamans.com

Dated: October 24, 2023

## **CERTIFICATE OF SERVICE**

I hereby certify that, on October 24, 2023, a true and accurate copy of the above document was filed and served upon all counsel of record by hand.

Dated: October 24, 2023                     */s/ Walter M. Foster*
                                            Walter M. Foster