IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RALPH TALARICO, individually and on behalf
of all others similarly situated,

          Plaintiff,

    v.

PUBLIC PARTNERSHIPS, LLC, d/b/a PCG,
PUBLIC PARTNERSHIPS,

          Defendant.

CIVIL ACTION
NO. 17-2165

## MEMORANDUM

**Schmehl, J.  /s/JLS**                                    **January 30, 2025**

**I.**      **INTRODUCTION**

This matter was filed by Plaintiff, Ralph Talarico, individually and on behalf of

all others similarly situated, against Public Partnerships, LLC, d/b/a PCG, Public

Partnerships ("PPL"). Talarico claims that PPL failed to pay overtime to he and other

direct care workers who delivered services to qualified disabled individuals in their

homes, thereby violating the Fair Labor Standards Act (29 U.S.C. §§ 201-291) and the

Pennsylvania Minimum Wage Act (43 P.S. §§ 333.101-333.1154).

On January 28, 2020, this Court granted PPL's Motion for Summary Judgment

and found PPL was not a joint employer of Talarico or any other direct care worker

("DCW"). On appeal, the Third Circuit found that an issue of fact existed as to whether

PPL was a joint employer and returned the case to this Court for decision. A seven-day

bench trial was held; thereafter, the parties submitted proposed findings of fact and

conclusions of law. Accordingly, with the benefit of a fully developed factual record, this

memorandum constitutes the Court's findings of fact and conclusions of law from the bench trial. For the reasons set forth below, the Court again finds that PPL was not a joint employer of Talarico or any DCWs and therefore cannot be liable for unpaid overtime.

## II.    FINDINGS OF FACT

### A.    The Medicaid HCBS Waiver Program

The Home and Community-Based Services Waiver Program ("HCBS") is a Medicaid service that permits individuals who would otherwise be institutionalized to continue to live in their home and receive services there. (Tr. Vol. 3, 493.) The HCBS waiver program is federally administered by the Centers for Medicare & Medicaid Services ("CMS") and in Pennsylvania, by the Office of Long-Term Living ("OLTL"). (*Id*., 493, 504; Tr. Vol. 4, 702-703) The waiver program specifically at issue in this matter is the Self-Directed Services model of the HCBS Waiver Programs. The Self-Directed Services ("SDS") model allows "individuals . . . to exercise decision-making authority in identifying, accessing, managing and purchasing their personal assistance services." 42 C.F.R. § 441.450(b).

Pennsylvania contracts with an enrollment broker to identify individuals who are eligible for the HCBS Waiver Programs and to provide those individuals with a list of available Service Coordinators ("SC"). (Tr. Vol. 1, 37-38; Tr. Vol. 3, 497.) SCs are contracted by OLTL to oversee implementation of services to the disabled individual, know as a Participant Employee ("PE"), assess the PE's needs and determine the number of hours of service the PE requires per week. (Tr. Vol. 3, 497-499.) Upon meeting, the PE and SC develop an Individualized Service Plan ("ISP") that identifies the specific tasks and activities that a PE needs help with and allocates the number of hours per week for

which the PE can obtain assistance. (Tr. Vol. 1, 42; Tr. Vol. 3, 498-499.) In addition to developing the ISP, the SC discusses the PE's options for receiving personal assistance services. (Tr. Vol. 3, 498.) The PE can select the agency model, where a third-party agency is the employer of the DCW and sends a DCW of their choosing to the PE's home to provide services, (Tr. Vol. 3, 500; Tr. Vol. 4, 757,) or the Self-Directed Services Model that is at issue in this case. (Tr. Vol. 1, 44-45.)

In the SDS model, the ISP dictates what the role of the DCW will be for the PE and what services the DCW will perform in the PE's home. (Tr. Vol. 4, 689-690.) The ISP is approved or disapproved by OLTL, and the SC then receives a notice from OLTL that the ISP is approved or disapproved. (Tr. Vol. 1, 42, 44, 93-94.) Once the PE and SC finalize the ISP and OLTL approves it, two electronic files are then sent to PPL as the fiscal agent. (Tr. Vol. 3, 529-530; Vol. 6, 1258-1259; Vol. 4, 796.)

**B.    PPL and the Self-Directed Services Model**

In 2012, Pennsylvania published a Request for Application ("RFA") to secure a vendor to fulfill the financial management services needed for the Self-Directed Services model. (Tr. Vol. 3, 509-510.) Prior to that time, many different vendors were responsible for these functions, and the RFA sought to obtain a single vendor in Pennsylvania. (*Id*.; Tr. Vol. 6, 1079.) PPL submitted a proposal in response to the RFA and was ultimately awarded the role, becoming the state-wide fiscal agent for OLTL in the Self-Directed Services model of the HCBS Waiver Programs. (Tr. Vol. 3, 510.) None of the services that PEs were currently receiving from their DCWs changed in any way when fiscal management services transferred to PPL. (KH, Dep. Tr. 150.)

OLTL entered into a Grant Agreement with PPL as the fiscal agent for the SDS

model from October 2012 to December 31, 2014. (JX357.) Pursuant to the Grant Agreement, PPL was compensated for its fiscal agent functions through a monthly administrative fee that was paid on a per member per month basis. (*Id.* at PPL757; Tr. Vol. 6, 1241-1242; JX396 at TAL414.) Thereafter, any PE in Pennsylvania who selected the SDS model was required to utilize PPL as the state-selected fiscal agent. (JX357 at PPL 751.) Pursuant to the Grant Agreement and Waiver Application, PPL used a third-party broker to obtain workers' compensation insurance on behalf of and in the names of the individual PEs (JX396 at TAL262; JX357 at PPL760; Tr. Vol. 6, 1232) and provided utilization reports to the Commonwealth that set forth the hours worked by a DCW on behalf of the PEs. (JX396 at TAL263; Tr. Vol. 6, 132-1233.)

### C.    The SDS Model Paperwork

When a PE is first enrolled in the SDS model, PPL provides them with a "Common Law Employer Informational Packet." (JX363.) This packet states, *inter alia*, "[i]n the OLTL program you have the opportunity to recruit and hire your own staff . . . PPL is the Vendor Fiscal/Employer Agent (VF/EA) that will support you by paying direct care workers (DCWs) and qualified vendors and assuming responsibility for managing tax filings on your behalf." (*Id.*, at PPL1014.) It also states that "Participant Directed Services allow you to use OLTL funds to hire your own DCWs. You are the common law employer and PPL is your Financial Management Service." (*Id.*, at PPL1015.) It goes on to state that the PE, as the employer, will recruit, train, and fire all DCWs, submit signed timesheets to PPL, establish wage rates and performance evaluation criteria for each DCW, and establish schedules and tasks to be completed by each DCW. (*Id.*)

4

When a PE notifies PPL that they intend to hire a DCW, PPL sends the PE a DCW Application. (Tr. Vol. 6, 1287; DX209.) PEs have their DCW candidate fill out the DCW Application, and it is sent to PPL. (JX364; PX59.) PPL then sends the enrollment packet to the DCW. (Tr. Vol. 1, 117, 211.) There is no dispute that all enrollment documents state that the PE is the employer of their DCW. (Tr. Vol. 5, 883.)

**D. *Enterprise* Factor No. 1: Authority to Hire and Fire**

PEs recruit their own DCWs, PPL has no role in recruiting or recommending DCWs. (Tr. Vol. 5, 908, 953, 990, 992.) PEs are responsible for reviewing the documents submitted by the DCW in support of the I-9 form, verifying that the DCW is eligible to work in the United States. (Tr. Vol. 6, 1280; DX 203 at PPL 7608; DX206; DX300 at PPL7774; Tr. Vol. 1, 244, 246; JX337; PX 33 at PPL6285-6286.) PEs interview DCWs in their homes and PPL does not participate in the interview process. (Tr. Vol. 4, 693; Tr. Vol. 5, 909, 953, 969.)

Pennsylvania requires that background checks be conducted on all DCWs in the HCBS Waiver Programs. (Tr. Vol. 3, 519; JX396 at TAL381-382; 55 Pa. Code § 52.19-20.) PPL transmits a DCW background check request to the Pennsylvania State Police, then provides the results to the hiring PEs. (Tr. Vol. 6, 1246.) The PE retains the discretion to hire their DCW of choice despite a positive criminal history, and PPL has no authority to overrule that decision. (Tr. Vol. 6, 1296-1297; PX37; JX341 at PPL801.) No DCW can begin working for a PE under the HCBS Waiver Programs unless the PE has received the results of the criminal background check. (Tr. Vol. 6, 1297; JX341 at PPL801.)

Pursuant to the DCW Agreement, no individual who is listed on the Office of Inspector General's List of Excluded Individuals/Entities ("LEIE") can be employed as a DCW. The LEIE is a list of individuals and entities that have a history of committing Medicaid fraud, and Medicaid does not permit the payment of its funds to these people. (KH Dep. Tr., 166-167.) PPL is charged with checking the federal LEIE prior to a DCW beginning work. (Tr. Vol. 6, 1300; Tr. Vol. 3, 517, 518; JX341 at PPL802.)

Once the new DCW's enrollment process is completed, a form is sent to each PE to inform them that their DCW can begin working. (PX89.) This is referred to as the DCW being "good to go." The steps necessary for a DCW to become "good to go" were dictated by OLTL. (Tr. Vol. 6, 1316-1317.) A DCW cannot be paid from Medicaid funds until the PE receives a "good to go" notice. However, a PE could pay a DCW out of pocket for any services not authorized under the HCBS Waiver Programs or services performed by the DCW prior to receiving the "good to go." (Tr. Vol. 6, 1319, Tr. Vol. 2, 344-345, 478; Tr. Vol. 4, 730.)

PPL does not discipline DCWs and all decisions regarding firing are made by the PE. (Tr. Vol. 5, 919; Tr. Vol. 2, 346, 423, 472; Tr. Vol. 5, 966; Tr. Vol. 1, 101-102.) PEs do not need to obtain permission from PPL to fire DCWs. (Tr. Vol. 4, 719-720.) Further, DCWs who resigned from employment with a PE did not need to notify PPL of their decision. (Tr. Vol. 5, 968; Tr. Vol. 1, 263, 264; Tr. Vol. 2, 1330-1332.) When a PE fired a DCW, the PE completed a termination form and sent it to PPL. (Tr. Vol. 7, 1330-1332.)

### E. *Enterprise* Factor No. 2: Authority to Set Work Rules

OLTL required that all DCW Agreements state that the DCW agrees to abide by the applicable rules, regulations, and policies of the HCBS Waiver Program. (Tr. Vol. 6,

1298-1299.) All work rules set forth in the DCW Agreement were established under state and federal law and were required to be included in the agreement by OLTL. (Tr. Vol. 6, 1233-1236, 1298-1299; JX396 at TAL303.) The DCW Agreement contains several provisions that state the PE is the employer of the DCW and that the employer is not PPL, the fiscal agent. (Tr. Vol. 6, 1300-1301; JX341 at PPL802; PX3 at PPL185; DX220 at PPL7667; DX301 at PPL7772; DX302 at PPL7711.) Further, it is undisputed that every DCW signed a DCW Agreement acknowledging the fact that PPL was not their employer. (PX39 at PPL6362, ¶17; PX3 at PPL185, ¶17; PX13 at PPL780, ¶17; PX25 at PPL6224, ¶17; PX30 at PPL6278, ¶17; PX46 at PPL6410, ¶17; DX179 at PPL6475, ¶17; DX188 at PPL7501, ¶17; DX208 at PPL7633, ¶14; DX219 at PPL7658, ¶17; DX220 at PPL7667, ¶17; DX300 at PPL7781, ¶14; DX302 at PPL7677, ¶17; DX303 at PPL7917,¶17; DX304 at PPL8036,¶14; DX305 at PPL7965,¶14; JX334 at PPL768, ¶14; JX335 at PPL847,¶14; JX337 at PPL901,¶14; JX341 at PPL802, ¶14; JX359 at PPL802, ¶14.) Despite making this acknowledgment, some DCWs did not understand who the fiscal agent was and who their employer was. (Tr. Vol. 2, 326; DX301 at PPL7732, ¶ 14; Tr. Vol. 2, 463.)

DCWs complete a DCW Qualification Form with their PE, which requires both the PE and the DCW to initial next to the program qualifications to verify that the DCW is qualified under the rules. (Tr. Vol. 1, 249; JX337 at 909; PX31 at PPL6281; DX180 at PPL6478.) PEs receive a member handbook that provides them with an overview of the managed care program, including the PEs rights and responsibilities and the services available to the PE. (DX293.) A handbook existed for PEs prior to PPL becoming involved in the program. This handbook was created by OLTL and was called "CLE

(Common Law Employer) Handbook for Participant Directed Services." (Tr. Vol. 6, 1132-1133, 1292; JX369.) In 2013, PPL updated the CLE Handbook at the direction of OLTL. (Tr. Vol. 6, 1133, 1238-1239; JX396 at TAL412.) It is undisputed that numerous sections of the CLE Handbook state that the PE is the sole employer of their DCW and that no other entity in the HCBS Waiver Programs is an employer of the DCW. (JX369 at PPL1269, 1264, 1265, 1167.)

Working with their Service Coordinator, every PE determines which specific job duties a DCW is to perform in the PE's home. (Tr. Vol. 6, 1260-1261; Tr. Vol. 7, 1349.) These duties are set forth in the ISP, and DCWs are only to perform the duties contained in the PE's ISP. (Tr. Vol. 6, 1297-1298; Tr. Vol. 1, ,202; Tr. Vol. 4, 689-690; Tr. Vol. 5, 913, 955.) The PE has the ultimate authority regarding how the DCW works in their home. (Tr. Vol. 1, 100.)

PEs are required to submit approved timesheets for the work performed by their DCWs to PPL for processing. (Tr. Vol. 6, 1309-1310; JX341 at PPL840.) DCWs clock in and clock out when providing services to their PEs through a GPS-activated device on the DCW's cell phone. (Tr. Vol. 3, 567.) After a DCW logs their time through the cell phone application, the PE logs in to an online portal to review and approve or reject the timesheet, and the timesheet is then sent to PPL for processing. (Tr. Vol. 6, 1309-1310; Tr. Vol. 4, 717-718; Tr. Vol 5, 894, 922; Tr. Vol. 2, 341, 426.) PPL will not process payment for a timesheet that has not been approved by the PE. (JX356 at PPL639; KH, Dep. Tr. 60, 145.) Once PPL receives a completed timesheet, it reviews the hours billed and compares them to the hours authorized in the ISP to ensure the timesheet follows the

program rules. (Tr. Vol. 6, 1169.) Thereafter, PPL pays out Medicaid funds received by Pennsylvania on behalf of the PEs. (Tr. Vol. 3, 1406; Tr. Vol. 5, 894.)

As of January 1, 2016, Pennsylvania began to permit some DCWs to receive overtime for services under the HCBS Waiver Program. (Tr. Vol. 2, 403; Tr. Vol. 6, 1201.) Prior to 2016, Pennsylvania did not authorize the payment of overtime to DCWs for services provided under the HCBS Waiver Program. (Tr. Vol. 6, 1201; Tr. Vol. 7, 1340; Tr. Vol. 3, 534.) Beginning in January of 2016, DCWs who did not live with their PE were paid overtime for any hour worked over 40 in a work week for that PE. (DX246; Tr. Vol. 3, 549.) OLTL sent a letter to PEs to inform them about the new overtime rules and instructed PEs to inform their DCWs about the overtime rule changes as of January 1, 2016. (JX343.) A new billing code was created to authorize overtime as part of the PE's ISP called a "TU authorization." (Tr. Vol. 3, 537; Tr. Vol. 4, 796-797, 798, 815, 1261-1262.) As part of the new overtime process, SCs modified all ISPs to include the new TU authorization service code so services could be properly billed as overtime going forward. (Tr. Vol. 3, 538, Tr. Vol. 1, 97-98.) The TU authorization for overtime is sent to OLTL for approval as part of the ISP review and approval process. (Tr. Vol. 4, 798; Tr. Vol. 6, 1309-1310.) The decision as to whether a DCW should be paid overtime was made between the SC and the PE, and PPL could not pay overtime on hours that were submitted without the appropriate TU authorization code. (Tr. Vol. 1345, 1261-1262; Tr. Vol. 7, 1411.)

Also as of January 1, 2016, OLTL required all PEs who employ DCWs who live in the PEs' home to take a live-in exemption, which results in DCWs who live with their PEs not being permitted to receive overtime. (DX113; Tr. Vol. 7, 1343; Tr. Vol. 6, 1213-

1214, 1284; JX364 at PPL1070.) OLTL developed a live-in exemption form to

implement the requirement that all PEs take the live-in exemption with respect to DCWs

that lived in the PEs home. (DX200; Tr. Vol. 7, 1343; Tr .Vol. 6, 1213-1214, 124.) OLTL

notified PEs of the live-in exemption via letter and obligated PEs to inform their DCWs

about the changes. (DX246; Tr. Vol. 3, 548-549.) Several live-in DCWs testified that

they did not understand that federal law exempted them from receiving overtime. (Tr.

Vol. 2 476, 338-339.)

  DCW training is conducted by each specific PE and does not involve PPL. (Tr.

Vol. 6, 1237-1238; Tr. Vol. 3, 500, 506, 508; Tr. Vol. 5, 914, 956, 995-956, 1030.) For a

period from May to August of 2017, PPL conducted a one-time pre-service orientation

for DCWs who were newly hired by a PE. (Tr. Vol. 6, 1249-1250, 1251-1252, DX153 at

PPL5329.) No DCW orientation was ever conducted from 2012 through May of 2017.

(Tr. Vol. 6, 1250.) This pre-service orientation included statements that PEs are the

employers of the DCWs. (DX185 at PPL7237, 7254-7255, 7258.) Once a new DCW had

attended this pre-service orientation, PPL would receive notification from the company

that conducted the training that the orientation had been completed. (Tr. Vol. 6, 1190.)

On August 14, 2017, OLTL directed PPL that the pre-service orientation must cease,

(DX313) then in 2018, OLTL instructed PPL to reimplement pre-service orientation for

DCWs on December 1, 2018. (PX44, Tr. Vol. 3, 1481-1483, 559-560.) This second

orientation requirement was only applicable to newly enrolled DCWs. (Tr. Vol. 3, 560,

1483.) A vendor named Frontline developed and presented the preservice orientation to

DCWs. (Tr. Vol. 7, 1481-1483; DX185.) PPL had a limited role in the development of

this orientation, mainly providing Frontline with copies of relevant documents to use

during the program. (*Id.*) PEs could not opt their DCW out of the orientation requirement. (Tr. Vol. 5, 944-945; Tr. Vol. 7, 1503.) PPL would procure "support brokers" to conduct "functions" training for DCWs on various topics such as personal care, mobility, and nutrition feeding. (PX 17 at 1864; JX371 at 1864-1865.)

PPL employed Enrollment Specialists whose duties focused on assisting the PE with the paperwork to enroll in the Medicaid Program. (Tr. Vol. 6, 1155; JX371 at PPL1838.) There was a period between 2017 and 2018 when Enrollment Specialists would make home visits to a small subset of PEs to help them with enrollment in the HCBS Waiver Program. (Tr. Vol. 6, 1154, 1271-1272.)

In the SDS Model, PEs chose a wage rate for their DCWs that is above the minimum wage and at or below the maximum rate established by OLTL's HCBS Waiver Program Fee Schedule. (Tr. Vol. 3, 531; Tr. Vol. 4, 713-714; Tr. Vol. 2, 343-344, 384.) When the program transitioned to PPL effective January 1, 2013, there were numerous forms that needed to be filled out, including a transition pay rate form which requested PEs to confirm the pay rate they were currently paying their DCWs under the prior fiscal agent. (DX213; Tr. Vol. 6, 1275-1277.) The rate of pay selected by a PE for their DCW was exclusively within the control of the PE; PPL had no input as to the specific rate a PE opts to pay their DCW. (Tr. Vol. 7, 1348.) OLTL sets the maximum pay rate that a DCW can be paid for services performed under the SDS model. (Tr. Vol. 6, 1243-1244; JX365 at PPL1096.) OLTL published a fee schedule that specified the maximum pay rates by unit for services throughout Pennsylvania. (Tr. Vol. 3, 531, Tr. Vol. 6, 1091; DX127.) DCWs testified that they understood that OLTL set the maximum rate that a DCW could be paid. (Tr. Vol. 1, 242; Tr. Vol. 4, 714.) Deductions were made from OLTL's

maximum rate for the cost of workers' compensation insurance, unemployment insurance costs, and employer taxes. This determination would yield a varying maximum pay rate for each different PE who enrolled in the SDS Model. (Tr. Vol. 6, 1094-1097, 1115-1116, 1123; JX326 at PPL479.) A PE's calculated maximum wage rate would be higher if the cost of their workers' compensation insurance, unemployment insurance and taxes were lower, and a PE who paid more for any of those expenses would have a lower maximum wage rate as a result. PEs learned of permitted increases to the maximum program rates when OLTL published increases in statewide bulletins or by accessing PPL's automated online system. (Tr. Vol. 3, 531; DX126; Tr. Vol. 6, 1128, 1268; JX365.) PEs could also consult with their SCs to determine the maximum program rate and whether there has been an increase to the maximum rate. (Tr. Vol. 1, 70; Tr. Vol. 2, 451.)

It was the responsibility of DCWs to discuss the possibility of a pay raise under the program with their PEs. (Tr. Vol. 5, 922.) If a PE attempted to pay a DCW a pay rate that exceeded the maximum rate set by OLTL, PPL would not be permitted to process payments for the DCW hours under the HCBS Waiver Programs. (Tr. Vol. 6, 1131.) During the relevant time frame, DCW pay rates ranged from $7.25 to $14.30.  (Tr. Vol. 4, 716.) Several PEs testified that they took advantage of the range in program pay rates to pay their DCWs different rates and build in incentives for performance. (Tr. Vol. 5, 994; KH Dep. 38; DS Dep. 104-105.) It is also possible that DCWs working for multiple PEs could receive different pay rates from different PEs. (Tr. Vol. 5, 922, 960.) PEs are provided a form called a Direct Care Worker Rate Sheet for PEs to notify PPL of the hourly rate that the PE selected for a DCW. (Tr. Vol. 6, 1285-1286, 1135; JX365.) This Rate Sheet stated that the PE and DCW "will discuss and agree on an hourly rate for each

service provided." (Tr. Vol. 6, 1286; JX365 at PPL1095.) PPL records the hourly pay rate selected and approved by the PE within the permissible program range. (Tr. Vol. 6, 1135.)

When PPL became the fiscal agent for the SDS model, it was discovered that some PEs had previously set hourly pay rates that exceeded the maximum permissible rate. (Tr. Vol. 6, 1145; JX350.) OLTL drafted a letter to be provided to the PEs who had been paying their DCWs more than the maximum rate stating that "the gross hourly wage currently assigned to your DCW exceeds the maximum service rate for your region," and that "[e]ffective July 1, 2014, you will no longer be able to pay your DCW this gross hourly wage." (JX350.)

DCWs do not receive any health benefits, vacation pay or sick leave from PPL. (Tr. Vol. 4, 720; Tr. Vol. 5, 893, 923; Tr. Vol. 2, 476, 346-347.) OLTL required PPL to obtain workers' compensation policies on behalf of the PEs and in each individual PEs name. (JX357 at PPL760; JX364 at PPL1066; JX396 at TAL262.) All DCWs received a form notifying them that they were covered by a workers' compensation policy taken out in the name of their PE. (Tr. Vol. 6, 1283; JX364 at PPL1066.) PPL has no role in the oversight of any workers' compensation policies issued in the names of the PEs, nor does it have any role in the claims process under such a policy. (Tr. Vol. 6, 110.) PPL's website contained fliers regarding general workplace safety, but these fliers were requested by OLTL and created by the workers' compensation broker. (Tr. Vol. 6, 1292-1294; PX98.) Further, the fliers were never sent to any PE or DCW. (Tr. Vol. 6, 1292-1294; PX45; PX98.)

As for unemployment compensation claims, when one is filed by a DCW, the former PE is notified of the claim. (Tr. Vol. 6, 1117, 1346.) If PPL receives a notice of an unemployment compensation claim, it forwards the paperwork to the PE to complete. (Tr. Vol. 7, 1347.) The Commonwealth's Office of Unemployment Compensation determines the unemployment cost for each PE, which is then factored into the algorithm to determine the maximum rate a PE can pay their DCW. (Tr. Vol. 7, 1115-1116.)

PEs establish, set and control work schedules for their DCWs. (Tr. Vol. 6, 1261; Tr. Vol. 5, 991; Tr. Vol. 4, 695.) This control by the PE includes the hours, days of the week, and how many hours a DCW works per day, as well as how the DCW should perform the work for the PE. (Tr. Vol. 5, 875, 894, 919; KH Dep. Tr. 30.) If a PE needs to change the DCW work schedule, the PE notifies the DCW about the scheduling change. (Tr. Vol. 5, 917.) If a PE has multiple DCWs, it is the responsibility of the PE to determine which DCWs work which authorized hours. (Tr. Vol. 5, 958.) Multiple DCWs testified that PPL never told them which hours or schedule to work for their PE. (Tr. Vol. 1, 213, 215-216; Tr. Vol. 2, 340, 471.)

   **F.  *Enterprise* Factor No. 3: Involvement in Day-to- Day Supervision**

In terms of day-to-day supervision, PPL is clearly not involved. PPL is never present in the PE's home to observe the DCW and never provides feedback about the DCW's performance. (Tr. Vol. 1, 213-214; Tr. Vol. 4, 719; KH Dep Tr., 31, 46; Tr. Vol. 5, 914, 919, 958-959; Tr. Vol. 2, 325-326, 421, 469-470, 472.) PEs have monthly meetings with their Service Coordinators where the coordinators check on the services being performed by the DCW and how well the DCW is performing those services. (Tr. Vol. 2, 422-423, 470-471.) Occasionally, DCWs will attend this meeting with the Service

Coordinators and the PEs, but PPL is never involved. (Tr. Vol. 2, 422; Tr. Vol. 5, 986-987.)

### G. *Enterprise* Factor No. 4: Control of Employee Records

In terms of employee records, some documents are maintained by the PEs, and some are maintained by PPL. PEs maintain copies of enrollment packet forms, timesheets, program forms, documents related to the DCWs and copies of the ISP. (Tr. Vol. 4, 704; KH Dep. Tr., 14-15; Tr. Vol. 7, 1334.) The DCW Agreement also requires the DCWs to maintain all program documents. (Tr. Vol. 6, 1298.) PPL maintains an online portal which houses time records, pay stubs, enrollment forms, DCW Agreements, rate sheets, verification of DCW orientation, DCW tax forms and year-end letters. (Tr. Vol. 6, 1195-1197, 1266; Tr. Vol. 7, 1337; JX326 at PPL470; Tr. Vol. 2, 316-317, 454; Tr. Vol. 1, 274.) If a DCW needed a copy of a timesheet or a paystub, they could not obtain it from their PE; rather, they had to obtain such copies from the PPL online portal. (Tr. Vol. 1, 143.)

### H. Additional Facts

The funds used to pay DCWs are Medicaid funds provided by Pennsylvania. (Tr. Vol. 4, 688, 718; Tr. Vol. 5, 959-960; Tr. Vol. 2, 423.) All Medicaid funds used to pay DCWs on behalf of PEs are kept in neutral bank accounts that do not allow funds to intermingle with any money paid to PPL under the Grant Agreement. (Tr. Vol. 6, 1254-1255; DX152 at PPL3984.) PEs execute pre-populated tax forms to allow PPL to act as their agent with respect to unemployment tax withholdings. (DS Dep. Tr. 57-58; Tr. Vol. 2, 391-392, 411; EW Dep. Tr. 20-21, 50.) PPL issues W-2s on behalf of each PE in the HCBS Waiver Programs, and every W-2 issued listed "Public Partnerships for PA HHER

Agent for John Doe," which stands for Public Partnerships for Pennsylvania Home Health Care Employer Agent acting as agent for John Doe, as required by the IRS. This same form listed the PE's name under the box on the W-2 entitled "Employer's name, address and ZIP code." (Tr. Vol. 6, 1313; JX341 at PPL842.) PPL also issued paystubs to each DCW on behalf of their PE. (Tr. Vol. 6, 1310-1313; JX341 at PPL841.) Each paystub listed the name of the PE under the heading "Common Law Employer." (Tr. Vol. 6, 1312; JX341 at PPL841.) A DCW who is employed by multiple PEs received a different paystub for each PE by whom they were employed. (Tr. Vol. 6, 1312; JX341 at PPL841.)

Each PE also completes an IRS Form 2678, whereby the PE designates PPL as its agent for purposes of "payments of employment" and "withholding taxes." (PX14 at PPL1004; DX303 at PPL8138.) At year end, PPL would send out letters that were reviewed and approved by OLTL for the upcoming year, describing the payroll schedule and increases in the maximum pay rate for a DCW. (Tr. Vol. 6, 1092, 1264, 1266-1267; JX326; JX327; JX328; JX329.)

### III.    <u>CONCLUSIONS OF LAW</u>

1. All of Plaintiff's claims in this matter are based upon the theory that PPL is the joint employer of the DCWs in both the FLSA Collective and Rule 23 class. Accordingly, PPL's liability in this matter is dependent upon a finding of joint employment with the PEs. In short, if PPL is not a joint employer, it cannot be liable for Plaintiff's claims.

2. To determine the existence of a joint employer relationship, we follow the *Enterprise* test and examine whether PPL has: "1) authority to hire and fire employees; 2) authority to promulgate work rules and assignments, and set conditions of employment,

including compensation, benefits, and hours; 3) day-to-day supervision, including

employee discipline, and 4) control of employee records, including payroll, insurance,

taxes and the like." *In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 683 F.3d

462, 468 (3d Cir. 2012) (quoting *NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117,

1124 (3d Cir. 1982.))

    3.  The four *Enterprise* factors "do not constitute an exhaustive list of all

potentially relevant facts." *Id.* (citing *Bonnette v. Cal. Health & Welfare Agency*, 704

F.2d 1465, 1469-70 (9th Cir. 1981). There is no specific number or combination of factors

that conclusively determines whether an alleged employer is a joint employer, and the

test cannot be "blindly applied." *Id.* (quoting *Bonnette*, 704 F.2d at 1470.)

    4.  Under the FLSA, "economic reality rather than technical concepts is to be the

test of employment." *Id.* at 467 (quoting *Goldberg v. Whitaker House Co-op., Inc.*, 366

U.S. 28, 33 (1961)).

    **A.  PPL Does Not Have Authority to Hire and Fire (*Enterprise* Factor No. 1)**

    5.  PPL does not have the authority to hire DCWs. PEs hire each DCW to work in

their home.

    6.  Multiple PEs testified that they were solely responsible for finding,

interviewing, and hiring their DCWs.

    7.  Further, multiple DCWs testified that they were hired by their PE and that PPL

never told the PE to hire them.

    8.  PPL arranged for a criminal background check of each DCW on behalf of the

PE, but this does not weigh in favor of PPL having authority to hire. Rather, this

background check provides evidence of the fact that PPL had **no** authority to hire DCWs,

because once PPL provides the results of the background check to the PE, the PE has the discretion to hire the DCW despite a positive finding on the criminal background check.

9.  Similarly, the fact that PPL is required to exclude potential DCWs found on the LEIE is also not evidence of PPL's authority to hire. This exclusion is required by the HCBS Waiver Programs' rules and PPL has no discretion in barring an individual on this list from working as a DCW.

10.  The fact that a DCW is required to complete an enrollment packet before they can begin working for a PE is also not evidence of PPL's authority to hire. PPL is required to use documents approved and authorized by OLTL in the enrollment packet and does not independently decide which forms a DCW must complete.

11.  The "good to go" step in the DCW hiring process is not evidence of PPL's control over the hiring process. Rather, "good to go" is merely confirmation that the qualifications required under the HCBS Waiver Programs have been met and the DCW can be paid.

12.  PPL has no authority to fire DCWs.

13.  Numerous PEs testified that when they fired DCWs, they did not get prior approval from PPL to do so. After firing a DCW, PEs are asked to complete a form notifying PPL that the DCW is no longer employed by the PE, and the reason for the firing. PPL processes the notice regardless of what reason is given for the firing.

14.  In fact, PPL often does not receive any notice that a DCW has been fired. Rather, PPL often simply no longer receives timesheets for that DCW.

15.  Based upon the evidence presented at trial, the Court concludes that PPL has no authority to hire or fire DCWs. Accordingly, the first *Enterprise* factor weighs against a finding of joint employment.

### B.  PPL Has Some Authority to Promulgate Work Rules and Set Conditions of Employment (*Enterprise* Factor No. 2)

16.  The minimum qualifications for a DCW to provide services in the HCBS Waiver Program (18 years of age, valid social security number, basic math, reading and writing skills and the ability to perform the tasks set forth in the PE's ISP) are not set by PPL. Rather, those qualifications are determined by state or federal law, Medicaid and/or by OLTL.

17.  However, there is no dispute that PPL conducted DCW training for a brief period in 2017, then re-implemented DCW training in 2018 for new DCWs. As part of this training, PPL developed a PowerPoint that provided information to DCWs regarding their job duties and functions.

18.  This orientation also specifically confirmed that PEs were the sole employers of DCWs under the Self-Directed Services model.

19.  Perhaps the biggest dispute between the parties' centers on whether PPL can set DCW compensation rates. The Court determines that while PPL sets the range within which PEs can pay their DCWs based upon OLTL program rates, it does not choose the exact hourly rate that a PE can pay their DCW. Accordingly, the Court finds PPL does not have the ability to set DCW compensation rates.

20.  The maximum pay rate is determined by an OLTL algorithm that accounts for the maximum program rate set by OLTL as well as the state-required individualized deductions for unemployment compensation and premiums for workers' compensation.

PPL has no discretion in applying this algorithm, determining the costs of the deductions, or setting the maximum program or pay rates.

21.  It is undisputed that a PE has the sole authority to set the DCW's pay rate at any hourly rate within the program range.

22. On two separate occasions, PPL implemented program-wide wage adjustments, once in 2014 when it became the fiscal agent and it was instructed to reduce the hourly rate paid to any DCW that was currently making more than the maximum pay rate under the program, and in 2020, when it distributed hazard pay during the COVID-19 pandemic to certain eligible DCWs.

23.  Beginning in 2016, DCWs who did not live with their PEs became eligible for overtime. All overtime hours had to be authorized by the ISP that was created by the DCW and the PE. PPL merely processes funds paid to a DCW for properly authorized and billed overtime.

24.  PPL does not pay DCWs vacation time, vacation pay or sick time.

25.  PPL assists PEs in obtaining Workers' Compensation insurance using their Medicaid funds. Said insurance policies are always in the name of the individual PEs. PPL does this by engaging an insurance broker who then obtains the policies for each PE.

26.  PEs exclusively set the work schedules for their DCWs. PPL has no role in the setting of DCW work schedules.

27.  Based upon all the evidence presented at trial, the Court concludes that PPL does have minor authority over setting some work rules and some of the conditions of employment. However, this *Enterprise* factor overwhelmingly leads to the conclusion that the PEs have more authority to set work rules, conditions of employment, etc. That

being said, this second *Enterprise* factor weighs slightly in favor of a finding of joint

employment.

### C. PPL Is Not Involved in the Day-to-Day Supervision of DCWs (*Enterprise* Factor No. 3)

28.  PPL never visited PEs' homes to observe or supervise the DCWs while they

were performing services for the PEs.

29.  PPL does not provide any feedback or performance evaluations to DCWs

regarding the quality of the services that they perform for the PEs.

30.  PPL does not discipline DCWs.

31.  Based on the evidence presented at trial, the Court concludes that PPL is not

involved in the day-to-day supervision of the DCWs. Accordingly, the third *Enterprise*

factor weighs against a finding of joint employment.

### D.  PPL Has Control of Some Employee Records (*Enterprise* Factor No. 4)

32.  PPL controls DCW employment records, tax forms, employment enrollment

packet, and time sheets. This *Enterprise* factor weighs in favor of joint employment.

### E.  Final Conclusions as to Joint Employment

33. Based on the foregoing conclusions of law, and the evidence introduced at

trial, one *Enterprise* factor weighs in favor of joint employment, and another only slightly

does, while two *Enterprise* factors weigh against a finding of joint employment.

34.  As discussed above, there is no specific number or combination of *Enterprise*

factors that determine whether an alleged employer is a joint employer. Rather, a Court is

to examine the "economic realities" of an alleged employee-employer relationship.

35.  The Court therefore determines that the economic realities of the relationship

between PPL and Talarico, as well as all the DCWs, is not one of a joint employer and

employees. The Court truly sees PPL as more of a fiscal manager for the PEs than a joint employer. Therefore, PPL cannot be jointly liable for the payment of unpaid overtime under the FLSA.

36.  As Pennsylvania law follows the FLSA in determining the existence of a joint employer relationship for purposes of the Pennsylvania Minimum Wage Act, and because PPL is not Plaintiff's employer under the Enterprise test, PPL is also not Plaintiff's employer under the MWA. Therefore, PPL is not liable under the Pennsylvania Minimum Wage Act.